JAMES T. HANNINK (131747)
jhannink@sdlaw.com
ZACH P. DOSTART (255071)
zdostart@sdlaw.com
DOSTART HANNINK & COVENEY LLP
4180 La Jolla Village Drive, Suite 530
La Jolla, California 92037-1474
Tel:  858-623-4200
Fax: 858-623-4299

MICHAEL RUBIN (80618)
mrubin@altber.com
ERIC P. BROWN (284245)
ebrown@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| PAULA L. BLAIR, ANDREA ROBINSON, and FALECHIA A. HARRIS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>RENT-A-CENTER, INC., a Delaware corporation; RENT-A-CENTER WEST, INC., a Delaware corporation; and DOES 1-50, inclusive,<br><br>Defendants. | CASE NO. 3:17-CV-02335-WHA<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF:**<br><br>1) **KARNETTE RENTAL-PURCHASE ACT**<br>   **[Cal. Civ. Code § 1812.620 *et seq.*]**<br>2) **CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**<br>   **[Cal. Civ. Code § 1750 *et seq.*]**<br>3) **USURY**<br>4) **UNFAIR COMPETITION**<br>   **[Cal. Bus. & Prof. Code § 17200 *et seq.*]**<br><br>**DEMAND FOR JURY TRIAL** |

**PRELIMINARY ALLEGATIONS**

1.     This is a consumer class action against the largest consumer rent-to-own company in the United States and the State of California, which preys on low-income Californians by charging exorbitant and unlawful prices to customers who sign up for long-term rentals of household appliances, furniture, or other consumer goods, or who purchase products that the customer had previously been renting.  This action alleges that defendants violated the Karnette Rental-Purchase Act, Cal. Civ. Code § 1812.620 et seq., the Unfair Competition Law, Bus. & Prof. Code §17200 et seq., the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq., and California's anti-usury law.  This action seeks a public injunction and other equitable relief, including restitution, invalidation of rental-purchase agreements, an accounting, and a declaratory judgment that Defendants' conduct violated California law, as well as compensatory and punitive damages.

2.     Defendants cynically seek to immunize themselves from liability for their widespread violations of California law by requiring all customers to sign a mandatory arbitration agreement with a class action prohibition that can only be avoided if the customer completes an "opt-out" procedure within 15 days.  That arbitration agreement does not apply here for several reasons.  First, plaintiff Paula Blair timely opted out of the arbitration agreement.  Second, California law precludes enforcement of a rental-purchase agreement where, as here, defendants did not set forth all rights and obligations between themselves and their customers in a single document and did not provide customers with a signed copy at the time of signing.  Third, the arbitration agreement is procedurally and substantively unconscionable, invalid, and unenforceable.  Fourth, even if the arbitration agreement is applied in accordance with its own terms and California law, that arbitration agreement directs that the claims for relief asserted in this action must be adjudicated in a court of law, not in arbitration.  For each of these reasons, plaintiffs are authorized to bring this action in court.

/ / /

/ / /

/ / /

SECOND AMENDED CLASS ACTION COMPLAINT                                           3:17-CV-02335-WHA

## THE PARTIES

3.      Plaintiff Paula Blair is an individual residing in Long Beach, California.

4.      Plaintiff Andrea Robinson is an individual residing in Alameda County, California.

5.      Plaintiff Falechia Harris is an individual residing in Alameda County, California. Collectively, Blair, Robinson and Harris will be referred to herein as "Plaintiffs."

6.      Plaintiffs are informed and believe and thereon allege that defendant Rent-A-Center, Inc. is a Delaware corporation that does business in the State of California.

7.      Plaintiffs are informed and believe and thereon allege that defendant Rent-A-Center West, Inc. is a Delaware corporation that does business in the State of California, and is a wholly-owned subsidiary of Rent-A-Center, Inc.  Rent-A-Center, Inc. and Rent-A-Center West, Inc. are collectively referred to herein as "Rent-A-Center" or "RAC."

8.      Plaintiffs do not know the names of the defendants sued as DOES 1 through 50 but will amend this complaint when that information becomes known.  Plaintiffs allege on information and belief that each of the DOE defendants is affiliated with one or more of the named defendants in some respect and is in some manner responsible for the wrongdoing alleged herein, either as a direct participant, or as the principal, agent, successor, alter ego, or co-conspirator of a named defendant.  For ease of reference, Plaintiffs will refer to the named defendants and the DOE defendants collectively as "Defendants."

## VENUE AND JURISDICTION

9.      Venue is proper in this judicial district because Defendants are doing business and reside in this district, neither Rent-A-Center, Inc. nor Rent-A-Center West, Inc. has designated a principal office within California, and a substantial part of the events or omissions giving rise to Robinson's and Harris's claims occurred in Alameda County.

10.      RAC removed the action to this Court from the Alameda County Superior Court on April 25, 2017 pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

/ / /

/ / /

/ / /

## **BACKGROUND REGARDING RENT-TO-OWN TRANSACTIONS**

11.     RAC is the largest "rent-to-own" consumer rental company in the United States and maintains at least 150 locations throughout the State of California.  Rent-to-own companies offer consumers new and used merchandise—most commonly appliances, electronics, or furniture—in exchange for a series of fixed payments due either weekly, biweekly, or monthly.  In a rent-to-own transaction, the company is referred to as the "lessor," and the terms of the agreement are set forth in a "rental-purchase agreement."  *See* Cal. Civ. Code § 1812.622(c), (d).  (Unless otherwise indicated, statutory citations herein are to the California Civil Code.)

12.     A typical rental-purchase agreement sets a specific time period after which, if all payments have been made, the consumer will own the merchandise.  These payments, in the aggregate, are referred to as the "Total of Payments."  *See* Section 1812.622(l).

13.     A typical rental-purchase agreement also sets a predetermined "Cash Price" at which the consumer has the option to purchase the item outright.  *See* Section 1812.622(e).  Ordinarily, if a consumer chooses to exercise the purchase option during a set initial period (*e.g.*, within 90 days after inception), the purchase price is the Cash Price minus all prior rental payments.  If a consumer chooses to exercise the purchase option after the initial period has expired, the consumer is usually given only partial credit for prior rental payments.  The vast majority of rent-to-own customers make weekly, biweekly, or month payments rather than paying the Cash Price.

14.     California law imposes strict limits on the amount that a rent-to-own company can charge for a particular item of merchandise, whether as the Cash Price or as the Total of Payments, as further discussed below.

15.     The customer base for the rent-to-own industry is among the poorest segment of the American population, consisting primarily of low-income and financially-distressed consumers, a disproportionate number of whom are minorities, who often cannot afford to purchase household

goods outright at retail prices.[1]  Rent-to-own transactions offer immediate access to merchandise for what *appears* to be a low periodic payment; but in fact, such transactions can end up being extremely costly.  The FTC Survey cited studies showing that the total cost of purchasing through a rent-to-own transaction is usually two or three times the retail price of comparable goods, and sometimes more.  Approximately 70% of rented merchandise is eventually purchased by the customer after making all payments necessary to acquire ownership.  Ex. 1 at 4.  Rent-to-own dealers make very few "cash" sales.  The legislative history of California's Karnette Rental-Purchase Act cites a survey of rent-to-own stores in 20 states, including California, which concluded that the ***average*** interest rate was ***111%***.  Ex. 2 at 11 (hearing of the Senate Committee on Judiciary, Apr. 4, 1994).  A typical rent-to-own customer is someone "who cannot afford to purchase an item and does not have the credit to finance it." *Id.*

### THE KARNETTE RENTAL-PURCHASE ACT

16.    Because of the foregoing concerns, California enacted the Karnette Rental-Purchase Act (the "Karnette Act") in 1994.  Among other things, the Karnette Act regulates the maximum Cash Price and the maximum Total of Payments that can be charged for any particular item of merchandise.

17.    The Legislature has declared the following in the Statement of Purpose of the Karnette Act, Civil Code § 1812.621:

> The Legislature hereby finds and declares that consumers enter into rental-purchase contracts that do not adequately disclose the actual terms and cost of the transaction or the consumer's liability for certain breaches of the contract, and that contain unfair provisions, including unfair terms related to fees and charges, the exercise or

---

[1] *See* Testimony of Margot Saunders, Before a Hearing of the U.S. House of Representatives Financial Services Committee, 26 July 2011, entitled "Examining Rental Purchase Agreements and the Potential Role for Federal Regulation" available at http://financialservices.house.gov/calendar/eventsingle.aspx?EventID=252659 (last accessed March 8, 2017).  According to the Federal Trade Commission's Survey of Rent-to-Own Customers ("FTC Survey") published in April 2000 (relevant portions of which are attached hereto as Exhibit 1), 59% of rent-to-own customers had a household income of less than $25,000, and 41% were members of a minority community.  (Ex. 1 at 4, 7.)

SECOND AMENDED CLASS ACTION COMPLAINT                                    3:17-CV-02335-WHA

the termination of purchase option rights, property loss and damage, and the repair or replacement of improperly functioning rental property.

It is, therefore, the intent of the Legislature in enacting this title to ensure that consumers are protected from misrepresentations and unfair dealings by ensuring that consumers are adequately informed of all relevant terms, including the cash price, periodic payments, total purchase price, and other applicable charges or fees, before they enter into rental-purchase contracts.

It is further the intent of the Legislature to (a) prohibit unfair or unconscionable conduct toward consumers in connection with rental-purchase transactions, (b) prohibit unfair contract terms, including unreasonable charges, (c) prevent the forfeiture of contract rights by consumers, (d) provide a right of reinstatement and a reasonable formula for the exercise of purchase option rights under a rental-purchase contract, (e) provide reasonable requirements for the servicing, repair, and replacement of improperly functioning rental property, and (f) cover rental-purchase transactions under existing laws, including laws governing debt collection, cosigners, home solicitation contracts, and warranties.  This title shall be liberally construed to achieve its remedial objectives.

18.    The Karnette Act defines "Cash Price" as "the price of the personal property described in the rental-purchase agreement that the consumer may pay in cash to the lessor at the inception of the rental-purchase agreement to acquire ownership of that personal property." Section 1812.622(e).

19.    The Karnette Act defines "Total of Payments" as the total amount of periodic payments necessary to acquire ownership of the property that is the subject of the rental-purchase agreement if the consumer makes all regularly scheduled payments."  Section 1812.622(l).

20.    Under the Karnette Act, if a lessor willfully discloses a Cash Price or a Total of Payments that exceeds the amount permitted under the Act, "the rental-purchase agreement is void, the consumer shall retain the property without any obligation, and the lessor shall refund to the consumer all amounts paid."  *See* Section 1812.644(g).

21.    The maximum Cash Price and the maximum Total of Payments that can be charged under the Karnette Act for a given item of merchandise depend primarily on the "lessor's cost," and secondarily on whether the item has been the subject of a prior rental-purchase agreement (*i.e.*, whether the item is new or used).

22.    The Karnette Act defines "lessor's cost" as "the documented actual cost, including actual freight charges, of the rental property to the lessor from a wholesaler, distributor, supplier, or manufacturer and net of any discounts, rebates, and incentives" (hereinafter, "Lessor's Cost").

1    *See* Section 1812.622(k).

2        23.    For an item's first rental, Section 1812.644(b) establishes the maximum Cash Price

3    as follows.

4        ●    For "computer systems and appliances," 1.65 times the Lessor's Cost.

5        ●    For "electronic sets," 1.7 times the Lessor's Cost.

6        ●    For "automotive accessories, furniture, jewelry, and musical instruments," 1.9

7    times the Lessor's Cost.

8        ●    For "all other items," 1.65 times the Lessor's Cost.

9        24.    With respect to an item's first rental, the maximum Total of Payments may not

10   exceed 2.25 times the maximum Cash Price that could have been charged for the first rental of that

11   item, as determined by Section 1812.644(b).   *See* Section 1812.644(c).   For example, the

12   maximum Total of Payments for the first rental of a laptop computer (whose maximum Cash Price

13   is 1.65 times the Lessor's Cost) is 2.25 x 1.65 (or 3.1725) times the Lessor's Cost.

14       25.    With respect to a second or subsequent rental (*i.e.*, used merchandise), the

15   maximum Total of Payments is computed as follows:  The maximum Total of Payments permitted

16   for a first rental of the item (as determined by Section 1812.644(c)) *minus* (i) for appliances and

17   electronic sets, one-third of the amount of all rental payments paid to the lessor by consumers who

18   previously rented that item, or (ii) for furniture, computer systems, and all other items, one-half of

19   the amount of all rental payments paid to the lessor by consumers who previously rented that item.

20   *See* Section 1812.644(d).

21       26.    With respect to a second or subsequent rental, the maximum Cash Price is

22   computed as follows:  The maximum Total of Payments permitted for the item (as determined by

23   Section 1812.644(d)) *divided by* 2.25.  *See* Section 1812.644(e).

24                    **PLAINTIFF BLAIR'S TRANSACTIONS WITH RAC**

25           **The Blair 2015 Rental Agreement**

26       27.    On or about July 27, 2015, Plaintiff Blair entered into a Rental-Purchase

27   Agreement ("Blair 2015 Rental Agreement") with RAC for a General Electric AEM10AT

28   Window Air Conditioner, which constitutes an "appliance" within the meaning of Section

1    1812.622(h).  A copy of the Blair 2015 Rental Agreement, as filed in the Court docket by RAC on

2    May 5, 2017 (*see* Dkt. No. 13-1), is attached hereto as Exhibit 3 and is incorporated herein by

3    reference.  As stated in the Blair 2015 Rental Agreement, RAC listed the Cash Price of the

4    General Electric AEM10AT Window Air Conditioner as $428.05 and the Total of Payments as

5    $951.66.

6         28.    Plaintiff Blair is informed and believes and thereon alleges that the Cash Price

7    and/or the Total of Payments listed in the Blair 2015 Rental Agreement exceed the maximum

8    amounts permitted by the Karnette Act, and that Defendants set and disclosed an improper Cash

9    Price and/or an improper Total of Payments in the Blair 2015 Rental Agreement intentionally and

10   willfully.

11        29.    The same make and model of the General Electric AEM10AT Window Air

12   Conditioner that was the subject of the 2015 Blair Rental Agreement was available at retail for

13   $249 with free shipping as of September 25, 2016.  Exhibit 4 at 23 (print-out from BrandsMart

14   U.S.A. website Sept. 25, 2016), and in July 2015 (the same month Plaintiff entered into the 2015

15   Rental Agreement), BrandsMart U.S.A. was offering a very similar model, the General Electric

16   AER10AT, for the retail price of $249.88.  Exhibit 5 (print-out from BrandsMart U.S.A website as

17   of July 27, 2015).[2]

18        30.    Plaintiffs are informed and believe and thereon allege that RAC acquires the

19   merchandise that it rents and sells to its customers at *less* than the retail price.  According to Rent-

20   A-Center, Inc.'s 2015 Form 10-K filed with the U.S. Securities and Exchange Commission, RAC

21   takes advantage of "discounted bulk purchasing" to obtain its inventory of products available for

22   rental and/or sale, which enables RAC to "generat[e] greater margins."  Exhibit 6 at 29.

23        31.    As discussed above, the Karnette Act sets a maximum Cash Price for a new

24   appliance of 1.65 times the Lessor's Cost.  For illustrative purposes, if RAC had purchased its

25

26   [2] The AEM10AT unit is 10,150 BTU with 3 fan speeds and remote control (Ex. 4 at 23), whereas
     the AER10AT unit is 10,100 BTU with 3 fan speeds, remote control, and electronic touch controls

27   (Ex. 4 at 24).

28

SECOND AMENDED CLASS ACTION COMPLAINT                              3:17-CV-02335-WHA

1  inventory of the General Electric AEM10AT *at retail* for $249, RAC would have been permitted

2  to charge a Cash Price of no more than $410.85 [$249 x 1.65 = $410.85].  The Cash Price listed in

3  the Blair 2015 Rental Agreement exceeds that amount.

4        32.  As discussed above, the Karnette Act sets a maximum Total of Payments for a new

5  appliance of 2.25 times the maximum Cash Price that could have been charged.  For illustrative

6  purposes, if RAC had purchased its inventory of the General Electric AEM10AT *at retail* for

7  $249, RAC would have been permitted to charge a Total of Payments of no more than $924.41

8  (*i.e.*, maximum Cash Price of $410.85 x 2.25).  The Total of Payments listed in the Blair 2015

9  Rental Agreement exceeds that amount.

10        33.  In order for the listed Cash Price ($428.05) for the General Electric AEM10AT

11  Window Air Conditioner to have been in compliance with the Karnette Act, RAC would have had

12  to pay a Lessor's Cost of *at least* $259.42 [$428.05 ÷ 1.65 = $259.42].  Given that RAC is able to

13  buy merchandise at discounted wholesale prices, Plaintiff Blair is informed and believes that

14  RAC's Lessor's Cost was actually less than $259.42.

15        34.  In order for the listed Total of Payments ($951.66) for the General Electric

16  AEM10AT Window Air Conditioner to have been in compliance with the Karnette Act, RAC

17  would have had to pay a Lessor's Cost of *at least* $256.34 [($951.66 ÷ 2.25) ÷ 1.65 = $256.34].

18  Given that RAC is able to buy merchandise at discounted wholesale prices, Plaintiff Blair is

19  informed and believes that RAC's Lessor's Cost was actually less than $256.34.

20  **The Blair 2016 Rental Agreement**

21        35.  On or about March 11, 2016, Plaintiff Blair entered into a Rental-Purchase

22  Agreement ("Blair 2016 Rental Agreement") with RAC for a used Microsoft Xbox Gears of War

23  Bundle Edition with one controller, which constitutes an "electronic set" within the meaning of

24  Section 1812.622(i).  A copy of the Blair 2016 Rental Agreement, as filed in the Court docket by

25  RAC on May 5, 2017 (*see* Dkt. No. 13-1), is attached hereto as Exhibit 7 and is incorporated

26  herein by reference.  RAC did not provide Plaintiff Blair with a signed copy of the Blair 2016

27  Rental Agreement at the time it was signed.  Instead, RAC provided Plaintiff Blair with an

28  unsigned copy of the Blair 2016 Rental Agreement, a copy of which is attached hereto as

9

1  Exhibit 8.  As stated in the Blair 2016 Rental Agreement, RAC listed the Cash Price as $476.10

2  and the Total of Payments as $1,299.48.

3       36.    Plaintiff Blair is informed and believes and thereon alleges that the Cash Price

4  and/or the Total of Payments listed in the Blair 2016 Rental Agreement exceed the maximum

5  amounts permitted by the Karnette Act, and that Defendants set and disclosed an improper Cash

6  Price and/or an improper Total of Payments in the Blair 2016 Rental Agreement intentionally and

7  willfully.

8       37.    As discussed above, the Karnette Act sets a maximum Cash Price for a new

9  electronic set of 1.7 times the Lessor's Cost and sets a maximum Total of Payments for a new

10 electronic set of 2.25 times the maximum Cash Price that could have been charged.

11      38.    At or about the time that Plaintiff Blair entered into the Blair 2016 Rental

12 Agreement, retailers were selling the Microsoft Xbox Gears of War Bundle Edition with one

13 controller at prices ranging from $254 to $279 (inclusive of shipping to the customer).  *See, e.g.*,

14 Exhibit 9 (print-outs of multiple offers for the same merchandise, available thru Amazon.com,

15 including free shipping).  For illustrative purposes, even if RAC had purchased its inventory of

16 Microsoft Xbox Gears of War Bundle Edition *at retail* for $279 (which price included shipping),

17 RAC would have been permitted to charge a Cash Price of no more than $474.30 (*i.e.*, $279 x 1.7

18 = $474.30), which in turn would have resulted in a maximum permissible Total of Payments of

19 $1,067.17 (*i.e.*, maximum Cash Price of $474.30 x 2.25 = $1,067.17).  Further, because the item

20 that Defendants rented to Plaintiff Blair was used, those figures would have been required to be

21 adjusted downward to take into account any previous rental payments by other consumers.  *See*

22 Section 1812.664(e).

23      39.    In order for Defendants' listed Cash Price ($476.10) for the Microsoft Xbox Gears

24 of War Bundle Edition with one controller to have been in compliance with the Karnette Act,

25 RAC would have had to pay a Lessor's Cost of *at least* $280.05 [$476.10 ÷ 1.7 = $280.05].  Given

26 that RAC is able to buy merchandise at discounted wholesale prices, Plaintiff Blair is informed

27 and believes that RAC's Lessor's Cost was actually less than $280.05.

28

SECOND AMENDED CLASS ACTION COMPLAINT                          3:17-CV-02335-WHA

40.     For Defendants' listed Total of Payments ($1,299.48) for the Microsoft Xbox Gears of War Bundle Edition with one controller to be in compliance with the Karnette Act, RAC would have had to pay a Lessor's Cost of *at least* $339.73 [($1,299.48 ÷ 2.25) ÷ 1.7 = $339.73].  Given that RAC is able to buy merchandise at discounted wholesale prices, Plaintiff Blair is informed and believes that RAC's Lessor's Cost was actually less than $339.73.

## PLAINTIFF ROBINSON'S TRANSACTION WITH RAC

41.     On or about April 28, 2015, Plaintiff Robinson entered into a Rental-Purchase Agreement ("Robinson 2015 Rental Agreement") with RAC for a 5-month-old *used* 65" Toshiba Television (Model 65L5400U) which constitutes an "electronic set" within the meaning of Section 1812.622(i).  RAC did not provide Robinson with a signed copy of the Robinson 2015 Rental Agreement at the time it was signed.  Instead, RAC provided Robinson with an unsigned copy of the Robinson 2015 Rental Agreement, a copy of which is attached hereto as Exhibit 10.  As stated in the Robinson 2015 Rental Agreement, RAC listed the Cash Price as $1,614.25 and the Total of Payments as $3,478.84.

42.     Plaintiff Robinson is informed and believes and thereon alleges that the Cash Price and/or the Total of Payments listed in the Robinson 2015 Rental Agreement exceeds the maximum amounts permitted by the Karnette Act, and that Defendants set and disclosed an improper Cash Price and/or an improper Total of Payments in the Robinson 2015 Rental Agreement intentionally and willfully.

43.     As discussed above, the Karnette Act sets a maximum Cash Price for a new electronic set of 1.7 times the Lessor's Cost and sets a maximum Total of Payments for a new electronic set of 2.25 times the maximum Cash Price that could have been charged.  However, as discussed above, for used electronic sets, the maximum Total of Payments is the maximum Total of Payments permitted for a first rental of the item (as determined by Section 1812.644(c)) *minus* one-third of the amount of all rental payments paid to the lessor by consumers who previously rented that item.  *See* Section 1812.644(d).

44.     The same 65" Toshiba television listed in the Robinson 2015 Rental Agreement was available for sale online with free shipping in February of 2015 at retail for $996.96.  *See*

1   Exhibit 11 (print-out of BrandsMart U.S.A. offer for the Toshiba 65" 65L5400U from February

2   2015).   For illustrative purposes, if RAC had purchased its inventory of the Toshiba 65"

3   65L5400U television at that retail price, with free shipping, the maximum permissible Cash Price

4   for a new item would have been $1,694.88 (*i.e.*, $996.96 x 1.7 = $1,694.88), which in turn would

5   have resulted in a maximum permissible Total of Payments for a new item of $4,207.46 (*i.e.*,

6   maximum Cash Price of $1,694.88 x 2.25 = $4,207.46).   Because the television leased to

7   Robinson was a used item, RAC was required to subtract from the maximum Total of Payments an

8   amount equal to one-third of all rental payments paid to RAC by consumers who previously rented

9   that item, and the maximum Cash Price likewise would have a corresponding reduction.   *See*

10  Sections 1812.644(d) and (e).

11          45.     Even for a new item, in order for Defendants' listed Cash Price ($1,614.25) for the

12  television to have been in compliance with the Karnette Act, RAC would have had to pay a

13  Lessor's Cost of *at least* $949.54 [$1,614.25 ÷ 1.7 = $949.54].   Plaintiff Robinson is informed and

14  believes that RAC's Lessor's Cost was actually less than $949.54, since the same product was

15  available at retail with free shipping for only $996.96 (a difference of only $47.41, or 4.9%), and

16  RAC is able to buy merchandise at discounted wholesale prices.

17          46.     Even for a new item, in order for Defendants' listed Total of Payments ($3,478.84)

18  for the television to be in compliance with the Karnette Act, RAC would have had to pay a

19  Lessor's Cost of *at least* $909.50 [($3,478.84 ÷ 2.25) ÷ 1.7 = $909.50].   Plaintiff Robinson is

20  informed and believes that RAC's Lessor's Cost was actually less than $909.50, since the same

21  product was available at retail with free shipping for only $996.96 (a difference of only $87.46, or

22  8.7%), and RAC is able to buy merchandise at discounted wholesale prices.

23          **PLAINTIFF HARRIS'S TRANSACTION WITH RAC**

24          47.     On or about October 17, 2015, Plaintiff Harris entered into a Rental-Purchase

25  Agreement ("Harris 2015 Rental Agreement") with RAC for two televisions: a 32" LG Television

26  (Model 32LF500B) and a 55" LG Television (Model 55LF6100), each of which constitutes an

27  "electronic set" within the meaning of Section 1812.622(i).   RAC did not provide Plaintiff Harris

28  with a signed copy of the Harris 2015 Rental Agreement at the time it was signed.   Instead, RAC

provided Plaintiff Harris with an unsigned copy of the Harris 2015 Rental Agreement, a copy of which is attached hereto as Exhibit 12.  As stated in the Harris 2015 Rental Agreement, for the two televisions combined, RAC listed the aggregate Cash Price as $1,237.26 and the aggregate Total of Payments as $2,819.06.

48.   Plaintiff Harris is informed and believes and thereon alleges that the Cash Price and/or the Total of Payments listed in the Harris 2015 Rental Agreement exceeds the maximum amounts permitted by the Karnette Act, and that Defendants set and disclosed an improper Cash Price and/or an improper Total of Payments in the Harris 2015 Rental Agreement intentionally and willfully.

49.   As discussed above, the Karnette Act sets a maximum Cash Price for a new electronic set of 1.7 times the Lessor's Cost and sets a maximum Total of Payments for a new electronic set of 2.25 times the maximum Cash Price that could have been charged.

50.   The same 55" LG television listed in the Harris 2015 Rental Agreement was available for sale online in June 2015 at retail for $699.99.  *See* Exhibit 13 (print-out of BrandsMart U.S.A. offer for the LG 55" Model 65LF6011 from June 2015).  The same 32" LG television was listed for sale online in December 2015, with free shipping, at $208.88.  *See* Exhibit 14 (print-out of BrandsMart U.S.A. offer for the LG 32" Model 32LF500B from December 2015).

51.   For illustrative purposes, if RAC had purchased its inventory of these LG television at those retail prices, the maximum permissible Cash Price would have been $1,545.07 (*i.e.*, ($699.99 + $208.88) x 1.7 = $1,545.079), which would have resulted in a maximum permissible Total of Payments of $3,476.42 (*i.e.*, maximum Cash Price of $1,545.079 x 2.25 = $3,476.42).

52.   In order for Defendants' listed Cash Price ($1,237.26) for the two televisions combined to have been in compliance with the Karnette Act, RAC would have had to pay a total Lessor's Cost of *at least* $727.80 [$1,237.26 ÷ 1.7 = $727.80].  Plaintiff Harris is informed and believes that RAC's Lessor's Cost was actually less than $727.80, since the same products were available at retail for only $908.87 (a difference of only $181.07, or 19.9%), and RAC is able to buy merchandise at discounted wholesale prices.

53.     For Defendants' listed Total of Payments ($2,819.06) for the two televisions to be in compliance with the Karnette Act, RAC would have had to pay a Lessor's Cost of *at least* $737.00 [($2,819.06 ÷ 2.25) ÷ 1.7 = $737.00].   Plaintiff Harris is informed and believes that RAC's Lessor's Cost was actually less than $737.00, since the same products were available at retail for only $908.87 (a difference of only $171.87, or 18.9%), and RAC is able to buy merchandise at discounted wholesale prices.

## DEFENDANTS' UNLAWFUL PRICING THROUGHOUT CALIFORNIA

54.     Plaintiffs are informed and believe and thereon allege that in the course of Defendants' business activities throughout the State of California, Defendants routinely list Cash Prices and/or Total of Payments that exceed the maximum amount allowable under the Karnette Act.   Although Plaintiffs do not currently have access to Defendants' internal documentation showing the actual wholesale price paid for merchandise (all of which information is in the exclusive possession and control of RAC and/or its vendors and should be readily available through discovery), a sample of merchandise offered by RAC locations in the State of California demonstrates that Defendants violate the Cash Price and Total of Payments limitations of the Karnette Act with respect to items in addition to the specific merchandise that Plaintiffs rented. Plaintiffs are informed and believe and thereon allege that Defendants engage in such unlawful pricing activity willfully and intentionally.

55.     To illustrate, the following charts reflect specific items of merchandise offered by RAC in San Francisco County (Chart A) and Los Angeles County (Chart B).   For each item, the chart shows the Cash Price and the Total of Payments listed by RAC and compares those amounts to the maximum Cash Price and the maximum Total of Payments that could be charged if RAC had purchased its merchandise inventory at the commonly-available *retail* price – *i.e.,* at a price far above what Plaintiffs are informed and believe, and RAC itself represents in its public filings, was RAC's actual Lessor's Cost.   Each chart reflects the following information:

**Column A**: A description of the item (a photo of the actual RAC advertisement of the product is contained within the exhibit corresponding to each item).

**Column B**: Indicates whether the item was offered by RAC as "new" or "used."

**Column C**: The Cash Price as listed by RAC.

**Column D**: The number of weekly payments as listed by RAC.

**Column E**: The amount of each weekly payments listed by RAC.

**Column F**:  The total of payments listed by RAC.

**Column G:** The actual price of the same item, *new*, as advertised elsewhere by a *retail* vendor (a photograph of each advertisement is in the exhibit corresponding to the item).

**Column H:** The maximum Cash Price that would have been allowable under the Karnette Act if the item had been purchased by a rent-to-own company from a *retail* vendor at an advertised retail price (each of these advertised retail prices includes free shipping).

**Column I:** The maximum Total of Payments that would have been allowable under the Karnette Act, computed based on the maximum Cash Price reflected in Column H.

**Column J:** The amount by which RAC's listed Cash Price exceeds the maximum allowable Cash Price from Column H.

**Column K:**  The amount by which RAC's listed Total of Payments exceeds the maximum allowable Total of Payments from Column I.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

SECOND AMENDED CLASS ACTION COMPLAINT                                          3:17-CV-02335-WHA

56.    The following Chart A reflects pricing of RAC merchandise offered in San Francisco County:[3]

## Chart A

| (A)<br>Name of Item | (B)<br>New or Used | (C)<br>RAC listed Cash Price | (D)<br>No. of Pmts | (E)<br>Weekly Pmt. | (F)<br>RAC listed Total of Pmts. | (G)<br>Actual New Retail Price from other vendors | (H)<br>Max allowable Cash Price 1.65 (or 1.7) x Actual New Retail Price | (I)<br>Max allowable Tot. of Pmts. Actual New Retail Price x 1.65 (or 1.7) x 2.25 | (J)<br>Excess RAC Cash Price | (K)<br>Excess RAC Total of Pmts |
|---|---|---|---|---|---|---|---|---|---|---|
| Vizio 50" Smart LED TV | New | $818.53 | 73 | $24.99 | $1,824.27 | $429.99 | $730.98 | $1,644.71 | $87.55 | $179.56 |
| Samsung 55" 4K Ultra High Def LED TV | Used | $1,261.44 | 81 | $34.99 | $2,834.19 | $717.60 | $1,219.92 | $2,744.82 | $41.52 | $89.37 |
| ACER 15.6" 4GB 500GB Laptop AND 7" 1GB Android Tablet | Used | $572.34 | 42 | $29.99 | $1,259.58 | $305.39 | $503.89 | $1,133.76 | $68.45 | $125.82 |
| Microsoft Xbox Video Game System | Used | $612.36 | 46 | $29.99 | $1,379.54 | $299.99 | $509.98 | $1,147.45 | $102.38 | $232.09 |

/ / /

/ / /

/ / /

/ / /

/ / /

_____

[3] *See* Exhibit 15 (Vizio 50" Smart LED TV); Exhibit 16 (Samsung 55" 4K Ultra High Def LED TV); Exhibit 17 (ACER 15.6" 4GB 500GB Laptop and 7" 1GB Android Tablet); Exhibit 18 (Microsoft Xbox Video Game System).

57. The following Chart B reflects pricing of certain RAC merchandise offered in Los Angeles County:[4]

## Chart B

| (A) Name of Item | (B) New or Used | (C) RAC listed Cash Price | (D) No. of Pmts | (E) Weekly Pmt. | (F) RAC listed Total of Pmts. | (G) Actual New Retail Price from other vendors | (H) Max allowable Cash Price 1.65 (or 1.7) x Actual New Retail Price | (I) Max allowable Total of Pmts. Actual New Retail Price x 1.65 (or 1.7) x 2.25 | (J) Excess RAC Cash Price | (K) Excess RAC Total of Pmts |
|---|---|---|---|---|---|---|---|---|---|---|
| Microsoft Xbox 500GB Console | Used | $543.50 | 49 | $24.99 | $1,224.51 | $299.00 | $508.30 | $1,143.68 | $35.20 | $80.83 |
| Sony PS4 Game Console | Used | $584.75 | 55 | $24.99 | $1,374.45 | $331.00 | $562.70 | $1,266.08 | $22.05 | $108.37 |
| ASUS 15" Touchscreen Computer | Used | $616.75 | 54 | $25.99 | $1,403.46 | $299.00 | $493.35 | $1,110.04 | $123.40 | $293.42 |
| LG 32" LED TV | New | $356.67 | 51 | $15.99 | $815.49 | $184.99 | $314.48 | $707.59 | $42.19 | $107.90 |
| LG 49" LED 4K Smart TV | Used | $1,322.83 | 100 | $29.99 | $2,999.00 | $549.99 | $934.98 | $2,103.71 | $387.85 | $895.29 |
| Samsung 32" LED TV 720p | Used | $375.05 | 53 | $15.99 | $847.47 | $188.00 | $319.60 | $719.10 | $55.45 | $128.37 |
| Vizio 50" 4K Smart LED TV | New | $975.76 | 74 | $29.99 | $2,219.26 | $499.99 | $849.98 | $1,912.46 | $125.77 | $306.80 |
| Vizio 29" Smart LED TV | New | $433.38 | 49 | $19.99 | $979.51 | $235.99 | $401.18 | $902.66 | $32.20 | $76.85 |
| Vizio 40" 1080p 120 Hz Smart TV | New | $909.55 | 91 | $19.99 | $1,819.09 | $344.99 | $586.48 | $1,319.58 | $323.07 | $499.51 |
| Whirlpool 4.8 cu. ft top load Laundry | New | $832.07 | 99 | $18.99 | $1,880.01 | $498.60 | $822.69 | $1,851.05 | $9.38 | $28.96 |

---

[4] True and correct copies of RAC's advertisement of each item, and a printout from a retailer showing the actual retail price of the item are submitted as follows: Exhibit 19 (Microsoft Xbox 500GB Console); Exhibit 20 (Sony PS4 Game Console); Exhibit 21 (ASUS 15" Touchscreen Computer); Exhibit 22 (LG 32" LED TV); Exhibit 23 (LG 49" LED 4K Smart TV); Exhibit 24 (Samsung 32" LED TV 720p); Exhibit 25 (Vizio 50" 4K Smart LED TV); Exhibit 26 (Vizio 29" Smart LED TV); Exhibit 27 (Vizio 40" 1080p 120 Hz Smart TV); Exhibit 28 (Whirlpool 4.8 ft Top Load Laundry).

1    58.    Plaintiffs are informed and believe and thereon allege that Defendants' illegal

2  business activities and violations of California law are continuing to occur throughout the State of

3  California, that such violations directly affect, and will continue to affect, Plaintiffs, Class

4  members, and members of the public of the State of California, and that such violations caused

5  and continue to cause such individuals actual economic harm.

6            **PLAINTIFFS' CLAIMS FOR RELIEF ARE PROPERLY BEFORE THIS COURT**

7    59.    Plaintiffs are informed and believe and thereon allege that RAC requires every

8  consumer who wishes to enter into a Rental-Purchase Agreement also to execute a separate

9  Consumer Arbitration Agreement, the terms of which are "incorporated by reference" into the

10 Rental-Purchase Agreement.  RAC's Consumer Arbitration Agreement is a pre-printed form that

11 was drafted in its entirety by RAC and is presented to consumers at the point of transaction on a

12 non-negotiable, take-it-or-leave-it basis.

13   60.    When Plaintiff Blair entered into the Blair 2015 Rental Agreement, RAC presented

14 her with—and required her to sign as a condition to entering into the Blair 2015 Rental

15 Agreement—RAC's boilerplate Consumer Arbitration Agreement, drafted by RAC.  A copy of

16 the Arbitration Agreement signed by Blair in July 2015, in the form filed in the Court docket by

17 RAC on May 5, 2017 (*see* Dkt. No. 13-1), is attached hereto as Exhibit 29 (the "Blair 2015

18 Arbitration Agreement").  RAC did not provide Plaintiff Blair with a signed copy of the Blair

19 2015 Arbitration Agreement at the time it was signed.

20   61.    When Plaintiff Blair entered into the 2016 Rental Agreement, RAC presented her

21 with—and required her to sign as a condition to entering into the 2016 Blair Rental Agreement—a

22 Consumer Arbitration Agreement (the "Blair 2016 Arbitration Agreement"), drafted by RAC.  A

23 copy of the 2016 Arbitration Agreement in the form filed in the Court docket by RAC on May 5,

24 2017 (*see* Dkt. No. 13-1) is attached hereto as Exhibit 30.  RAC did not provide Plaintiff Blair

25 with a signed copy of the Blair 2016 Arbitration Agreement at the time it was signed.

26   62.    Plaintiff Robinson is informed and believes and thereon alleges that, in connection

27 with the Robinson 2015 Rental Agreement, RAC presented her with—and required her to sign as

28 a condition to entering into the Robinson 2015 Rental Agreement—RAC's boilerplate Consumer

18

Arbitration Agreement (the "Robinson 2015 Arbitration Agreement"), drafted by RAC.  RAC did not provide Plaintiff Robinson with a signed copy of the Robinson 2015 Arbitration Agreement at the time it was signed.  An unsigned copy of the Robinson 2015 Arbitration Agreement is attached hereto as Exhibit 31.

63.     Plaintiff Harris is informed and believes and thereon alleges that, in connection with the Harris 2015 Rental Agreement, RAC presented her with—and required her to sign as a condition to entering into the Harris 2015 Rental Agreement—RAC's boilerplate Consumer Arbitration Agreement (the "Harris 2015 Arbitration Agreement"), drafted by RAC.  RAC did not provide Plaintiff Harris with a signed copy of the Harris 2015 Arbitration Agreement at the time it was signed.  An unsigned copy of the Harris 2015 Arbitration Agreement is attached hereto as Exhibit 32.

64.     The Blair 2015 and 2016 Arbitration Agreements, the Robinson 2015 Arbitration Agreement, and the Harris 2015 Arbitration Agreement are identical in all material respects.

65.     The Karnette Act requires that "all of the agreements of the lessor and the consumer with respect to the rights and obligations of each party" must be set forth in a "single document."  Section 1812.623(a).  RAC failed to comply with this requirement insofar as it separately set forth some of the rights and obligations of itself and its customers, including Plaintiffs and Class members, in at least two separate documents: the Rental Purchase Agreement and the Arbitration Agreement.  Pursuant to Section 1812.623(a), all Arbitration Agreements executed by Plaintiffs and Class members with RAC are void and unenforceable under Section 1812.623(a) because RAC failed to include the terms and conditions of the Arbitration Agreement in the Rental-Purchase Agreement.

66.     The Karnette Act requires lessors to physically deliver to their consumers "a copy of the fully completed rental purchase agreement and all other documents which the lessor requests the consumer to sign" and requires that such delivery be made "at the time [those documents] are signed."  Section 1812.629(c).  The Karnette Act further provides in that same Section that the rental-purchase agreement "shall not be enforceable against the consumer until the consumer has received a signed copy."  *Id*.  RAC did not deliver a copy of the fully completed

19

1    rental-purchase agreements and Arbitration Agreements to Plaintiffs at the time they signed those

2    documents.  On information and belief, RAC did not deliver a copy of the fully completed rental-

3    purchase agreement and Arbitration Agreement to Class members at the time they signed those

4    documents.  Pursuant to Section 1812.629(c), RAC's failure to provide a copy of all signed

5    documents to Plaintiffs and Class members at the time those documents were signed renders those

6    agreements unenforceable.

7    　　　　67.    The Arbitration Agreement provides in Section (A) that the consumer has 15 days

8    after signing the Arbitration Agreement to reject that Agreement by sending a written rejection

9    notice via certified mail to Rent-A-Center's legal department in Plano, Texas.  *See* Ex. 29 at 118

10    (regarding Blair 2015 Arbitration Agreement); Ex. 30 at 123 (regarding Blair 2016 Arbitration

11    Agreement).

12    　　　　68.    Plaintiff Blair timely rejected the 2016 Arbitration Agreement.  Attached hereto as

13    Exhibit 33 is a true and correct copy of Plaintiff Blair's rejection notice dated March 24, 2016

14    addressed to the Rent-A-Center Legal Department.  Attached hereto as Exhibit 34 is a true and

15    correct copy of the certified mail receipt, together with a copy of the return receipt showing a

16    signature upon delivery.  Attached hereto as Exhibit 35 is a true and correct copy of a letter dated

17    April 20, 2016 from Rent-A-Center's Legal Department to Blair, confirming that "The Rent-A-

18    Center Legal Department has received your notice to reject the Arbitration Agreement associated

19    with Rental Purchase Agreement No. 72029007."   Because Blair timely rejected the 2016

20    Arbitration Agreement, Blair's claims for relief arising out of the 2016 Rental Agreement are

21    properly before this Court.

22    　　　　69.    Section (D) of RAC's Arbitration Agreements is entitled "Requirement of

23    Individual Arbitration."   Subject to certain exceptions discussed below, that provision prohibits

24    class or collective adjudication and requires that any disputes between RAC and its customers be

25    resolved by individual arbitration only.   The text of Section (D) is set forth below, with

26    underlining added to identify those provisions that are most relevant to the allegations of

27    Plaintiffs' Complaint.:

28

SECOND AMENDED CLASS ACTION COMPLAINT                                    3:17-CV-02335-WHA

**(D)  Requirement of Individual Arbitration**:  You and RAC agree that arbitration shall be conducted on an individual basis, and that <u>neither you nor RAC may seek, nor may the arbitrator award, relief that would affect RAC account holders other than you</u>.  There will be no right or authority for any dispute to be brought, heard, or arbitrated as a class, collective, mass, private attorney general, or representative action.  Nor shall the arbitrator have any authority to hear or preside over any such dispute or to join or consolidate arbitrations involving more than one consumer unless RAC and the affected consumer all agree in writing.  In addition, although the arbitrator shall be bound by rulings in prior arbitrations involving the same customer to the extent permitted by the applicable law, the Arbitrator shall not be bound by rulings in prior arbitrations involving different customers.  Regardless of anything else in your Consumer Contract, this Agreement, or the arbitration provider's rules or procedures, <u>the interpretation, applicability, and enforceability of this Paragraph, including, but not limited to, any claim that all or part of this Paragraph is void or voidable, may be determined only by a court</u>.  <u>Any such court challenge shall be governed by the law of the customer's mailing address at the time the dispute arises, but only to the extent permitted and not preempted by the FAA or other federal law</u>.  <u>If there is a final judicial determination that applicable law precludes enforcement of this Paragraph's limitations as to a particular claim for relief, then that claim (and only that claim) must be severed from the arbitration and may be brought in court</u>.

Ex. 29 at 119; Ex. 30 at 124; Ex. 31 at 129; Ex. 32 at 134.

70.     Section (D) provides that any challenge to its interpretation, applicability, or enforceability shall be "governed by the law of the customer's mailing address at the time the dispute arises …," which in this case is California law.

71.     The limitations, restrictions, and deprivations of statutory rights imposed by Section (D) are unlawful, unenforceable, and contrary to the public policy of the State of California, and therefore do not apply to Plaintiff Blair or to this action.

72.     Even if Plaintiff Blair had not timely opted out of RAC's 2016 Arbitration Agreement, and even though Plaintiffs Blair, Robinson, and Harris did not opt out of their respective 2015 Arbitration Agreements, Section (D) of the Arbitration Agreement vests jurisdiction in the Court, not an arbitrator, to determine the enforceability of that Section, the interpretation, applicability, and enforceability of which Plaintiff is challenging in this class action lawsuit.

73.     Even if Plaintiff Blair had not timely opted out of RAC's 2016 Arbitration Agreement, and even though Plaintiffs Blair, Robinson, and Harris did not opt out of their respective 2015 Arbitration Agreements, Plaintiffs are entitled to pursue their class action claims in this Court pursuant to Section (D) of the Arbitration Agreement.

74.     The prohibition in the first sentence of Section (D) against a consumer seeking or an arbitrator awarding any relief that would "affect" any other RAC account holder is unlawful, unenforceable, and void because it purports to prevent consumers from pursuing a consumer protection claim that seeks a public injunction under California law, as Plaintiffs seek in this case. *See, e.g., McGill v. Citibank, N.A.*, 2 Cal.5th 945, 961 (2017) (contract provision that purports to preclude consumer from seeking an injunction for the benefit of the general public is void); Cal. Civ. Code § 3513 ("Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement.").  The Federal Arbitration Act, 9 U.S.C. § 2, expressly preserves from federal preemption any state contract law rule of general application, such as Civil Code § 3513 and the rule announced in *McGill.  See McGill*, 2 Cal.5th at 961-66.

75.     Every claim for relief set forth in this Second Amended Complaint seeks a public injunction within the meaning of *McGill,* and the requested public injunction would by its nature "affect RAC account holders other than [Plaintiffs]."  Because the right to seek a public injunction is not waivable, RAC's prohibition against public injunctive relief in Section (D) of its Arbitration Agreement is void and cannot be enforced with respect to any of the claims for relief alleged in this Second Amended Complaint.  That prohibition is also void and unenforceable with respect to any claim for relief that could be asserted by or on behalf of RAC's customers other than Plaintiffs, *i.e.*, putative class members.

76.     The final sentence of Section (D) states that if a court decides that applicable law precludes enforcement of Section (D) with respect to any claim for relief, that entire claim for relief "*may be brought in court.*"  (Italics added.)  Because applicable law precludes enforcement of Section (D)'s prohibition against seeking and obtaining a public injunction, and because every claim for relief in Plaintiffs' Second Amended Complaint seeks a public injunction, by its own terms the final sentence of Section (D) entitles Plaintiffs to pursue in court every claim for relief alleged in this Second Amended Complaint, on their own behalf, on behalf of the general public, and on behalf of every class member as defined herein.

1

**CLASS ACTION ALLEGATIONS**

2      77.      Plaintiffs bring this lawsuit as a class action under Fed. R. Civ. P. 23.  Plaintiffs

3  seek to represent the following Class: "All individuals who, at any time on or after March 13,

4  2013, entered into a rent-to-own transaction with Defendants in the State of California.  Excluded

5  from the class are all employees of Defendants, all employees of Plaintiffs' counsel, and the

6  judicial officers to whom this action is assigned."  Plaintiffs reserve the right to modify this class

7  definition.

8      78.      <u>Ascertainability</u>.  The members of the Class may be ascertained from Defendants'

9  business records.

10      79.      <u>Common Questions of Fact or Law</u>.  This lawsuit is suitable for class treatment

11  because common questions of fact and law predominate over any individual issues.  Common

12  questions include but are not limited to: (1) whether Defendants' rental-purchase agreements with

13  Plaintiffs and the Class members state a Cash Price and/or a Total of Payments that exceeds the

14  maximum amounts permitted by the Karnette Act, and, if so, whether Defendants set or disclosed

15  those prices intentionally or willfully; (2) whether Defendants' rental-purchase agreements violate

16  the Karnette Act in other respects; (3) whether Defendants' conduct violates the California

17  Consumers Legal Remedies Act; (4) whether the subject transactions constituted loans or

18  forbearances under California law and, if so, whether such loans or forbearances are in violation of

19  California's usury law; (5) whether Defendants' conduct constitutes an unlawful, unfair, or

20  fraudulent business act or practice; and (6) the appropriate remedies for Defendants' conduct.

21      80.      <u>Numerosity</u>.  Plaintiffs allege on information and belief that the Class consists of

22  well over 100 members.

23      81.      <u>Typicality and Adequacy</u>.  Plaintiffs' claims are typical of the claims of all other

24  Class members.  Plaintiffs will fairly and adequately protect the interests of the other Class

25  members and have no interests that are adverse to the Class members.

26      82.      <u>Superiority</u>.  A class action is superior to other methods for resolving this

27  controversy.  Because the amount of damages to which each Class member may be entitled is low

28  in comparison to the expense and burden of individual litigation, it would be impracticable for

members of the Class to redress the wrongs done to them without a class action.   Class certification will not present any significant management difficulties.  Plaintiffs are informed and believe and thereon allege that records showing the Lessor's Cost, the Cash Price, and the Total of Payments for each item of personal property rented or sold by RAC are in the possession or control of RAC and are readily available through discovery.  By statute, RAC is obligated to maintain a copy of each rental-purchase agreement, together with records that establish the Lessor's Cost for each and every item of personal property that is the subject of a rental-purchase agreement.  Section 1812.644(a).  RAC is required to maintain those records for at least two years after termination of a rental-purchase agreement.  *Id*.  Class certification would also conserve judicial resources and avoid the possibility of inconsistent judgments.

83.   <u>Risk of Inconsistent or Varying Adjudications</u>.  Prosecuting separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.  As a practical matter, adjudication with respect to individual Class members would be also dispositive of the interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

84.   <u>Conduct on Grounds that Apply Generally to the Class</u>.  Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## **FIRST CLAIM FOR RELIEF**

(Violation of the Karnette Rental-Purchase Act)

85.   Plaintiffs incorporate by reference the preceding paragraphs.

86.   Plaintiffs are informed and believe and thereon allege that, throughout the Class Period, Plaintiffs and Class members entered into rental-purchase agreements with RAC in the State of California, with respect to which:

a.   Defendants stated a Cash Price in excess of the maximum Cash Price permitted by Section 1812.644(b) or (e), in violation of Section 1812.624(a)(17).

SECOND AMENDED CLASS ACTION COMPLAINT                                    3:17-CV-02335-WHA

1        b.     Defendants stated a Total of Payments in excess of the maximum Total of

2   Payments permitted by Section 1812.644(c) or (d), in violation of Section 1812.624(a)(18).

3        c.     Defendants engaged in unfair, unlawful, and/or deceptive conduct, and/or

4   made untrue and misleading statements, including but not limited to stating Cash Prices and/or

5   Total of Payments that exceeded the maximum amount allowed by the Karnette Act, in violation

6   Section 1812.639.

7        d.     Defendants failed to set forth in a single document all agreements between

8   Defendants and each consumer with respect to the rights and obligations of each party, in violation

9   of Section 1812.623(a).

10        e.     Defendants failed to provide to consumers at the time of signing a copy of

11   the fully completed rental-purchase agreement and all other documents that the lessor requested

12   the consumer to sign, in violation of Section 1812.629.

13      87.    Defendants' acts as alleged herein were and continue to be willful, intentional,

14   malicious, oppressive, and conducted in conscious disregard of the rights of Plaintiffs and the

15   Class members.

16      88.    Unless enjoined and restrained by a court of law, Defendants will continue to

17   commit the violations alleged herein with respect to Plaintiffs, Class members, and other members

18   of the general public of the State of California.

19      89.    As a result of the foregoing violations, Plaintiffs seek relief against Defendants,

20   including, without limitation:

21        a.     A public injunction (i) enjoining Defendants from committing future

22   violations of the Karnette Act in the State of California, (ii) requiring Defendants to provide an

23   accounting of all monies obtained from California consumers pursuant to rental-purchase

24   agreements entered into in violation of the Karnette Act in the State of California during the

25   applicable limitations period, (iii) requiring Defendants to give individualized notice to all

26   consumers who entered into such contracts with Defendants in the State of California during the

27   applicable limitations period of those customers' rights under the Karnette Act and applicable

28   California law (including their right to restitution of all monies paid to Defendants and to keep the

property at issue without further obligation), (iv) requiring Defendants to provide individualized notice to each such customer of the procedures available for enforcing the customer's rights under the Karnette Act, and (v) establishing an effective monitoring mechanism to ensure Defendants' continued compliance with the terms of the injunction.

b.     A judicial declaration that the rental-purchase agreements entered into by Plaintiffs and Class members are voidable at the consumers' option, pursuant to Section 1812.624(b).

c.     A judicial declaration that the rental-purchase agreements entered into by Plaintiffs and Class members are void, that the consumers are entitled to retain the property obtained pursuant to such agreements without any obligation, and an order that Defendants shall refund to Plaintiffs and the Class members all amounts paid, pursuant to Section 1812.644(g).

d.     An award to Plaintiffs and Class members of actual damages, pursuant to Section 1812.636(a)(1).

e.     With respect to each violation of the Karnette Act by Defendants, a monetary award to Plaintiffs and Class members in the amount of 25 percent of an amount equal to the total amount of payments required to obtain ownership of the property if all payments were made under the rental-purchase agreement, but not less than $100 or more than $1,000, pursuant to Section 1812.636(a)(2).

f.     An award of attorney's fees and costs, pursuant to Section 1812.636(a)(3).

g.     An award of exemplary damages in favor of Plaintiffs and Class members, in an amount the court deems proper, pursuant to Section 1812.636(a)(5).

## SECOND CLAIM FOR RELIEF

(Violation of the Consumers Legal Remedies Act)

90.     Plaintiffs incorporate by reference paragraphs 1 through 89 as if set forth herein.

91.     Plaintiffs and the Class members are "consumers" within the meaning of Section 1761(d) insofar as Plaintiffs and the Class members sought or acquired Defendants' goods and/or services for personal, family, or household purposes.

92.     Defendants' products, merchandise, and services are "goods" and/or "services" within the meaning of Section 1761(a) and (b).

93.     The transactions set forth in Plaintiffs' and Class members' rental-purchase agreements are "transactions" within the meaning of Section 1761(e).

94.     Defendants have violated and continue to violate Section 1770(a)(14) by representing that the rental-purchase agreement transactions with Plaintiffs and Class members involve rights or obligations that those transaction do not create or establish, and have violated Section 1770(a)(19) by inserting unconscionable provisions into such contracts.

95.     Defendants' conduct alleged herein was and is continuing to be undertaken by Defendants with oppression, fraud, and/or malice, within the meaning of Section 3294(c).

96.     Unless enjoined and restrained by a court of law, Defendants will continue to commit the violations alleged herein with respect to Plaintiffs, Class members, and other members of the general public of the State of California.  Plaintiffs seek a public injunction (i) enjoining Defendants from committing future violations of the Karnette Act and the Consumers Legal Remedies Act in the State of California, (ii) requiring Defendants to provide an accounting of all monies obtained from California consumers pursuant to rental-purchase agreements entered into in violation of the Karnette Act or the Consumers Legal Remedies Act in the State of California during the applicable limitations period, (iii) requiring Defendants to give individualized notice to all consumers who entered into such contracts with Defendants in the State of California during the applicable limitations period of those customers' rights under the Karnette Act, the Consumers Legal Remedies Act, and applicable California law (including their right to restitution of all monies paid to Defendants and to keep the property at issue without further obligation), (iv) requiring Defendants to provide individualized notice to each such customer of the procedures available for enforcing the customer's rights under the Karnette Act and the Consumers Legal Remedies Act, and (v) establishing an effective monitoring mechanism to ensure Defendants' continued compliance with the terms of the injunction.

97.     On behalf of themselves and Class members, Plaintiffs seek an appropriate injunction, statutory damages, restitution, compensatory and punitive damages, attorneys' fees,

27

1  costs, an accounting, and any other relief the Court deems proper as a result of Defendants'

2  violations of the Consumers Legal Remedies Act.

3  **THIRD CLAIM FOR RELIEF**

4  (Usury)

5  98.  Plaintiffs incorporate paragraphs 1 through 84 as though fully set forth herein.

6  99.  The exchange of Defendants' merchandise in return for the payments by Plaintiffs

7  and Class members constituted loans or forbearances by Defendants, which were for use primarily

8  for personal, family, or household purposes, and which were or are absolutely repayable.

9  100.  The effective annual interest rate on Defendants' loans or forbearances to Plaintiffs

10  and the Class members exceeds the interest rate limit established by Article XV, Section 1(1) of

11  the California Constitution.

12  101.  Defendants had a willful intent to enter into usurious transactions with Plaintiffs

13  and the Class members.

14  102.  Pursuant to Cal. Uncodified Initiative Measures and Statutes 1919-1, Section 3,

15  Plaintiffs and the Class members are entitled to three times the interest paid on the usurious

16  transactions, in an amount to be proved at trial.

17  103.  Defendants' acts are willful, malicious, oppressive, and in conscious disregard of

18  the rights of Plaintiffs and the Class members, entitling Plaintiffs and the Class members to an

19  award of punitive damages, in an amount to be proved at trial.

20  104.  Unless enjoined and restrained by a court of law, Defendants will continue to

21  commit the foregoing violation with respect to Plaintiffs, Class members, and other members of

22  the general public of the State of California.  Plaintiffs seeks a public injunction: (i) enjoining

23  Defendants from making illegal loans or forbearances to consumers in the State of California,

24  (ii) requiring Defendants to provide an accounting of all monies obtained from California

25  consumers pursuant to contracts entered into in violation of California usury law during the

26  applicable limitations period, (iii) requiring Defendants to give individualized notice to all

27  consumers who entered into such contracts with Defendants in the State of California during the

28  applicable limitations period of those customers' rights under California usury law, (iv) requiring

28

1   Defendants to provide individualized notice to each such customer of the procedures available for

2   enforcing the customer's rights under California usury law, and (v) establishing an effective

3   monitoring mechanism to ensure Defendants' continued compliance with the terms of the

4   injunction.

5                              **FOURTH CLAIM FOR RELIEF**

6                                    (Unfair Competition)

7          105.    Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

8          106.    By violating the Karnette Act as alleged above, by violating the Consumers Legal

9   Remedies Act as alleged above, and/or by making and offering illegal and usurious loans to

10  Plaintiffs, Class members, and other members of the general public of the State of California,

11  Defendants have engaged, are engaging, and are likely to continuing engaging in, in business

12  practices that are unlawful, unfair, and/or fraudulent, in violation of Cal. Bus. & Prof. Code

13  § 17200 et seq.

14         107.    Defendants' business practices described herein have no social utility since they

15  serve only to increase the profit accruing to Defendants without providing any corresponding

16  benefit to California consumers.  Plaintiffs, Class members, and other members of the public of

17  the State of California cannot reasonably avoid the injuries, economic and otherwise, directly

18  caused by Defendants' unlawful conduct as alleged herein.   There are reasonably available

19  alternatives to further Defendants' legitimate business interests, other than the conduct described

20  herein.

21         108.    Plaintiffs and Class members have suffered injury in fact and lost money as a result

22  of Defendants' acts of unfair competition alleged herein.

23         109.    Unless enjoined and restrained by a court of law, Defendants will continue to

24  commit the foregoing violations with respect to Plaintiffs, Class members, and other members of

25  the general public of the State of California.

26         110.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs are entitled to (i) an order on

27  behalf of the general public of the State of California enjoining Defendants from committing

28  violations of the Unfair Competition Law, the Karnette Act, the Consumers Legal Remedies Act,

1   and/or from making illegal loans or forbearances to consumers in the State of California; (ii) an

2   order requiring Defendants to make full restitution to Plaintiffs and Class members; (iii) an order

3   requiring Defendants to provide an accounting of all monies obtained from California consumers

4   pursuant to rental-purchase agreements entered into in violation of the Unfair Competition Law,

5   the Karnette Act, the Consumers Legal Remedies Act, and/or California usury law in the State of

6   California during the applicable limitations period, (iv) requiring Defendants to give

7   individualized notice to all consumers who entered into such contracts with Defendants in the

8   State of California during the applicable limitations period of those customers' rights under all

9   applicable laws (including their right to restitution of all monies paid to Defendants and to keep

10  the property at issue without further obligation), (v) requiring Defendants to provide

11  individualized notice to each such customer of the procedures available for enforcing the

12  customer's rights under all applicable California laws, and (vi) establishing an effective

13  monitoring mechanism to ensure Defendants' continued compliance with the terms of the

14  injunction.

## **PRAYER**

16      WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

17      On the First Claim for Relief:

18      1.      For a public injunction on behalf of the People of the State of California as alleged

19  herein;

20      2.      For a judicial declaration that the rental-purchase agreements at issue are void or

21  voidable at the option of the consumer, that the consumer shall retain the property obtained

22  through such agreements without any obligation, and an order directing Defendants to refund to

23  Plaintiffs and Class members all amounts paid, pursuant to Section 1812.644(g);

24      3.      For compensatory damages according to proof, pursuant to Section 1812.636(a)(1);

25      4.      With respect to each violation of the Karnette Act, a monetary award to Plaintiffs

26  and Class members in the amount of 25 percent of an amount equal to the total amount of

27  payments required to obtain ownership of the property if all payments were made under the rental-

28  purchase agreement, but not less than $100 or more than $1,000, pursuant to Section

1    1812.636(a)(2);

2         5.      For an award of attorney's fees and costs, pursuant to Section 1812.636(a)(3);

3         6.      For an award of exemplary damages in an amount the court deems proper, pursuant

4    to Section 1812.636(a)(4);

5         7.      For declaratory relief, injunctive relief, and restitution, pursuant to Section

6    1812.636(a)(5).

7         On the Second Claim for Relief:

8         8.      For a public injunction on behalf of the People of the State of California as alleged

9    herein;

10        9.      For an award of monetary damages and restitution for Plaintiffs and Class

11   members;

12        10.     For an award of attorneys' fees and costs, pursuant to Section 1780(e).

13        On the Third Claim for Relief:

14        11.     For a public injunction on behalf of the People of the State of California as alleged

15   herein;

16        12.     For three times the amount of interest paid by Plaintiffs and Class members on the

17   usurious loans or forbearances, in an amount according to proof;

18        13.     For exemplary damages pursuant to Section 3294.

19        On the Fourth Claim for Relief:

20        14.     For a public injunction on behalf of the People of the State of California as alleged

21   herein;

22        15.     For restitution in favor of Plaintiffs and Class members.

23        On All Claims for Relief:

24        16.     For injunctive relief on terms the Court deems just and proper;

25        17.     For reasonable attorneys' fees, pursuant to Cal. Code Civ. Proc. § 1021.5;

26        18.     For costs of suit;

27   / / /

28   / / /

SECOND AMENDED CLASS ACTION COMPLAINT                                    3:17-CV-02335-WHA

19.     For pre-judgment interest; and

20.     For such other relief that the Court deems just and proper.

Dated: July 7, 2017                              DOSTART HANNINK & COVENEY LLP


                                                 /s/ Zach P. Dostart
                                                 ZACH P. DOSTART
                                                 Attorneys for Plaintiffs


## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all claims and claims for relief so triable.

Dated: July 7, 2017                              DOSTART HANNINK & COVENEY LLP


                                                 /s/ Zach P. Dostart
                                                 ZACH P. DOSTART
                                                 Attorneys for Plaintiffs

814559.4

SECOND AMENDED CLASS ACTION COMPLAINT                              3:17-CV-02335-WHA