JAMES T. HANNINK (131747)
jhannink@sdlaw.com
ZACH P. DOSTART (255071)
zdostart@sdlaw.com
DOSTART HANNINK & COVENEY LLP
4180 La Jolla Village Drive, Suite 530
La Jolla, California 92037-1474
Tel: 858-623-4200
Fax: 858-623-4299

MICHAEL RUBIN (80618)
mrubin@altber.com
ERIC P. BROWN (284245)
ebrown@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: 415-421-7151
Fax: 415-362-8064

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| PAULA L. BLAIR, ANDREA ROBINSON, and FALECHIA A. HARRIS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>RENT-A-CENTER, INC., a Delaware corporation; RENT-A-CENTER WEST, INC., a Delaware corporation; and DOES 1-50, inclusive,<br><br>        Defendants. | CASE NO. 3:17-CV-02335-WHA<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:     June 28, 2018<br>Time:    8:00 a.m.<br>Ctrm.:   12<br>Judge:  Hon. William Alsup |

## NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 28, 2018, at 8:00 a.m. or as soon thereafter as the matter may be heard, in Courtroom 12 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA, 94102, plaintiffs Paula Blair, Andrea Robinson, and Falechia Harris will and hereby do move this Court for certification of their class and subclass claims against Defendants Rent-A-Center, Inc. and Rent-A-Center West, Inc. (collectively "RAC") under Federal Rule of Civil Procedure 23. Plaintiffs also move for themselves and one other class member, Celinda Garza, to be appointed as Class Representatives, and for Dostart Hannink & Coveney LLP and Altshuler Berzon LLP to be appointed as Class Counsel.

Plaintiffs seek to certify a class of all individuals who entered into a rent-to-own transaction with RAC in California at any time between March 13, 2013, and the date notice is sent to the class. Plaintiffs seek to pursue class claims alleging violations of California's Karnette Rental-Purchase Act, Cal. Civ. Code §§1812.620 *et seq.*, Consumers Legal Remedies Act, Civ. Code §§1750 *et seq.*, and Unfair Competition Law, Civ. Code §§17200 *et seq.* Plaintiffs also seek to pursue subclass claims alleging violations of California usury law on behalf of class members for whose transactions RAC has no applicable arbitration agreement. In the absence of a signed arbitration agreement, there is no contractual limitation on those subclass members' ability to pursue prospective and retroactive relief under California usury law.

Plaintiffs seek certification under Federal Rule of Civil Procedure 23(b)(3), or in the alternative, Rule 23(b)(2), having satisfied the requirements of both. Common issues predominate in this case, and class treatment is superior to requiring putative class members to pursue individual actions. In the alternative, plaintiffs seek certification of a class to pursue injunctive and declaratory relief under Rule 23(b)(2), because RAC "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

1   This motion is based on this Notice of Motion, plaintiffs' Memorandum of Points and

2   Authorities, the declarations of Paula Blair, Andrea Robinson, Falechia Harris, Celinda Garza,

3   David Breshears, Zachariah P. Dostart, and Michael Rubin submitted herewith, any reply

4   memoranda or other papers plaintiffs may file, any argument the Court may entertain, and all

5   pleadings and papers on file in this matter.

6

7   Dated: May 10, 2018                    Respectfully submitted,

8                                          DOSTART HANNINK & COVENEY LLP
                                           ALTSHULER BERZON LLP
9

10                                         _____
                                           Michael Rubin
11                                         Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................... 1

II. THE KARNETTE RENTAL-PURCHASE ACT ..................................................... 1

    A. Background ..................................................................................................... 1

    B. The Karnette Act's Pricing Limitations ....................................................... 2

    C. Summary of the Disputes in This Case ......................................................... 4

        1. Whether RAC's Rental-Purchase Agreements State a Cash Price and/or a Total of Payments That Exceed a Statutory Maximum .................. 4

        2. Whether RAC is Required to Include in a "Single Document" All Agreements With Respect to All Rights and Obligations ............................ 5

        3. Whether RAC Properly Discloses All Merchandise as "New" or "Used" ................................................................................................ 6

III. STATEMENT OF FACTS ........................................................................................ 6

    A. Plaintiffs' Rental Purchase Agreements with Rent-A-Center ...................... 6

        1. Paula Blair ......................................................................................... 6

        2. Andrea Robinson ............................................................................... 7

        3. Falechia Harris .................................................................................. 8

        4. Celinda Garza .................................................................................... 8

    B. Procedural History ......................................................................................... 9

IV. ARGUMENT ......................................................................................................... 11

    A. Legal Standard for Class Certification ........................................................ 11

    B. Plaintiffs' Proposed Class Satisfies All Rule 23(a) Requirements .............. 11

        1. Numerosity ....................................................................................... 11

        2. Commonality .................................................................................... 11

        3. Typicality ......................................................................................... 12

        4. Adequacy of Representation ............................................................. 13

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION        3:17-CV-02335-WHA

C.     Certification is Appropriate under Rule 23(b) ............................................... 13

      1.     A Class Should Be Certified Under Rule 23(b)(3) Because Common Questions Predominate Over Any Individual Issues and Class Treatment is Superior to Individual Adjudications ..................................... 13

          (a)     The Karnette Act pricing claims…………………………………14

          (b)     The "single document" claim…………………………………...16

          (c)     The CLRA and UCL claims…………………………………….17

          (d)     The subclass members' usury claim…………………………….18

          (e)     Class treatment is superior to individual adjudications…………..18

      2.     A Class Should Be Certified for Injunctive Relief Under Rule 23(b)(2) ................................................................................................. 19

D.     The Procedural Limitations in RAC's Arbitration Agreement Were Not Intended to Apply Outside of the Arbitration Context, and Any Prohibition on Pursuing This Class Action in Court Would Be Unenforceable ...................... 21

      1.     By Its Terms, The Second Sentence of Paragraph D Does Not Apply to Court Proceedings ............................................................................... 21

      2.     Class Action Prohibitions Are Unenforceable Outside the Arbitration Context ............................................................................... 23

          (a)     The CLRA and Karnette Act forbid waiver of the right to pursue statutory claims on a class action basis……………………………23

          (b)     Outside the arbitration context, California law precludes enforcement of a class action waiver in consumer adhesion contracts………………………………………………………...24

V.     CONCLUSION ........................................................................................................ 25

**Federal Cases**

*Abdullah v. U.S. Sec. Assoc., Inc.*,
    731 F.3d 952 (9th Cir. 2013)...........................................................................11, 17

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ......................................................................................24, 25

*In re Autozone, Inc.*
    289 F.R.D. 526 (N.D. Cal. 2012) ............................................................................17

*Beaver v. Tarsadia Hotels*,
    816 F.3d 1170 (9th Cir. 2016) ................................................................................17

*Campion v. Old Republic Home Protection Co., Inc.*,
    272 F.R.D. 517 (S.D. Cal. 2011) ............................................................................17

*Doe 1 v. AOL LLC*,
    552 F.3d 1077 (9th Cir. 2009) ................................................................................24

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ................................................................................................11

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2001)..............................................................................11, 20

*Etter v. Allstate Ins. Co.*,
    323 F.R.D. 308 (N.D. Cal. 2017) (Alsup, J.) .....................................................15, 16

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998)............................................................................13, 14

*I.B. by and through Bohannon v. Facebook, Inc.*,
    82 F.Supp.3d 1115 (N.D. Cal. 2015) ......................................................................20

*Jones v. ConAgra Foods, Inc.*,
    No. C 12-1633, 2014 WL 2702726 (N.D. Cal. Jun. 13, 2014) ...............................20

*Krzesniak v. Cendant Corp.*,
    No. C 05-5156, 2007 WL 1795703 (N.D. Cal. Jun. 30, 2007) ...............................10

*Mendez v. R&L Carriers, Inc.*,
    No. C 11-2478, 2012 WL 5868973 (N.D. Cal. Nov. 19, 2012) ...............................17

*Nagrampa v. MailCoups, Inc.*,
　　469 F.3d 1257 (9th Cir. 2006)..................................................................25

*In re NCAA I-A Walk-on Football Players Litig.*,
　　2006 WL 1207915 (W.D. Wash. May 3, 2006) .........................................16

*Negrete v. Allianz Life Ins. Co.*,
　　238 F.R.D. 482 (C.D. Cal. 2006) ..............................................................11

*Nozzi v. Hous. Auth. of L.A.*,
　　No. CV 07-380, 2016 WL 2647677 (C.D. Cal. May 6, 2016).....................16

*Preap v. Johnson*,
　　303 F.R.D. 566 (N.D. Cal. 2014) ..............................................................16

*Rodriguez v. Hayes*,
　　591 F.3d 1105 (9th Cir. 2010)...................................................................19

*Staton v. Boeing Co.*,
　　327 F.3d 938 (9th Cir. 2003)....................................................................13

*In re Telectronics Pacing Sys.*,
　　172 F.R.D. 271 (S.D. Ohio 1997) ...............................................................9

*Torres v. Mercer Canyons, Inc.*,
　　835 F.3d 1125 (9th Cir. 2016)...................................................................14

*Wal-Mart Stores, Inc. v. Dukes*,
　　564 U.S. 338 (2011) ..................................................................................11

*Walters v. Reno*,
　　145 F.3d 1032 (9th Cir. 1998)...................................................................20

*Wolin v. Jaguar Land Rover N. Am., LLC*,
　　617 F.3d 1168 (9th Cir. 2010)..................................................12, 18, 19

*In re Yahoo Mail Litig.*,
　　308 F.R.D. 577 (N.D. Cal. 2015) ..............................................................19

*In re Yahoo! Litig.*,
　　251 F.R.D. 459 (C.D. Cal. 2008) ..............................................................25

*Zinser v. Accufix Research Instit., Inc.*,
　　253 F.3d 1180 (9th Cir. 2001)...................................................................20

**California Cases**

*America Online, Inc. v. Superior Court*,
　　90 Cal.App.4th 1 (2001)............................................................................24

*Ghirardo v. Antonioli,*
    8 Cal.4th 791 (1994)..................................................................................................12, 18

*McGill v. Citibank,*
    2 Cal.5th 945 (2017)................................................................................................9, 10, 17

*Ontiveros v. DHL Exp., Inc.,*
    164 Cal.App.4th 494 (2008), *recognized as abrogated on other grounds by Tiri*
    *v. Lucky Chances, Inc.,* 226 Cal.App.4th 231 (2014) ............................................................17

*Tahoe Nat'l Bank v. Phillips,*
    4 Cal.3d 11 (1971)................................................................................................................23

**Federal Statutes**

Class Action Fairness Act, 28 U.S.C.
    § 1332(d) ..............................................................................................................................9

**California Statutes**

Cal Civ. Code
    § 1641..................................................................................................................................22
    § 1654..................................................................................................................................23
    § 1668..................................................................................................................................24
    § 1751..................................................................................................................................23
    § 1760..................................................................................................................................17
    § 1771(a)(19).......................................................................................................................17
    § 1781(a) .............................................................................................................................23

Karnette Rental-Purchase Act, Civ. Code
    § 1812.620, *et seq.*.............................................................................................. *passim*

**Other Authorities**

Federal Rules of Civil Procedure
    Rule 23 .................................................................................................. *passim*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

This is a consumer class action against the largest rent-to-own company in California, defendants Rent-A-Center, Inc. and Rent-A-Center West, Inc. ("RAC"). Plaintiffs contend that RAC violated the Karnette Rental-Purchase Act, Civ. Code §§1812.620 *et seq.*, which regulates the prices that rent-to-own companies may charge their customers. Plaintiffs also bring related claims under California's Consumer Legal Remedies Act ("CLRA"), Unfair Competition Law ("UCL"), and usury law, although the usury claims are limited to the subclass of customers for whose transactions RAC does not have an applicable arbitration agreement.

The parties' disputes present common questions with common answers. Once the threshold questions of statutory construction are resolved, RAC's Karnette Act pricing liability can be adjudicated by applying the statutory formulae to RAC's computerized transaction database and other records (RAC is required by statute to maintain that information, and produced a database of all putative class members' transactions and other records in response to this Court's October 23, 2017 Order, Dkt. 80). Plaintiffs' UCL and CLRA claims are largely derivative of their Karnette Act claims and can be proven the same way. The subclass's usury claims also can be proven or disproven based on RAC's database and other records, which can be used to establish the effective rate of interest for each transaction.

The Court has also asked the parties to brief whether the "Requirement of Individual Arbitration" paragraph in RAC's form arbitration agreement prohibits plaintiff Blair from pursuing this action on behalf of consumers with transactions subject to that agreement. Dkt. 82, 83. As explained *infra* at 20-25, that prohibition is neither applicable nor enforceable.

## II.    THE KARNETTE RENTAL-PURCHASE ACT

### A.     Background

Rent-to-own transactions offer consumers access to furniture, appliances, electronics, and other household merchandise for what *appears* to be a low periodic payment with an option to purchase. Customers who enter into rent-to-own contracts typically make fixed weekly or monthly payments and obtain ownership after completing the specified term of payments. *See*

1  Declaration of Zachariah P. Dostart ("Dostart Decl.") Ex. 1 at 2.  Rent-to-own transactions are

2  particularly enticing to low-income consumers who cannot afford up-front retail prices and may be

3  unable to obtain credit through conventional means.  Yet rent-to-own transactions can end up

4  being extremely costly.  Often, the total cost of purchasing through RAC is many times the retail

5  price.

6  The Legislature enacted the Karnette Act in 1994 to crack down on price-gouging and

7  deceptive sales practices in the rent-to-own industry, and intended the Act to be "liberally

8  construed to achieve its remedial objectives."  Civ. Code §1812.621.  The Legislature recognized

9  that "many low-income consumers who rent major appliances, stereos and other items from RTO

10  businesses with the intent to acquire ownership are not aware that the low periodic fee is actually

11  very high in relation to the actual value of the property if the contract runs for an appreciable

12  length of time."  Dostart Decl. Ex. 1 at 3.  The Legislature also cited a survey showing that "the

13  average interest rate charged by the industry is 111%," and noted that these exorbitant interest

14  rates are incurred primarily by a customer base comprised of those "who cannot afford to purchase

15  an item and do[] not have the credit to finance it."  *Ibid*.  The Legislature's intent was "to ensure

16  that consumers are protected from misrepresentations and unfair dealings," to "prohibit unfair or

17  unconscionable conduct toward consumers," and to "prohibit unfair contract terms, including

18  unreasonable charges."  §1812.621.

19  **B.      The Karnette Act's Pricing Limitations**

20  The Act's core substantive provision sets statutory maximums on the dollar amount rent-

21  to-own companies can charge for the "Cash Price" and "Total of Payments" of any particular item

22  of merchandise.  The "Cash Price" is "the price of the personal property described in the rental-

23  purchase agreement that the consumer may pay in cash to the lessor at the inception of the rental-

24  purchase agreement to acquire ownership of that personal property."  §1812.622(e).  The "Total of

25  Payments" is "the total amount of periodic payments necessary to acquire ownership of the

26  property that is the subject of the rental-purchase agreement if the consumer makes all regularly

27  scheduled payments."  §1812.622(l).

28

The maximum Cash Price and the maximum Total of Payments are both calculated as a function of the "Lessor's Cost." The "Lessor's Cost" is "the documented actual cost, including actual freight charges, of the rental property to the lessor from a wholesaler, distributor, supplier, or manufacturer and net of any discounts, rebates, and incentives." §1812.622(k).

The multiplier used to determine the statutory maximum depends on the type of merchandise at issue and whether the item is new or used. For new items, the maximum Cash Price for "computer systems and appliances" is 1.65 times the Lessor's Cost; for "electronic sets," it is 1.7 times the Lessor's Cost; for "automotive accessories, furniture, jewelry, and musical instruments," the maximum Cash Price is 1.9 times the Lessor's Cost; and for "all other items," it is 1.65 times the Lessor's Cost. §1812.644(b). The maximum Total of Payments that can be charged for a new item is 2.25 times the maximum Cash Price. §1812.644(c).

A similar pricing structure applies to used merchandise. The Total of Payments for used merchandise is limited to the maximum Total of Payments permitted for a first rental of the item when new (as determined by §1812.644(c)) *minus* (1) for appliances and electronic sets, one-third of the amount of all rental payments paid to the lessor by consumers who previously rented that item, or (2) for furniture, computer systems, and all other items, one-half of the amount of all rental payments paid to the lessor by consumers who previously rented that item. §1812.644(d). For used items, the maximum Cash Price is the maximum Total of Payments permitted under §1812.644(d) divided by 2.25. §1812.644(e).

The maximum Cash Price and the maximum Total of Payments are thus multiples of the Lessor's Cost. The practical implication is that the more money a rent-to-own company can allocate to its Lessor's Cost, the more it can charge as the Cash Price and the Total of Payments.

Every rental-purchase agreement must disclose the Cash Price and Total of Payments applicable to the agreement. §1812.623(a)(4)-(5). It is a violation of the Karnette Act for a rental-purchase agreement to state a Cash Price that exceeds the statutory maximum Cash Price computed in accordance with §1812.644, or to state a Total of Payments that exceeds the statutory maximum Total of Payments computed in accordance with §1812.644. §1812.624(a)(17), (18).

### C. Summary of the Disputes in This Case

#### 1. Whether RAC's Rental-Purchase Agreements State a Cash Price and/or a Total of Payments That Exceed a Statutory Maximum

Plaintiffs contend that RAC violated the Karnette Act's pricing limitations with respect to its rental-purchase agreements ("RPAs") in two principal respects.

First, although the Karnette Act defines "Lessor's Cost" as including the "*actual* freight charges" for delivery of the rental property "*to* the lessor *from* a wholesaler, distributor, supplier, or manufacturer," §1812.622(k) (emphasis added), RAC includes amounts that are neither the "actual" amount of a freight charge nor the cost of transporting merchandise "to" RAC "from" a wholesaler, distributor, supplier, or manufacturer. Instead, RAC includes estimated or projected expenses associated with the intra-company shipment of items from a warehouse or other distribution facility, *after* RAC has already taken title to the merchandise, to RAC's retail stores.

RAC shipped some items to its retail stores through a wholly-owned subsidiary, RAC National Product Services, LLC ("NPS"). Dostart Decl. Ex. 3 at 11 (Pope depo. 54:4-22). As to most new items that NPS shipped from a warehouse to a RAC retail location, RAC added to its "Purchase Cost" a standard "up-charge" of $23.49 per item. *Id*. Ex. 3 at 12-16 (Pope depo. 79:23 – 80:23; 111:1 – 113:11). RAC also hired a logistics contractor, NFI, Inc. ("NFI") to handle shipment of some items from a warehouse to RAC's retail locations. *Id*. Ex. 3 at 17 (Pope depo. 121:1-24). As to those items, RAC "allocated" anticipated costs with the goal of recouping (on a nationwide basis) all payments made to NFI under the logistics contract. *Id*. Ex. 4 at 22-29 (Parks depo. 104:6 – 111:3). Whether shipped by NPS or NFI, RAC owns all of the merchandise during the entire time of course of transit, having already taken title (*id*. Ex. 5 at 43-44 (Glasky depo. 63:25 – 64:20). Nevertheless, when computing its "Purchase Cost" or "store-landed cost" (the terms RAC uses instead of the statutory term, "Lessor's Cost"), RAC includes an "up-charge" for shipping those items to itself. *Id*. Ex. 6 at 50-52 (Cross depo. 64:18 – 66:10 (explaining that Column W of the RAC transaction database, entitled "Purchase Cost," includes transfer up-charges); 67:11 – 68:6 ("store landed cost" is the "fully-loaded cost," which includes transfer upcharges)). Other than the invoice price paid to the manufacturer or supplier of the merchandise,

"up-charges" (also often referred to as "Cost Per Unit," or "CPU") associated with intra-company transfers are the only additional costs included within RAC's "Purchase Cost" data. *Id*. Ex. 6 at 53-54 (Cross depo. 67:19 – 68:7).

Plaintiffs contend that RAC's up-charge/CPU amounts may not lawfully be included in its Lessor's Cost (as defined in the Karnette Act) when calculating the maximum Cash Price and maximum Total of Payments that can be charged to a consumer. RAC disagrees. This presents a common issue that will drive the resolution of class members' claims.

Second, while the Karnette Act defines "Lessor's Cost" as "net of any discounts, rebates, and incentives," §1812.622(k), RAC does not fully subtract all discounts, rebates, and incentives. In some instances, RAC becomes entitled to take a discount, rebate, or incentive from its invoice cost after the merchandise has been shipped from a warehouse to a RAC retail location. Dostart Decl. Ex. 7 at 62-69 (Holihan depo. 81:19 – 83:5; 83:16 – 88:1). When that occurs, RAC generally does not reduce its "Purchase Cost" to reflect the discount, rebate, or incentive it has received. *Ibid*. That, too, results in an inflated computation of the maximum Cash Price and the maximum Total of Payments for the subject merchandise.

Separate and apart from pricing violations rooted in transfer up-charges or unrecognized discounts, rebates, or incentives, the RAC transaction database discloses many transactions for which RAC's pricing appears to violate the Karnette Act, even using RAC's stated "Purchase Cost" data. Declaration of David Breshears ("Breshears Decl.") ¶13.

As described in more detail below, among other data, RAC has produced a transaction database that includes information relating to all transactions during the class period. An excerpt of the transaction database, showing only information relating to transactions of the proposed class representatives as discussed herein, is submitted with the Dostart Declaration as Exhibit 2.

### 2. Whether RAC is Required to Include in a "Single Document" All Agreements With Respect to All Rights and Obligations

The Karnette Act requires that "[e]very rental-purchase agreement shall be contained in a single document which shall set forth all of the agreements of the lessor and the consumer with respect to the rights and obligations of each party." §1812.623(a). Plaintiffs contend that RAC

violated this provision by requiring plaintiff Blair and many other putative class members to sign separate RPAs and arbitration agreements that were not set forth in a single document. Whether that practice violates the Karnette Act presents another common issue.

### 3. Whether RAC Properly Discloses All Merchandise as "New" or "Used"

The Karnette Act requires each RPA to state "[w]hether the property subject to the rental-purchase agreement is new or used." §1812.623(a)(2). In some instances, RAC's transaction database identifies an item as "new" even though that database shows that RAC previously received rental income for that particular item. Breshears Decl. ¶14. The legality of that practice also raises a common issue.

## III. STATEMENT OF FACTS

### A. Plaintiffs' Rental Purchase Agreements with Rent-A-Center

#### 1. Paula Blair

On July 27, 2015, plaintiff Blair entered into a RPA with RAC for a General Electric AEM10AT Window Air Conditioner, an "appliance" within the meaning of §1812.622(h). Declaration of Paula Blair ("Blair Decl.") Ex. 1 ("Blair 2015 Rental Agreement"). RAC's transaction database reflects that RAC's "Purchase Cost" for that air conditioner was $259.43. Dostart Decl. Ex. 2. However, that amount includes what plaintiffs contend is an improper up-charge of $23.49 for the item to be shipped from the RAC warehouse to the RAC store where Blair obtained it. *Id*. Ex. 8; *id*. Ex. 5 at 39-42 (Glasky depo. 59:4 – 62:20); *id*. Ex. 3 at 12-16 (Pope depo. 79:23 – 80:23; 111:1 – 113:11). (In addition to the sources cited here, the amount of each transfer upcharge/CPU for the proposed class representatives and for putative class members can be ascertained from databases that RAC produced on May 4, 2018. *See* Breshears Decl. ¶¶16-19, Dostart Decl. Exs. 15-17.) Accordingly, plaintiffs contend the actual Lessor's Cost of the air conditioner for purposes of the Karnette Act was $235.94 ($259.43 - $23.49), Civ. Code §1812.622(k), which comports with the unit price of $235.94 reflected in RAC's purchase order database. *Id*. Ex. 8. Using $235.94 as the true Lessor's Cost, the statutory maximum Cash Price for the air conditioner was $389.30 (1.65 x $235.94), Civ. Code §1812.644(b) (1.65 multiplier for "appliances"), and the statutory maximum Total of Payments was $875.93 (2.25 x $389.30), Civ.

Code §1812.644(c) (maximum Total of Payments is 2.25 times maximum Cash Price). Accordingly, RAC's stated Cash Price ($428.05) exceeded the statutory maximum Cash Price ($389.30) by $38.75, and RAC's stated Total of Payments ($951.66) exceeded the statutory maximum Total of Payments ($875.93) by $75.73.

On or about March 11, 2016, Blair entered into an RPA for a used Microsoft Xbox, an "electronic set" within the meaning of §1812.622(i). Blair Decl. Ex. 3 ("Blair 2016 Rental Agreement"). RAC's transaction database reflects that RAC's "Purchase Cost" for that item was $348.20. Dostart Decl. Ex. 2. However, RAC's purchase order database reflects that the unit cost from the supplier was $331.00, *id*. Ex. 9, to which RAC added a transfer up-charge of $17.20, *id*. Ex. 10. Accordingly, plaintiffs contend the actual Lessor's Cost was $331.00. Civ. Code §1812.622(k). Using $331.00 as the Lessor's Cost, the statutory maximum Cash Price for the Xbox was $562.70 (1.7 x $331.00) and the statutory maximum Total of Payments was $1,266.07 (2.25 x $562.70). Thus, RAC's stated Total of Payments ($1,299.48) exceeded the statutory maximum Total of Payments by $33.41.

### 2. Andrea Robinson

On April 28, 2015, plaintiff Robinson entered into an RPA for a 5-month-old used 65" Toshiba Television (Model 65L5400U), an "electronic set" within the meaning of §1812.622(i). Declaration of Andrea Robinson ("Robinson Decl.") Ex. 1 ("Robinson 2015 Rental Agreement"). According to RAC's transactions database, RAC's "Purchase Cost" for that television was $963.49. Dostart Decl. Ex. 2. However, RAC's purchase order database reflects that the unit cost for that television was $940.00, *id*. Ex. 11, to which RAC added a transfer up-charge of $23.49. As noted above, the television was a *used* item, and RAC's transactions database reflects that RAC had received previous rental payments for that television of $159.93, *id*. Ex. 2, which required RAC to reduce the permissible Total of Payments by $53.31. Applying the Karnette Act's formula for used merchandise, the statutory maximum Total of Payments was $436.44 [($940 x 1.7 x 2.25) = $3,595.50 if new, less credit of $53.31 = $3,542.19], and the maximum Cash Price was $1,574.30 ($3,542.19 ÷ 2.25). Thus, RAC's stated Total of Payments of $3,478.84 (Robinson Decl. Ex. 1) was within the statutory limit, but RAC's stated Cash Price of

1  $1,614.25 exceeded the statutory maximum Cash Price by $39.95.

2        **3.**      **Falechia Harris**

3        On October 17, 2015, plaintiff Harris entered into an RPA for two televisions: a 32" LG

4  Television (Model 32LF500B) and a 55" LG Television (Model 55LF6100), each of which

5  constitutes an "electronic set" within the meaning of §1812.622(i).  Declaration of Falechia Harris

6  ("Harris Decl.") Ex. 1 ("Harris 2015 Rental Agreement").  According to RAC's transactions

7  database, RAC's total "Purchase Cost" for Harris' televisions was $744.05 ($214.13 for the 32"

8  television and $529.92 for the 55" television).  Dostart Decl. Ex. 2.  However, RAC's purchase

9  order database reflects that the unit cost from the supplier was $189.47 for the 32" television, *id*.

10  Ex. 12 and $505.26 for the 55" television, *id*. Ex. 13.  To those amounts RAC added a transfer up-

11  charge of $24.66 for each item.  *See* Dostart Decl. Ex. 6 at 53-54 (Cross depo. 67:19 – 68:7) (the

12  only additional costs included in "Purchase Cost" data are for intra-company transfers).  Without

13  those up-charges, the two televisions combined had a Lessor's Cost of $694.73, so the statutory

14  maximum Cash Price was $1,181.04 (1.7 x $694.73), and the statutory maximum Total of

15  Payments was $2,657.34.  In comparison, RAC's stated Cash Price for the combined televisions

16  was $1,237.26 (which exceeded the statutory maximum by $56.22), and RAC's stated Total of

17  Payments was $2,819.06 (which exceeded the statutory maximum by $161.72).

18        **4.**      **Celinda Garza**

19        On March 30, 2016, Celinda Garza entered into an RPA for a Frigidaire refrigerator

20  (Model FFSS2314QE), an "appliance" within the meaning of §1812.622(i).  Declaration of

21  Celinda Garza ("Garza Decl.") Ex. 1 ("Garza 2016 Rental Agreement").  According to RAC's

22  transactions database, its "Purchase Cost" for Garza's refrigerator was $787.48.  Dostart Decl.

23  Ex. 2.  However, this amount includes a transfer up-charge of $92.48, *id*. Ex. 14, so the actual

24  Lessor's Cost was $695.00.  Using that figure, the statutory maximum Cash Price was $1,146.75

25  (1.65 x $695.00), and the statutory maximum Total of Payments was $2,580.19.  In comparison,

26  RAC's stated Cash Price (Garza Decl. Ex. 1) was $1,299.34 (which exceeded the statutory

27  maximum by $152.59), and RAC's stated Total of Payments was $2,807.22 (which exceeded the

28  statutory maximum by $227.03).

Ms. Garza, a putative class member, is requesting to be appointed as a class representative. Rule 23 does not require that a class representative be a named plaintiff. *See In re Telectronics Pacing Sys.*, 172 F.R.D. 271, 283 (S.D. Ohio 1997). In any event, Ms. Garza is willing to be added as a named plaintiff in addition to being a class representative. Garza Decl. ¶ 9.

**B.    Procedural History**

On March 13, 2017, Blair filed this case as a class action in Alameda County Superior Court. RAC removed the case on April 25, 2017, pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d). Dkt. 1. After an initial amendment, Dkt. 16, plaintiffs filed a Second Amended Complaint ("2AC"), adding Robinson and Harris as named plaintiffs. Dkt. 43.

In the 2AC, plaintiffs alleged that RAC violated the Karnette Act, CLRA, UCL and state usury laws by charging more than the statutory maximum Cash Price and/or Total of Payments, and by failing to set out all terms of the parties' agreements in a single document. Dkt. 43 ¶¶85-86, 90-95, 105-08. Plaintiffs sought a public injunction on behalf of the People of the State of California to enjoin future statutory violations and to require RAC to provide an accounting of monies obtained from California consumers and individualized notice to those consumers of their statutory rights. *Id.* ¶¶94, 101, 108. Plaintiffs also sought declaratory relief, compensatory damages and restitution, and attorneys' fees and costs.

RAC moved to compel plaintiff Blair to individually arbitrate her claims arising from her 2015 transaction. Dkt. 22. The Court denied the motion, ruling that *McGill v. Citibank*, 2 Cal.5th 945, 962 (2017), precludes the enforcement of any agreement that purports to prohibit individuals from pursuing claims for public injunctive relief, because doing so would "seriously compromise the public purposes [the laws] were intended to serve." Dkt. 82 at 3 (quoting *McGill*, 2 Cal.5th at 962). The Court ruled that *McGill* controlled Blair's 2015 Karnette Act, CLRA, and UCL claims, all of which sought public injunctive relief, but not her 2015 usury claim, which the Court held could not support a public injunction. *Id.* at 3-10.

Initially, the Court also struck Blair's class action allegations, based on the second sentence in Paragraph D of RAC's arbitration agreement, entitled "Requirement of Individual Arbitration." The first sentence of Paragraph D provides "[y]ou and RAC agree that arbitration

shall be conducted on an individual basis, and that neither you nor RAC may seek, nor may the Arbitrator award, relief that would affect RAC account holders other than you." Dkt. 22-1 ¶D. The second sentence, which the Court originally relied upon to strike Blair's class action allegations, provides, "[t]here will be no right or authority for any dispute to be brought, heard, or arbitrated as a class, collective, mass, private attorney general, or representative action." Dkt. 22-1 ¶D; Dkt. 62 at 10. Plaintiffs sought leave to pursue reconsideration, Dkt. 70, based on language in the arbitration agreement establishing that procedural limitations imposed by the arbitration agreement were intended to apply only in the context of arbitration, not to claims properly litigated in court. Dkt. 70 at 6-9. Plaintiffs also demonstrated that because the Federal Arbitration Act has no preemptive effect absent an enforceable arbitration agreement, if that second sentence were interpreted to apply outside the arbitration context, the resulting prohibition against class actions in court would be unenforceable under California law. *Id.* at 9-11. The Court then amended its prior order to remove the language striking Blair's class action claim, Dkt. 82, and ruled that "[i]ssues regarding class action claims will be decided at the class certification hearing." Dkt. 83.[1]

Plaintiffs now seek certification of a class comprising all individuals who, on or after March 13, 2013, entered into a rent-to-own transaction with Defendants in California, and a usury subclass of those for whose transactions RAC cannot produce a signed arbitration agreement.

---

[1] Should the Court determine that the second sentence of Paragraph D of RAC's standard arbitration agreement was intended to apply to disputes resolved outside of the arbitration context, and if the Court should further determine that that sentence is effective under California law to preclude signatories from pursuing class treatment for Karnette Act, CLRA, and/or UCL claims properly brought in court, it would still be appropriate for the Court to certify a subclass of consumers for whose transactions RAC is unable to produce a signed arbitration agreement. *See* Dkt. 54. The parties have stipulated that plaintiffs' subclass is sufficiently numerous for purposes of F.R.C.P. 23(a)(1). Dkt. 104; *see also Krzesniak v. Cendant Corp.*, No. C 05-5156, 2007 WL 1795703, at *7 (N.D. Cal. Jun. 30, 2007) ("Although there is no exact number, some courts have held that numerosity may be presumed when the class comprises forty or more members.").

IV.   **ARGUMENT**

    A.   **Legal Standard for Class Certification**

"Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits, and (2) to protect rights of persons who might not be able to present claims on an individual basis." *Negrete v. Allianz Life Ins. Co.*, 238 F.R.D. 482, 487 (C.D. Cal. 2006). A party seeking to certify a class must demonstrate that she has met the "four threshold requirements of Federal Rule of Procedure 23(a): (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation." *Levya*, 716 F.3d at 512. Once these four prerequisites are satisfied, a court must consider whether the proposed class can be maintained under at least one of the requirements of F.R.C.P. 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981, 983 n.8 (9th Cir. 2001).

    B.   **Plaintiffs' Proposed Class Satisfies All Rule 23(a) Requirements**

        1.   **Numerosity**

Numerosity exists if "the class is so numerous that joinder of all members is impracticable." F.R.C.P. 23(a)(1). Plaintiffs' proposed class is comprised of more than 338,000 California consumers. Dkt. 91-1 ¶2 (Cross Declaration). RAC has stipulated that plaintiffs' proposed usury subclass satisfies the numerosity element. Dkt. 104 ¶1.

        2.   **Commonality**

Commonality exists if "there are questions of law or fact common to the class," meaning "that the determination of [a question's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Abdullah v. U.S. Sec. Assoc., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (internal quotation marks omitted). "This does not, however, mean that *every* question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single *significant* question of law or fact." *Id.* (emphasis in original) (internal quotation marks omitted).

In this case, there are a number of common legal issues, including: (1) whether a lessor is allowed to include in its "Lessor's Cost" intra-company transfer charges that do not reflect an *actual* freight expense for shipping an item *to* the lessor *from* a wholesaler, distributor, supplier, or manufacturer; (2) whether a lessor is allowed to ignore discounts, rebates, or incentives that the lessor receives from a supplier or manufacturer after the merchandise has left the lessor's warehouse; (3) whether RAC's practice of presenting customers with an arbitration agreement separate from the RPA violates the requirement that "[e]very rental-purchase agreement shall be contained in a single document," §1812.623(a); and (4) what are the appropriate remedies, injunctive and otherwise, for the alleged violations. Plaintiffs' proposed usury subclass also presents common issues, including (1) whether RAC's rent-to-own transactions are a "loan or forbearance" within the meaning of Cal. Const. art. XV, sec. 1; (2) whether the "loan or forbearance" is "absolutely repayable by the borrower" under the terms of the RPA; and (3) whether RAC had a "willful intent" to enter into usurious transactions with class members. *See Ghirardo v. Antonioli*, 8 Cal.4th 791, 798 (1994) (describing elements).

### 3. Typicality

Typicality exists if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." F.R.C.P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiff[], and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quotations omitted).

Plaintiffs' claims, like the claims of absent class members, arise from RAC's common policies and practices. Plaintiffs contend that RAC charged each of them unlawfully high prices, in violation of the Karnette Act, the CLRA, the UCL, and California usury law. *Supra* at 2-9. RAC also violated the Karnette Act, the CLRA, and the UCL by failing to set forth all "rights and obligations of each party" in a single document. Blair Decl. Exs. 1-2. Because the factual and legal circumstances giving rise to class members' claims are substantially similar, the proposed

1  class representatives have sufficient incentive to pursue those claims on behalf of all class

2  members, and typicality is satisfied.

3      **4.      Adequacy of Representation**

4         Class representatives and class counsel are adequate if they "will fairly and adequately

5  protect the interests of the class." F.R.C.P. 23(a)(4). This standard is met if the representatives

6  "have [no] conflicts of interest with other class members" and will "prosecute the action

7  vigorously on behalf of the class." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

8         The proposed class representatives have the same types of interests and suffered the same

9  types of injury as other class members, and none have conflicts of interest. Blair Decl. ¶¶25-26;

10  Robinson Decl. ¶¶15-16; Harris Decl. ¶¶16-17; Garza Decl. ¶¶18-19. In addition, the proposed

11  class representatives have already provided valuable assistance in the investigation and

12  prosecution of this matter. Blair Decl. ¶¶18-22; Robinson Decl. ¶¶8-12; Harris Decl. ¶¶8-13;

13  Garza Decl. ¶¶10-15. Each understands the responsibilities of a class representative and has

14  committed to putting the interests of the class ahead of her own personal interests. Blair Decl.

15  ¶¶24, 26; Robinson Decl. ¶¶14, 16; Harris Decl. ¶¶15, 17; Garza Decl. ¶¶17, 19. They are

16  adequate class representatives within the meaning of Rule 23(a)(4), as are plaintiffs' counsel who

17  have extensive experience in class action litigation and have vigorously pursued these claims from

18  the outset. Rubin Decl. ¶¶3, 5; Dostart Decl. ¶¶19-20.

19      **C.     Certification is Appropriate under Rule 23(b)**

20         Class certification is appropriate under all three of the alternative Rule 23(b) prongs.

21      **1.      A Class Should Be Certified Under Rule 23(b)(3) Because Common
           Questions Predominate Over Any Individual Issues and Class

22             Treatment is Superior to Individual Adjudications**

23         "To qualify for certification under [Rule 23(b)(3)], a class must satisfy two conditions in

24  addition to the Rule 23(a) prerequisites: common questions must 'predominate over any questions

25  affecting only individual members,' and class resolution must be 'superior to other available

26  methods for the fair and efficient adjudication of the controversy.'" *Hanlon v. Chrysler Corp.*,

27  150 F.3d 1011, 1022 (9th Cir. 1998) (quoting F.R.C.P. 23(b)(3)). The predominance inquiry

28  "tests whether proposed classes are sufficiently cohesive to warrant adjudication by

1 representation," and focuses on the "relationship between the common and individual issues." *Id.*

2 (quotation marks and citation omitted).

3 "When common questions present a significant aspect of the case and they can be resolved

4 for all members of the class in a single adjudication, there is clear justification for handling the

5 dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022. That

6 some class members may have been injured to different degrees, or that others may not have been

7 injured at all, does not defeat certification. *See Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125,

8 1136 (9th Cir. 2016) ("[E]ven a well-defined class may inevitably contain some individuals who

9 have suffered no harm as a result of a defendant's unlawful conduct."); *Leyva*, 716 F.3d 510, 513

10 (9th Cir. 2013) ("In this circuit, however, damage calculations alone cannot defeat certification.").

11 **(a)     The Karnette Act pricing claims**

12 Plaintiffs' Karnette Act claims are particularly well-suited for class treatment. With

13 respect to their core claim that RAC violated (and continues to violate) the statutory price caps,

14 liability will be established through mathematical calculations using statutory formulae and RAC's

15 records. The calculation of those statutory maximums rests on four readily identified variables:

16 the Lessor's Cost, the category of the item (e.g., furniture, computer, appliance), whether the item

17 is new or used and, if used, the prior rental income RAC received.

18 The Act requires RAC to maintain this information, §1812.644(a), and RAC, in response

19 to this Court's order requiring it to "produce transactional data for rent-to-own transactions within

20 California during the purported class period . . . sufficient to calculate the formulas under the

21 Karnette Act (e.g., maximum cash price and maximum total of payments, etc.)," Dkt. 80, produced

22 a database setting forth information on each of more than one million items of merchandise sold or

23 leased to approximately 338,000 California consumers during the class period. Dkt. 91-1 ¶2. That

24 database includes, *inter alia*: name and contact information of the lessee; date of the RPA; term

25 and monthly rate; Total of Payments; Cash Price; serial number, brand, model, and description of

26 the item of merchandise; category of each item for purposes of determining the Karnette Act's

27 applicable multiplier; amount RAC contends is its "Purchase Cost"; and whether the item was new

28

1  or used and, if used, the previous rental payments for the item.  Dkt. 91-1 ¶2; Breshears Decl. ¶¶5-

2  10; *see also* Dostart Decl. Ex. 2.

3       If the Court agrees with plaintiffs that RAC may not include up-charges for intra-company

4  transfers in its Lessor's Cost (because intra-company transfers are not "to" the lessor "from" a

5  manufacturer or supplier, and because such amounts were not "actual" freight charges), those up-

6  charge amounts can be deducted from RAC's reported "Purchase Cost" in order to arrive at the

7  Lessor's Cost within the meaning of the Karnette Act.

8       The calculations are straightforward for new items shipped to RAC retail locations by

9  NPS, because for that merchandise RAC generally added a fixed up-charge of $23.49 per item.

10  Dostart Decl. Ex. 5 at 45-46 (Glasky depo. 144:22-145-15).  RAC recently produced a database

11  that includes more than 37,000 rows identifying all items shipped by NPS to California during the

12  class period, together with the corresponding up-charge/CPU amount.  Dostart Decl. ¶16 and Ex.

13  15 at 86 (excerpt of NPS database).  The calculations are also straightforward for items shipped to

14  RAC retail locations by NFI, because for those items RAC recently produced data showing the

15  dollar amount of the up-charge/CPU to be allocated to each item during the class period.  Dostart

16  Decl. ¶¶ 17-18, Ex. 16 (summary table of CPU allocations prepared by Mr. Parks), Ex. 17 at 90

17  (excerpt of NFI database); *see also id*. Ex. 4 at 32-34 (Parks depo. 149:8 – 151:2).  These NPS and

18  NFI databases can be used to identify and quantify any up-charge/CPU that RAC allocated to each

19  item of merchandise.  Breshears Decl. ¶¶15-19.  Backing out those amounts from RAC's Purchase

20  Cost data would produce figures more in line with the statutory definition of Lessor's Cost.

21  Because all class members' claims can be adjudicated using a "common method of proof," *Etter*,

22  323 F.R.D. at 313, this case is well-suited for class treatment.  *See Leyva*, 716 F.3d at 514.

23       Similarly, if the Court agrees with plaintiffs that RAC must reduce its "Purchase Cost" to

24  take into account each discount, rebate, and incentive, regardless of when RAC becomes entitled

25  to it and regardless of whether the merchandise has left the warehouse, those adjustments can be

26  made.  RAC has produced records identifying all discounts, rebates, or incentives during the class

27  period, including which discounts, rebates, or incentives were (or were not) already taken into

28  account, together with identification of the particular items of merchandise.  Dostart Decl. Ex. 7 at

15

60-61; 70-71 (Holihan depo. 10:20 – 11:19; 121:16 – 122:7).

The Court has already rejected RAC's attempt to compel Blair's 2015 Karnette Act claim to arbitration. Dkt. 82. Because other putative class members signed either the same arbitration agreement or no arbitration agreement at all, the scope and availability of public injunctive relief on plaintiffs' claims is a predominating class issue. Relatedly, to the extent RAC disputes that it bears the burden of establishing which putative class members have arbitration agreements (having conceded that four of the five transactions of the proposed class representatives are not covered by an arbitration agreement and that many other customers also have no locatable arbitration agreement), this burden-of-proof issue also predominates. *See Etter v. Allstate Ins. Co.*, 323 F.R.D. 308, 315 (N.D. Cal. 2017) ("[I]nsofar as defendants are the ones responsible for the absence of more detailed records . . . , they should not benefit from their poor recordkeeping by dodging a class action on that basis.") (Alsup, J.).

The Court will be presented with common questions of statutory interpretation that predominate as well. *See Preap v. Johnson*, 303 F.R.D. 566, 585 (N.D. Cal. 2014); *Ortega*, 258 F.R.D. at 368-70. These include whether the Karnette Act allows intra-company transfer costs to be included in "Lessor's Cost." §1812.622(k). The remedial issues in this case also predominate, including what the scope of any injunctive relief should be and how to calculate monetary damages and restitution. *See Nozzi v. Hous. Auth. of L.A.*, No. CV 07-380, 2016 WL 2647677, at *3 (C.D. Cal. May 6, 2016); *In re NCAA I-A Walk-on Football Players Litig.*, 2006 WL 1207915, at *5 (W.D. Wash. May 3, 2006); Newberg on Class Actions §3:27 (5th ed. 2013).

### (b) The "single document" claim

Common issues also predominate with respect to the significance of RAC failing to present all rights and obligations "in a single document." §1812.623(a). Plaintiffs contend that RAC's form RPA and arbitration agreement are two different documents, not a "single document" for purposes of the Act. RAC apparently contends that the two separate documents are somehow treated as a single document (even though for some class members, RAC cannot even find an arbitration agreement). Because the RPAs and arbitration agreement are form documents, identical from one customer to the next except for the transaction details, the Court need only

1  review exemplars of each to determine whether they constitute a "single document."  No

2  individualized inquiry is necessary.  *Abdullah*, 731 F.3d at 957.

3              (c)       **The CLRA and UCL claims**

4       Plaintiffs' CLRA and UCL claims are largely derivative of their Karnette Act claims.

5  Because these claims are derivative, they present the same predominant common questions and

6  should also be certified.  *See, e.g.*, *Mendez v. R&L Carriers, Inc.*, No. C 11-2478, 2012 WL

7  5868973, at *18 (N.D. Cal. Nov. 19, 2012) (certifying derivative claims where underlying claims

8  are suitable for certification); *In re Autozone, Inc.*, 289 F.R.D. 526, 529 n.4 (N.D. Cal. 2012).

9       The CLRA's "underlying purpose[]" is "to protect consumers against unfair and deceptive

10  business practices and to provide efficient and economical procedures to secure such protection."

11  Civ. Code §1760.  The CLRA is to be "liberally construed" to promote those purposes.  *Id.*

12  Plaintiffs have alleged that RAC's challenged practices violate the CLRA in two ways.  First, as

13  this Court has already held, Dkt. 82, RAC's arbitration agreement violates *McGill*, 2 Cal.5th 945,

14  because it prohibits the arbitrator from awarding any relief that would affect other RAC account

15  holders, thus forcing customers to forfeit their right to pursue public injunctive relief in any forum,

16  judicial or arbitral.  That same provision also violates §1770(a)(4), which prohibits "[r]epresenting

17  that a transaction confers or involves rights, remedies, or obligations that it does not have or

18  involve, or that are prohibited by law."  Second, because RAC's prices violate the Karnette Act,

19  they are necessarily unconscionable.  *See Ontiveros v. DHL Exp., Inc.*, 164 Cal.App.4th 494, 510

20  (2008), *recognized as abrogated on other grounds by Tiri v. Lucky Chances, Inc.*, 226 Cal.App.4th

21  231, 248-49 (2014).  Accordingly, RAC's unlawful prices also violate the CLRA, which prohibits

22  "[i]nserting an unconscionable provision in the contract."  Civ. Code §1771(a)(19).

23       The UCL is violated whenever a defendant's conduct is: "(1) unlawful; (2) unfair;

24  (3) fraudulent; or (4) false advertising."  *Campion v. Old Republic Home Protection Co., Inc.*, 272

25  F.R.D. 517, 532 (S.D. Cal. 2011).  "Each prong of the UCL is a separate and distinct theory of

26  liability."  *Id.*  For purposes of the "unlawful" prong, the UCL "borrows violations of other laws

27  and treats them as unlawful practices that the unfair competition law makes independently

28  actionable."  *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1177 (9th Cir. 2016) (quoting *Cal-Tech*

17

*Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163 (1999)). RAC's practices are unlawful in each of the ways described above. Because the UCL claim is derivative, it is suitable for certification, like the underlying Karnette Act claims.

### (d) The subclass members' usury claim

The Court should also certify a Rule 23(b)(3) subclass comprised of those consumers for whose transactions RAC is unable to produce a signed arbitration agreement. California Constitution Art. XV §1 provides that "no corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action." For items that "are for use primarily for personal, family, or household purposes," the maximum permissible interest rate is 10%. *Id.*

"The essential elements of usury are: (1) The transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction." *Ghirardo*, 8 Cal.4th at 798. Common questions predominate with respect to plaintiffs' usury claims, including (1) whether RAC's rent-to-own transactions are a "loan or forbearance" within the meaning of Art. XV, §1; (2) whether the "loan or forbearance" is "absolutely repayable by the borrower" under the RPA; and (3) whether RAC had a "willful intent" to enter into usurious transactions with class members. Whether particular transactions violate the 10% maximum can be determined by querying the RAC database to establish whether the total dollar amount received in rental payments exceeds the Lessor's Cost, Cash Price, or other appropriate benchmark by more than 10% compounded over the term of the RPA.

### (e) Class treatment is superior to individual adjudications

The final requirement of Rule 23(b)(3) is that plaintiffs must demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin*, 617 F.3d at 1175 (internal quotation marks omitted). Here, that is plainly the case.

Each Rule 23(b)(3) superiority factor supports certification. Plaintiffs' core Karnette Act claim can efficiently be adjudicated using common proof. *See supra* at 14-15. There should be no particular "difficulties in managing" this case as a class action. F.R.C.P. 23(b)(3)(D). Plaintiffs are not aware of other pending actions addressing these issues, F.R.C.P. 23(b)(3)(B). And there is no better forum than this Court to hear plaintiffs' claims, F.R.C.P. 23(b)(3)(C).

The "class members' interests in individually controlling the prosecution or defense of separate actions," F.R.C.P. 23(b)(3)(A), also weighs in favor of certification. Here, the damages recoverable by any particular class member are relatively small, and it would be nearly impossible for most class members to retain counsel and pursue their claims on an individual basis—even if they knew about their Karnette Act rights and were able to evaluate potential violations. "Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Wolin,* 617 F.3d at 1175. This is surely the case here, where class members obtained items through rent-to-own transactions precisely because they are not people of means. If class members were required to proceed individually or not at all, RAC would be largely immunized from the consequences of its unlawful practices.

### 2. A Class Should Be Certified for Injunctive Relief Under Rule 23(b)(2)

A class may be certified under Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." F.R.C.P. 23(b)(2). "Unlike Rule 23(b)(3), a plaintiff does not need to show predominance of common issues or superiority of class adjudication to certify a Rule 23(b)(2) class. Rather, '[i]t is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate.'" *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 598 (N.D. Cal. 2015) (quoting *Walters v. Reno,* 145 F.3d 1032, 1047 (9th Cir. 1998)). Moreover, "questions of manageability and judicial economy are . . . irrelevant to 23(b)(2) class actions." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010).

"Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Zinser v. Accufix Research Instit., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001). Nonetheless, "[a] class seeking monetary damages may be certified pursuant to Rule 23(b)(2) where such relief is 'merely incidental to [the] primary claim for injunctive relief.'" *Id.* (quoting *Probe v. State Teachers' Retirement Sys.*, 780 F.2d 776, 780 (9th Cir. 1986)).

Here, plaintiffs seek a public injunction on their Karnette Act, CLRA, and UCL claims on behalf of the people of the State of California that would, among other things: (1) enjoin RAC from committing future violations, (2) require RAC to provide an accounting of all monies obtained from California consumers under RPAs entered into in violation of the Karnette Act or the CLRA, (3) require RAC to provide individualized notice of statutory rights to all consumers who entered into such contracts with RAC in California during the applicable limitations period (including their right to restitution of all monies paid to RAC, while being permitted to keep the merchandise they rented), (4) require RAC to provide individualized notice to each such customer of the procedures available for enforcing that customer's rights under the Karnette Act and CLRA, and (5) establish an effective monitoring mechanism to ensure RAC's continued compliance with the terms of the injunction. Dkt. 43 ¶¶89, 96, 110.

Rule 23(b)(2) certification is appropriate because plaintiffs challenge a "pattern or practice that is generally applicable to the class as a whole." *Walters*, 145 F.3d at 1047. Plaintiffs challenge RAC's business practices that result in systematic violations of the Act's pricing and single document requirements. The declaratory and injunctive relief plaintiffs seek for these violations is "appropriate respecting the class as a whole."[2] F.R.C.P. 23(b)(2).

---

[2] Plaintiffs do not argue that the monetary damages they seek are "incidental" to their request for injunctive and declaratory relief. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 987 (9th Cir. 2011). Nonetheless, should the Court decline to certify plaintiffs' proposed class under Rule 23(b)(3), or even if it does certify a Rule 23(b)(3) class, the Court should also certify a Rule 23(b)(2) class for the purpose of seeking declaratory and injunctive relief for the same violations. *See, e.g.*, *I.B. by and through Bohannon v. Facebook, Inc.*, 82 F.Supp.3d 1115, 1132-33 (N.D. Cal. 2015); *Jones v. ConAgra Foods, Inc.*, No. C 12-1633, 2014 WL 2702726, at *12 (N.D. Cal. Jun. 13, 2014).

**D.** **The Procedural Limitations in RAC's Arbitration Agreement Were Not Intended to Apply Outside of the Arbitration Context, and Any Prohibition on Pursuing This Class Action in Court Would Be Unenforceable**

The Court previously reserved the question of whether the second sentence of Paragraph D of RAC's Arbitration Agreement was intended to prohibit class actions in court, and if so, whether such a provision would be enforceable in this case. That prohibition, set forth not in the RPA but in RAC's "Consumer Arbitration Agreement," states:

> **(D) Requirement of *Individual Arbitration*:** You and RAC agree that *arbitration shall be conducted on an individual basis*, and that neither you you nor RAC may seek, *nor may the Arbitrator award*, relief that would affect RAC account holders other than you. There will be *no right or authority for any dispute* to be brought, heard, or arbitrated *as a class*, collective, mass, private attorney general, or representative *action. Nor shall the Arbitrator have any authority* to hear or preside *over any such dispute or to join or consolidate arbitrations* involving more than one consumer unless RAC and the affected consumers all agree in writing. . . . Regardless of anything else in your Consumer Contract, this Agreement, or the arbitration provider's rules or procedures, the interpretation, applicability, and enforceability of this Paragraph, including, but not limited to, any claim that all or part of this Paragraph is void or voidable, may be determined only by a court. Any such court challenge shall be governed by the law of the customer's mailing address at the time the dispute arises, but only to the extent permitted and not preempted by the FAA or other federal law. *If there is a final judicial determination that applicable law precludes enforcement of this Paragraph's limitations as to a particular claim for relief, then that claim (and only that claim) must be severed from the arbitration and may be brought in court.*

Dkt. 22-1 at 11 (italics added).

This paragraph does not preclude certification of plaintiffs' claims for relief in court. By its own terms, the stated prohibition applies only to arbitration proceedings and to the authority of the Arbitrator. Moreover, because this Court has already made "a final determination that applicable law precludes enforcement of this Paragraph's limitations as to [plaintiffs' Karnette Act, CLRA, and UCL] claim[s] for relief," the Agreement *requires* those claims to be "brought in court"—where any class action prohibition would be unenforceable under California law.

**1.** **By Its Terms, The Second Sentence of Paragraph D Does Not Apply to Court Proceedings**

California contracts must be construed under the well-settled principles of Civ. Code. §1635 *et seq.* Those principles weigh heavily in favor of construing the class action prohibition in Paragraph D to be limited *only* to claims to be resolved in arbitration.

RAC's class action prohibition is contained in a document entitled "Consumer *Arbitration* Agreement." Dkt. 22-1 at 10 (italics added). Paragraph K of that Agreement states that "[t]his is the complete Agreement of the parties *on the subject of arbitration of claims or disputes.*" *Id.* at 13. Had the parties intended that prohibition to apply to claims that were *not* subject to arbitration, they would have included it in RAC's RPA or some other document.

Not only is RAC's prohibition set forth in its Consumer *Arbitration* Agreement, but it is presented in the paragraph entitled "**Requirement of Individual *Arbitration*,**" where it is surrounded by at least four other provisions that can *only* apply to arbitration proceedings. Dkt. 22-1 at 11 (italics added, bold in original). The first sentence of Paragraph D states that "*arbitration* shall be conducted on an individual basis …." *Id.* (emphasis added). The second sentence, which RAC relies upon for its reference to "any dispute," must be read in conjunction with the very next sentence, which limits "the Arbitrator['s] authority to hear or preside over *any such* dispute," meaning any group action dispute in arbitration. *Id.* (emphasis added). There is no similar limitation on *judicial* authority to preside over class cases.

The restrictions imposed by the fourth sentence are also limited to arbitrations. It provides that "*the Arbitrator* shall be bound by rulings in prior arbitrations involving the same customer," and that "*the Arbitrator* shall not be bound by rulings in prior arbitrations involving different customers." *Id.* (emphasis added). Reading Paragraph D in context and as a whole, there is no basis for concluding that the second sentence was intended to have any application outside the arbitration context. Civ. Code §1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."); *see also id.* §1650 ("Particular clauses of a contract are subordinate to its general intent."). Moreover, if RAC's construction were correct, Paragraph H would require that "[j]udicial review [of any order of the Court or arbitrator] be governed by the Federal Arbitration Act," Dkt. 22-1 at 13, an absurd and unlawful result. A similarly absurd result would occur if the prohibition against the arbitrator "join[ing] or consolidate[ing] arbitrations involving more than one consumer" applied to court actions, where joinder, consolidation, and class actions are commonplace and expressly authorized by the Federal Rules of Civil Procedure.

A valid waiver of the right to pursue non-waivable public law rights in court on a class action basis requires a far clearer expression of the parties' intent than the RAC Arbitration Agreement provides. Quite simply, nothing in that Agreement limits or restricts claims that it allows to be brought in court; and if RAC had intended the Arbitration Agreement to impose such limitations or restrictions, it could have done so clearly and unambiguously. As it is, the provision must be construed "most strongly" against RAC as the unilateral drafter of the form contract language. Civ. Code §1654; *see also Tahoe Nat'l Bank v. Phillips*, 4 Cal.3d 11, 20 (1971).

### 2. Class Action Prohibitions Are Unenforceable Outside the Arbitration Context

#### (a) The CLRA and Karnette Act forbid waiver of the right to pursue statutory claims on a class action basis

Even if the parties had intended RAC's Arbitration Agreement to prohibit class actions as to claims properly "brought in court," such a provision would be unenforceable. The Karnette Act and CLRA expressly prohibit pre-dispute agreements that force California consumers to forfeit the right to enforce statutory rights on a class or other group action basis.

A California consumer may "bring [a CLRA] action on behalf of himself *and such other consumers* to recover damages or obtain other relief as provided for in Section 1780" when "the unlawful method, act, or practice [at issue] has caused damage to other consumers similarly situated." Civ. Code §1751, 1781(a) (italics added.) This provision, together with the other provisions of §1781, entitles consumers to bring CLRA claims as a class and prohibits any pre-dispute waiver of that right. Specifically, Civil Code §1751 states, "Any waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void."

The Karnette Act similarly prohibits any provision by which the consumer waives, agrees to waive, or offers to waive "any defense, counterclaim, or *right* the consumer may have against the lessor, its agent, or its successor in interest" or "*any right* or remedy against the lessor, its agents, or its successors in interest for any violation of this title or any other illegal act." §1812.624(a)(4) & (a)(15) (emphasis added). Any such provision in an RPA "shall be void and unenforceable and a violation of this title." §1812(b). Thus, under California law, a consumer's pre-dispute waiver of her statutory right to enforce the Act through a class action is unenforceable.

1    RAC previously argued that California's statutory anti-waiver protections would be
2  preempted by the FAA if applied to require class *arbitration*.  It is true that the FAA preempts
3  California state law rules that disfavor arbitration.  But nothing in the FAA preempts state law
4  protections as applied to *judicial* proceedings; and this Court has already determined that
5  plaintiffs' Karnette Act, CLRA, and UCL claims will proceed in court, not arbitration (as should
6  the subclass members' usury claims).

7    In *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346-52 (2011), the Supreme Court
8  held that California's *Discover Bank* rule was preempted because class *arbitration* proceedings
9  conflict with the "fundamental attributes of arbitration," such as speed, informality and low cost.
10  563 U.S. at 344, 348-50.  No such conflict exists with respect to judicial proceedings (where there
11  is no obligation to protect any "fundamental attributes of arbitration" and where no principle of
12  FAA preemption applies).  Consequently, California's statutory prohibition against waiver of the
13  right to pursue Karnette Act and CLRA claims on a class action basis *in court* must be given
14  effect.  *See America Online, Inc. v. Superior Court*, 90 Cal.App.4th 1, 14-15 (2001) (declining to
15  enforce forum selection clause and choice of law clause, which would have been the functional
16  equivalent of a waiver of rights under the CLRA, including the right to file a class action); *Doe 1*
17  *v. AOL LLC*, 552 F.3d 1077, 1085 (9th Cir. 2009) (same).

18 | 19      **(b)     Outside the arbitration context, California law precludes enforcement of a class action waiver in consumer adhesion contracts**

20    In *Discover Bank*, the California Supreme Court held that consumer class action
21  prohibitions are unconscionable under California law–and thus unenforceable—when contained in
22  a contract of adhesion, "in a setting in which disputes between the contracting parties predictably
23  involve small amounts of damages, and when it is alleged that the party with the superior
24  bargaining power has carried out a scheme to cheat large numbers of consumers out of
25  individually small sums of money …."  *Discover Bank*, 36 Cal.4th at 162-63.  In that context, a
26  prohibition against class actions "becomes in practice the exemption of the party 'from
27  responsibility for [its] own fraud, or willful injury to the person or property of another.'  (Civ.
28  Code § 1668)."  *Id*. at 163.

1  Although the *Discover Bank* rule is preempted by the FAA where it could result in

2  compulsory class *arbitration*, *see Concepcion*, 563 U.S. at 346-48, that rule retains its full vitality

3  outside the arbitration context. *See, e.g., See In re Yahoo! Litig.*, 251 F.R.D. 459, 465-70 (C.D.

4  Cal. 2008) (applying the *Discover Bank* rule to a contractual class action waiver provision that was

5  not part of an arbitration agreement).

6  The *Discover Bank* rule precludes enforcement of any pre-dispute contractual class action

7  prohibition as applied to plaintiffs' claims for violation of the Karnette Act, the CLRA, UCL, and

8  usury law. The Arbitration Agreement is a contract of adhesion. *See Nagrampa v. MailCoups,*

9  *Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006); *see also* Blair Decl. ¶5 (RAC Arbitration Agreement a

10  standardized contract that she had no opportunity to negotiate). The RAC Arbitration Agreements

11  are entered into in the context of rental-purchase transactions, with respect to which plaintiffs have

12  alleged (among other violations) that RAC charges a Cash Price or a Total of Payments that

13  exceeds the statutory maximum. RAC has vastly superior bargaining power. *See* Blair Decl. ¶5.

14  And the Second Amended Complaint describes a scheme by which RAC is alleged to have

15  cheated many consumers out of relatively small amounts of money. *See* Dkt. 43 ¶¶ 7-58.

16  **V. CONCLUSION**

17  For the foregoing reasons, plaintiffs and the proposed class representatives request that the

18  Court certify the class and subclass identified above, appoint Paula Blair, Andrea Robinson,

19  Falechia Harris, and Celinda Garza as class representatives, and appoint Dostart, Hannink &

20  Coveney LLP and Altshuler Berzon LLP as class counsel.

21

22  Dated: May 10, 2018                    Respectfully submitted,

23                                         DOSTART HANNINK & COVENEY LLP
                                           ALTSHULER BERZON LLP
24

25  _____

26                                         Michael Rubin
                                           Attorneys for Plaintiffs
   847472.8
27

28

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                    3:17-CV-02335-WHA