CHRISTINA G. SARCHIO (Pro Hac Vice)
christina.sarchio@dechert.com
DECHERT LLP
1900 K Street, NW
Washington, District of Columbia 20006
Telephone:    202.261.3300
Facsimile:    202.261.3333

H. JOSEPH ESCHER III (No. 85551)
h.joseph.escher@dechert.com
LILY A. NORTH (No. 260709)
lily.north@dechert.com
DECHERT LLP
One Bush Street, Suite 1600
San Francisco, California  94104
Telephone:    415.262.4500
Facsimile:    415.262.4555

GREGORY G. ISKANDER (No. 200215)
giskander@littler.com
LITTLER MENDELSON, P.C.
Treat Towers
1255 Treat Boulevard, Suite 600
Walnut Creek, California 94597
Telephone: 925.932.2468
Facsimile: 925.946.9809

ROBERT F. FRIEDMAN (Pro Hac Vice)
rfriedman@littler.com
LITTLER MENDELSON, P.C.
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, Texas 75201.2931
Telephone: 214.880.8100
Facsimile: 214.880.0181

VICKIE E. TURNER (No. 106431)
vturner@wilsonturnerkosmo.com
WILSON TURNER KOSMO LLP
550 West C Street, Suite 1050
San Diego, CA 92101
Telephone: 619.236.9600
Facsimile: 619.236.9669

Attorneys for Defendants
RENT-A-CENTER, INC. and RENT-A-
CENTER WEST, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

PAULA L. BLAIR, ANDREA
ROBINSON, and FALECHIA HARRIS,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

RENT-A-CENTER, INC., a Delaware
corporation; RENT-A-CENTER WEST,
INC., a Delaware corporation; and DOES
1-50, inclusive

Defendants.

Case No.  3:17-cv-02335-WHA

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION**

DATE:     July 19, 2018
TIME:     8:00 a.m.
CTRM:    12 (19th Floor)
JUDGE:   Hon. William H. Alsup

**TABLE OF CONTENTS**

                                                                                            **Page**

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 2

    A.    RAC Stores And Its Distribution Network ................................................ 3

    B.    Store-Landed Costs And RAC's "Legal Engine" Software .................... 5

    C.    Discounts, Rebates And Incentives ........................................................ 6

    D.    RAC Documentation And The Litigation Database ............................. 7

    E.    Plaintiffs' Purchases ............................................................................. 9

ARGUMENT ..................................................................................................... 12

I.    PLAINTIFFS HAVE NOT ESTABLISHED COMMONALITY,
PREDOMINANCE OF COMMON ISSUES, NOR TYPICALITY ................. 12

    A.    Common Questions Do Not Predominate When A Software Glitch Caused
A Few Misclassifications With No Impact On Pricing .......................... 13

    B.    None Of The Representatives Claim That Their Transactions Failed To
Receive Rebates Or Credits, Nor Can They Show Commonality Or
Predominance ....................................................................................... 14

    C.    Plaintiffs' Theory That Adding A CPU For Items Shipped By NFI And
NPS Violates The Karnette Act Fails Because Plaintiffs Do Not Present
Common Proof Nor Do Common Issues Predominate ........................ 15

    D.    Plaintiffs Cannot Rely On A Catch-All Allegation That "Many
Transactions" Were Also Found To Violate The Karnette Act To Support
Class Certification ................................................................................ 17

    E.    Plaintiffs' Usury Claim Is Not Appropriate For Class Treatment ......... 20

II.    PLAINTIFFS' OVERINCLUSIVE CLASS DEFINITION PRESENTS
MANAGEABILITY PROBLEMS AND IS THEREFORE NOT SUPERIOR ... 21

III.    THE LAWYER-DRIVEN NATURE OF THE SUIT RENDERS THE PUTATIVE
CLASS REPRESENTATIVES INADEQUATE ............................................. 23

IV.    PLAINTIFFS DO NOT SATISFY THE (B)(2) CLASS REQUIREMENTS ... 25

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

Page

**Cases**

*Am. Council of the Blind v. Astrue,*
  No. C 05-04696, 2008 WL 4279674 (N.D. Cal. Sept. 11, 2008) (Alsup, J) ..................... 13, 25

*Benedict v. Hewlett-Packard Co.,*
  314 F.R.D. 457 (N.D. Cal. 2016) ........................................................................................... 13

*Bodner v. Oreck Direct, LLC,*
  No. C 06-4756, 2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) .............................................. 23

*Busby v. JRHBW Realty, Inc.,*
  513 F.3d 1314 (11th Cir. 2008) ............................................................................................ 22

*Carlisle v. LTV Electrosvstems, Inc.,*
  54 F.R.D. 237 (N.D. Tex. 1972) ........................................................................................... 23

*Clemens v. Hair Club for Men, LLC,*
  No. C 15-01431, 2016 WL 1461944 (N.D. Cal. Apr. 14, 2016) (Alsup, J.) ................ 13, 17, 18

*Doninger v. Pacific Northwest Bell, Inc.,*
  564 F.2d 1304 ....................................................................................................................... 25

*Dugan v. Lloyds TSB Bank, PLC,*
  No. C12-02549, 2013 WL 1703375 (N.D. Cal. Apr. 19, 2013) .............................................. 21

*Eisen v. Carlisle & Jacquelin,*
  417 U.S. 156 (1974) .............................................................................................................. 21

*Ellis v. Costco Wholesale Corp.,*
  657 F.3d 970 (9th Cir.2011) ............................................................................................ 13, 19

*Endres v. Wells Fargo Bank,*
  No. C 06-7019, 2008 WL 344204 (N.D. Cal. Feb. 6, 2008) ................................................. 21

*Epic Sys. Corp. v. Lewis,*
  584 U. S. __ (2017) (slip op., ) ............................................................................................. 20

*Etter v. Allstate Ins. Co.,*
  323 F.R.D. 308 (N.D. Cal. 2017) .................................................................................. 13, 14, 17

*Gerritsen v. Warner Bros. Entm't Inc.,*
  112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) ....................................................................... 3

*Ghirardo v. Antonioli,*
  8 Cal. 4th 791 (1994) ............................................................................................................ 21

ii

DECHERT LLP
ATTORNEYS AT LAW

*Griego v. Rent-A-Center, Inc.*,
    Case No. JCCP 4244 (Cal. Super. Ct., filed Jan. 31, 2002)........................................22

*Gutierrez v. Wells Fargo Bank, N.A.*,
    No. C 07-05923, 2008 WL 4279550 (N.D. Cal. Sept. 11, 2008) (Alsup, J.).........................23

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992)........................................13

*Harik v. California Teachers Ass'n*,
    326 F.3d 1042 (9th Cir. 2003)........................................20

*Harris v. Vector Marketing Corp.*,
    753 F. Supp. 2d 996 ........................................21

*In re Am. Apparel, Inc. S'holder Litig.*,
    855 F. Supp. 2d 1043 (C.D. Cal. 2012) ........................................22

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478, 483 (N.D. Cal. 2008). ........................................15, 18, 22

*Lemon v. Int'l Union of Operating Engineers*,
    216 F.3d 577 (7th Cir. 2000)........................................25

*Lou v. Ma Labs., Inc.*,
    No. C 12-05409, 2014 WL 68605 (N.D. Cal. Jan. 8, 2014) (Alsup, J.).........................17

*McArdle v. AT&T Mobility LLC*,
    No. 17-17246 (9th Cir.)........................................20

*McGill v. Citibank, N.A.*,
    2 Cal. 5th 945 (2017) ........................................20

*Meachum v. Outdoor World Corp.*,
    654 N.Y.S.2d 240 (1996) ........................................23

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008)........................................3

*Molski v. Geich*,
    318 F.3d 937 (9th Cir. 2003)........................................25

*Rent-A-Center, Inc. v. Duron*,
    No. 09-04-147 CV (Tex. Ct. App. Oct. 28, 2004) ........................................21

*Roberts v. AT&T Mobility LLC*,
    No. 18-15593 (9th Cir.)........................................20

*Saechao v. Landry's Inc.*,
    No. C 15-00815 WHA, 2016 WL 1029479 (N.D. Cal. Mar. 15, 2016) ........................14, 17

iii

*Sanchez v. McDonald's Restaurants of California, Inc.*,
    No. BC499888, 2017 WL 4620746 (Ca. Sup. Ct. July 6, 2017) ...............................18

*Sanchez v. WalMart Stores, Inc.*,
    No. Civ. 2:06-CV-02573, 2009 WL 1514435 (E.D. Cal. May 28, 2009)................................23

*Stearns v. Ticketmaster Corp.*,
    655 F.3d 1013 (9th Cir. 2011)..........................................................................................22

*Tillage v. Comcast Corp.*,
    No. 18-15288 (9th Cir.)....................................................................................................20

*Ubaldi v. SLM Corp.*,
    No. 11-01320, 2014 WL 1266783 (N.D. Cal. Mar. 24, 2014)................................21

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)........................................................................................................12

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001).........................................................................................22

**Statutes**

Cal. Civ. Code § 1812.644 ..............................................................................................8

Cal. Civ. Code § 1812.636 ............................................................................................19

Karnette Rental-Purchase Act ................................................................................. *passim*

**Other Authorities**

Fed. R. Evid. 201 ....................................................................................................3, 22

Fed. R. Civ. P. 23 ..........................................................................................2, 12, 22, 25

This case is a prime example of a "solution in search of a problem," in which plaintiffs are forced to cobble together disparate theories of what problems might exist. The result, however, is a set of theories that fail to provide a method of class-wide proof for an extremely over-inclusive proposed class of 338,000 California consumers with 1.06 million agreements covering over 1.2 million pieces of merchandise. Plaintiffs' various theories of liability do not account for challenges with the relevant data, pulled from two different data systems spanning more than five years, or the changes to RAC's product distribution model. Moreover, because 95.3% of the transactions unquestionably are in full compliance with the law and it would take considerable time and effort to determine whether some portion of the remaining 4.7% of the transactions comply, a class action is not the superior or manageable method of adjudication.

Underscoring the point that no problem existed until putative class counsel went looking for one, none of the plaintiffs had any complaints regarding their transactions with Defendant Rent-A-Center, Inc. ("RAC") until <u>after</u> they received solicitation letters from counsel advising not only that RAC may have violated the California Karnette Rental-Purchase Act ("Karnette Act"), but that plaintiffs could get their money back <u>and</u> keep their rental merchandise. In fact, after receiving counsel's letter, Paula Blair, who had rented various products from RAC in the past, decided to rent a Microsoft Xbox—a product she has yet to open two years later and has made no effort to return. She is now serving as the lead plaintiff, having also promptly signed the arbitration opt-out notice counsel prepared.

Initially, the complaint compared plaintiffs' purchases from RAC with similar products available at Brandsmart to illustrate alleged overpricing.[1] None of the plaintiffs had heard of Brandsmart, however, let alone compared RAC's prices with that store.[2] Moreover, plaintiffs testified that they knew when they signed the rental-purchase agreements ("RPA") that they could

---

[1] Dkt No. 43, Second Amended Complaint ¶¶ 29, 38, 44, 50.
[2] Declaration Lily A. North ("North Decl.") Exs. 10 (Dep. Tr. of Paula Blair ("Blair Dep.")) 145:5-8, 152:22-153:3; 14 (Dep. Tr. of Celinda Garza ("Garza Dep.")) at 152:8-14; 16 (Dep. Tr. of Falechia Harris ("Harris Dep.")) at 140:6; 17 (Dep. Tr. of Andrea Robinson ("Robinson Dep.")) at 122:25-123:24.

end up paying more than if they bought the merchandise outright from another store.[3] No other store offered the terms and conditions that mattered to plaintiffs, namely the ability to make smaller payments with the benefit of receiving the merchandise right away, and having delivery and repairs included in the cost.[4] Thus, the initial overpricing "problem" described in the complaint has since been abandoned.

Plaintiffs now present the Court with a variety of new theories of liability. These alleged problems include misclassifying products as "new" rather than "used," although it had no effect on pricing; properly accounting for rebates or credits RAC received from a manufacturer after merchandise had been rented or sold to customers; allocating actual freight costs paid to a third-party logistics supplier and distribution subsidiary in RAC's costs to consumers; and other miscellaneous pricing "violations." For each theory, however, extensive analysis is required to determine if a putative class member's agreement was subject to the alleged problem, and, if so, what unique defenses might apply. Plaintiffs cannot show that common issues predominate.

Plaintiffs also cannot meet their burden to show typicality and adequacy of the named plaintiffs, and no plaintiff has standing to bring a claim under the misclassification or rebate theory as no plaintiff was affected by those alleged violations. Resolution on a class basis is neither manageable nor superior. Finally, plaintiffs move for an injunction-only class when monetary relief is not incidental. Rule 23 is a powerful tool that can accomplish significant litigation efficiencies if utilized prudently and judiciously. This is just not the case for it.

## FACTUAL BACKGROUND

RAC provides consumers an easy and alternative way to furnish their homes or businesses without needing access to credit and with the option of keeping the merchandise or returning it. RAC offers more than 1,200 types of new and used merchandise, including furniture, electronics, appliances and computers, and provides flexible payments. RAC offers

---

[3] Blair Dep. at 159:6-10; Garza Dep. at 96:2-7; Harris Dep. 100:18-101:8. Although Robinson claims she didn't understand and doesn't remember anything about pricing. Robinson Dep. at 73:24-76:8.
[4] Blair Dep. at 71:13-19; Harris Dep. at 68:5-11; Garza Dep. at 68:23-69:9, 81:7-11, 79:19-25 ("I just know my payments were really small per month and that was what I was looking for."). Robinson could not remember if the payments were comfortable. Robinson Dep. at 126:1-16.

prompt free delivery, free repairs and will replace faulty merchandise at no cost.  These rental-purchase options are designed to appeal to a wide variety of consumers, ranging from young professionals, those recently divorced, start-up business owners, to those with credit difficulties.  Declaration of Michael Cross ("Cross Decl.") ¶¶ 2-3.

While plaintiffs point to studies showing that it costs more to purchase merchandise through a rent-to-own contract than buying it outright, rent-to-own companies run the substantial risk of not being able to collect the rental payments or recover the merchandise.  According to the Federal Trade Commission ("FTC") survey cited by plaintiffs, "[n]early half of all rent-to-own customers had been late making a payment."[5]  The FTC cautioned, "[c]areful analysis also should be undertaken before adopting policies that would substantially reduce the availability of rent-to-own transactions.  Most rent-to-own customers are satisfied with their experience with rent-to-own transactions, suggesting that the rent-to-own industry provides a service that meets and satisfies the demands of most of its customers."  *Id.*

## A.     RAC STORES AND ITS DISTRIBUTION NETWORK

RAC owns and operates stores nationwide, as well as in Canada, Puerto Rico, and Mexico, including 131 stores in California.  At the start of the class period, vendors shipped most products direct to store, charging RAC for both the cost of the product and freight.  *See* North Decl. Ex. 5 (Dep. Tr. of Daniel Glasky ("Glasky Dep.")) at 35:17-38:5, 150:2-14.  Under this model, the cost to move the merchandise to each store was included in the cost of goods.  *See id.* at 120:13-121:14.  RAC also relied on its authorized service center, RAC National Product Service, LLC ("NPS"), a wholly owned subsidiary,[6] to deliver used, refurbished, or, at times, new merchandise to stores.  Glasky Dep. at 37:6-9; North Decl. Ex. 6 (Dep. Tr. of Bobby Pope ("Pope Dep.")) at 53:5-11.  NPS's services include pick-up and delivery of merchandise for repair, at no

---

[5] Fed Trade Comm'n, Survey of Rent-to-Own Customers (Apr. 2000), https://www.ftc.gov/reports/survey-rent-own-customers. *See, e.g., Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) ("the court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies"); Fed. R. Evid. 201.

[6] *See* North Decl. Ex. 23 (RAC Form S-4 filed with the U.S. Securities & Exchange Commission ("SEC") (Jan. 25, 2011)); *see, e.g., Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064, fn. 7 (9th Cir. 2008) (judicial notice of SEC filings are is proper); Fed. R. Evid. 201.

additional expense.  Glasky Dep. at 113:16-25; Pope Dep. at 50:19-51:3.[7]  Plaintiffs do not dispute that freight from vendors may be included in RAC's lessor's cost.  Dkt. No. 109, pp. 4-5.

In 2014, RAC considered a distribution model to better provide efficiencies in the supply chain.  Glasky Dep. at 121:6-14, 150:1-11; North Decl. Ex. 7 (Dep. Tr. of Jonathan Parks ("Parks Dep.")) at 158:22-159:18.  RAC signed an agreement with a third-party logistics provider, NFI, for distribution of much of RAC's merchandise.  Under this model, vendors would typically ship products to NFI, and NFI, using its trucks and personnel, would transport those products to RAC stores.  Glasky Dep. at 30:12-31:25.  In June 2015, NFI started using its Chino warehouse to deliver to California stores.  *Id.* at 32:1-10; Parks Dep. at 51:14-22.

NFI does not charge RAC per product, but charges based on fixed monthly and annual fees for distribution services, as well as variable components that depend on the type of products and frequency of shipments.  Parks Dep. at 48:18-49:13, 56:3-57:15, 105:9-11.  Those costs are "part of the cost to put that asset in service, available for rent to the customer."  North Decl. Ex. 8 (Dep. Tr. of Katrina Holihan ("Holihan Dep.")) at 125:7-126:9.  As is standard in the industry, RAC allocates the costs it pays to NFI to transport an individual unit of merchandise transported to a store, in "costs per unit" or CPUs.[8]  Glasky Dep. at 149:5-17; Parks Dep. at 103:24-105:4: *see* Declaration of Kevin Davis ("Davis Decl.") ¶¶ 20-23, 26-33; Declaration of David Jacoby ¶¶ 18, 21, 30-31, 34.  RAC frequently updates the CPUs to better align with what RAC is paying NFI, thus the same products might have different CPU charges within the same year.  Parks Dep. at 131:20-132:10; 156:23-157:21.  All of the costs allocated to products shipped by NFI are part of RAC's incurred and paid actual costs of merchandise.  *Id.* at 48:18-50:2, 56:3-57:14, 59:16-60:6.  However, RAC has "always underestimated [its] cost per unit.  And there's a portion of expense that does not [get] allocated to the cost."  *Id.* at 167:12-16.  There are actual

---

[7] NPS is a RAC wholly-owned subsidiary and also services and repairs merchandise for other stores and manufacturers, including Sam's Club, Wal-Mart, Ultima Electronics.  Pope Dep. at 54:11-18, 73:3-11, 153:3-14.
[8] In their motion, Plaintiffs describe the CPU as an "up-charge."  Dkt. No. 109, pp. 4-5.  Regardless of the term used, the CPU or "up-charge" is an allocation of actual cost, which does not reflect any profit margin to RAC.  Parks Dep. at 48:18-50:2, 56:3-57:14, 59:16-60:6; Holihan Dep. at 125:7-126:9; Glasky Dep. at 82:13-22.

costs paid by RAC associated with NFI that RAC does not pass on to consumers. *Id.* at 168:6-9.

RAC at times needed products delivered more quickly, such as for promotions. Glasky Dep. at 41:4-18; Pope Dep. at 158:7-17. RAC therefore relied on NPS to deliver new merchandise to stores, creating additional actual costs for which NPS charges a flat CPU of $23.49. Pope Dep. at 81:24-83:1. The amount of the NPS CPU was arrived at by identifying the extra costs incurred in transporting the additional merchandise. *Id.* Although the costs to NPS to transport products have gone up, NPS continues to charge $23.49. *Id.* at 156:13-157:14. As with NFI, the costs allocated to individual products shipped by NPS are part of RAC's incurred and paid actual costs. *See* Holihan Dep. at 125:7-126:9; North Decl. Ex. 32 (Dep. Tr. of Michael Cross ("Cross Dep.")) at 66:24-67:1.

From June 2015 through January 2018, NFI delivered approximately 216,600 products and NPS delivered approximately 37,997 products to California. Glasky Dep. at 148:15-149:4; Dkt. No. 109-20, Breshears Decl. ¶ 18. Vendors continue to distribute merchandise direct to store, however, including Ashley and others. Glasky Dep. at 32:21-33:8, 87:21-88:18, 125:15-24.

**B.    STORE-LANDED COSTS AND RAC'S "LEGAL ENGINE" SOFTWARE**

RAC has always used "store-landed costs" to set the pricing terms for each rental item. Glasky Dep. at 120:13-121:14. RAC's merchandising team negotiates prices with vendors, and that information is provided to RAC's pricing team. *See* North Decl. Ex. 9 (Dep. Tr. of Eric Albright ("Albright Dep.")) at 74:14-75:24. The pricing team inputs the price into RAC's system, as well either vendor freight or CPUs from NFI or NPS. Holihan Dep. at 124:20-126:9; Albright Dep. at 165:22-166:5. Once the cost has been inputted, the pricing team determines the proper pricing terms for a product based on a range of factors, including any price caps set by law. Albright Dep. at 72:14-75:24, 81:11-24, 280:5-15. When customers want to rent multiple items at once, the price for each item is determined separately, and then aggregated together to provide one price on the RPA for all products. Cross Dep. at 130:16-24.

To ensure that RAC complies with pricing laws, including the Karnette Act, RAC uses a Legal Engine software program that works with RAC's other systems to review, prior to execution, all proposed RPAs and ensure they comply with regulations regarding rate, term, cash

| | |
|---|---|
| 1 | price, total of payments, cost of rental, and other regulated aspects of the rental transaction. |
| 2 | Albright Dep. at 84:6-22, 105:4-6.  If a proposed RPA does not comply, the Legal Engine adjusts |
| 3 | the terms to ensure compliance.  Cross Decl. ¶ 7.  With respect to used merchandise, once an |
| 4 | item is returned, the pricing team sets the price which the Legal Engine adjusts based on |
| 5 | previous rent received for the product.  Albright Dep. at 122:13-123:25.  The pricing team also |
| 6 | uses a "Conflict Checker" program to quality check pricing of older products.  Albright Dep. at |
| 7 | 273:16-275:23.  The "Legal Engine is the last step prior to the price tag being printed."  Albright |
| 8 | Dep. at 124:7-10.  RAC store employees cannot increase the price of merchandise to consumers, |
| 9 | although they can discount it.  Albright Dep. at 43:10-15; North Decl. Ex. 11 (Dep. Tr. of Nate |
| 10 | Rewers) at 22:6-21, 24:15-22, 26:11-19, 27:4-12. |

**C.    DISCOUNTS, REBATES AND INCENTIVES**

| | |
|---|---|
| 12 | RAC negotiates the best price it can from its vendors and then uses that reduced price as |
| 13 | the basis for cost.  Glasky Dep. at 81:1-13.  RAC's Director of Accounting, Katrina Holihan, |
| 14 | testified that "on occasion" RAC has received discounts, rebates or credits from its suppliers, but |
| 15 | not "incentives," after purchase.  Holihan Dep. at 17:1-6.  While RAC endeavors to track down |
| 16 | products and reduce cost when it receives such a rebate, if an item is already on a store shelf or in |
| 17 | a customer's home, it becomes more challenging.  *Id.* at 37:23-38:4; Davis Decl. ¶ 37.  During the |
| 18 | class period, RAC received less than 20 credits or rebates covering approximately 62,000 |
| 19 | products for sale throughout the United States.  Davis Decl. ¶ 38. |
| 20 | ***Discounts***: The <u>single</u> instance of RAC receiving a "discount" during the class period was |
| 21 | when a vendor requested RAC pay an invoice within 15 days for it to receive a percentage off the |
| 22 | invoice.  Holihan Dep. at 17:7-16. |
| 23 | ***Rebates or Credits***: Some vendors may offer credits if RAC purchases a certain amount of |
| 24 | merchandise within a certain timeframe.  Holihan Dep. at 18:10-20.  "Only a small number of |
| 25 | vendors do that kind of thing," however.  *Id.* at 18:23-24.  For instance, Toshiba provided the |
| 26 | largest such credit during the class period of $165 per unit.  *Id.* at 60:19-64:8.  Of the 9,000 units |
| 27 | impacted, RAC was able to track down 93% of the units (8,433) that had not yet been rented or |
| 28 | purchased and discounted the cost of each by $165.  Davis Decl. ¶ 35.  Given that the credit was |

1  for purchases throughout the country, it is unclear whether any of the outstanding 567 units were

2  rented or sold in California.  *Id.*

3      Ashley Furniture also provided a rebate to RAC during the class period.  Holihan Dep. at

4  22:16-23:8; North Decl. Ex. 24 (Pl. Dep. Ex. 67).  However, RAC only received the rebate at the

5  end of the year once it was determined that RAC met the minimum purchases; it applied to

6  different types of merchandise at different prices; it applied to purchases all over the U.S. and not

7  just California; and by the time RAC received the rebate, most of the products had been rented or

8  sold.  Holihan Dep. at 45:1-46:12, 122:11-19.  From an auditing perspective, it was difficult to

9  locate these products or know how to apply the rebate since it was uniform for all items.  *Id.*

10     RAC occasionally receives price protection credits where it gets a credit if the wholesale

11  price drops.  Holihan Dep. at 23:9-24:21.  For instance, in March 2016, Whirlpool provided a $15

12  credit on Amana washers after the units had shipped, yet RAC was able to find and apply the

13  credit to 78.9% of the units.  *Id.* at 90:6-24.

14     ***Accounting Practices:***  Whenever merchandise subject to a credit can be located, RAC

15  reduces the cost retroactively.  Davis Decl. ¶¶ 36-38.  RAC's practice complies with generally

16  accepted accounting principles ("GAAP"), as described by defendants' expert, Kevin Davis.  *See*

17  *id.* ¶¶ 34-40.  Citing various accounting guides and principles, Davis explains that the cost of

18  inventory should include all costs and expenditures to bring an item to its point of sale.  *Id.* ¶¶ 19-

19  22, 26.  To the extent vendors provided RAC with credits <u>after</u> merchandise had been rented or

20  sold, RAC properly calculated costs based on the best available information at the time an

21  agreement is entered into.  *Id.* ¶¶ 39-40.

22     **D.     RAC DOCUMENTATION AND THE LITIGATION DATABASE**

23     ***Point of Sale***: RAC utilizes a Point of Sale or Enterprise Management software system to

24  process rental transactions.  RAC used the "High Touch" system, but in 2014, RAC began using a

25  program called the Store Information Management System ("SIMS").  As RAC rolled out SIMS

26  between October 2014 and June 2016, there was a period of time when both systems were

27  actively used in California.  Albright Dep. at 49:1-8.  Historical information from both systems is

28  maintained in a "data warehouse," a consolidated data repository.  Dkt. No. 91-1 ¶ 5.  As High

Touch and SIMS did not have identical fields, there is not always a one-to-one mapping between the two systems.  Cross Decl. ¶ 4.

***Document Retention***:  RAC fully complies with the Karnette Act's requirement for rent-to-own companies to maintain documents for two years following the termination of an agreement.  Cal. Civ. Code § 1812.644.  The Act does not mandate that companies keep executed copies, and so RAC has only electronically stored the underlying data supporting each RPA.  Hard copies of executed RPAs might be found in one of the 131 California stores, if the RPA is active, or in an Iron Mountain storage facility if inactive.  The documents in storage are not well-organized, and one would have to weed through dozens of boxes containing all sorts of materials to try to find a particular original and signed RPA.  Cross Decl. ¶ 11; *see also* North Decl. Ex. 38.

***Litigation Database***:  Given the challenges in physically searching thousands of boxes to find original agreements or pulling up one-by-one the underlying data for each of the 1.2 million products at issue in this litigation, RAC agreed, in response to discovery requests, to design a litigation database that would pull historical point-of-sale and cost information from the data warehouse into one spreadsheet.  The "Litigation Database" provided: (i) customer name and contact information; (ii) store; (iii) RPA's active and inactive dates; (iv) item number, description, serial number, model, age, acquisition date, whether new or used; (v) Total of Payments; (vi) Cost of Rental; (vii) Cash Price; (viii) Rental Period; (ix) Number of Payments; (x) Amount of Each Payment; and (xi) any prior rental paid on that item.[9]  Dkt. No. 91-1 ¶ 3.  The Litigation Database reveals that there are 332,896 unique California customers, of whom 189,809 (57.0%) had more than one agreement.  Cross Decl. ¶ 12.  Of the 1,062,161 agreements covering more than 1.2 million products, 389,795 (36.7%) went to ownership with most of the products being returned back to RAC.  *Id.*.

RAC refined the Litigation Database three times to ensure accuracy given that it was generated from historical data pulled from two different systems. Dkt. No.91-1 ¶ 4.  Some

---

[9] Cross Dep. at 114:3-10 (this field may not match payments, particularly before 2016 and "the only way to determine how much a consumer paid . . . is by accessing RAC's Oracle database and individually review the history of payments for each of the RPAs").

errors nonetheless remain in the Litigation Database, which plaintiffs wholly fail to acknowledge.[10]  Dkt. No. 91-1 ¶¶ 5, 10, 11, 14.  Thus, the only way to determine the exact pricing terms on a particular agreement is to pull the physical agreement from boxes in storage, to the extent it can be located, or electronically pull the agreement data from RAC's databases and print out screen shots showing the back-up information on costs, one-by-one, as was done for the named plaintiffs and a sampling of other class members.  *See* Dkt. No. 109-2, Dostart Decl., Exs. 8, 10, 12-14 (filed under seal).

### E.    PLAINTIFFS' PURCHASES

*Paula Blair:*  Plaintiff Blair entered into three separate RPAs with RAC: in 2012 for a TV and stand, in 2015 for an air conditioner, and in 2016 for an Xbox.  Blair Dep. at 75:7-10, 80:7-11;107:14-17. Blair rented the TV from RAC because of a bad experience she had at Best Buy purchasing a TV.  *Id.* at 68:11-18.  It also took her a few years to pay off the TV she charged on the Best Buy credit card.  *Id.* at 66:16-18.   Blair thought it would be easier to deal with RAC because RAC not only delivered to her home at no charge, in contrast to Best Buy, but would also pick up and repair it at no charge if she had any problems.  *Id.* at 68:11-71:19.  She also found RAC's payment schedule manageable.  *Id.* at 71:16-19.

In 2015, Blair returned to RAC for an air conditioner because Wal-Mart did not carry the same size.  Blair Dep. at 81:3-12.  While Blair did not produce a signed copy of her RPA, she had in her possession an unsigned version, and confirmed her signature on RAC's copies of her transaction documents.  *Id.* at 86:5-88:6, 92:23-93:7.  Blair understood that she could pay for the unit earlier for less.  *Id.* at 97:3-25, 159:6-10.  Blair has poor credit, having been sued and her wages garnished by several credit card and other companies, and liens. *Id.* at 19:9-22:20.

In October 2015, Blair received a letter from class counsel regarding an investigation

---

[10] Cross explains that RAC's two point-of-sale systems kept different information, and some RPAs might have originated in one system but transitioned to the other, in which case different information might appear, and that "the only way you can determine truthfully what showed up on the agreement is to look at a physical agreement and come up with some rules around how to use that."  Cross Dep. at 98:24-101:15.

into RAC.  Blair Dep. at 161:17-162:21; North Decl. Ex. 25.  Blair has been a part of two other class action lawsuits in the past, for which she recovered money.  Blair Dep. at 15:2-16, 17:4-18:20.  Thinking this was another suit she could join, Blair filled out the questionnaire counsel included with the letter.  *Id.* at 161:17-162:21.  A few months later, Blair went into a RAC and rented a Microsoft Xbox with a Gears of War Bundle Edition.  *Id.* at 162:8-21.  In response to the question, "At the time that you went into the Rent-A-Center store and entered into the contract for the Xbox, had you already retained counsel in this case," Blair responded, "Yes." *Id.* at 138:7-11.  Blair noted that before she had received the letter from counsel, she had no complaints about RAC, stating "I didn't have any complaints about the other two [agreements]."  *Id.* at 115:3-16, 118:4-15.  Within 13 days of renting the Xbox, Blair signed the opt out letter counsel had typed up and returned it to counsel to be sent to RAC certified mail, at no cost to her.  *Id.* at 123:1-125:20; North Decl. Ex. 26.

Blair testified that the Xbox has remained unopened in her home for the last two years. Blair Dep. at 118:17-23.  Blair has not tried to return the Xbox, choosing instead to pursue litigation as the lead plaintiff.  *Id.* at 163:19-164:2.  Blair claims she is suing RAC "[b]ecause they illegally charged too much for the products," but she admitted she has no independent basis to make that claim, other than what she learned from her lawyers.  *Id.* at 58:3-16.

***Celinda Garza***: Plaintiff Garza entered into an agreement with RAC in 2016 for a refrigerator because she needed it quickly, did not have the money to pay cash up front, and appreciated RAC's financing options.  Garza Dep. at 68:23-69:20, 107:11-108:1.  Garza called RAC in advance to get information on dimensions, pricing and free installation.  *Id.* at 74:6-19. While Garza had other options, "Rent-A-Center at that time had the best payment plan option for me."  *Id.* at 107:11-108:1.  Garza testified that RAC always provided her with fair and full information on pricing.  *Id.* at 118:1-8.  Garza signed both the RPA and consumer arbitration agreement.  *Id.* at 90:10-22, 97:3-5.

Within one week of her purchase, Garza received from class counsel a similar letter as Blair.  Garza Dep. at 145:6-10; North Decl. Ex. 27.  Before receiving the letter, Garza did not "feel that the charges for [her] refrigerator that Rent-A-Center was charging were unreasonable,"

nor did she "feel that the contract terms that [she] entered into with Rent-A-Center were unfair," in fact stating "[y]ou never want to pay twice [the price of] a fridge, but they were fine." Garza Dep. at 147:16-148:7. Nevertheless, Garza responded to counsel's letter and a week later, she rejected RAC's arbitration agreement, submitting the same opt out letter as Blair had. *Id.* at 122:13-123:24; North Decl. Ex. 28. But Garza could not explain why she rejected arbitration, other than it was based on "a conversation between myself and my lawyer." Garza Dep. at 130:24-132:2. And she was unwilling to concede that someone else prepared the opt-out notice and mailed it. *Id.* at 122:13-24. But at the time she had sent the opt-out notice—14 days after renting the refrigerator—Garza had engaged counsel in response to his letter. *Id.* at 136:8-16.

***Falechia Harris***: Plaintiff Harris was convicted of fraud for trying to cash a check that did not belong to her and then skipping out on her court hearing, resulting in a bench warrant. Harris Dep. at 14:6-15:8. In addition, creditors have brought cases against her for failure to pay. *Id.* at 17:6-18:20. Harris rented from RAC because it was the only store where she could negotiate the amount and frequency of payments that fit her pay schedule and also take the merchandise right away, as opposed to layaway. *Id.* at 68:5-11, 100:18-101:8.

In March 2013, Harris rented a TV console and Blu-ray player, which RAC replaced for free a few months later after it failed. Harris Dep. at 82:3-93:17. In July 2014, Harris rented an Ashley Furniture sectional sofa from RAC. *Id.* at 103:5-104:8. Harris paid the sofa off early and is "still very satisfied with it." *Id.* at 108:20. In 2015, Harris rented two TVs from RAC, because of fast and free delivery, flexibility on the amount and timing of payments, and free repair or replacement policies—features not available elsewhere. *Id.* at 109:5-111:20. Harris also received information regarding class counsel's investigation against the rent-to-own industry and contacted counsel sometime in or around 2016. Harris Dep. at 132:6-22; North Decl. Ex. 29.

***Andrea Robinson***: Robinson also received a letter from class counsel alleging that RAC "has engaged in improper conduct," before which she was not intending to sue RAC. Robinson Dep. at 103:9-104:2, 106:16-23; North Decl. Ex. 30. Robinson rented a used TV from RAC in 2015. Robinson Dep. at 64:18-25. Robinson could not recall much about her transaction. *Id.* at 88:4-25 (Q:You don't remember anything about your transactions with Rent-A-Center? A:I don't

11

1  remember.).  Robinson could not remember when she first decided to become a plaintiff in the

2  case.  *Id.* at 103:6-8.  Importantly, when asked if she had seen the complaint, she responded

3  "What is a Complaint? I don't know what you are talking about."  *Id.* at 120:12-20.  Robinson did

4  not remember whether she rejected arbitration.  *Id.* at 91:2-12.  Although when later shown

5  requests for admission in which she admitted she did not reject the arbitration agreement, she

6  responded: "No, I did not reject it, but I didn't accept it either."  *Id.* at 149:5-25.  When asked if

7  she signed documents under penalty of perjury and what she thinks that means, she responded

8  :"What—what, is that a trick question? It is what it is.  What do you mean?"  *Id.* at 133:6-21.

9  <u>**ARGUMENT**</u>

10  **I.    PLAINTIFFS HAVE NOT ESTABLISHED COMMONALITY, PREDOMINANCE OF COMMON ISSUES, NOR TYPICALITY**

12        Plaintiffs ask this Court to certify a class of approximately 338,000 California consumers

13  with 1.06 million unique agreements with RAC over a five-year period for over 1.2 million

14  products[11] under the core theory that RAC violated different provisions of the Karnette Act in a

15  number of distinct ways.[12]  But the commonality requirement for class certification under Rule

16  23(a)(2) obligates the plaintiffs to demonstrate that class members have *suffered the "same*

17  *injury,"* not merely that they have all suffered a violation of the same regulatory scheme; claims

18  must depend upon a common contention , and that common contention must be of such a nature

19  that it is capable of class wide resolution, meaning that determination of its truth or falsity will

20  resolve issue that is central to validity of each one of the claims in one stroke.  *Wal-Mart Stores,*

21  *Inc. v. Dukes*, 564 U.S. 338, 348-349 (2011).

22        Plaintiffs must also meet the exacting predominance standard under Rule 23(b)(3) that

23  common questions "predominate over any questions affecting only individual members."

24  *Amchem Products, Inc. vs. Windsor,* 521 U.S. 591, 622 (1997). The "predominance inquiry tests

25  whether proposed classes are sufficiently cohesive to warrant adjudication by representation."

26

---

[11] Dkt. No. 109-20, Breshears Decl. ¶ 9; Dkt No. 109, p. i (proposed class definition).
[12] On the "single document claim" RAC is not disputing that the same practice was applied to all class members during the class period.  RAC is separately moving for summary judgment as this practice does not violate the Karnette Act.

12

DECHERT LLP
ATTORNEYS AT LAW

*Benedict v. Hewlett-Packard Co.*, 314 F.R.D. 457, 474 (N.D. Cal. 2016)(citations omitted).

While courts do not resolve the "merits" of a plaintiff's case at certification, careful scrutiny of the elements of plaintiffs' claims is required to determine whether class treatment is warranted. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir.2011)

Finally, plaintiffs must show how the putative class representatives are typical of class members. The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citations omitted). This Court has not hesitated to find plaintiffs are not typical when they have "no direct connection" to the conduct alleged. *Am. Council of the Blind v. Astrue*, No. C 05-04696, 2008 WL 4279674, at *2 (N.D. Cal. Sept. 11, 2008) (Alsup, J.). Plaintiffs do not satisfy any of the above requirements.[13]

### A. COMMON QUESTIONS DO NOT PREDOMINATE WHEN A SOFTWARE GLITCH CAUSED A FEW MISCLASSIFICATIONS WITH NO IMPACT ON PRICING

Plaintiffs inexplicably raise as a common question an issue that impacted only 1,062 of the more than 1.2 million products at issue in this case—the fact that some products were categorized as "New" in the Litigation Database when there was prior rental income associated with them, suggesting they were actually "Used." Dkt. No. 109, p. 6; Declaration of Sonya Kwon ("Kwon Decl.") ¶ 22. As an initial point, since plaintiffs do not argue that any of the putative class representatives' rented products were misclassified in this way, plaintiffs fail to establish typicality for this theory of alleged harm and lack standing to bring a claim under this theory. *See Etter v. Allstate Ins. Co.*, 323 F.R.D. 308, 311 (N.D. Cal. 2017) (plaintiff who could not prove he received subject fax alleged to violate TCPA lacked standing, thus certification denied as to the fax); *Saechao v. Landry's Inc*., No. C 15-00815 WHA, 2016 WL 1029479, at *9 (N.D. Cal. Mar.

---

[13] As plaintiffs contend that the CLRA and UCL claims are derivative of the Karnette Act claims, for the same reasons the Karnette Act violations are not fit for class certification, so too go the CLRA and UCL claims. *Clemens v. Hair Club for Men, LLC*, No. C 15-01431, 2016 WL 1461944, at *8 (N.D. Cal. Apr. 14, 2016) (Alsup, J.)(also denying "certification as to plaintiffs' claims that are derivative thereof").

1   15, 2016) (plaintiff who never received payment by direct deposit or a pay card was not typical
2   and lacked standing to bring claim based on those theories).

3       More significantly, plaintiffs utterly fail to show how a "glitch" that affected only 0.01%
4   of the overall transactions is common to the very large putative class and predominates.  Even
5   their expert could not explain why his report notes this issue, other than to claim he simply
6   wanted to show "inconsistency" in the database.  North Decl. Ex. 31 (Dep. Tr. of David Breshears
7   ("Breshears Dep.")) at 99:11-25.  While these and other inconsistencies do not seem to stop
8   plaintiffs from claiming that they can establish "common proof" through the Litigation Database,
9   the inconsistency here happens to be irrelevant because the "glitch" that caused the
10  misclassification did not affect the pricing of those products.  Cross Dep. at 72:21-73:13, 117:14-
11  119:4.

12      Furthermore, various reasons caused this glitch, including "switch-outs" when
13  replacement products were provided to customers free of charge temporarily during repairs or
14  permanently.  Cross Dep. at 149:14-152:12.  For RAC to be able to defend against "the legality of
15  that practice," RPAs would need to be pulled and analyzed one-by-one to see whether each on its
16  face had the wrong classification, the cause for the misclassification, and what if any harm is
17  alleged, since price does not appear to have been impacted.  Dkt. No. 109, p. 6.  Given the need
18  for individual inquires, plaintiffs cannot show predominance here.

19      **B.    NONE OF THE REPRESENTATIVES CLAIM THAT THEIR
        TRANSACTIONS FAILED TO RECEIVE REBATES OR CREDITS, NOR
20      CAN THEY SHOW COMMONALITY OR PREDOMINANCE**

21      Plaintiffs cannot establish typicality nor that they have standing under their "credits"
22  theory as they do not argue that the "discounts, rebates, or incentives," theory applies to the
23  putative class representatives.  Moreover, plaintiffs mischaracterize both the scope and RAC's
24  practice on this issue.  RAC received less than 20 credits during the class period, and RAC did
25  not ignore these credits.  Davis Decl. ¶ 37.  Rather, if a vendor provided RAC with a credit for
26  merchandise, RAC would routinely reduce its cost and therefore the price to customers, if
27  RAC could locate the merchandise.  *Id.* ¶¶ 37-39.  Of the 61,100 products that were subject to
28  a credit during the class period, RAC could not track down 13,600 of them, likely because they

1    already had been rented or sold.  Holihan Dep. at 37:23-38:4; Davis Decl. ¶ 37.

2           Plaintiffs offer the Court no common plan on how they will be able to locate these

3    products, if they even landed in California. RAC can also raise unique defenses regarding this

4    allegedly improper "practice."  Since vendors provided the credits to RAC well-after

5    merchandise had shipped, it is not surprising that RAC could not find some.  Thus, those

6    products were rented at prices that reflected the documented actual cost at the time of rental, a

7    practice consistent with GAAP as set-forth in Accounting Standard Codification 330,

8    "Inventory."  Davis Decl. ¶ 20-23, 26-32.  Common questions and common proof therefore do

9    not predominate.

10          C.      **PLAINTIFFS' THEORY THAT ADDING A CPU FOR ITEMS SHIPPED
                    BY NFI AND NPS VIOLATES THE KARNETTE ACT FAILS BECAUSE**
11                  **PLAINTIFFS DO NOT PRESENT COMMON PROOF NOR DO COMMON
                    ISSUES PREDOMINATE**
12

13          Plaintiffs contend that another common legal issues is whether the Karnette Act permits

14   RAC to add the cost per unit associated with transfer of product through its distributor and

15   subsidiary to its lessor's cost.  Putting aside the legal challenge to this argument that is the

16   subject of RAC's motion for partial summary judgment, incorporated herein by reference, "[t]he

17   complex structure of defendants' chain of distribution and the particularized sales transactions

18   associated with each sale . . . present a significant barrier to certification." *In re Graphics*

19   *Processing Units Antitrust Litig.* ("*In re Graphics*"), 253 F.R.D. 478, 483 (N.D. Cal. 2008)

20   (Alsup, J.) (order certifying limited direct-purchaser class and denying indirect purchaser).

21          RAC did not impose any CPUs on agreements entered into from March 13, 2013 to at

22   least October 2014, when RAC signed the contract with NFI, and arguably until June 2015 when

23   NFI became operational in California.  Glasky Dep. at 117:6-19, 127:5-8.  Even after its contract

24   with NFI, RAC continued to rely on vendors to ship certain products direct to store.  Glasky

25   Dep. at 32:21-33:8, 87:21-88:18, 125:15-24.  In fact, out of the 1.2 million products at issue here,

26   NFI shipped approximately 216,699 products and NPS shipped approximately 37,997 products

27   between June 2015 and January 2018.  Dkt No. 109-20, Breshears Decl. ¶¶ 16, 18.  As the vast

28   majority of merchandise to California was shipped outside of the NFI and NPS distribution

channels, this alleged violation of the Karnette Act does not present a class-wide issue.

Nor do plaintiffs offer common proof. Although consistent with the Karnette Act, RAC retains documents for two years, RAC does not maintain information in a way that easily links specific CPUs to specific RPAs. For this litigation, RAC has created summaries of products for which a CPU was applied by pulling historical data from RAC's different systems where the mapping does not always match. While plaintiffs claim in conclusory fashion that they can match up information from these summaries to determine which California RPAs had products subject to a CPU, plaintiffs have not even attempted to show the Court how this can be done, claiming only that it "preliminarily" "appears" that they can match the products. *See* Breshears Dep. at 134:4-135:2 ("I have not been asked to perform a full analysis . . . .").

There is a reason plaintiffs skirt this issue.[14] Although not disclosed in his report, plaintiffs' expert testified in deposition as to a few examples where he tried to match a CPU to a product on a particular RPA. But to do this task across all 1.2 million products, he recognized would be "a time-intensive exercise that would be costly." Breshears Dep. at 135:4-17. Although his report states that given adequate time, he could match each item to its appropriate CPU, if any (Dkt No. 109-20 ¶ 19), when pressed as to how much time, Breshears revealed, "I would think more time than either party would want to spend, and -- and -- and I'll just leave it at that." Breshears Dep. at 139:19-140:3. Moreover, Breshears observed inconsistencies in the matching process, which would necessarily require individualized inquiries to ferret out the issues: "we can see where it works, but I can see examples where I can't find certain items. . . . I don't know what the cause for entries that we could look at that we couldn't match would be, but it would require a lot of labor-intensive activity." *Id.* at 135:4-17.

Given the limitations of the Litigation Database, the only way to determine if a product was subject to a CPU is to pull cost information for individual item one-by-one. RAC did that for the named plaintiffs' agreements and produced screenshots from RAC's electronic

---

[14] Plaintiffs claim the "calculations are straightforward for new items" (Dkt. 109, p. 15, line 8), but do not address calculation of costs for used products that were initially transported by NPS or NFI, particularly given issues surrounding depreciation. *See* discussion *infra* at n.20.

systems, which plaintiffs rely on to support their motion. Dkt. No. 109-2, Dostart Decl., Exs. 8, 10, 12-14 (filed under seal). Given the work needed for each and every transaction, common proof does not predominate. *Clemens,* 2016 WL 1461944, at *7 ("Plaintiffs have failed to demonstrate that their [] claims can be adjudicated based on any common form of proof. The only way to determine whether Hair Club is liable . . . is to comb through the timesheets and to vet each edited entry. This cannot be done on a class-wide basis.") *Lou v. Ma Labs., Inc.*, No. C 12-05409, 2014 WL 68605, at *4 (N.D. Cal. Jan. 8, 2014) (Alsup, J.) (without reliable data "capable of proving plaintiffs' [] claims on a classwide basis, this action becomes swollen with individualized, anecdotal, and occasionally speculative testimony").

**D.      PLAINTIFFS CANNOT RELY ON A CATCH-ALL ALLEGATION THAT "MANY TRANSACTIONS" WERE ALSO FOUND TO VIOLATE THE KARNETTE ACT TO SUPPORT CLASS CERTIFICATION**

Lastly, plaintiffs also claim broadly that RAC's Litigation Database discloses other transactions for which RAC's pricing "appears to violate California law," based on their expert's "analysis." Dkt. No. 109, p. 5 (citing Dkt. No. 109-20, Breshears Decl. ¶ 13). As a threshold issue, plaintiffs do not argue that any one of the four putative representatives are typical of class members who fall under this nonspecific category. Dkt. 109, p. 5. Plaintiffs' expert makes no mention of the representatives' transactions in his report, and could not testify whether their RPAs were among the "numerous" violations allegedly found. Breshears Dep. at 58:21-59:2, 61:21-62:10 ("I would have to go back and look at each of the plaintiff's particular agreements to see whether or not they met the requirement."). In fact, when asked whether the representatives' agreements might not be in violation, Breshears conceded, "That is possible."[15] *Id.* at 62:12-21.

Moreover, plaintiffs gloss over what those pricing violations might be and fail to present the Court common proof or a trial plan to support this theory, contending simply that liability can be "established through mathematical calculations using statutory formulae and RAC's records."

---

[15] RAC's expert actually analyzed the putative class representatives' RPAs and observed that all but one were in compliance with Karnette Act maximums. Kwon Decl. ¶¶ 38-44. Since Robinson's RPA pricing was over by $0.01, however, RAC can raise unique defenses regarding this *de minimus* potential overcharge that further renders her not typical. The remaining named plaintiffs lack standing to represent a class based on this catch-all pricing claim. *See Etter*, 323 F.R.D. at 311; *Saechao*, 2016 WL 1029479, at *9.

17

Dkt. No. 109, p. 14. But RAC did not act uniformly as to all the subject transactions, and the

proof necessary to address the variety of transactions will vary greatly. *Clemens*, 2016 WL

1461944, at *6 (certification denied where "plaintiffs have presented no direct evidence of a

uniform policy or practice"); *In re Graphics*, 253 F.R.D. at 505 ("what defeats certification here

is plaintiffs' failure to demonstrate a methodology for proving impact that is sufficiently

common to the class").

Curiously, Breshears did not provide a single example in his report of these alleged

violations. When asked what he meant when he said there were "numerous" of these

transactions, he testified simply, "Thousands." Breshears Dep. at 83:21. When asked how many

thousands or what percentage of the overall transactions were supposedly in violation of the

Karnette Act, he could not answer. *Id.* at 83:15-84:19, 94:4-95:3. Breshears eventually explained

that the purpose of his report was just to show that "it is possible" to run the calculation and he

was "just showing that this formula can be applied." *Id.* at 93:9-10, 95:5-10. But he did nothing

to validate the data provided to him; nor did he consider materiality of a difference when opining

that numerous transactions violated the Act. *Id.* at 95:19-20. One court has already disregarded

him for these practices,[16] the Court should do the same here. *See In re Graphics*, 253 F.R.D. at

494-96 (criticizing class certification expert who had the data, but conducted an analysis filled

with broad categories and did not correlate individual products to particular purchasers).

RAC's expert, Sonya Kwon, on the other hand, reviewed testimony and documents

produced to validate the data and reach independent conclusions. Kwon Decl. ¶¶ 7-17. Kwon

opines that numerous agreements actually do not exceed Karnette Act maximums, and provides

five such examples in her report. Kwon Decl. ¶¶ 32-37. Of the examples where prices exceed

the maximum, she breaks her findings down into three scenarios: "(1) Where 'exceed' is defined

at a $0.00 threshold, after rounding to the nearest cent; (2) Where 'exceed' is defined at a $0.05

threshold, to account for slight differences due to rounding; and (3) Where exceed is defined at a

---

[16] *Sanchez v. McDonald's Rest. of Cal., Inc.*, No. BC499888, 2017 WL 4620746, at *6 (Ca. Sup.
Ct. July 6, 2017) ("'[Breshears'] lack of understanding as to whether the data would support the
request or how it would affect the validity of his conclusions rendered him not credible," and
deeming him "and his testimony generally unreliable").

1    $1.00 threshold, as a nominal benchmark." *Id.* ¶ 45.

2         Kwon found that approximately 4.7% of RPAs had prices that exceeded the Karnette

3    Act's maximums, with 3,403 agreements exceeding by more than $1.00; 4,876 agreements

4    exceeding by more than $0.05; and the overwhelming majority of the 4.7% total (49,332

5    agreements) exceeding by an amount between $0.00 and $0.05.  Kwon Decl. ¶¶ 45-50.  While

6    plaintiffs will likely argue that it does not matter by how much the RPAs exceeded the maximum,

7    even if by a penny, since any amount is a violation of the RPA, Kwon's (and Breshears's)

8    analysis at a minimum beg for individualized inquiry.

9         It appears that 98% of the RPAs found in excess of the maximums were generated through

10   High Touch, the point of sale system RAC used before it transitioned to SIMS.  Kwon Decl. ¶ 50.

11   There were few agreements exceeding Karnette maximums before roughly September 2013 or

12   after July 2016.[17]  *Id.* ¶¶ 48-49.  Kwon also included in her calculations 14,918 RPAs that had the

13   same active and inactive date, suggesting there were likely either not executed or canceled out on

14   the same day.  *Id.* ¶ 17.  Finally, Breshears noted that "about half of the violations were because

15   of prior rental income . . . ."  Breshears Dep. at 97:10-98:2  Indeed, used items present a whole

16   host of challenges plaintiffs do not even address, and the challenges increase when you have

17   RPAs that include both used and new merchandise.[18]  "It would require an individualized inquiry

18   into each of these agreements," including having to pull cost and payment information, to

19   determine whether a glitch presented itself when pulling information into the Litigation Database

20   or whether RAC has other defenses to these findings.  Kwon Decl. ¶ 17.  As there will not be a

21   common answer here, nor have plaintiffs proposed a plan to get there, a class under this catch-all

22   theory cannot be certified.  *See Ellis*, 657 F.3d at 981.

23

24

[17] Dkt. No. 91-1 ¶¶ 10-11, 14 (noting challenges with the Litigation Database).

25   [18] *See* Cross Dep. at 123:24-130:24 (describing how income is allocated when RPAs have
     multiple items, how items are depreciated in several ways, and how one item might have different
26   methods of appreciation applied to it over a period of time).  In addition, since customers can
     negotiate down the price of a used item, the overall RPA pricing might still comply with the
27   Karnette Act, even if "upcharges" had been applied, "credits" had not, or under any other theory
     of liability. Since §1812.636 of the Karnette Act requires "damage," not just a technical violation,
28   this presents RAC with additional defenses unique to those items.

### E. PLAINTIFFS' USURY CLAIM IS NOT APPROPRIATE FOR CLASS TREATMENT[19]

As an initial matter, only four people have attempted to opt out of RAC's arbitration agreement during the class period, two of whom are proposed class representatives here. North Decl. Ex. 33 (RAC's Suppl. Resps. to Req. for Production of Docs) No. 3. Thus, plaintiffs face a numerosity problem in certifying a usury class, even a subclass, which contrary to their representation to this Court, RAC did not stipulate away.[20] *Harik v. Ca. Teachers Ass'n*, 326 F.3d 1042, 1051 (9th Cir. 2003) ("[t]he Supreme Court has held fifteen is too small").

In an effort to enlarge the class size, plaintiffs contend that any consumers for whom RAC cannot produce a signed arbitration agreement should be included in this class. Dkt. No. 109, p. 18. The law does not require RAC to keep original signed RPAs, much less arbitration agreements, and certainly not for more than two years. *See* discussion *supra* at 8. While RAC believes it has many original agreements, they constitute millions of pages of documents stored either in dozens of boxes across the state in 131 stores, a handful of RAC service centers, and an off-site storage facility with Iron Mountain.[21] Cross Decl. ¶ 11.

Moreover, plaintiffs neglect to address how this Court should apply usury to rent-to-own contracts, which are strictly governed by a separate and specific body of law, the Karnette Act. For instance, what amount from a rental-purchase transaction should constitute the "loan"

---

[19] The Court previously reserved issues regarding class action claims. Dkt. No. 83, Order. Any usury subclass must exclude individuals who signed and did not reject arbitration agreements. RAC respectfully preserves its argument that those individuals also are required to arbitrate their Karnette Act, UCL, and CLRA claims. The issue is on appeal to the Ninth Circuit, RAC has filed its opening appellate brief, and Plaintiffs' opposition is due by July 6, 2018. The case relied on by Blair to avoid arbitration, *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017), is on appeal to the Ninth Circuit in three other cases. *McArdle v. AT&T Mobility LLC*, No. 17-17246 (9th Cir.); *Tillage v. Comcast Corp.*, No. 18-15288 (9th Cir.); *Roberts v. AT&T Mobility LLC*, No. 18-15593 (9th Cir.). The U.S. Supreme Court recently reiterated that rules "that target arbitration either by name or by more subtle methods, such as by 'interfer[ing] with fundamental attributes of arbitration'" are preempted. *Epic Sys. Corp. v. Lewis*, 584 U. S. __, __ (2017) (slip op., at 7) (citations omitted). Were the Ninth Circuit to find that the arbitration agreement covers the Karnette Act, UCL, and CLRA claims, the class on all of the claims in this case would be reduced to only some of named plaintiffs.

[20] RAC stipulated only that there are numerous consumers for which RAC cannot presently locate the signed arbitration agreement. Dkt. No. 109, p. 11; *cf.* Dkt. No. 104, Order ¶ 1.

[21] These challenges also preclude a subclass from being certified as requested in Dkt.109, n.1.

DEFS' OPP'N TO PLS.' MOTION FOR CLASS CERTIFICATION       Case No. 3:17-CV-02335-WHA

amount? How should the "rate" of interest "per annum" on a rental-purchase transaction be determined? Plaintiffs' conclusory claim that RAC's records can be used to establish the effective rate of interest for each transaction does not satisfy their burden of showing a common plan. Dkt. 109, p.1. There may well be numerous individualized inquiries and unique defenses precluding class certification.[22] *See Endres v. Wells Fargo Bank*, No. C 06-7019, 2008 WL 344204, at *13 (N.D. Cal. Feb. 6, 2008) (no typicality in case alleging usury); *Ubaldi v. SLM Corp.*, No. 11-01320, 2014 WL 1266783, at *8 (N.D. Cal. Mar. 24, 2014).

## II. PLAINTIFFS' OVERINCLUSIVE CLASS DEFINITION PRESENTS MANAGEABILITY PROBLEMS AND IS THEREFORE NOT SUPERIOR

"Even if the need for the individualized [inquiries do] not defeat the predominance requirement . . . they should be considered [when addressing] manageability." *Harris v. Vector Marketing Corp.*, 753 F. Supp. 2d 996, 1023. Manageability requires the court to assess the "whole range of practical problems that" may affect adjudication of the case, and where such practical problems exist, the class must be denied. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).

In asking the Court to certify a class of all of RAC's California consumers on all of the one million plus transactions since March 13, 2013 to the present, plaintiffs have proposed a class so large, that trying to determine who might have been damaged and how much they might be entitled to will be extremely difficult, if not impossible. *See Dugan v. Lloyds TSB Bank, PLC*, No. C12-02549, 2013 WL 1703375, at *2 (N.D. Cal. Apr. 19, 2013) (rejecting efforts to certify all the classes plaintiffs could imagine) (citations omitted) ; *Rent-A-Ctr., Inc. v. Duron*, No. 09-04-147 CV, slip op. at 8 (Tex. Ct. App. Oct. 28, 2004) (attached at North Decl. Ex. 37) (class certification reversed as individual damage issue predominate). First, RAC's expert revealed the majority of class members seemingly suffered no injury at all,[23] and the law is well-settled that it is improper to certify a class that includes many class members who were not subject to the

---

[22] Plaintiffs also cannot meet their "burden of proving the essential elements of a usurious transaction" or rebutting the presumption that transactions are not usurious. *Ghirardo v. Antonioli*, 8 Cal. 4th 791, 798-99, (1994), as modified on denial of reh'g (Feb. 2, 1995). Plaintiffs do not reconcile how pricing terms that permitted by the Act can nonetheless be usurious interest.
[23] *See* Kwon Decl. ¶ 45 (4.7% of agreements may have exceeded Karnette Act maximums).

DECHERT LLP
ATTORNEYS AT LAW

1  alleged wrong.  *See Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1024 (9th Cir. 2011).

2       In addition, plaintiffs do not even bother to produce a "suitable and realistic plan for trial

3  of the class claims."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001)

4  (citation omitted).  Indeed, other than the unsupported assertion that they can match RAC's

5  summaries generated for this litigation and apply a formula to calculate the damages, plaintiffs

6  have utterly failed to "supply a class-wide method for proving 'impact' on a class wide basis."  *In

7  re Graphics*, 253 F.R.D. at 489.

8       Nor do the plaintiffs address how they will notify class members or distribute any monies

9  received, particularly given the transient nature of RAC's customers who are typically seeking to

10 rent products because their life situation is in flux.  In past cases involving RAC, class action

11 administrators have not been able to find the majority of RAC's customers to award them

12 settlement money.[24]  Thus, as plaintiffs do not to propose a plan on even finding class members to

13 provide notice, they fail to satisfy their burden.  *See* Fed. R. Civ. P. 23(c)(2) (requiring adequate

14 notice in class actions under Rule 23(b)(3)).

15      Still, a "court need not confine itself [only] to other available 'judicial' methods of

16 handling the controversy in deciding the superiority of the class action."  7AA Wright and Miller,

17 Federal Practice and Procedure § 1779, p 171 (2005).  Here, RAC offers consumers the ability to

18 seek arbitration.  To the extent any of the putative class members feel aggrieved by RAC's

19 pricing or policies, there is another "available method[] for the fair and efficient adjudication of

20 the [claims]."  *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1326 (11th Cir. 2008) (citations

21 omitted).  Thus, as class members have other and better options to adjudicate their claims,

22 plaintiffs cannot show superiority.

23

---

24 [24] For instance, of the 93,976 checks the class action administrator tried to issue as a result of
   RAC's settlement in 2006 with the California Attorney General's Office ("AG"), 58,863 were
25 undeliverable and uncashed.  North Decl. Ex. 34 (claims administrator plan provided to the AG);
   *see, e.g., In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1064 (C.D. Cal. 2012)
26 (documents obtained through public records request judicially noticeable as "matters of public
   record"); Fed. R. Evid. 201.  In the 2005 settlement in *Griego v. Rent-A-Ctr., Inc.*, Case No. JCCP
27 4244 (Cal. Super. Ct., filed Jan. 31, 2002) the class action administrator sent out 325,836 claim
   forms to RAC customers in California but only received 35,764 back.  *Id.* Ex. 35 (Mar. 21. 2005
28 declaration of claims administrator Kim R. Schmidt in *Griego*).

DECHERT LLP
ATTORNEYS AT LAW

III.    **THE LAWYER-DRIVEN NATURE OF THE SUIT RENDERS THE PUTATIVE CLASS REPRESENTATIVES INADEQUATE**

Courts in this jurisdiction and elsewhere have not hesitated to find adequacy is not met when "plaintiff's counsel constructed this lawsuit" before it had a plaintiff. *Bodner v. Oreck Direct, LLC*, No. C 06-4756, 2007 WL 1223777, at *2 (N.D. Cal. Apr. 25, 2007) ("[counsel] or his firm had the research performed on the product at issue and had a theory about the product's deficiencies [and] [*t*]*hen,* armed with that information they went in search of a plaintiff"); *Sanchez v. WalMart Stores, Inc.,* No. Civ. 2:06-CV-02573, 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009) (proposed representative who "learned that she . . . had a claim . . . only after . . . class counsel contacted her and told her so" not adequate); *Meachum v. Outdoor World Corp.*, 654 N.Y.S.2d 240, 251 (1996)*; Carlisle v. LTV Electrosvstems, Inc.*, 54 F.R.D. 237, 240 (N.D. Tex. 1972).

As in *Bodner*, the putative representatives here possess "overwhelming and undeniable ignorance about the nature" of the case, making it clear that "plaintiff's counsel, and not plaintiff, is the driving force" in the action.[25]  2007 WL 1223777, at *2.  For instance, the initial complaint alleged pricing violations based on comparing what plaintiffs paid to RAC with what they could have paid to Brandsmart, but putative representatives had not heard of Brandsmart, let alone performed that comparison. *See* discussion *supra* at n.2.  Until class counsel suggested that RAC's pricing violated the law, and that as a result plaintiffs could get their money back and keep the goods, they had no complaints about RAC or their agreements.  *See* discussion *supra* at 9-12.

This is unlike *Gutierrez v. Wells Fargo Bank, N.A.*, No. C 07-05923, 2008 WL 4279550, at *18 (N.D. Cal. Sept. 11, 2008) (Alsup, J.), where the Court deemed adequate a plaintiff found through publication of a suit after the lawsuit already had other plaintiffs.  Here, ***all*** of these putative class representatives were recruited for the case, none actually initiated this lawsuit, and none have contributed to the development of the legal theories. *See, e.g.*, Blair Dep. at 58: 3-16

---

[25] When asked "Why did you decide to be the lead plaintiff in this lawsuit . . . outside of your communications with counsel," Blair responded, "I can't answer."  Blair Dep. at 141:7; Garza Dep. at 98:6-99:8 (does not know what arbitration means, even though she rejected arbitration). No named plaintiffs met counsel until the day before her deposition. *See* Blair Dep. at 24:19-22. Garza did not read the complaint until just before her deposition.  Garza Dep. at 152:8-14.

(Q: And why are you suing Rent-A-Center? A: Because they illegally charged too much for the products that they—that they sell. Q: How do you know that? A: I don't).

More disturbing is the fact that the putative representatives submitted sworn declarations in support of this motion that suspiciously omit or shade key information. For instance, Blair claims she went to RAC because she received a flyer for air conditioners and she could "not afford to purchase outright from a traditional retailer." Dkt. No. 109-22 ¶ 2. The declaration omits the fact she previously rented with RAC, and that the reason she did not buy the air conditioner from WalMart, as she testified, was because the unit was not as large as the one in RAC's flyer, and had she bought it at WalMart and "would have paid for it on [her] credit card." Blair Dep. at 81:13-16. She also vaguely declares how she spoke with class counsel in March 2016 "to discuss her transactions with Rent-A-Center," and decided to seek redress not only for her own transactions but for other consumers. Dkt. No. 109-22 ¶ 18. Blair fails to mention the letter received from class counsel months earlier and the fact that "[a]t the time [she] went into the Rent-A-Center store and entered into the contract for the Xbox, [she had] already retained counsel in this case." Blair Dep. at 138:7-11. In fact, to underscore that class counsel was the instigator of the lawsuit, she declares "When I found out that Rent-A-Center was breaking California law, I knew that I wanted to help . . . ." Dkt. No. 109-22 ¶23.

Robinson similarly claims that only after she "came to understand that Rent-A-Center's conduct toward me may have been illegal" she "decided to participate in this lawsuit to seek redress" for myself and others. Dkt. No. 109-29 ¶ 8. Robinson was able to remember a number of details of her transaction, including that the RAC employee who sold her the television "did not offer to allow me to negotiate over the terms of these forms. I knew that I had no leverage to demand changes to the agreement Rent-A-Center had drafted," even though at deposition she could not remember facts about her transaction. *Compare id.* ¶ 3 *with* Robinson Dep. at 88:4-25, (she does not remember "anything" about her transaction).

Harris and Garza also signed declarations with comparable language, similarly omitting the fact that they received information from class counsel, but conceding that they decided to participate only after learning of RAC's illegal conduct. Dkt. Nos. 109-31 & 109-33. These

representatives are therefore not adequate to represent the interests of the class.

## IV. PLAINTIFFS DO NOT SATISFY THE (B)(2) CLASS REQUIREMENTS

Plaintiffs cannot avoid the requirements of a (b)(3) class by seeking certification of a (b)(2) class where, as here, their claim for money damages is the predominant form of relief sought. *Molski v. Geich*, 318 F.3d 937, 947 (9th Cir. 2003) ("the claim for monetary damages must be secondary to the primary claim for injunctive or declaratory relief"); *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1314 (1977). In addition, while a (b)(2) class does not have to satisfy the "predominance" requirement of a (b)(3) class, it does have to be cohesive and homogeneous. *Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577, 580 (7th Cir. 2000) ("Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogeneous"). The challenges noted above with respect to predominance also preclude certification under Rule 23(b)(2).

Plaintiffs here seek monetary damages for more than 1.2 million products and concede that monetary damages are not incidental. Dkt No. 109, motion, p. 20 n.2. Moreover, plaintiffs have not alleged that RAC engaged in an illegal practice that applies to the class as a whole. To the contrary, plaintiffs allege a variety of practices that are, again, not cohesive other than their conclusory claim that RAC violated the Karnette Act. This is insufficient to sustain plaintiffs' burden, particularly in light of the fact RAC instituted a Legal Engine to and other systems to avoid violations, which have been raised against RAC in the past, RAC has strived to correct, and the evidence strongly suggests RAC has. *Cf. Am. Council of the Blind*, 2008 WL 4279674, at *6.

## CONCLUSION

For the foregoing reasons, RAC respectfully requests that the Court deny plaintiffs motion for class certification.

Dated: June 14, 2018                                  Respectfully submitted,


                                                    */s/ Christina G. Sarchio*
                                                    CHRISTINA G. SARCHIO
                                                    *Attorneys for Defendants*
                                                    **RENT-A-CENTER, INC.** and **RENT-A-CENTER WEST, INC.**

1

2

3    16600253.8.LITIGATION

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECHERT LLP
ATTORNEYS AT LAW