JAMES T. HANNINK (131747)
jhannink@sdlaw.com
ZACH P. DOSTART (255071)
zdostart@sdlaw.com
DOSTART HANNINK & COVENEY LLP
4180 La Jolla Village Drive, Suite 530
La Jolla, California 92037-1474
Tel:  858-623-4200
Fax: 858-623-4299

MICHAEL RUBIN (80618)
mrubin@altber.com
ERIC P. BROWN (284245)
ebrown@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: 415-421-7151
Fax: 415-362-8064

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| PAULA L. BLAIR, ANDREA ROBINSON, and FALECHIA A. HARRIS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>RENT-A-CENTER, INC., a Delaware corporation; RENT-A-CENTER WEST, INC., a Delaware corporation; and DOES 1-50, inclusive,<br><br>Defendants. | CASE NO. 3:17-CV-02335-WHA<br><br>**PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date:    August 23, 2018<br>Time:    8:00 a.m.<br>Ctrm.:    12<br>Judge:    Hon. William Alsup |

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................. 1

II.     ARGUMENT ...................................................................................................... 3

      A.      RAC Has Waived Any Argument Based on the Class Arbitration Prohibition
           in Its Arbitration Agreement ....................................................................... 3

      B.      The Rule 23 Requirements Are Met ........................................................... 3

           1.      Plaintiffs' Claims Present Common Issues  ................................... 3

           2.      Common Issues Predominate .......................................................... 7

           3.      The Named Plaintiffs' Claims Are Typical .............................. 11

           4.      The Proposed Class Representatives Are Adequate ................. 11

      C.      The Usury Subclass Should Be Certified .................................................. 14

      D.      Certification Is Also Appropriate Under Rule 23(b)(2) ......................... 15

III.    CONCLUSION ................................................................................................ 15

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>

3

*Abdullah v. U.S. Sec. Assoc., Inc.*,
    731 F.3d 952 (9th Cir. 2013) ............................................................................................ 4, 5

4

5

*Am. Council of the Blind v. Astrue*,
    No. C 05-04696 WHA, 2008 WL 4279674 (N.D. Cal. Sept. 11, 2008) ............................ 5

6

*Amaral v. Cintas Corp. No. 2*,
    163 Cal.App.4th 1157 (2008) ............................................................................................ 10

7

8

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................................................ 3

9

*Anderson v. Mt. Clemens Pottery Co.*,
    328 U.S. 680 (1946) .......................................................................................................... 10

10

11

*Armstrong v. Davis.*,
    275 F.3d 849 (9th Cir. 2001) ............................................................................................ 10

12

*Ashbey v. Archstone Prop. Mgmt., Inc.*,
    785 F.3d 1320 (9th Cir. 2015) .......................................................................................... 14

13

14

*Bodner v. Oreck Direct, LLC*,
    No. C 06-4756 MHP, 2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) .............................. 13

15

*Burney v. Thorn Ams., Inc.*,
    944 F. Supp. 762 (E.D. Wis. 1996) .................................................................................. 15

16

17

*Etter v. Allstate Ins. Co.*,
    323 F.R.D. 308 (N.D. Cal. 2017) ................................................................................. 2, 10

18

*Fogie v. THORN Ams., Inc.*,
    190 F.3d 889, 899-901 (8th Cir. 1999) ............................................................................ 15

19

20

*Fogie v. THORN Ams., Inc.*,
    95 F.3d 645 (8th Cir. 1996) .............................................................................................. 15

21

*George v. Kraft Foods Global, Inc.*,
    251 F.R.D. 338 (N.D. Ill. 2008) ...................................................................................... 12

22

23

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .......................................................................................... 10

24

*Heffelfinger v. Elec. Data Sys. Corp.*,
    No. 07-101, 2008 U.S. Dist. LEXIS 5296 (C.D. Cal. Jan 7, 2008) ................................... 7

25

26

*Henry v. Cash Today, Inc.*,
    199 F.R.D. 566 (S.D. Tex. 2000) ..................................................................................... 15

27

*In re Comp. Memories Sec. Litig.*,
    111 F.R.D. 675 (N.D. Cal. 1986) ..................................................................................... 12

28

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008) ................................................................. 8

*In re Yahoo Shareholder Derivative Litig.*,
    153 F.Supp.3d 1107 (N.D. Cal. 2015) ........................................................ 3

*Jerry Enters. v. Allied Bev. Group, LLC*,
    178 F.R.D. 437 (D.N.J. 1998) .................................................................. 13

*Kanawi v. Bechtel Corp.*,
    254 F.R.D. 102, 111 (N.D. Cal. 2008) ..................................................... 13

*Kennedy v. United Healthcare of Ohio, Inc.*,
    206 F.R.D. 191 (S.D. Ohio 2002) ............................................................ 13

*Madden v. Midland Funding, LLC*,
    786 F.3d 246 (2d Cir. 2015) .................................................................... 15

*McConnell v. Merrill Lynch, Pierce, Fenner & Smith*,
    33 Cal. 3d 816 (1983) ............................................................................. 15

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ............................................................... 6, 11

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) ................................................................. 11

*Roper v. Consurve, Inc.*,
    578 F.2d 1106 (5th Cir. 1978) ................................................................. 15

*Saechao v. Landry's Inc.*,
    No. C 15-00815 WHA, 2016 WL 1029479 (N.D. Cal. Mar. 15, 2016) ........... 10

*Sanchez v. Wal Mart Stores, Inc.*,
    2009 WL 1514435 (E.D. Cal. May 28, 2009) .......................................... 13

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ................................................................... 11

*Stearns v. Ticketmaster Corp.*,
    655 F.3d 1013 (9th Cir. 2011) ................................................................... 6

*Surowitz v. Hilton Hotels Corp.*,
    383 U.S. 363 (1966) ................................................................................ 12

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*,
    209 F.R.D. 159 (C.D. Cal. 2002) ............................................................. 12

*Torres v. Mercer Canyons, Inc.*,
    835 F.3d 1125 (9th Cir. 2016) ................................................................... 6

*Trosper v. Stryker Corp.*,
    2014 WL 4145448 (N.D. Cal. Aug. 21, 2014) ......................................... 13

*Upshaw v. Ga.  Catalog Sales, Inc.*,

      206 F.R.D. 694 (M.D. Ga. 2002) ............................................................... 15

*Urakhchin v. Allianz Asset Mgmt. of Am., LP*,
      No. 8:15-cv-1614, 2017 WL 2655678 (C.D. Cal. Jun. 15, 2017) ..................................... 11

*Walters v. Reno*,
      145 F.3d 1032 (9th Cir. 1998) ................................................................ 15

*Wit v. United Behavioral Health*,
      2017 WL 3478775 (N.D. Cal. Aug. 14, 2017) .................................................. 9

**Statutory Authorities**

Cal. Civ. Code §1812.622 ........................................................................ 4

Cal. Civ. Code §1812.623 ........................................................................ 4

Cal. Civ. Code §1812.644 ................................................................ 1, 4, 5, 7

**Rules and Regulations**

Fed. R. Civ. P. 23(a)(1) ......................................................................... 14

Fed. R. Civ. P. 23(a)(4) .......................................................................... 2

Fed. R. Civ. P. 23(b)(2) ......................................................................... 15

Fed. R. Civ. P. 23(b)(2), 1966 Amendment advisory committee note ............................ 6

Fed. R. Civ. P. 23(b)(3) ......................................................................... 15

## I.    INTRODUCTION

Defendants Rent-A-Center Inc.'s and Rent-A-Center West, Inc.'s ("RAC's") opposition to class certification focuses more on the substantive merits of plaintiffs' claims than on the appropriateness of adjudicating those claims on a classwide basis.  For example, although RAC asserts that plaintiffs have failed to identify "common" claims, at the same time it argues that the principal legal issues can be decided in RAC's favor on summary judgment because they are "purely legal, factually uncontested, and can serve to narrow the issues in this case going forward," Dkt. 118 at 1 – which necessarily means they can be resolved on a classwide basis.

Plaintiffs agree that many of their claims rest upon statutory issues that can be decided as a matter of law, including the parties' disputes over: (1) the proper interpretation of "Lessor's Cost" under the Karnette Act, including whether it can include "upcharges" for intra-company transfers; (2) whether RAC's separate rental-purchase agreement and arbitration agreement constitute a "single document" within the meaning of the Karnette Act; and (3) whether RAC may ignore certain rebates received from suppliers when calculating its "Lessor's Cost."  As plaintiffs have shown, once these and other threshold liability questions have been answered – on a classwide basis – the resulting damages owed by RAC can be established by simple arithmetic based on statutory formulae and RAC's records.  Mot. at 14-17.

RAC contends that it will be too difficult for plaintiffs to prove damages on a classwide basis, even if plaintiffs establish classwide liability.  This argument ignores that the Karnette Act requires rent-to-own companies maintain records necessary to prove compliance, Cal. Civ. Code §1812.644(a), and that this Court has ordered RAC to produce such records.  Dkt. 80.  RAC did, in fact, produce a searchable database and other records that establish the details of every rent-to-own transaction during the class period.  Indeed, RAC's own expert was able to apply the Karnette Act's statutory formulae to RAC's data to identify the number of pricing violations during the class period under *RAC's* theory of the case (i.e., accepting RAC's allocation of estimated intra-company transfer costs to RAC's "Lessor's Cost" to calculate maximum prices under the Act).  RAC *concedes* that the number of transactions its expert identified – 49,332, or 4.7% of RAC's rental-purchase agreements ("RPAs") during the class period – "had prices that exceeded the

1    Karnette Act's maximums," *even under its own theory*.  Opp. at 19.  Under plaintiffs' construction

2    of the Act, that number is much higher – but just as easily calculated.

3            Liability can be proven or disproven in this case on a classwide basis.  The Court will use

4    traditional tools of statutory construction to decide whether plaintiffs are right or wrong about the

5    threshold legal issues.  Then, if the Court accepts plaintiffs' analysis of the statute's requirements,

6    RAC's own transactions database and other electronic records can be used to determine which

7    transactions were unlawful and what remedies the statute requires.  If there are material gaps or

8    errors in RAC's database, the appropriateness of burden-shifting and inference-drawing in favor of

9    plaintiffs will raise common issues as well, because RAC had exclusive access to its transaction-

10   and-pricing data and had an affirmative statutory duty to maintain records sufficient to establish

11   Karnette Act compliance.  Careless or inadequate recordkeeping cannot be a shield against class

12   certification.  *See Etter v. Allstate Ins. Co.*, 323 F.R.D. 308, 315 (N.D. Cal. 2017).

13           RAC also challenges the adequacy of the named plaintiffs, but misstates the standard.

14   Rule 23(a)(4) requires only that class representatives have no conflicts of interest with other class

15   members and be willing and able to prosecute the action vigorously on behalf of the class.  Here,

16   the named plaintiffs have already demonstrated their adequacy, and RAC does not challenge the

17   adequacy of proposed class counsel.

18           In this case, a class action is the only procedural mechanism available to protect the

19   statutory rights of RAC's California consumers.  Very few consumers understand their rights

20   under the Karnette Act, or even know the statute exists.  Fewer still have the resources needed to

21   analyze the elements of RAC's calculations of Lessor's Cost and maximum pricing.  Even if a

22   handful of class members had such resources (unlikely, given the consumer population targeted by

23   RAC), the costs of conducting the required analysis would far outstrip their potential individual

24   recoveries.  The economies of scale inherent in class action litigation is what makes the analysis

25   and presentation of proof in this case economically feasible.  This is one of those cases where the

26   violations are real, the economic harms to low-income consumers are substantial, but because the

27   costs of proof are so dauntingly high, there is insufficient "incentive for any individual to bring a

28

1   solo action prosecuting his or her rights." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617

2   (1997) (internal quotation marks omitted).

3   **II.      ARGUMENT**

4    **A.      RAC Has Waived Any Argument Based on the Class Arbitration Prohibition
  in Its Arbitration Agreement**

5

6     After this Court mostly denied RAC's motion to compel arbitration in October 2017, it

7   *initially* ruled, without the benefit of any briefing by the parties, that plaintiff Paula Blair could not

8   pursue any of her claims in court on a class action basis because of the class arbitration prohibition

9   in RAC's form Arbitration Agreement.  Plaintiffs promptly moved for reconsideration, pointing

10  out that RAC's class arbitration prohibition, by its terms, had no application to claims pursued in

11  court.  *See* Dkt. 70.  Plaintiffs also explained that even if RAC's Arbitration Agreement had

12  prohibited class actions in court, that prohibition would be invalid and unenforceable under

13  controlling California law.  *Id.*  In response, the Court vacated its initial order and issued an

14  amended order removing the language striking Blair's class action allegations.  Dkt. 82, 83.

15  Instead of deciding the issue on reconsideration, though, the Court ruled that these "[i]ssues

16  regarding class action claims will be decided at the class certification hearing," and it specifically

17  instructed that "[t]he defendants shall brief this issue as part of any opposition to class

18  certification."  Dkt. 83.

19    Despite the Court's invitation, and despite the fact that plaintiffs briefed the issue in their

20  motion for class certification, Mot. at 21-25, RAC has chosen *not* to argue that any language in its

21  form Arbitration Agreement precludes plaintiffs from pursuing their claims in court on a class

22  action basis.  For that reason, any such argument is waived.  *See In re Yahoo Shareholder

23  Derivative Litig.*, 153 F.Supp.3d 1107, 1124 n.11 (N.D. Cal. 2015).

24   **B.      The Rule 23 Requirements Are Met**

25    **1.      Plaintiffs' Claims Present Common Issues**

26    Plaintiffs' claims present significant common issues that will drive the resolution of this

27  case.  Plaintiffs allege two main theories of liability under the Karnette Act: first, that RAC

28  charges class members prices that exceed the statutory maxims; and second, that RAC fails to

3

1   comply with the Act's "single document" requirement.  RAC challenges parts of both theories in

2   its recently filed motion for partial summary judgment, which focuses on plaintiffs' claims that:

3   (1) RAC is not allowed to include in its "Lessor's Cost" its estimated intra-company transfer costs

4   that do not reflect any *actual* freight expense for shipping an item *to* RAC *from* a wholesaler,

5   distributor, supplier, or manufacturer;[1] and (2) RAC's practice of presenting customers with a

6   rental-purchase agreement and a separate arbitration agreement violates the Karnette Act's "single

7   document" requirement.[2]  RAC asserts that these issues are "purely legal, factually uncontested,

8   and can serve to narrow the issues in this case going forward," Dkt. 118 at 1, thus essentially

9   conceding the existence of common issues supporting class certification.  *See Abdullah v. U.S.*

10  *Sec. Assoc., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (issue is common where "determination of its

11  truth or falsity will resolve an issue that is central to the validity of each claim in one stroke").[3]

12      Having effectively conceded that the "single document" claim is amenable to class

13  certification, RAC nevertheless argues that a class should not be certified for plaintiffs' other

14  Karnette Act pricing claims because pricing violations may result from any combination of one or

15  more of its allegedly unlawful practices – e.g., mis-categorizing products when calculating the

16  maximum price, improperly including transfer costs in its "Lessor's Cost," and not accounting for

17  rebates.  Opp. at 13-17.  But each of those violations can be independently identified and

18  calculated by applying the statutory formulae to RAC's transactions database, even when two or

19  more violations apply to a single transaction.  The fact that different damages may have been

20

21  ───────────────────

22  [1] *See* Cal. Civ. Code §1812.622(k) ("'Lessor's cost' means the documented actual cost, including
    actual freight charges, of the rental property to the lessor from a wholesaler, distributor, supplier,
23  or manufacturer and net of any discounts, rebates, and incentives.").  Unless otherwise noted, all
    further statutory references are to the Cal. Civil Code.

24  [2] *See* Civ. Code §1812.623(a) ("Every rental-purchase agreement shall be contained in a single
    document which shall set forth all of the agreements of the lessor and the consumer with respect to
25  the rights and obligations of each party.").

26  [3] Although RAC addresses plaintiffs' "single document" claim in its motion for summary
    judgment, Dkt. 109 at 20, 24-25, it entirely ignores that claim in opposing class certification, other
27  than acknowledging in a footnote that "the same practice was applied to all class members during
    the class period."  Opp. at 12 n.12.
28

───────────────────

4

1  suffered by different class members because defendant committed several statutory violations

2  cannot defeat class certification.  *See Abdullah*, 731 F.3d at 957; *Am. Council of the Blind v.*

3  *Astrue*, No. C 05-04696 WHA, 2008 WL 4279674, at *3 (N.D. Cal. Sept. 11, 2008).  That is

4  because for each transaction, whether there was a Karnette Act pricing violation (regardless of the

5  cause), and if so, what damages resulted, can be determined as a matter of arithmetic and applying

6  the appropriate formula.  Kwon Decl. ¶¶24-27 (Dkt. 120-38); Breshears Decl. ¶¶8-19 (Dkt. 109).

7         In RAC's view, an issue cannot be "common" unless it applies to each and every member

8  of the class.  That has never been the law.  The class is defined to include all of RAC's California

9  customers because that is the universe of individuals who, during the class period, could have been

10  deprived of their Karnette Act and other statutory rights by RAC, based on the pricing and other

11  violations alleged by plaintiffs.  Plaintiffs do not have to prove that each alleged violation affected

12  every RAC customer during the class period, just that an efficient mechanism exists, using

13  classwide evidence (principally the transactions database and evidence establishing the nature of

14  the challenged practices) to determine which class members have been harmed and what damages

15  are due – all of which is provable here using classwide evidence.

16         RAC argues that although during the class period it included intra-company transfer

17  upcharges in its Lessor's Cost for more than 254,000 items of merchandise (and counting, because

18  these unlawful practices continue – which is why a public injunction is necessary as an element of

19  the requested relief), its alleged upcharge violations do not present a "common" issue because

20  RAC also rented items that were *not* shipped by NFI or NPS and therefore did not result in an

21  upcharge.  Opp. at 15-16.[4]  Similarly, RAC asserts that of the 1.2 million items sold to customers

22

23

---

24  [4] RAC characterizes the term "upcharge" as *plaintiffs'* description of RAC's inclusion of intra-
company transfer costs when computing statutory maximum prices, arguing that it "is an

25  allocation of actual cost, which does not reflect any profit margin to RAC."  Opp. at 4 n.8.  In fact,
"up charge" is the term used in RAC's computer systems to describe these estimated cost

26  allocations, *see* Dkt. 109-12 (Dostart Decl. Exh. 10, RAC-000458) (filed under seal).  Although it
does not directly represent profit, these cost allocations increase RAC's profits by artificially

27  raising the statutory maximum prices.  For example, for a new appliance, which is subject to
successive multipliers of 1.65 and 2.25, Civ. Code §1812.644(c), a transfer upcharge of $23.49

28  inflates the Total of Payments by $87.20.

1  during the class period, only 13,600 were the subject of a trailing rebate or credit for which RAC

2  did not adjust the Lessor's Cost, Opp. at 14; that only 49,332 transactions exceed the Karnette Act

3  pricing maximums *if* no reductions are made to account for intra-company transfer upcharges or a

4  trailing rebate or credit, Opp. at 19; and that 1,062 used items for which RAC had previously

5  received rental income were categorized as "new."  Opp. at 13.  But the precision of those

6  numbers demonstrates why this case is appropriate for certification.  Regardless of how many

7  violations the Court finds (after conducting the necessary statutory construction) and no matter

8  how large the ultimate award of damages resulting from those violations, RAC effectively

9  concedes that once the Court tells us what the statute means, the rest is arithmetic. At that point,

10 the parties' experts can apply the formulas and algorithms to the data and determine which class

11 members suffered which violations, on which transactions, in what amounts.

12        Commonality "does not require a finding that all members of the class have suffered

13 identical injuries."  *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014).  "[E]ven a well-defined

14 class may inevitably contain some individuals who have suffered no harm as a result of a

15 defendant's unlawful conduct."  *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1136 (9th Cir.

16 2016).[5]  The same is true of plaintiffs' proposed public injunction class.  The Rule 23 Advisory

17 Committee's Note explains that class certification is appropriate even if the defendant's action or

18 inaction "has taken effect or is threatened only as to one or a few members of the class, provided it

19 is based on grounds which have general application to the class."  F.R.C.P. 23(b)(2), 1966

20 Amendment advisory committee note.  Further, although there is no need in this case, it would be

21 possible to define classes or subclasses to correspond to the issues RAC raises.  For example,

22 although most transactions did not involve the mischaracterization of an item as "new," those that

23 did can be readily identified from the RAC database.  Thus, if the Court deems it necessary or

_____

[5] *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011), cited by RAC, Opp. at 21-22, is
not the contrary.  There, plaintiffs' proposed class was not well defined because a narrower
definition could easily eliminate those who were not subject to the allegedly unlawful conduct.
655 F.3d at 1024.  Moreover, because damages may be calculated by reference to RAC's records
in this case, there is no risk that anyone who has not been harmed will be compensated.

1   desirable, one or more classes or subclasses could be designated – although there seems to be no

2   reason to do so.  *See Armstrong v. Davis*, 275 F.3d 849, 871 n.28 (9th Cir. 2001) (noting district

3   court's discretion to redefine class), *abrogated on other grounds by Johnson v. California*, 543

4   U.S. 499 (2005).

5             **2.**        **Common Issues Predominate**

6          In an effort to challenge predominance, RAC argues that its transactions database,

7   spreadsheets of transfer upcharges, rebate/credit data, and other business records are inadequate as

8   a source of "common proof," and that individualized inquiries are therefore necessary to establish

9   liability for pricing violations.  Opp. at 8-9, 14-17.  With this argument, RAC walks a fine line

10  between, on one hand, furthering its incentive to avert class certification and, on the other,

11  acknowledging violation of (1) its statutory obligation to maintain such records,[6] and (2) its

12  obligation to comply with the Court's order requiring it to produce information "sufficient to

13  establish the Lessor's Cost" of each item of merchandise, and information "sufficient to calculate

14  the formulas under the Karnette Act (e.g., maximum cash price and maximum total payments,

15  etc.)."  Dkt. 80.  In fact, the information necessary to determine liability for pricing violations and

16  assess damages is available in electronic databases and other electronic records maintained by

17  RAC, most of which have already been produced in discovery.  Mot. at 14-16.  To the extent RAC

18  argues otherwise, its failure to fulfill its obligation to maintain and produce such records cannot

19  defeat certification.

20         RAC maintains sophisticated IT systems to track and record its purchasing, supply chain,

21  and customer transactions.  During discovery, RAC produced a transactions database that contains

22  pertinent information regarding every rental-purchase transaction in California during the class

23  period.  Dkt. 91-1 (Cross Decl.); *see also* Dkt. 80 (order describing required content of

24

25  _____

26  [6] *See* Cal. Civ. Code §1812.644(a) ("A lessor shall maintain records that establish the lessor's cost, as defined in subdivision (k) of Section 1812.622, for each item of personal property that is the

27  subject of the rental-purchase agreement.  A copy of each rental-purchase agreement and of the records required by this subdivision shall be maintained for two years following the termination of

28  the agreement.").

1   transactions database).  RAC has also produced electronic spreadsheets reflecting the amount of

2   any NFI- or NPS-related upcharge as to each item of property.  Dkt. 109-17, 109-19 (Dostart Decl.

3   Exhs. 15, 17) (filed under seal).  RAC has also produced records concerning each trailing rebate or

4   credit that was received.  Dkt. 109-9 (Holihan Depo. Tr. 121:16 – 122:7).

5          In spite of the scope of existing data (largely from what RAC refers to as its "data

6   warehouse"), RAC argues that information produced cannot provide common proof of the alleged

7   violations.  RAC contends that its transactions database contains "some errors," Opp. at 8-9, but

8   does not specify what they are.  RAC contends that its upcharges cannot be "easily link[ed]" to the

9   items in the transactions database.  Opp. at 16.  RAC also contends that too much detailed analysis

10  would be required to identify items sold in California that were subject to a documented rebate or

11  credit for which RAC did not adjust its Lessor's Cost.  Opp. at 6-7.[7]

12         None of these arguments are sufficient to prevent class certification.  With respect to the

13  transactions database, RAC's own expert has concluded that the database is accurate and

14  complete.  Kwon Decl. ¶10 (Dkt. 120-38).  Kwon's declaration also establishes she has already

15  used the database to identify transactions in which, even without adjusting Lessor's Cost to reflect

16  transfer upcharges or rebates/credits, the Cash Price or Total of Payments exceeded a statutory

17

18  ──────────────────

19  [7] RAC's citation to *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal.
    2008), is unavailing.  Opp. at 15.  In that case, plaintiffs sought certification of a "massive" class

20  to pursue multi-district antitrust claims, requiring plaintiffs to prove that defendants' practices had
    a "common impact" on price negotiations with hundreds of different purchasers in very different

21  circumstances.  253 F.R.D. at 483.  The court noted:

22         [T]he overwhelming majority of wholesale-purchaser transactions were made after
           individualized negotiations between defendants and the particular wholesale

23         purchaser.  Several factors influenced these negotiations, including the volume of
           the purchase, the particular market power of the wholesale purchaser, the extent of

24         customization of the product, the specific market for which the chip or card was
           designed for (i.e., desktop, notebook, workstation, etc.), the degree of customer

25         support, the performance level of the chip or card, and the varying representations
           and warranties that were included in the sales contract.  No doubt other purchaser-

26         specific factors played a role in the negotiations.

27  *Id.* at 480-81.  *In re Graphics* is a far cry from this case, in which plaintiffs need not prove abstract
    "common impact" on disparate price negotiations, but need only prove that RAC's prices

28  exceeded statutory maximums determined by common formulae applied to a database.

maximum. Kwon Decl. ¶¶18-27 (Dkt 120-38).[8] Moreover, RAC asserts that it uses a "Legal Engine software program" to "ensure that RAC complies with pricing laws, including the Karnette Act." Opp. at 5. If RAC can use a software program to determine statutory maximum prices for each individual item of merchandise (based on its theory of what costs should be included in "Lessor's Cost" under the Karnette Act), it cannot now argue that such a classwide analysis (based on plaintiffs' theory) is impossible to conduct.

With respect to rebates and credits, RAC's expert has identified about 13,600 items of merchandise as to which the Lessor's Cost was not adjusted. Davis Decl. ¶37 (Dkt. 120-42). Because RAC tracks merchandise by item number and serial number (both of which are including in RAC's transactions database), those records can also be used to determine which items ended up being rented in California.[9]

With respect to the upcharge spreadsheets, RAC has not identified a single instance in which an upcharge cannot be linked to a particular transaction. RAC tries to support its argument that the upcharge spreadsheets might not be "easy" to match to its transactions database by citing snippets from the deposition of plaintiffs' expert, David Breshears. Opp. at 16. But RAC did not produce the upcharge spreadsheets until just a few days before the filing deadline for plaintiffs' motion for class certification, and as a result, the analysis set forth in Breshears' initial declaration was preliminary, as he expressly stated at the time. Breshears Decl. ¶¶16-19 (Dkt. 109-20). Since

---

[8] Kwon's calculations of pricing violations are premised on RAC's theory of the case, most notably its contention that it is entitled to include estimated intra-company transfer costs in the "Lessor's Cost" for purposes of determining statutory maximum prices. Kwon Decl. ¶25 (Dkt. 120-38). At the class certification stage, however, it is plaintiffs' theory of the case that controls. *See Wit v. United Behavioral Health*, 2017 WL 3478775, at *11 (N.D. Cal. Aug. 14, 2017) ("[T]he ultimate question addressed in the Class Certification Order was whether Plaintiffs' claims were amenable to class treatment under Rule 23 when considered in light of Plaintiffs' theories of the case."). Moreover, the fact that RAC acknowledges that even under its theory of the case some 49,332 transactions, approximately 4.7% of the transactions during the class period, violated the Karnette Act's pricing provisions, Opp. at 19, Kwon Decl. ¶45, is sufficient to support certification.

[9] Regardless, even if it proves impossible to locate items for which RAC received trailing rebates, that does not prevent certification of class to pursue RAC's pricing violations based on other errors, such as its inclusion of intra-company transfer costs in "Lessor's Cost" for purposes of calculating statutory maximum prices.

REPLY MEMORANDUM ISO MOTION FOR CLASS CERTIFICATION      3:17-CV-02335-WHA

1    that date, Breshears has confirmed his initial, preliminary conclusion that the upcharges can in fact

2    be linked to particular transactions in the database.  Supplemental Declaration of David Breshears

3    ¶¶3-5 (filed herewith).  Further, RAC's counsel has confirmed that "RAC has produced sufficient

4    information to link an item listed in RAC-1253 and RAC-1254 [identifying intra-company transfer

5    cost allocations] to an item in the Litigation Database."  Declaration of Eric P. Brown ¶2 (filed

6    herewith).  Indeed, RAC was able to allocate these upcharges on an item-by-item basis to include

7    them in the "Lessor's Cost" when calculating prices for each item of merchandise (other than

8    furniture) sold during the class period.  It cannot credibly argue now that those same upcharge

9    amounts cannot be subtracted if that is what the Karnette Act requires.[10]

10       Accordingly, the evidence demonstrates that classwide proof is possible.  Even if the Court

11   were to accept RAC's arguments concerning deficiencies in its recordkeeping, that cannot defeat

12   certification.  Courts routinely shift the burden of proof on facts essential to a claim where

13   defendants assert that their records are inadequate, but plaintiffs have no meaningful access to the

14   necessary information.  *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946);

15   *Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157, 1189-90 (2008).  Burden-shifting is

16   especially appropriate where, as here, the defendant had a statutory obligation to maintain the

17   necessary records.  *See Mt. Clemens*, 328 U.S. at 687-88.  This is no less true at the class

18   certification stage.  *See, e.g., Etter*, 323 F.R.D. at 315 (defendants "should not benefit from their

19   poor recordkeeping by dodging a class action on that basis"); *Saechao v. Landry's Inc.*, No. C 15-

20   00815 WHA, 2016 WL 1029479, at *4 (N.D. Cal. Mar. 15, 2016) (employer's timesheet records

21   were a common method of proof, and any failure to record breaks "is its own fault.").  Indeed,

22   whether burden-shifting is appropriate here is another predominating common issue.  Mot. at 16.

23

24

25   _____

26   [10] In advance of trial, plaintiffs will present a trial plan as required by this Court's Guidelines for
     Trial and Final Pretrial Conference.  At this time, it is sufficient to show that plaintiffs' claims
27   may be resolved on a classwide basis and that "class resolution" is "superior to other available
     methods for the fair and efficient adjudication of the controversy."  *Hanlon v. Chrysler Corp.*, 150
28   F.3d 1011, 1022 (9th Cir. 1998).  Nothing more is required at this stage.  *See* Opp. at 22.

**3.      The Named Plaintiffs' Claims Are Typical**

RAC argues that typicality is not satisfied with respect to class members for whom a Karnette Act pricing violation arose from RAC's failure to adjust its Lessor's Cost to reflect a rebate or credit, and those whose merchandise was mischaracterized as "new."  Opp. at 13-14, 17. (Notably, RAC raises no such argument regarding any other violations.)  But in the Ninth Circuit, "the typicality requirement is permissive and requires only that the representative's claims are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010); *see also Parsons*, 754 F.3d at 685 ("[T]ypicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought.").

RAC's course of conduct and class members' resulting injuries are sufficiently similar to satisfy the typicality element of Rule 23.  "It does not matter that the named plaintiffs may have in the past suffered varying injuries . . . Rule 23(a)(3) . . . [does not require] that they be identically positioned to each other or to every class member."  *Parsons*, 754 F.3d at 686.  Nevertheless, if the Court believes there must be a class representative personally affected by RAC's failure to adjust Lessor's Cost for a rebate or credit, or for whom a used item was characterized as new, plaintiffs should be granted leave to propose one or more such individuals as class representatives.

**4.      The Proposed Class Representatives Are Adequate**

Adequacy of representation is judged by two criteria:  First class representatives must "have [no] conflicts of interest with other class members," and, second, they must be willing and able to "prosecute the action vigorously on behalf of the class."  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).  RAC does not contend that any conflict of interest renders named plaintiffs inadequate.  Rather, it argues that they are not sufficiently sophisticated to represent the proposed class.  Opp. at 23-24.

"[T]he Ninth Circuit has never imposed a knowledge requirement on proposed class representatives."  *Urakhchin v. Allianz Asset Mgmt. of Am., LP*, No. 8:15-cv-1614, 2017 WL 2655678, at *6 (C.D. Cal. Jun. 15, 2017) (internal quotation marks omitted).  Indeed, the Supreme Court has held that certification of a shareholder derivative class action may be appropriate even

1   where the named plaintiff "knew nothing about the content of the suit," "[was] uneducated

2   generally and illiterate in economic matters." *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 372

3   (1966).  Class representatives are adequate if they "have at least a rudimentary understanding of

4   the nature of the present action and they have a demonstrated willingness to assist counsel in the

5   prosecution of the litigation." *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives &*

6   *Composites, Inc.*, 209 F.R.D. 159, 165 (C.D. Cal. 2002).  In complex areas of law, "it is not

7   surprising that [plaintiffs] cannot articulate the nature of their claims" in detail.  *George v. Kraft*

8   *Foods Global, Inc.*, 251 F.R.D. 338, 351 (N.D. Ill. 2008).  "[A] court must be wary of a

9   defendant's efforts to defeat representation of a class on grounds of inadequacy when the effect

10  may be to eliminate any class representation[.]"  *In re Comp. Memories Sec. Litig.*, 111 F.R.D.

11  675, 682 (N.D. Cal. 1986).

12          Here, RAC's attempts to manufacture evidence of inadequacy are unpersuasive.  For

13  Andrea Robinson, RAC deems it "important[]" that, at her deposition, before being shown a copy,

14  she did not know what defense counsel was referring to as "the Complaint."  Opp. at 12.  But

15  Robinson recognized the Second Amended Complaint upon being shown a copy and recalled that

16  she reviewed it before it was filed.  Dkt. 120-17 (Robinson Tr. 121:1 – 122:6).  RAC challenges

17  Falechia Harris by asserting that she was "convicted of fraud for trying to cash a check that did not

18  belong to her and then skipping out on her court hearing, resulting in a bench warrant" and that

19  she had several credit card disputes.  Opp. at 16.  But the check incident took place "more than 25

20  years ago" and the credit card disputes were "about ten years ago."  Dkt. 120-16 (Harris Tr. 14:10,

21  17:6 – 18:18).  Ms. Harris has been employed for the past 14 years with Catholic Charities

22  Treasure Island Supportive Housing Program, and for the six years before that with Homeless

23  Prenatal Program as a substance abuse case manager.  Brown Decl. Ex. 1 (Harris Tr. 23:9 – 25:1).

24  For Paula Blair, RAC finds it significant that she never opened the Microsoft Xbox that she rented

25  from RAC on March 11, 2016.  Opp. at 1, 9-10.  But it was only after renting the Xbox that Blair

26  learned that Internet service is required in order to use it; and since she did not have Internet

27  access at that time, she "basically was stuck."  Brown Decl. Exh. 2 (Blair Tr. 119:20-25).  RAC

28

1    has nothing bad to say about Celinda Garza, except that she rejected the RAC arbitration

2    agreement after consulting with counsel.  Opp. at 11.

3         There is nothing unusual or improper about a class representative learning of alleged

4    illegal conduct through consultation with counsel, and it is certainly not grounds for denying class

5    certification.  *See Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 106, 111 (N.D. Cal. 2008) (rejecting

6    contention that proposed representatives were inadequate because they contacted counsel in

7    response to newspaper advertisement without previous awareness of claims); *Kennedy v. United*

8    *Healthcare of Ohio, Inc.*, 206 F.R.D. 191, 197 (S.D. Ohio 2002) (First Amendment "forbids denial

9    of class certification for solicitation of potential class representatives"); *Jerry Enters. v. Allied Bev.*

10   *Group, LLC*, 178 F.R.D. 437, 445 (D.N.J. 1998) ("a lack of *ex ante* 'claims consciousness' does

11   not demonstrate [plaintiff's] inadequacy as the class representative"; no surprise" that plaintiffs

12   "not educated in substantive or procedural aspects of the law" would not know of claims).[11]

13        Here, proposed class representatives testified that they are pursuing claims based on

14   RAC's unlawful pricing.  Brown Decl. Exh. 1 (Harris Tr. 60:24 – 61:25), Exh. 2 (Blair Tr. 57:21 –

15   58:5), Exh. 3 (Garza Tr. 151:3-11), Exh. 4 (Robinson Tr. 35:16 – 36:1).  Further, RAC does not

16   dispute that each of the proposed class representatives understands and accepts the duties of class

17   representatives, have responded to discovery and sat for lengthy depositions, or that Ms. Harris

18   attended two mediation sessions at the Ninth Circuit Court of Appeals.  Mot. at 13.  They have

19   done what is expected of class representatives, and should be appointed.

_____

21   [11] *Bodner v. Oreck Direct, LLC*, No. C 06-4756 MHP, 2007 WL 1223777 (N.D. Cal. Apr. 25,
22   2007), cited by RAC, Opp. at 23-24, does not require a different outcome.  There the proposed
     class representatives demonstrated an "undeniable and overwhelming ignorance regarding the
23   nature of this action, the facts alleged, and the theories of relief against defendant." *Id.* at *2.
     Moreover, plaintiffs' counsel in *Bodner* had previously been disqualified for filing ten class
24   actions in which either a lawyer at the law firm, or a relative of one of the lawyers, was the named
     plaintiff.  *Id.* at *6.  *Bodner* is often invoked by defendants seeking to avoid class certification, but
25   is usually distinguished as not persuasive outside its particular facts.  *See, e.g., Trosper v. Stryker
     Corp.*, 2014 WL 4145448, at *13 (N.D. Cal. Aug. 21, 2014) (given that defendant did not contest
26   appointment of class counsel, invocation of *Bodner* was unpersuasive); *Kanawi*, 254 F.R.D. at
     102, 111 (rejecting contention that plaintiffs who contacted class counsel in response to a
27   newspaper advertisement were thereby inadequate).  Similarly, in *Sanchez v. Wal Mart Stores,
     Inc.*, 2009 WL 1514435 (E.D. Cal. May 28, 2009), cited by RAC, Opp. at 23, the court's primary
28   concern was "strategic claim-splitting," which created a conflict of interest.  *Id.* at *3.

1

### C.    The Usury Subclass Should Be Certified

2    Although this Court held that plaintiff Blair's usury claim arising from her 2015 RPA was

3    subject to mandatory arbitration, it allowed her to pursue her 2016 usury claim in court because

4    her 2016 transaction was not subject to a binding arbitration agreement.[12]  Plaintiffs have since

5    determined that RAC does not have valid, signed arbitration agreements for many, and probably

6    most class members – perhaps as many as 75% of them (as plaintiffs will demonstrate in

7    opposition to RAC's summary judgment motion).  Plaintiffs therefore seek to certify a subclass

8    class comprised of those California customers for whom RAC is unable to produce a signed

9    arbitration agreement, to pursue usury claims.  Mot. at 18.

10    In opposition, RAC first argues that numerosity is not satisfied because only four people

11    attempted to opt out of RAC's arbitration agreement during the class period.  Opp. at 20.  But the

12    proposed subclass includes all class members for whom RAC is unable to produce a signed

13    arbitration agreement, and RAC has stipulated that any proposed subclass "of California

14    consumers for whom RAC cannot produce a signed arbitration agreement is sufficiently numerous

15    for purposes of Fed. R. Civ. Pro. 23(a)(1)."  Dkt. 104 ¶1.  RAC's stipulation is unsurprising given

16    its acknowledgment that is cannot produce signed arbitration agreements for three of the four

17    transactions to which named plaintiffs are party.  Dkt. 54.  To the extent that RAC argues that

18    class members for whom it cannot produce a signed arbitration agreement are nonetheless bound

19    by that agreement, it is mistaken.  *See Ashbey v. Archstone Prop. Mgmt., Inc*., 785 F.3d 1320,

20    1323 (9th Cir. 2015) ("A party seeking to compel arbitration has the burden under the FAA to

21    show (1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) that the

22    agreement to arbitrate encompasses the dispute at issue.").

23    _____

24    [12] This Court held that while Blair is not required to arbitrate her Karnette Act, CLRA, and UCL
claims, she is required to arbitrate any usury claim arising from her *2015* RPA.  Dkt. 82.  RAC did

25    not, however, move to compel arbitration of claims arising out of Blair's *2016* rental-purchase
agreement because she opted out of the arbitration agreement for that transaction.  RAC also

26    acknowledged that it does not have a signed arbitration agreement relating to plaintiff Robinson's
or plaintiff's Harris's transactions and, thus, did not move to compel arbitration of any of their

27    claims.  Dkt. 54.  Proposed class representative Celinda Garza opted out of the arbitration
agreement relating to her transaction.  Opp. at 11.

28

1    RAC next argues that there are questions about how usury law should to be applied to rent-

2    to-own contracts.  Opp. at 20-21.  But, as plaintiffs explained in their motion, these issues present

3    common questions supporting class certification.  Mot. at 18.  Many courts have certified usury or

4    related claims, and appellate courts have upheld class certification, upheld classwide judgments, or

5    overturned trial court orders denying certification of such claims, including several notable cases

6    against RAC itself.  *See, e.g.*, *Madden v. Midland Funding, LLC*, 786 F.3d 246, 254-55 (2d Cir.

7    2015); *Fogie v. THORN Ams., Inc.*, 190 F.3d 889, 893-94, 899-901 (8th Cir. 1999); *Fogie v.

8    THORN Ams., Inc.*, 95 F.3d 645 (8th Cir. 1996); *Burney v. Thorn Ams.*, Inc., 944 F. Supp. 762

9    (E.D. Wis. 1996); *Henry v. Cash Today, Inc.*, 199 F.R.D. 566 (S.D. Tex. 2000); *Upshaw v. Ga.

10   Catalog Sales, Inc.*, 206 F.R.D. 694 (M.D. Ga. 2002); *McConnell v. Merrill Lynch, Pierce, Fenner

11   & Smith*, 33 Cal. 3d 816 (1983).  As the Fifth Circuit explained with respect to a usury claim, class

12   action procedures are "not only superior to other methods but singularly appropriate for the

13   adjudication of this controversy."  *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1108 (5th Cir. 1978).

14          **D.      Certification Is Also Appropriate Under Rule 23(b)(2)**

15          In addition to certification under Rule 23(b)(3), Plaintiffs also seek certification of a class

16   to pursue injunctive and declaratory relief pursuant to Rule 23(b)(2).  Mot. at 19-20.  Certification

17   is appropriate because plaintiffs challenge a "pattern or practice that is generally applicable to the

18   class as a whole."  *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998).  In particular, plaintiffs

19   challenge RAC's unlawful pricing, as well as its violation of the Karnette Act's single-document

20   requirement.  Plaintiffs need not show that every class member has been injured to demonstrate

21   that RAC's unlawful pricing practices are "generally applicable."  *See supra* at 6.  Moreover, with

22   respect to the single document issue, "RAC is not disputing that the same practice was applied to

23   all class members during the class period."  Opp. at 12 n.12.  Accordingly, Rule 23(b)(2)

24   certification is appropriate.

25   **III.    CONCLUSION**

26          For the reasons stated, plaintiffs request the Court certify the proposed class and subclass,

27   appoint Paula Blair, Andrea Robinson, Falechia Harris, and Celinda Garza as class representatives,

28   and appoint Dostart Hannink & Coveney LLP and Altshuler Berzon LLP as class counsel.

Dated: July 12, 2018                    Respectfully submitted,

                                        DOSTART HANNINK & COVENEY LLP
                                        ALTSHULER BERZON LLP

                                        /s/ Michael Rubin
                                            Michael Rubin
                                            Attorneys for Plaintiffs

REPLY MEMORANDUM ISO MOTION FOR CLASS CERTIFICATION          3:17-CV-02335-WHA