JAMES T. HANNINK (131747)
jhannink@sdlaw.com
ZACH P. DOSTART (255071)
zdostart@sdlaw.com
DOSTART HANNINK & COVENEY LLP
4180 La Jolla Village Drive, Suite 530
La Jolla, California 92037-1474
Tel:  858-623-4200
Fax: 858-623-4299

MICHAEL RUBIN (80618)
mrubin@altber.com
ERIC P. BROWN (284245)
ebrown@altber.com
ANDREW KUSHNER (316035)
akushner@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: 415-421-7151
Fax: 415-362-8064

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| PAULA L. BLAIR, ANDREA ROBINSON, and FALECHIA A. HARRIS, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>RENT-A-CENTER, INC., a Delaware corporation; RENT-A-CENTER WEST, INC., a Delaware corporation; and DOES 1-50, inclusive,<br><br>    Defendants. | CASE NO. 3:17-CV-02335-WHA<br><br>**PLAINTIFFS' NOTICE OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT, CROSS-MOTION, AND MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF CROSS-MOTION AND IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:  August 23, 2018<br>Time:  8:00 a.m.<br>Ctrm.:  12<br>Judge:  Hon. William Alsup |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION .................................................................................................2

II.    BACKGROUND ..................................................................................................4

       A.    The Karnette Act's Pricing Caps Are Defined by Reference to the Lessor's
             "Documented Actual Cost" of Acquiring an Item of Merchandise From a
             Vendor ...................................................................................................4

       B.    RAC's Allocation of Internal Storage and Transportation Expenses........................7

             1.    NPS Upcharges ...........................................................................7

             2.    The RAC/NFI Logistics Contract .....................................................9

III.   LEGAL STANDARD ..........................................................................................11

IV.    THE KARNETTE ACT RESTRICTS LESSOR'S COST TO THE
       DOCUMENTED ACTUAL COST OF ACQUIRING AN ITEM OF
       MERCHANDISE FROM A VENDOR ......................................................................12

       A.    The Karnette Act Does Not Authorize RAC to Include Intra-Company
             Storage and Transportation Expenses in the Lessor's Cost of an Item of
             Merchandise ...........................................................................................13

       B.    Rent-A-Center May Not Increase Its Lessor's Cost for an Item of
             Merchandise by Allocating an Estimated, Projected, or Average Cost That
             Is Not the "Actual Cost" of Transporting That Particular Item ...............................17

V.     RAC VIOLATES THE KARNETTE ACT'S "SINGLE DOCUMENT"
       REQUIREMENT BY USING AN ARBITRATION AGREEMENT THAT IS
       SEPARATE AND APART FROM A RENTAL-PURCHASE AGREEMENT ...............18

VI.    THIS COURT SHOULD ENJOIN RAC'S UNLAWFUL PRACTICES .........................23

VII.   CONCLUSION ...................................................................................................24

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Allphin v. Peter K Fitness, LLC*,
 2014 WL 3593108 (N.D. Cal. July 18, 2014) ........................................................................16

5

6

*Bonnel v. Medical Board*,
 31 Cal.4th 1255 (2003) ...........................................................................................................12

7

8

*Camarena v. Meissner*,
 78 F.Supp.2d 1044 (N.D. Cal. 1999) .....................................................................................23

9

*Continental Airlines Inc. v. Intra Brokers, Inc.*,
 24 F.3d 1099 (9th Cir. 1994) ..................................................................................................23

10

11

*Coyote Valley Band of Pomo Indians v. United States*,
 639 F.Supp. 165 (E.D. Cal. 1986) ..........................................................................................11

12

13

*Dow v. Lassen Irrigation Co.*,
 216 Cal.App.4th 766 (2013) ...................................................................................................14

14

*DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*,
 176 Cal.App.4th 697 (2009) ...................................................................................................21

15

16

*Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*,
 249 F.3d 1132 (9th Cir. 2001) .......................................................................................9, 11, 12

17

18

*Harper v. U.S. Seafoods LP*,
 278 F.3d 971 (9th Cir. 2002) ..................................................................................................12

19

*Jurcoane v. Superior Court*,
 93 Cal.App.4th 886 (2001) .....................................................................................................20

20

21

*Kaatz v. City of Seaside*,
 143 Cal.App.4th 13 (2006) .....................................................................................................15

22

*Kleffman v. Vonage Holdings Corp.*,
 49 Cal.4th 334 (2010) .............................................................................................................20

23

24

*Microsoft Corp. v. Intrax Group, Inc.*,
 No. C 07-1840, 2008 WL 4500703 (N.D. Cal. Oct. 6, 2008) ................................................23

25

26

*Molski v. M.J. Cable, Inc.*,
 481 F.3d 724 (9th Cir. 2007) ..................................................................................................22

27

28

*Pineda v. Bank of Am., N.A.*,
 50 Cal.4th 1389 (2010) ...........................................................................................................17

ii

CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION              3:17-CV-02335-WHA
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

*Rojas v. Platinum Auto Group, Inc.*,
    212 Cal.App.4th 997 (2013).........................................................................22

*Rubio v. Superior Court*,
    244 Cal.App.4th 459 (2016).........................................................................17

*Texaco Inc. v. United States*,
    528 F.3d 703 (9th Cir. 2008).......................................................................12

**California Statutes**

Bus. & Prof. Code
    §17200.............................................................................................................1, 3
    §22901(v)............................................................................................................15

Cal. Civ. Code
    §1738.12..............................................................................................................15
    §1770(a)(19).........................................................................................................3

Com. Code §10103(a)(24).........................................................................................15

Consumers Legal Remedies Act, Cal. Civ. Code
    §§1750 *et seq.*.....................................................................................................1

Health & Safety Code §18003 ..................................................................................15

Karnette Rental-Purchase Act, Cal. Civ. Code
    §1812.620 *et seq.*........................................................................... *passim*

Pub. Util. Code §4451(g) .........................................................................................15

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 23, 2018, at 8:00 a.m. or as soon thereafter as the matter may be heard, in Courtroom 12 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA, 94102, plaintiffs Paula Blair, Andrea Robinson, and Falechia Harris will and hereby do move this Court for entry of partial summary judgment against defendants Rent-A-Center, Inc. and Rent-A-Center West, Inc. (collectively "RAC") under Federal Rule of Civil Procedure 56, and for a permanent injunction against RAC's unlawful practices.

This motion is made on the ground that there is no dispute as to any material fact and plaintiffs are entitled to an order establishing as a matter of law that:

(1) RAC violated California's Karnette Rental-Purchase Act ("Karnette Act"), Cal. Civ. Code §§1812.620 *et seq.*, Consumers Legal Remedies Act, Cal. Civ. Code §§1750 *et seq.*, and Unfair Competition Law, Cal. Bus. & Prof. Code §§17200 *et seq.*, by improperly including in its "Lessor's Cost" for merchandise rented and sold to plaintiffs and other California customers during the class period its expenses associated with the intra-company storage or transportation of that merchandise and by calculating those improper expenses based on estimated, projected, or averaged costs rather than "actual cost."

(2) RAC separately violated the Karnette Act, Consumers Legal Remedies Act, and Unfair Competition Law, by setting forth plaintiffs' and other California customers' rights and obligations in separate documents rather than in a "single document" as required by the Karnette Act.

This motion is based on this Notice of Motion, plaintiffs' Memorandum of Points and Authorities, the declaration of Zachariah P. Dostart submitted herewith, any reply memoranda or other papers plaintiffs may file, any argument the Court may entertain, and all pleadings and papers on file in this matter.

1

CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION                3:17-CV-02335-WHA
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

RAC's Motion for Partial Summary Judgment asks the Court to construe two provisions of the Karnette Act in a manner contrary to the plain statutory language and express legislative intent. First, RAC argues that, in addition to any actual freight charge that RAC pays to obtain a particular item of merchandise from a vendor, it is permitted by the Act to include in its "Lessor's Cost" – the basis of the Act's price caps – the estimated or averaged costs of its intra-company storage and transportation.  Second, RAC argues that, notwithstanding the Act's "single document" requirement, the Act permits it to set forth the parties' rights and obligations concerning arbitration in a separate document from the rental-purchase agreement.  Both arguments must be rejected.  The plain language of the Karnette Act, a consumer protection statute enacted in 1994 and amended in 2006 to impose strict requirements on an industry that targets California's most vulnerable low-income residents, precludes both arguments.  Under the undisputed facts, plaintiffs, not RAC, are entitled to partial summary judgment.

1. The Karnette Act establishes the maximum prices a rent-to-own company may charge for any particular item of merchandise.  Those maximum prices are determined by applying a specified multiplier (or successive multipliers) to the company's cost of acquiring the item of merchandise from a vendor, defined as the "Lessor's Cost." Cal. Civ. Code §1812.644(b).[1]  The maximum allowable price per item depends on what expenses may lawfully be included in the "Lessor's Cost" for that item, which the Act limits to "the *documented actual* cost, including *actual* freight charges, of *the* rental property *to* the lessor *from* a wholesaler, distributor, supplier, or manufacturer and net of any discounts, rebates, and incentives." §1812.622(k) (emphasis added).

Discovery has established that for more than 250,000 items of merchandise rented by RAC to its customers in California during the class period, RAC unlawfully included in its "Lessor's Cost" not only the actual freight charge it incurred in obtaining each item *from* the vendor, but an

---

[1] Except as otherwise stated, all statutory references are to the California Civil Code.

additional amount that RAC based on a ballpark estimate or average of RAC's overhead expenses associated with storing and transporting merchandise *after* it was received from the vendor.  After increasing its "Lessor's Cost" in this manner, RAC applied the statutory multipliers to arrive at unlawfully inflated statutory maximum prices that it contends may be charged for those items.  As a result, in hundreds of thousands of transactions, RAC's customers paid a substantially higher price for merchandise than the Karnette Act's price caps allow.[2]

The Karnette Act was enacted to prevent such price gouging.  As amended in 2006, the Act specifies that Lessor's Cost for any given item of merchandise is limited to "the documented actual cost," including "actual freight charges," to transport the item "to" the rent-to-own company "from" a wholesaler, distributor, supplier, or manufacturer.  RAC's bookkeeping ploy thus violates the Act in two separate and independent ways: first, by including in RAC's Lessor's Cost an amount for storage and transportation expenses that RAC did not incur in obtaining the particular item of merchandise "from" a wholesaler, distributor, supplier, or manufacturer; and second, by allocating ballpark estimates, projections, and/or averages of overall company-wide logistics expenses, without regard to the "actual cost" of storing and transporting the particular item of merchandise.  The legislative history of the Karnette Act demonstrates that the Legislature added the word "actual" before "freight charges" to prohibit exactly what RAC now seeks judicial approval to continue doing – to artificially increase the maximum prices it may charge for a given item of merchandise.  The Act requires rent-to-own companies like RAC to include in an item's Lessor's Cost only the company's "documented actual cost" of acquiring the item from a vendor (which can be verified directly from the vendor's invoice), not an additional allocation of its internal overhead expenses, which are too easily manipulated.

2.  Among the Karnette Act's disclosure provisions is a requirement that rent-to-own companies must "set forth *all* of the agreements of the lessor and the consumer with respect to the rights and obligations of each party" in a "single document."  §1812.623(a) (emphasis added).

---

[2] RAC's violations of the Karnette Act are also "unlawful" business practices in violation of Business & Professions Code §17200 that resulted in unconscionable pricing provisions, in violation of Civil Code §1770(a)(19).

Despite this clear instruction, whenever RAC presents a customer with an arbitration agreement, it does so in a document that is separate and apart from the rental-purchase agreement ("RPA").

RAC contends that it is allowed to use a separate document to set forth its customers' rights and obligations regarding arbitration because, notwithstanding §1812.623(a), two unrelated provisions of the Act make reference to "other documents" in addition to the RPA. That construction would render the "single-document" requirement superfluous. Under the Act as written, RAC must include every *material* term and condition of a party's rights and obligations in a single document, even if other, non-material information about RAC and its products or services may be set forth in a separate document. RAC makes no attempt to argue that the parties' rights and obligations regarding arbitration are immaterial in the context of a rental-purchase transaction.

On both of the foregoing issues, RAC's arguments undermine important legislative objectives and find no support in the text of the Act, the legislative history, or any other authority. For the reasons set forth below, the Court should grant partial summary judgment to plaintiffs, and against RAC, as to these disputed legal issues, and should permanently enjoin RAC's unlawful practices.

## II.    BACKGROUND

### A.    The Karnette Act's Pricing Caps Are Defined by Reference to the Lessor's "Documented Actual Cost" of Acquiring an Item of Merchandise From a Vendor

In 1994, the California Legislature enacted the Karnette Act to rein in price-gouging and deceptive sales practices in the rent-to-own industry. In particular, the Legislature sought "to ensure that consumers are protected from misrepresentations and unfair dealings," and to "prohibit unfair or unconscionable conduct toward consumers" and "unfair contract terms, including unreasonable charges." §1812.621.

As originally enacted, the Karnette Act did not set a maximum price that a rent-to-own company could charge over time for a particular item of merchandise. Instead, the original Act required rent-to-own companies to disclose the "cash price" for the property subject to the rental-purchase agreement, defined as "the price at which retail sellers are selling and retail buyers are buying the same or similar property for cash in the same trade area in which the lessor's place of

4

business is located." §1812.622(e) (1994) (Dostart Decl. Ex. 1 at 3 (AB 722)). For consumers who paid over time (as nearly all rent-to-own customers do), the 1994 Act merely required rent-to-own companies to disclose the "cost of rental," which was defined as "the difference between the total of all periodic payments necessary to acquire ownership under the rental-purchase agreement and the cash price of the rental property." §1812.622(f) (1994) (Dostart Decl. Ex. 1 at 3 (AB 722)).

In 2006, the Legislature substantially revised the Karnette Act at the request of both the Attorney General and the rent-to-own industry. North Decl. [Dkt. No. 120] Ex. 1 at 3 (AB 594, Senate Judiciary Comm. Hearing, June 20, 2006). AB 594 was a "collaborative effort between the AG and the rental-purchase industry" to "seek[] to address the problems with the Act that have been encountered in practice." *Id.* As explained by the Senate Judiciary Committee, one of the problems with the Act was the ambiguity and administrative burden inherent in determining "what the real cash price is." *Id.* at 5. The Senate Judiciary Committee explained that AB 594 would address that problem by creating "bright-line pricing caps," both for the "cash price" and also for a newly-defined "total of payments." *Id.* The bright-line pricing caps were intended to "ensure that consumers are not taken advantage of by unconscionable pricing" and to "help law enforcement by making it easier to obtain documentation supporting the cash price and payments disclosed in the contract." *Id.* While the new pricing caps would set an absolute maximum that could be charged to a consumer over time, the Committee believed the proposed formulas would provide a "sufficient" margin for rent-to-own companies. *Id.*

The report of the Senate Judiciary Committee repeatedly refers to the need for certainty in calculating the maximum Cash Price and Total of Payments. The Attorney General asserted that the new legislation, including the new price caps, would "bring certainty" as well as "provide consumers greater protection from price gouging or overreaching by RTOs than is available under current law." North Decl. Ex. 1 at 6. The Attorney General also explained that it would be advantageous to get away from the "fact intensive inquiry" that was required under the initial Act to determine the cash price (and, by extension, the "cost of rental"). *Id.* at 7. As a sponsor of AB

594, RAC itself argued that the legislation was needed to provide "clear direction" for everyone involved, "consumers, enforcement agencies, and retailers" alike. *Id.* at 6.

The Consumer Attorneys of California (CAOC) expressed support for the goal of clarifying the law but also raised several points of concern. The CAOC noted that discovery sometimes revealed that rather than tracking "actual" freight costs, some rent-to-own companies used an "approximated or collective value that was not truly representative of the RTOs actual freight costs." Letter dated June 16, 2006 from Frank Pitre, President of Consumer Attorneys of California, to Assembly Member Betty Karnette (Dostart Decl. Ex. 2 at 16). To prevent that, the CAOC suggested that only "*actual* freight charges" should be included in the Lessor's Cost. *Id.* Soon thereafter, the Legislature amended the bill to insert "actual" before "freight charges" in the definition of "Lessor's Cost." Dostart Decl. Ex. 3 at 20.

As amended, the Karnette Act establishes a maximum Cash Price and a maximum Total of Payments that can be charged for any given item of merchandise. §1812.644(b). For "each item of personal property that is a subject of the rental-purchase agreement," the price caps are calculated as a function of the "Lessor's Cost" for that item. §1812.644(b).[3] The Lessor's Cost, in turn, is defined as "the documented *actual* cost, including *actual* freight charges, of *the* rental property *to* the lessor *from* a wholesaler, distributor, supplier, or manufacturer and net of any discounts, rebates, and incentives." §1812.622(k) (emphasis added). The multiplier(s) used to determine the statutory maximum(s) vary depending on the category of merchandise and whether the item is new or used.[4]

---

[3] "Cash price" is defined as "the price of the personal property described in the rental-purchase agreement that the consumer may pay in cash to the lessor at the inception of the rental-purchase agreement to acquire ownership of that personal property." §1812.622(e). "Total of payments" is defined as "the total amount of periodic payments necessary to acquire ownership of the property that is the subject of the rental-purchase agreement if the consumer makes all regularly scheduled payments." §1812.622(l).

[4] For new items, the maximum Cash Price for "computer systems and appliances" is 1.65 times the Lessor's Cost; for "electronic sets," it is 1.7 times the Lessor's Cost; for "automotive accessories, furniture, jewelry, and musical instruments," it is 1.9 times the Lessor's Cost; and for "all other items," it is 1.65 times the Lessor's Cost. §1812.644(b). The maximum total of payments that can be charged for a new item is 2.25 times the maximum Cash Price. §1812.644(c). A similar pricing structure applies to used merchandise. *See* §1812.644(d),(e).

1    Under this system, which has been in place since 2006, there is no uncertainty about the
2    price caps imposed by the Act.  The Lessor's Cost is the "documented actual cost, including actual
3    freight charges, of the rental property to the lessor from a wholesaler, distributor, supplier, or
4    manufacturer," §1812.622(k), and the respective price caps are computed mathematically as a
5    specified multiple of that amount.  It is a violation of the Act for a lessor to state a Cash Price or a
6    Total of Payments that exceeds a statutory maximum, §1812.624(a) (17)-(18), and any rental
7    purchase agreement that states a price that exceeds a statutory maximum is voidable by the
8    consumer, §1812.624(b).  Further, if a lessor willfully discloses a Cash Price or Total of Payments
9    that exceeds a statutory maximum, the rental-purchase agreement is void, the consumer may retain
10   the property without obligation, and the lessor must refund to the consumer all amounts paid.
11   §1812.644(g).  To permit meaningful enforcement of these provisions, the Act requires each rent-
12   to-own company to maintain the records necessary to establish the Lessor's Cost for each and
13   every item that is rented or sold to a consumer, §1812.644(a).  For the Act's remedial purpose to
14   be achieved, and for there to be any sort of "bright-line" rule that can promote certainty for
15   consumers and law enforcement, the statutory constraints on what expenses may be included in
16   Lessor's Cost must be strictly enforced in favor of the consumer.

17        **B.    RAC's Allocation of Internal Storage and Transportation Expenses**

18        As RAC acknowledges, for many years it contracted to have its vendors ship merchandise
19   directly to its stores in California and elsewhere.  Those vendors' invoices to RAC covered the
20   cost of the merchandise itself as well as the associated freight expense.  Dkt. 118 at 3 (RAC's
21   Motion for Partial Summary Judgment) (hereinafter "Mot"); Davis Decl. ¶11 (Dkt. 120-42 at 4).
22   However, during the class period, RAC changed this practice and began relying on logistics
23   companies for internal transportation and other services, such as the storage and handling of
24   merchandise, and added "upcharges" to its Lessor's Cost to include these additional internal
25   overhead expenses.

26        **1.    NPS Upcharges**

27        Since at least late 2014, RAC has added to its Lessor's Cost an upcharge for each item of
28   merchandise handled by its wholly-owned subsidiary, National Product Services, LLC ("NPS").

7

NPS operates 22 service centers for RAC across the country, including two in California: in Santa Fe Springs (near Los Angeles) and Galt (near Sacramento).  Dostart Decl. Ex. 4 at 31 (Pope depo. 48:9-14).  RAC used those two NPS service centers in California, plus one in Kansas City, to ship certain types of items to RAC retail stores in California.  *Id*. Ex. 4 at 31-33 (Pope depo. 48:15 - 49:16; 49:23 - 50:2).

RAC contracts with many vendors to have items shipped from the vendor directly to an NPS service center in California (or, for smartphones only, in Kansas City).  For all such merchandise, RAC takes title as soon as that merchandise arrives at the NPS service center. Dostart Decl. Ex. 5 at 60 (Glasky depo. 64:13-16).  The NPS service centers then store the merchandise until RAC asks NPS to re-ship the merchandise to one of RAC's California retail stores.  *Id*. Ex. 4 at 34-35  (Pope depo. 57:6-17; 65:2-20).  NPS uses United Parcel Service to ship smartphones from the Kansas City service center to RAC's California stores, *id*. Ex. 4 at 36-37 (Pope depo. 78:21 - 79:5), but otherwise NPS uses its own trucking network to deliver the items from its service centers to RAC's stores.  *Id*. Ex. 4 at 34-35 (Pope depo. 57:6-7; 65:2-20).  NPS does not deliver new merchandise for any company other than RAC.  *Id*. Ex. 4 at 43 (Pope depo. 86:16-21).  NPS's employees are RAC employees (consistent with NPS's status as RAC's wholly owned subsidiary), and its trucks bear the name "Rent-A-Center, Inc."  *Id*. Ex. 4 at 44-45, 46 (Pope depo. 93:13 - 94:2; 95:6-15).

Even though RAC takes title to all merchandise from vendors upon delivery to the NPS facility, and even though the Karnette Act permits the Lessor's Cost for any given item to include only the "documented actual cost, including actual freight charges, . . . *to the lessor from a distributor, supplier or manufacturer*," §1812.622(k) (emphasis added), RAC added to its Lessor's Cost for each item an upcharge (also referred to as a "CPU," or "cost per unit") to include additional expenses attributed to NPS's storage and shipping activities.[5]  The amount of the

---

[5] RAC quibbles with the term "upcharge."  *See* Mot. at 4 n.6.  But the term is RAC's own: RAC's internal software labels the $23.49 transportation upcharge as "NPS_upchrg."  *See, e.g.*, Declaration of Zachariah P. Dostart in Support of Plaintiffs' Motion for Class Certification, Ex. 8 (under seal) (RAC-000457); Dostart Decl. Ex. 4 at 48-49 (Pope depo. 112:16 - 113:11).  RAC's own accounting expert uses the term "transfer upcharges."  *See, e.g.*, Davis Decl. ¶16.

CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION          3:17-CV-02335-WHA
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

upcharge was (typically) a flat $23.49 for each and every item handled by NPS, regardless of the item's size, weight, time stored, or distance shipped.  Dostart Decl. Ex. 4 at 37-38, 41, 47-49 (Pope depo. 79:23 - 80:23; 83:6-14; 111:1 - 113:11).  For example, RAC's records reflect that a $23.49 upcharge was assigned to items such as a smartphone, a smartphone case, and even a gift card.  Dostart Decl. ¶10.  RAC set that per-item amount after considering various expenses such as NPS's "labor, . . . trucks, leasing fees, insurance, . . . hotel, [and] meals."  *Id*. Ex. 4 at 39-42 (Pope depo. 81:24 - 84:13).

Thus, for every item of merchandise rented in California that was handled by NPS, there were at least *two* "freight" components included within RAC's Lessor's Cost and used to compute the statutory maximum Cash Price and Total of Payments: an "actual" freight charge to get the item of merchandise to RAC from the vendor, which was included in the vendor's invoice; and a flat $23.49 per-item amount "allocated" for NPS's storage and subsequent shipping of the item to a RAC retail location.

### 2.    The RAC/NFI Logistics Contract

Beginning in 2014, RAC took a further step away from the "direct-to-store" delivery model.  Apparently with the intent to "provide efficiencies in the supply chain," Mot. at 3, RAC contracted with a logistics provider, NFI Industries ("NFI"), to perform a variety of logistics functions for RAC across the entire United States, including warehousing merchandise at five distribution centers throughout the country and, when requested by RAC, transporting merchandise from those warehouses to RAC retail locations.  Mot. at 4.  Under the RAC/NFI arrangement, RAC's California stores received merchandise inventory from the NFI distribution center in Chino, California.  Mot. at 4.

Even after entering into this new arrangement with NFI, RAC continued to receive invoices from its vendors that included the cost of the merchandise and the freight expenses paid by the vendor to ship the merchandise to RAC.  Davis Decl. ¶12 (Dkt. 120-42 at 4).  The difference was that instead of the vendor paying to ship the merchandise directly to a California store location, the vendor instead paid to ship the merchandise to NFI's Chino distribution center. *See, e.g.*, Declaration of Zachariah P. Dostart in Support of Plaintiffs' Motion for Class

9

1    Certification, Ex. 9 (under seal) (invoice from Mecca Electronics Industries, Inc. for Xbox

2    consoles to be shipped from the "Supplier" (Mecca) to "Chino DC," with the freight "Prepaid by

3    Seller"); Dostart Decl. Ex. 5 at 56-57 (Glasky depo. 30:15 - 31:3) (NFI held merchandise at the

4    warehouse until asked to deliver it to a particular RAC retail store).  For all merchandise shipped

5    by a vendor to the Chino distribution center, RAC took title to the merchandise upon delivery at

6    that distribution center.  Dostart Decl. Ex. 6 at 73 (Parks depo. 52:6-12).

7           RAC acknowledges that "NFI does not charge RAC per unit shipped."  Mot. at 4.  In fact,

8    RAC and NFI made no attempt to determine the cost of transporting any particular item of

9    merchandise.  Instead, under the RAC/NFI contract, RAC pays NFI "certain fixed monthly and

10   annual fees for warehouse and distribution services, as well as variable components that depend on

11   the type of products being shipped and the frequency of shipments."  Mot. at 4.

12          Even though RAC took title to merchandise immediately upon its arrival at the Chino

13   distribution center, and even though the Karnette Act limits the Lessor's Cost for any given item

14   of property only the "documented actual cost, including actual freight charges, . . . *to* the lessor

15   *from* a wholesaler, distributor, supplier or manufacturer," §1812.622(k) (emphasis added), RAC

16   nevertheless added to its Lessor's Cost an upcharge for each item of merchandise covered by the

17   RAC/NFI contract.  Jonathan Parks, RAC's Vice President of Global Logistics and Distribution,

18   used an annual forecast to estimate and attempt to capture all costs associated with the RAC/NFI

19   contract, including fixed and variable costs.  Dostart Decl. Ex. 6 at 78-79 (Parks depo. 104:19 -

20   105:15).  RAC then divided that estimate by the number of units it anticipated shipping through

21   NFI, and adjusted that amount to take into account weight, volume, and other factors that could

22   affect shipping costs.  *Id.* Ex. 6 at 79-81 (Parks depo. 105:16 - 107:7).  For all items of

23   merchandise covered by the RAC/NFI contract, RAC's estimates were prospective in nature,

24   allocating overall *forecasted* expenses rather than identifying actual past costs incurred to ship a

25   particular item.  *Id.* Ex. 6 at 77-79, 80-81 (Parks depo. 103:20 - 105:15; 106:5 - 107:22).  As of

26   April 2018, the average allocated upcharge for items shipped through the nationwide RAC/NFI

27   network was in the "mid $40s."  *Id.* Ex. 6 at 82 (Parks depo. 146:13-25).

28

CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION                3:17-CV-02335-WHA
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1    Thus, for every item of merchandise sold in California that was covered by the RAC/NFI

2  contract, there were at least *two* "freight" components included within RAC's Lessor's Cost (and

3  used to compute the statutory maximum Cash Price and Total of Payments): an "actual" freight

4  charge to get the item of merchandise to RAC from the vendor; and an "allocated" amount derived

5  from RAC's projected overall annual payments to NFI and spread in some fashion across all

6  merchandise handled by NFI nationwide.  Davis Decl. ¶¶12-13 (Dkt. 120-42 at 4).

7    RAC did not obtain the anticipated cost efficiencies from its logistics contract with NFI.

8  That contract cost RAC approximately $35-37 million per year, with $21-25 million of that for

9  transportation.  Dostart Decl. Ex. 5 at 65-66 (Glasky depo. 148:11 - 149:21).  Approximately 30%

10 of the overall NPS contract expense is fixed.  Dostart Decl. Ex. 6 at 72, 76 (Parks depo. 48:18-25;

11 65:8-12).  As RAC's business slowed, each item shipped by NFI was burdened with a higher

12 allocation of logistics expenses, Dostart Decl. Ex. 6 at 75-76 (Parks depo. 64:13 - 65:19); Ex. 5 at

13 61-64 (Glasky depo. 120:20 - 123:4), all of which RAC continued to include in its Lessor's Cost.

14   Although the RAC/NFI contract was slated to run for five years, RAC announced on April

15 30, 2018 that it would revert to a direct-to-store supply chain and discontinue its distribution

16 center network.  Dostart Decl. Ex. 7 at 92 (Form 8-K).  According to a recent RAC Form 8-K,

17 when fully implemented the change is expected to reduce annualized working capital by

18 approximately $12 million, with an additional $15 million working capital benefit from the

19 elimination of distribution centers, in addition to other savings.  Dostart Decl. Ex. 7 at 92 (Form 8-

20 K).  RAC's CEO, Mitchell Fadel, recently stated in an earnings call that reverting to the direct-to-

21 store model "will be a seamless, non-disruptive change as we're basically going back to the way

22 we did it for years."  Dostart Decl. Ex. 8 at 104.

23 ## III.    LEGAL STANDARD

24   A party may move for summary judgment as to all or part of any claim or defense.  Fed. R.

25 Civ. P. 56(a).  Summary judgment is appropriate "if the movant shows that there is no genuine

26 dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id*.

27 Questions of "statutory construction and legislative history present legal questions which are

28 properly resolved by summary judgment."  *Coyote Valley Band of Pomo Indians v. United States*,

1   639 F.Supp. 165, 167 (E.D. Cal. 1986); *see also Harper v. U.S. Seafoods LP*, 278 F.3d 971, 973,

2   978 (9th Cir. 2002).  Where, as here, the parties have submitted cross-motions for summary

3   judgment, "[e]ach motion must be considered on its own merits."  *Fair Housing Council of*

4   *Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting Schwarzer,

5   et. al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 499 (1992)).

6          Under both California and federal law, questions of statutory construction are answered, if

7   possible, by reference to the plain language of the statute alone.  "[I]f the language of the statute is

8   not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the

9   Legislature's intent is unnecessary. . . .  When the statutory language is unambiguous, we presume

10  the Legislature meant what it said and the plain meaning of the statute governs."  *Bonnel v.*

11  *Medical Board*, 31 Cal.4th 1255, 1261 (2003); *see also Texaco Inc. v. United States*, 528 F.3d

12  703, 707 (9th Cir. 2008).

13  **IV.   THE KARNETTE ACT RESTRICTS LESSOR'S COST TO THE DOCUMENTED**
    **        ACTUAL COST OF ACQUIRING AN ITEM OF MERCHANDISE FROM A**
14  **        VENDOR**

15          RAC's pricing practices violate the Karnette Act in several ways, two of which are at issue

16  in the parties' cross-motions.  First, for every item of merchandise stored or transported by NPS or

17  NFI, RAC includes in its Lessor's Cost an allocation of estimated or average overall expenses for

18  storage and intra-company transfer of merchandise.  Plaintiffs contend that none of those allocated

19  expenses may be included in the Lessor's Cost for the item, because those expenses were not

20  incurred in transporting the item "to" RAC "from" a vendor.   Second, even if an intra-company

21  transportation expense were permissible, RAC's expense allocation does not reflect the "actual

22  cost" of transporting the particular item, but is at best an approximation or a very rough overall

23  average, rather than the "actual" freight expense.  Permitting RAC to include these allocated intra-

24  company expenses in calculating its Lessor's Cost violates the plain language and express purpose

25  of the Karnette Act and has caused substantial economic harm to the very consumers the

26  Legislature sought to protect.

27

28

12

CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION          3:17-CV-02335-WHA
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**A.    The Karnette Act Does Not Authorize RAC to Include Intra-Company Storage and Transportation Expenses in the Lessor's Cost of an Item of Merchandise**

The Karnette Act defines "Lessor's Cost" as "the documented actual cost, including actual freight charges, of the rental property to the lessor from a wholesaler, distributor, supplier, or manufacturer and net of any discounts, rebates, and incentives." §1812.622(k). This plain language establishes that the only "freight" cost that may be included is the cost to transport the item "*to* the lessor *from* a wholesaler, distributor, supplier, or manufacturer." In the context of this case, it is undisputed that RAC, as a corporate entity, is the "lessor." Dostart Decl. Ex. 9 at 114 (Davis depo. 94:11-25). It is also undisputed that title to each item of merchandise transfers from the vendor to RAC upon the item's delivery to an NPS service center or to an NFI distribution center. The legal question is whether RAC may properly include in its calculation of Lessor's Cost any additional amounts for shipping those items from the NPS service centers or the NFI distribution center to RAC's stores and, if so, whether those amounts may be based on either a flat per-item allocation (for NPS) or an estimate of future costs (for NFI).

According to RAC's Rule 30(b)(6) witness, Michael Cross, RAC decided to "treat" NPS and NFI as if each entity was a "seller." Dostart Decl. Ex. 10 at 133-34 (Cross depo. 66:11 - 67:5). For each item handled by NPS or NFI, RAC added an upcharge to the vendor's invoice amount in order to arrive at what RAC refers to as the "landed cost" or the "fully-loaded cost." *Id.* at 134-35 (Cross depo. 67:11 - 68:7). RAC used that "landed cost" figure to compute Karnette Act price maximums. Davis Decl. ¶19 (Dkt. 120-42 at 6).

RAC all but concedes that its practice of including NPS and NFI upcharges in its Lessor's Cost violates the plain language of the statute. *See* Mot. at 24 (urging this Court not to adopt an "overly literal reading of §1812.622(k)"). RAC attempts to justify its practices by arguing that, despite the Act's plain language, the Legislature did not really mean to limit the statutory term "documented actual costs" to the actual charges incurred in having an item shipped "to the" rent-to-own company "from a wholesaler, distributor, supplier, or manufacturer." *Id.* at 21. According to RAC, the words "to" and "from" were unintended, and any expense that a rent-to-own company

CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION                    3:17-CV-02335-WHA
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1   allocates as a cost of getting the merchandise to the final retail location should be includible in

2   Lessor's Cost.  *Id*.  The statute says otherwise, and the Legislature meant what the statute says.[6]

3          RAC's primary argument is that the Karnette Act's pricing limits were designed to provide

4   "sufficient margin" to rent-to-own companies and that RAC must be allowed to allocate additional

5   overhead expenses to its "Lessor's Cost" to make a fair profit.  Mot. at 20-22.  But a "sufficient

6   margin" is *already built in* to the generous multiples (ranging from 1.65 to 1.9) that the

7   Legislature allowed rent-to-own companies like RAC to apply to their per-item Lessor's Cost to

8   establish the maximum Cash Price, and to the even higher subsequent multiple (2.25) that they

9   may apply to the Cash Price to establish the maximum Total of Payments.  RAC was an active

10  participant in the legislative process giving rise to the 2006 amendments, and was fully aware that

11  rationale was to provide "certainty," "clear direction," and eliminate the need for "fact intensive

12  inquiry" around pricing, for the benefit of consumers, enforcement agencies, and retailers alike.

13  Dkt. 120-1 at 5-7.  RAC must comply with the law as written.

14         RAC's second argument is that it is "industry standard" to use logistics companies, and

15  that the statutory term "documented actual cost" should be taken as a "term of art" to encompass

16  every possible expenditure that an accountant might find to be related to "bringing the goods to

17  the point of sale and converting them into a saleable condition."  Mot. at 22, quoting Davis Decl.

18  ¶23.  Although RAC's accounting expert generally describes the GAAP principles regarding

19  inventory, nowhere does he state that the term "actual cost" appears in Accounting Standard

20  Codification 330, or that "actual cost" is a generally recognized term of art under GAAP.  More

21  important still, even if "actual cost" were a term of art for purposes of GAAP, nothing in the

22  language or legislative history of the Karnette Act suggests that the Legislature intended to use

23

24         [6] RAC's argument, focused on the clause "including actual freight charges," also ignores that
    the clause is a parenthetical phrase "segregate[d]" from the rest of the sentence, *not* a phrase that
25  modifies the remainder of the sentence.  *See Dow v. Lassen Irrigation Co.*, 216 Cal.App.4th 766,
    783 (2013) ("[w]here, as here, a phrase is set off from the rest of the main sentence by commas,' it
26  'should be read as a parenthetical [phrase]'") (internal quotation marks omitted).  Accordingly, the
    only costs that may be included in the "Lessor's Cost" under the Karnette Act are the documented
27  actual costs to the lessor (which may include the actual freight charges) incurred in acquiring a
    particular item from a wholesaler, distributor, supplier, or manufacturer to the rent-to-own
28  company.

14

CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION          3:17-CV-02335-WHA
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

that term other than in its traditional, common meaning.  If RAC's interpretation were correct, the Legislature would have defined Lessor's Cost as including "all expenditures incurred in bringing the item to the point where it is ready to rent to a consumer."  Or, the Legislature could simply have said Lessor's Cost includes "all expenditures that may be included in the cost of inventory under Generally Accepted Accounting Principles."  That is not how the Act is written.

RAC's assertion that other companies routinely use logistics companies is irrelevant.  *See* Mot. at 22-23.  None of the companies identified by RAC are rent-to-own companies subject to the Karnette Act.  Even if RAC were able to identify another rent-to-own company with similar practices, though, that could not excuse RAC's failure to comply.  The Karnette Act does not prevent RAC from streamlining its supply chain operations.  But when it comes to calculating Lessor's Cost and computing the maximum price caps, RAC must comply with the Act's plain language restrictions.

RAC's third argument is that NPS and NFI should be considered "distributors" or "suppliers" within the meaning of §1812.622(k).  Mot. at 24.  But RAC's own expert states that a "distributor" is similar in function to a "wholesaler," meaning "an entity that obtains products, and then resells them to an organization like Rent-A-Center."  Dostart Decl. Ex. 9 at 115-16 (Davis depo. 116:19 - 117:16).  Moreover, in similar contexts throughout the California Code, the Legislature has repeatedly defined "supplier" and "distributor" to refer to entities that provide merchandise to consumers or retailers in the first instance, not entities that handle a company's intra-company shipping needs.  *See, e.g.*, Bus. & Prof. Code §22901(v); Civ. Code §1738.12; Com. Code §10103(a)(24); Health & Safety Code §18003; Pub. Util. Code §4451(g).  These definitions exclude entities like NPS and NFI, one of which is RAC's wholly-owned subsidiary and both of which provide logistics services for RAC only *after* RAC has already acquired the items of merchandise from an actual "wholesaler, distributor, supplier, or manufacturer."

Were there any doubt about the meaning of "supplier" and "distributor" under §1812.622(k), it would be extinguished by the words' context.  A word in a list is not to be interpreted in a vacuum, but "takes meaning from the company it keeps."  *Kaatz v. City of Seaside*, 143 Cal.App.4th 13, 40 (2006).  The terms "distributor" and "supplier" appear with the categories

1    of "wholesaler" and "manufacturer," all of which are entities through which rent-to-own retailers

2    acquire merchandise in the first instance.[7]

3            Plaintiffs' common-sense reading of the statute is fully consistent with the Act's

4    underlying purpose.  The Karnette Act is *consumer protection statute,* designed to protect low-

5    income consumers who cannot afford to pay up-front retail prices or obtain conventional credit to

6    finance their purchases.  North Decl. Ex. 4 at 4 (Report re AB 722).  The Legislature enacted the

7    Act "to ensure that consumers are protected from misrepresentations and unfair dealings."

8    §1812.621.  The Act's pricing caps, which are a function of Lessor's Cost, are central to the Act's

9    remedial purpose.

10            When the Karnette Act was amended in 2006, the Attorney General explained that the

11    price caps would "provide consumers greater protection from price gouging or overreaching" by

12    rent-to-own companies.  North Decl. Ex. 1 at 6 (Analysis re AB 594).  Construing the Act as

13    written – to restrict any freight component of Lessor's Cost to the expense that was actually

14    incurred for the lessor to obtain the item of merchandise *from* a wholesaler, distributor, supplier,

15    or manufacturer – furthers the Act's pro-consumer purpose by establishing a "bright-line" that is

16    not subject to manipulation and that avoids any need for a "fact intensive inquiry" into a

17    company's opaque internal accounting practices before one is able to determine the actual

18    Lessor's Cost, and thus the maximum Cash Price and Total of Payments.  *See* North Decl. Ex. 1 at

19    5, 7.

---

[7] The only authority that RAC cites in support of its construction is *Allphin v. Peter K Fitness, LLC,* 2014 WL 3593108 (N.D. Cal. July 18, 2014), in which the question was whether a logistics company that shipped merchandise *from* a manufacturer *to* a consumer could be held strictly liable under California tort law as a distributor of a defective products.  *Id.* at *4-*5.  The question of what constitutes a distributor for purposes of the common law of products liability is, of course, quite different from the question of statutory interpretation at issue here.  Besides, the logistics company in *Allphin* transferred merchandise *from the manufacturer to the consumer* and did not conduct any intra-company transfers.

16

**B.    Rent-A-Center May Not Increase Its Lessor's Cost for an Item of Merchandise by Allocating an Estimated, Projected, or Average Cost That Is Not the "Actual Cost" of Transporting That Particular Item**

Even if it were permissible for a rent-to-own company such as RAC to include in its Lessor's Cost its internal expenses associated with storage and intra-company transfer of merchandise, RAC's pricing practices would still be unlawful because its allocations do not reflect the "actual cost" of such internal transfers for particular items of merchandise.

The text of the Karnette Act could not be clearer.  The Lessor's Cost is the rent-to-own company's "*documented actual cost*" of *the* rental property, which may include only "*actual freight charges*." §1812.622(k) (emphasis added).  The only sensible interpretation of this language is that Lessor's Cost excludes any expense that is an estimate, projection, or average based on some aggregate, collective amount.  RAC's expert, Kevin Davis, agrees:  "On its own, the word, actual, and the word, estimated, do not mean the same to me."  Dostart Decl. Ex. 9 at 117 (Davis depo. 162:3-25).  Davis further admits that the "average cost" accounting methodology used by Tailored Brands to calculate its inventory acquisition costs – which he describes as "very similar" to RAC's inclusion of transfer upcharges in Lessor's Cost – would *not* comply with the Karnette Act, which Davis concedes requires that Lessor's Cost be calculated based on "the specific costs related to a specific product."  *Id*. Ex. 9 at 122-24 (Davis depo. 234:14 - 236:21).  Indeed, in another context, the California Court of Appeal has construed the term "actual cost" to mean "[t]he real expenditures incurred in buying or producing something, *especially as opposed to a budgeted or estimated cost*."  *Rubio v. Superior Court*, 244 Cal.App.4th 459, 475 (2016) (quoting Oxford English Dict. Online (emphasis added)).

Other provisions of the Karnette Act confirm that "documented actual cost" and "actual freight charges" refer to specific expenses traceable to each particular item.  Within §1812.622(k), the phrase "documented actual cost, including actual freight charges" modifies "of *the* rental property."  The definitive article signals a reference "to a specific . . . thing."  *See Pineda v. Bank of Am., N.A.*, 50 Cal.4th 1389, 1396 (2010).  The Legislature would not have tied the definition of Lessor's Cost to "*the* rental property" unless it intended Lessor's Cost to be calculated based on the true, verifiable expense traceable to each particular item.

17

Similarly, the Lessor's Cost is the foundation for calculating the maximum Cash Price and Total of Payments, which the Karnette Act defines, respectively, as "the price of *the personal property described in the rental-purchase agreement* that the consumer may pay [for] in cash . . . " and "the total amount of periodic payments necessary to acquire ownership of *the property that is the subject of the rental-purchase agreement* . . . ." §1812.622(e), (l) (emphasis added).  Each definition refers to the specific item of merchandise described in the RPA, further confirming that the Legislature intended the entire pricing formula to be based on verifiable expenses traceable directly to the particular item.

The legislative history also supports plaintiffs' construction.  As noted above, an early version of the proposed 2006 amendments did not include the adjective "actual" before the term "freight charges."  *See* North Decl. Ex. 1 at 4.  In response to the concern expressed by the Consumer Attorneys of California that some rent-to-own companies do not account for "actual" freight costs, but instead use "*some approximated or collective value that was not truly representative of the [rental-purchase retailer's] actual freight costs[,]*" *id*. Ex. 2 at 16 (emphasis added), the Legislature promptly amended the definition of Lessor's Cost to insert "actual" before "freight charges."  *Id*. Ex. 3 at 20.

RAC's argument about what other companies may or may not do is irrelevant.  Whatever Tailored Brands or Amazon.com might pay for freight from their vendors, or what internal logistics expenses they incur, or what expenses they may allocate to inventory, have no bearing on this case; neither is a rent-to-own company subject to the Karnette Act.  Dostart Decl. Ex. 9 at 121 (Davis depo. 229:1-4 ("Taylor Brands [sic] is not in the rent-to-own industry.")).  Tailored Brands and Amazon can charge consumers whatever each company thinks the market will bear.  That is not the case for RAC.

**V.     RAC VIOLATES THE KARNETTE ACT'S "SINGLE DOCUMENT" REQUIREMENT BY USING AN ARBITRATION AGREEMENT THAT IS SEPARATE AND APART FROM A RENTAL-PURCHASE AGREEMENT**

RAC also violates the Karnette Act's rules governing the structure and content of RPAs. The Act expressly provides: "Every rental-purchase agreement shall be contained in a *single document* which shall set forth *all* of the agreements of the lessor and the consumer with respect to

18

1   the rights and obligations of each party." §1812.623(a) (emphasis added).  RAC nonetheless uses

2   a form arbitration agreement that is separate and apart from the RPA, even though both documents

3   contain information concerning "the rights and obligations" of the signatories.

4          The Act begins with the Legislature's declaration and finding that "consumers enter into

5   rental-purchase contracts that do not adequately disclose the actual terms and cost of the

6   transaction." §1812.621.  The purpose of the Act's "single document" requirement is to avoid

7   customer confusion and to ensure that consumers are aware of *all* relevant terms of the

8   complicated contractual agreements presented by rent-to-own companies.  §1812.623(a).  If a

9   customer is presented with an arbitration agreement only after the customer has agreed to the RPA

10  and all of its "rights and obligations," the consumer may feel that he or she has come too far to not

11  proceed, or may sign the arbitration agreement with little attention given to it.  Plaintiff Blair, for

12  example, testified that she "really didn't pay attention to – really don't understand what arbitration

13  is, what it meant, but I did sign it.  I know you're supposed to read before you sign stuff, but I did

14  sign it." Dostart Decl. Ex. 11 at 143 (Blair depo. 111:7-15).  It is certainly within the purview of

15  the Legislature to conclude that California customers entering into contracts with companies in an

16  industry with a history of price-gouging and deceptive sales practices directed against low-income

17  and often unsophisticated consumers should not be asked to parse multiple documents bearing on

18  a single transaction.

19         RAC does not dispute that its separate arbitration agreement is an "agreement[] . . . with

20  respect to the rights and obligations" of RAC and its consumers.  Rightly so.  RAC's form

21  arbitration agreement purports to require signatories to waive their right to sue in court; their right

22  to join together with others to pursue claims against RAC on a joint, collective, class or other

23  concerted basis; and their right to seek a public injunction for any unlawful practices.  *See* Dkt.

24  120-12 at 29 (RAC arbitration agreement).  RAC argued as much in its Motion to Compel

25  Arbitration.  *See* Dkt. 22 (motion to compel); Dkt. 28 (opposition to motion to compel).

26  According to the plain language of §1812.623(a), then, RAC is required to present the terms of its

27  separate arbitration agreement in the same document as its rental-purchase agreement.

28

1    RAC resists this conclusion by pointing to §§1812.624(a) and 1812.629(c) of the Act.

2   Mot. at 14-15.  The former provides certain rules for a "rental-purchase agreement or any

3   document that the lessor requests the consumer to sign."  §1812.624(a).  The latter requires that

4   consumers receive a "copy of the fully completed rental-purchase agreement and all other

5   documents which the lessor requests the consumer to sign."  §1812.629(c).  While both provisions

6   recognize that there are circumstances in which a rent-to-own company may wish a customer to

7   review and sign another document in addition to an RPA, neither allows the company to present

8   for signature a separate document "with respect to the[ir respective] rights and obligations."  The

9   reason Sections 1812.624(a) and 1812.629(c) refer separately to the "rental-purchase agreement"

10  and any "other document(s)" is because the Legislature sought to distinguish between the

11  agreement setting forth the parties' rights and obligations and any other documents that may

12  provide useful information but do not directly establish any rights or obligations.  For example,

13  when plaintiff Blair entered into her July 2015 rental-purchase transaction for an air conditioner,

14  she also signed a form to enroll in a Benefits Plus program that provides discounts at certain health

15  care providers or pharmacies.  *See* Dostart Decl. Ex. 12.  That form expressly stated that it "does

16  not affect your rights, obligations, or cost for the rental or purchase of goods under the rental

17  purchase agreement."  *Id*.

18    When the Legislature uses two materially different terms in a statute, it must be presumed

19  that "a difference in meaning was intended."  *Kleffman v. Vonage Holdings Corp.*, 49 Cal.4th 334,

20  343 (2010).  The reference to "other document(s)" in Sections 1812.624(a) and 1812.629(c) must

21  mean other document(s) that are *not* the single "agreement[] . . . with respect to the rights and

22  obligations of each party."  *See Jurcoane v. Superior Court*, 93 Cal.App.4th 886, 893 (2001) ("We

23  must read statutes as a whole, giving effect to all their provisions, neither reading one section to

24  contradict others or its overall purpose, or reading the whole scheme to nullify one section.").

25  Because RAC's five-page, 13-subsection arbitration agreement sets forth rights and obligations of

26  RAC and its signatory customers in great detail, including by compelling a waiver of significant

27  rights the signatory would otherwise enjoy, RAC violates the Karnette Act by not including those

28  terms in the single-document RPA itself.

20

1    As a fallback position, RAC argues that its RPA satisfies the Karnette Act's "single-

2    document" requirement because it incorporates the arbitration agreement by reference.  Mot. at

3    15-18.  But the Act says nothing about incorporation by reference as an alternative form of

4    compliance, and incorporation by reference would defeat the full-disclosure purpose of the single-

5    document requirement.  The doctrine of incorporation by reference is usually applied to disputes

6    over contract interpretation where it is unclear whether the parties "intended to be bound by

7    specific terms that were not mentioned in the contract" but are contained in an "extrinsic

8    document."  *DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal.App.4th 697, 713-14

9    (2009).  That inquiry generally focuses on the clarity of the language of incorporation: where there

10   is a "clear and unequivocal reference to the extrinsic document," courts generally find that "the

11   mutual intent of the parties" was to incorporate that document by reference.  *Id*.  The Karnette

12   Act's single-document requirement, by contrast, does not require application of any maxims of

13   contract interpretation, because it is an express statutory directive in a consumer-protection law

14   that requires rent-to-own companies to set forth all "rights and obligations of each party" in a

15   single document, so important terms are *not* spread among two or more documents, no matter how

16   clearly they may be incorporated by reference.  Compliance with the single-document rule under

17   the Karnette Act is measured not by the parties' intent but by the plain language of §1812.623(a)

18   that requires all material terms to be included in a single document.

19   Finally, RAC argues that plaintiffs may not seek to enforce the single-document rule

20   because they were not "damaged by" RAC's violation.  Mot. at 18-20 (quoting §1812.636(a)).  To

21   the extent RAC is arguing that a customer must suffer direct economic harm to pursue a claim

22   based on RAC's violation of the disclosure requirements of §1812.623(a), RAC is wrong.[8]  That

23   section of the Karnette Act identifies at least 14 separate requirements, ranging from the size of

24   the font in a RPA to specific notice language that must be included to explain the principles of a

25   rent-to-own transaction.  Rarely would a rent-to-own company's violation of those provisions

26

27   _____

[8] The legislative history on which RAC relies merely repeats the "damaged by" language of
28   the statute and gives no indication that the Legislature intended to impose an actual damages
requirement for recovery under the Karnette Act.  *See* Mot. at 19.

CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION          3:17-CV-02335-WHA
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1    result in actual economic damages.  That is why, in addition to allowing plaintiffs to recover

2    "actual damages" caused by a statutory violation, the Act also permits, among other remedies,

3    injunctive relief and "[t]wenty-five percent of an amount equal to the total amount of payments

4    required to obtain ownership."  §1812.636(a)(1), (2); *cf. Molski v. M.J. Cable, Inc.*, 481 F.3d 724,

5    731 (9th Cir. 2007) (construing damages provision of California's Unruh Civil Rights Act, which

6    allows "actual damages" and "statutory damages," to authorize plaintiff's recovery of "the

7    independent statutory damages" without proving "she suffered actual damages.").  Where, as here

8    and in the Unruh Act, the Legislature has authorized statutory damages in addition to actual

9    damages, a plaintiff whose rights under the statute have been violated need not demonstrate actual

10   damages to recover the statutory damages provided in the Act.[9]

11          Moreover, even if plaintiffs were required to prove some actual damage, that requirement

12   would be satisfied here.  By setting forth arbitration provisions in a document separate and apart

13   from the RPA, RAC increases the chance that a customer who signed both and RPA and an

14   arbitration agreement and who later has a dispute with RAC may have misplaced the arbitration

15   agreement, or perhaps never received it.  That would make it difficult for the consumer to

16   determine where and how to initiate the already-difficult process of pursuing a claim against RAC.

17   Conversely, customers who did not sign an arbitration agreement and who later have a dispute

18   with RAC may see the reference to arbitration in the RPA and may erroneously assume they are

19   bound by an agreement to arbitrate.  The risk of confusion is compounded by RAC's inability to

20   locate signed arbitration agreements for most California customers.  RAC has stated that it does

21   not maintain electronic copies of arbitration agreements and that hard copies are maintained only

22   at its retail stores (for recent transactions) and at an off-site storage facility (for all others,

23   including for most of the class period).  *See* Dkt. 119 at 25.  But a recent review of a sample of

24

25        [9] Further, plaintiffs are not required to demonstrate actual damages to void RAC rental-
     purchase agreements that do not comply with the single-document rule.  In addition to providing
26   for damages, the Karnette Act also renders voidable by the consumer any rental-purchase
     agreement that does not conform to the Act's requirements.  *See* §1812.624(b).  The California
27   Court of Appeal has construed an analogous provision in the Rees-Levering Act (which regulates
     car sales financing) *not* to require that the customer suffer any actual damage.  *See Rojas v.
28   Platinum Auto Group, Inc.*, 212 Cal.App.4th 997, 1005 (2013).

CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION                  3:17-CV-02335-WHA
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1  RAC's records reveals that the vast majority of the arbitration agreement documents it does have

2  are unsigned, and are therefore not enforceable.  Dostart Decl. ¶9.

3  　　　　　RAC has conceded that it cannot produce signed arbitration agreements for two of the

4  three named plaintiffs in this case, *see* Dkt. 54 (admitting that RAC has "not located signed

5  Arbitration Agreements for Plaintiffs Robinson and Harris"), and has stipulated that any class "of

6  California consumers for whom RAC cannot produce a signed arbitration agreement is sufficiently

7  numerous for purposes of Fed. R. Civ. Pro. 23(a)(1)." Dkt. 104.  If RAC cannot say with certainty

8  whether any particular customer is bound by an arbitration agreement purporting to restrict that

9  customer's rights, it cannot credibly assert that most of its customers can know for sure whether

10  they are bound by such an agreement.  Lack of transparency and resulting customer confusion

11  were some of the principal harms the Karnette Act was enacted to prevent.  *See* §1812.621.

12  **VI.    THIS COURT SHOULD ENJOIN RAC'S UNLAWFUL PRACTICES**

13  　　　　　This Court should permanently enjoin RAC's violations of the Karnette Act.  *See, e.g.*,

14  *Microsoft Corp. v. Intrax Group, Inc.*, No. C 07-1840, 2008 WL 4500703 at *4 (N.D. Cal. Oct. 6,

15  2008) (granting plaintiff's motion for summary judgment and corresponding request to

16  permanently enjoin the offending practice); *Camarena v. Meissner*, 78 F.Supp.2d 1044, 1050

17  (N.D. Cal. 1999) (same); *see also Continental Airlines Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099,

18  1102 (9th Cir. 1994) ("There is nothing novel about a permanent injunction issued on summary

19  judgment rather than after trial . . .  If there are no triable fact issues and the court believes

20  equitable relief is warranted, it is fully empowered to grant it on a Rule 56 motion.")  That

21  injunction should permanently enjoin RAC from (1) including in its calculation of Lessor's Cost

22  any upcharges based on any expenses, actual or estimated, associated with storage and intra-

23  company transfer of merchandise; and (2) requesting its customers to sign an arbitration

24  agreement, or any other agreement respecting the customers' "rights and obligations" in

25  connection with their rental-purchase transaction, that is presented separate and apart from RAC's

26  rental-purchase agreement.

27  / / /

28  / / /

23

CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION          3:17-CV-02335-WHA
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1  **VII.    CONCLUSION**

2          For the foregoing reasons, plaintiffs request that this Court deny RAC's motion for partial

3  summary judgment, grant plaintiffs' cross-motion for partial summary judgment, and permanently

4  enjoin RAC's unlawful practices.

5  Dated: July 19, 2018                           Respectfully submitted,

6                                                 DOSTART HANNINK & COVENEY LLP
                                                   ALTSHULER BERZON LLP
7

8                                                  _____
                                                   Michael Rubin
9                                                  Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION          3:17-CV-02335-WHA
TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT