# Exhibit 40

# MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT** (this "*Agreement*"), made and entered into as of this 21ˢᵗ day of October, 2014 by and between Rent-A-Center Texas, L.P., a Texas limited partnership, having its principal office at 5501 Headquarters Drive, Plano, Texas 75024 (hereinafter referred to as "RAC"), and NFI Interactive Logistics, LLC, a Delaware limited liability company, having a principal office at 1515 Burnt Mill Road Cherry Hill, New Jersey 08003 (hereafter referred to as "NFI").

## WITNESSETH

**WHEREAS,** RAC desires to engage NFI to provide and perform dedicated and shared warehouse and distribution services, dedicated fleet operations, contract transportation operations, transportation management, and other related services;

**WHEREAS,** NFI as an independent contractor, desires to accept such engagement to provide and perform such dedicated and shared warehouse and distribution services, dedicated fleet operations, transportation management, and other related services for RAC, upon the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS,** NFI warrants that it is duly qualified as a motor carrier and as a transportation broker in interstate commerce operating under MC #'s 559886 and 840311, respectfully, issued by the U.S. Department of Transportation;

**WHEREAS,** this Agreement shall be effective as of the date of the last signature on the signature page of this Agreement; and

**NOW THEREFORE,** in consideration of the promises and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1)   **TERM AND TERMINATION**

**Term**

Unless terminated in accordance with the provisions of this Agreement, the initial term of this Agreement shall remain in full force and effect for a period of five (5) years from a Term Commencement Date of June 1 2015(the "Initial Term"). Thereafter, RAC shall have the right to renew the Term of this Agreement for successive periods of one (1) year each ("Renewal Term"), provided the parties are able to reach a mutual agreement on revised pricing within thirty (30) days of the date on RAC's renewal notice. If a mutual agreement cannot be reached on pricing, this Agreement will terminate at the end of the Initial Term or then-effective Renewal Term. RAC must send a written notice of intention to renew to NFI no less than one hundred twenty (120) days prior to the expiration of the Initial Term or any Renewal Term.

**Material Breach**

**Right to Cure.** In the event of a material breach of this Agreement by either Party, the non-breaching Party will provide the breaching party with written notification of the breach, and the breaching Party will be given at least thirty (30) days from receipt of the notification to remedy the breach. In the event of a material breach that

RAC-001272

cannot be remedied within thirty (30) days, the breaching Party will be given sixty (60) days to remedy the breach so long as the breaching Party provides reasonable evidence that it has begun taking steps to remedy the breach within thirty (30) days of receiving the written notification. If the breaching Party fails to remedy the breach to the reasonable satisfaction of the non-breaching Party within the applicable time frame, the non-breaching Party may terminate this Agreement.

**Service Level Commitments.**   Specifically with respect to Service Level Commitments ("SLC"s). as they are specifically described in the Addenda and Exhibits attached hereto, NFI shall have committed a material breach of this Agreement (subject to its right to cure as set out above) to the extent it fails to meet or exceed the same SLC for two or more consecutive months. If NFI fails to cure a material breach related to a particular SLC, then RAC may terminate all or any portion of this Agreement without penalty. Nothing stated herein, however, shall preclude RAC's right to terminate this Agreement  due to a material breach by NFI for reasons unrelated to SLCs. Notwithstanding the above, for purposes of this section only, there shall be a "grace period" of six (6) months, starting from April 2, 2015, during which grace period NFI's performance shall be measured against the SLCs, although any SLC failures during this grace period will not be counted towards an NFI breach for purposes of this section.

**Termination by RAC for Material Breach by NFI.**   If the breaching Party is NFI, and RAC terminates this Agreement or a specific service, NFI shall be liable to RAC for any excess costs for such similar services and for any other damages incurred by RAC due to NFI's failure to perform, for a period not to exceed one year.  NFI shall continue performance of this Agreement to the extent not terminated.  As an alternate remedy and in lieu of termination for material breach, RAC, at its sole discretion, may elect to waive RAC's right to terminate on account of  deficiencies in NFI's performance, with NFI remaining liable for any  actual damages arising from the deficiencies in NFI's performance.

**Termination by NFI for Material Breach by RAC.**   In the event of a termination of this Agreement by NFI for a material breach by RAC, then RAC shall pay to NFI, within thirty (30) days of the effective date of termination, all amounts set forth in Addendum I, which shall include all unamortized capital expenses, start-up costs and wind-down costs incurred by NFI in connection with this Agreement.  RAC shall also be liable to NFI for all other damages sustained by NFI as a result of RAC's material breach, including reasonable attorneys fees, costs and expenses of suit, arising out of any action by NFI to collect such damages from RAC.

<u>**Termination for Convenience by RAC**</u>

RAC has the right to terminate this Agreement. without cause, as follows:

(a)     By providing NFI with atleast 180 days advance notice of its intention to terminate the Agreement effective at the thirty-six (36) month anniversary of this Agreement.  In the event RAC exercises its right to terminate for convenience pursuant to this paragraph (a), then RAC shall pay to NFI, within thirty (30) days of the effective date of the termination, the following Termination Fee:

     $2,598.036, which relates to the Distribution Services; and
     $1,800,000, which relates to the Transportation Services.

(b)     By providing NFI with atleast 180 days advance notice of its intention to terminate the Agreement effective at the forty-eight (48) month anniversary of this Agreement. In the event RAC exercises its right to terminate for convenience pursuant to this paragraph (b), then RAC shall pay to NFI, within thirty (30) days of the effective date of the termination, the following Termination Fee:

     $1,542,190, which relates to the Distribution Services; and

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001273

$1,200,000, which relates to the Transportation Services.

Payment of the above referenced Termination Fee by RAC shall be RAC's sole liability to NFI in connection with a termination of this Agreement pursuant to (a) or (b) above.

### Miscellaneous

Notwithstanding the foregoing, either NFI or RAC may terminate this Agreement immediately with written notice to the other Party if the other Party files a voluntary petition in bankruptcy or makes an assignment for benefit of creditors, or is voluntarily or involuntarily adjudicated a bankrupt, or has a receiver appointed for its business, or becomes insolvent.

In the event of termination of this Agreement by RAC or NFI, NFI shall be entitled to payment for all services completed to RAC's satisfaction through the date of termination. If RAC is delinquent on its payment obligations to NFI as of the date of termination, or if the Agreement has been terminated by NFI due to a material breach of this Agreement by RAC, NFI may retain RAC products in its warehouses until it has received full and final payment from RAC.

2)      **SERVICES PROVIDED, RATES AND CHARGES**

NFI agrees to perform and provide the dedicated and shared warehouse and distribution services described in Addendum A (the "*Warehouse and Distribution Services*") in exchange for payment by RAC of the rates and charges described in Exhibit 2 to Addendum A, and in any properly executed amendments thereto; such payment by RAC shall constitute full compensation for said Warehouse and Distribution Services performed by NFI.

NFI further agrees to perform and provide the transportation management and dedicated fleet operations described in Addendum B utilizing motor vehicles and other equipment capable of performing all transportations services required by RAC (the "*Transportation Services*") in exchange for payment by RAC of the rates and charges as described in Exhibits 3 and 5 to Addendum B, and in any properly executed amendments thereto; such payment by RAC shall constitute full compensation for said Transportation Services provided by NFI. The Warehouse and Distribution Services and Transportation Services shall be collectively referred to herein as the "Services".

The following Addenda are attached to this Agreement and are each incorporated by reference herein:

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001274

- Addendum A – Warehouse and Distribution Services
  - Exhibit 1 – Description of Services & Operational Requirements
  - Exhibit 2 – Rates and Charges

- Addendum B – Transportation Services
  - Exhibit 1 – Dedicated Fleet Operations
  - Exhibit 2 – Dedicated Equipment Requirements
  - Exhibit 3 – Dedicated Fleet Operations Rates & Charges
  - Exhibit 4 – Description of Transportation Management Services
  - Exhibit 5 – Transportation Management Services Rates & Charges
  - Exhibit 6 – Warehousing & Dedicated Fleet Gainshare
  - Exhibit 7 – Transportation Management Gainshare
  - Exhibit 8 – Dedicated Fuel Surcharge Table

- Addendum C – RAC Security Requirements
- Addendum D – Key Performance Indicators
- Addendum E – Form of Carrier Contract
- Addendum F – RAC Affiliates
- Addendum G – 3PL Security Requirements
- Addendum H – Solutions Scope Definition
- Addendum I – Amortization Schedule

RAC is entitled to obtain the Services for the benefit and use by affiliates of RAC. Such affiliates are entitled to use the Services in accordance with this Agreement, and have and are entitled to all rights, benefits, and protections granted to RAC pursuant to this Agreement with respect to such Services. RAC is responsible for compliance by its affiliates with the terms and conditions set forth in this Agreement. The corporate structure diagram attached as Addendum F, which is incorporated by this reference, includes the current affiliates of RAC. RAC may amend or supplement Addendum F from time to time by providing an updated corporate structure diagram to NFI at any time. NFI will only enter into transactions under this Agreement with the affiliates listed in Addendum F (as may be supplemented or amended by RAC from time to time).

All prices set forth in this Agreement are firm and shall not be subject to change unless specifically allowed by this Agreement, an Addendum, Exhibit or Schedule. NFI's prices shall be complete and no additional charges of any type shall be added without the prior written consent of RAC. Such excluded additional charges include, without limitation taxes (including, but not limited to, sales, use, excise, value added, privilege, payroll or occupational taxes), all of which are included in the prices set forth in this Agreement. If sales and/or use tax is included in the prices, such tax shall be listed separately on the invoices. NFI warrants that the pricing for the Services shall not exceed the pricing for the same or comparable services offered by NFI to third parties. NFI shall promptly inform RAC of any lower pricing levels for the same or comparable services, and the Parties shall promptly make the appropriate price adjustment(s) for this Agreement. NFI will remain cost competitive for the duration of this Agreement.

NFI shall provide reporting to RAC, in a form reasonably acceptable to RAC, regarding NFI's performance against the key performance indicators ("KPIs") identified on Addendum D on a weekly basis, at a mutually agreeable time and place. The Parties shall meet on a monthly basis to review NFI's performance for the first ninety (90) days of this Agreement at a mutually agreeable time and place. By the end of the first six month period of this Agreement, the parties shall in good faith negotiate a Service Level Agreement, which shall establish committed service levels based on the KPIs identified on Addendum D, or additional metrics agreed upon by the Parties. Notwithstanding the foregoing, NFI shall meet or exceed the Service Level Commitments, specified in the Addenda and Exhibits attached to this Agreement.

4

RAC-001275

3)    PAYMENT

A)    NFI agrees to properly submit its invoices (each, an "*NFI Invoice*") to RAC on a weekly or monthly basis, as specified in the attached Addenda and in accordance with the procedures set forth in this Section 3. RAC shall pay all invoices submitted by NFI within thirty (30) calendar days of receipt of such valid and undisputed invoices from NFI. RAC shall be entitled at any time to set off any and all amounts owing from RAC to NFI on this or any other agreement or to decline to pay any amount invoiced by NFI under this Agreement to protect it from loss due to: (a) breach by NFI of any of its obligations under this Agreement; b) third party claims filed or reasonable evidence indicating the probable filing of such claims; or (c) damage to RAC, where such damage arises out of the actual or alleged acts, omissions or breach of this Agreement by NFI or its agents or employees. Notwithstanding the above, RAC may not take a set off for any amount, or claim made by RAC, which is reasonably disputed by NFI. NFI agrees to pay a late charge of one percent (1%) per month, (but not in excess of the rate allowed by law), on any overdue credits or other amounts due to RAC that are past due by more than sixty (60) days, provided any such overdue credits or other amounts due to RAC are not reasonably disputed by NFI. NFI shall be responsible for all expenses, including legal fees, incurred by RAC for collection. RAC agrees to pay a late charge of one percent (1%) per month, (but not in excess of the rate allowed by law), on any overdue payments due to NFI that are past due by more than sixty (60) days, provided any such amounts due to NFI are not reasonably disputed by RAC. RAC shall be responsible for all expenses, including legal fees, incurred by NFI for collection.

B)    Unless otherwise stated in an Addendum to this Agreement, it is agreed that, to be properly submitted by NFI and eligible for payment by RAC, each NFI Invoice shall be submitted with the applicable supporting documentation agreed to between the Parties. NFI Invoices are deemed submitted by NFI when electronically transmitted to RAC's payment agent at the address set forth below (or to such other payment agent, or at such other address, as RAC shall designate in writing to NFI from time to time).

**RAC Accounts Payable Group – accountspayable@rentacenter.com**

**With a copy sent to:**

**Sr. Director of Logistics and Distribution – Jonathan.Parks@rentacenter.com**

**and**

**Director of Logistics and Distribution – Art.Vanderstuyf@rentacenter.com**

C)    All prices contemplated by this Agreement are in US Dollars, and shall be converted into local currency based upon the exchange rates reported by the Bloomberg New York Composite Mid-Rate Spot Close quote on the last business day of the prior month of the current month, one month in arrears. For example, the exchange rates reported by the Bloomberg New York Composite Mid-Rate Spot Close quote on January 31, 2014 would be utilized in the creation of the March 2014 Purchase Orders and associated invoices. Purchase Order pricing will be in US Dollars or will be converted to local currency in accordance with this Section. NFI will ensure that all pricing for each country will be updated in all appropriate NFI ordering procedures so that the new exchange rates for all business transactions will be effective on the same day as the monthly rates become effective. The currency exchange rates will be applied at the time a Purchase Order is issued, not at the time of payment. Payment will be based on the Purchase Order price, unless required by local law.

(D) NFI shall be solely and exclusively liable and responsible for the payment of rates and charges to motor carriers engaged by NFI pursuant to the transportation management services to be provided by NFI, provided NFI has been first paid in full by RAC for such services. RAC's sole obligation with regard to the

5

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001276

payment of transportation charges of a motor carrier for services provided pursuant to the transportation management services is to pay NFI as required by this Agreement. NFI shall specifically provide in its contract with each motor carrier that NFI utilizes to transport RAC's shipments that NFI will bill RAC for transportation charges on the motor carrier's behalf and shall remit such proceeds to which such motor carrier may be entitled to said motor carrier, but that each such motor carrier shall specifically agree that it will look solely to NFI, and not to RAC, any consignor or any consignee, for the payment of its charges. NFI agrees that it shall be a conduit from RAC to each motor carrier for purposes of receiving each motor carrier's freight charges from RAC and paying the freight charges to the motor carrier. NFI agrees that neither a bank, a factoring company nor any other financial institution shall have a valid security interest in the portion of any freight charges collected by NFI from RAC which are owed to a motor carrier. NFI agrees that the portion of any freight charges collected by NFI from RAC which are owed to a motor carrier, while in the possession of NFI are held as trust funds for the motor carrier(s) that is (are) entitled to receive payment of such freight charges. NFI agrees to comply with the regulations contained in Part 371 of Title 49, Code Of Federal Regulations for all of NFI's transportation broker operations – both in interstate commerce and in intrastate commerce.

4)    **COMPLIANCE WITH LAWS AND REGULATIONS; TAXES**

In performing and providing the Services, NFI shall comply with all laws, regulations and rules prescribed by federal, state and/or municipal authorities applicable to the services, including but not limited to the Federal Motor Carrier safety regulations and the transportation broker regulations contained in C.F.R. Furthermore, NFI shall be responsible for the compliance with this paragraph by any Carrier it uses to deliver services to RAC.

Neither federal, state nor local income tax nor payroll tax of any kind shall be withheld or paid by RAC on behalf of NFI or the employees of NFI. NFI shall be responsible for the payment of local, state and federal payroll taxes or contributions or taxes for unemployment insurance, old age pensions, workmen's compensation or other social security and related protection with respect to the persons engaged in the performance of the Services and agrees to comply with applicable rules and regulations promulgated under such laws. The Parties agree that any tax consequences or liability arising from RAC's payments to NFI shall be the sole responsibility of NFI. Should any state or federal taxing authority determine that RAC's payments to NFI under this Agreement constitute income subject to withholding under any federal or state law, NFI agrees to indemnify and hold RAC harmless from any and all tax liability, including but not limited to taxes, levies, assessments, fines, interests, costs, expenses, penalties and attorneys' fees. RAC shall provide NFI with and NFI shall accept in good faith, resale, direct pay, or other exemption certificates, as applicable.

5)    **NFI SERVICES; INDEPENDENT CONTRACTOR STATUS**

NFI will act at all times as an independent contractor, and nothing contained in this Agreement or any Addendum or amendment hereto shall be construed to create the relationship of principal and agent, or employer and employee between NFI and RAC, or to make either NFI or RAC partners, joint venturers, principals, agents or employees of the other, or result in joint service offerings to their respective business partners. NFI's personnel or contractors assigned to perform the Services for RAC are solely the employees of NFI or its third-party contractors and are not the employees of RAC. NFI, as an independent contractor, shall be solely responsible for its own actions and/or inactions. NFI shall neither act nor represent itself as an agent or employee of RAC to any person or entity.

NFI hereby agrees to provide and perform the Services applying prudent and commercially reasonable business practices, using commercially reasonable care and diligence, and in accordance with applicable federal, state, and local laws and regulations. NFI shall also obtain and maintain all governmental permits, licenses and registrations necessary or required to perform the Services.

6

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001277

NFI shall use all reasonable efforts to ensure that it and its contracted carriers have adequate personnel, equipment and capacity needed to perform the Warehouse and Distribution Services and, as applicable, the Transportation Services for RAC. NFI shall further ensure that all personnel employed or otherwise retained to perform the Warehouse and Distribution Services and, as applicable, the Transportation Services for RAC are competent, able and properly licensed for the operation of the Equipment (as defined in Addendum B – Transportation Services).

6)   **INSURANCE**

NFI agrees to maintain warehouse legal liability insurance in the minimum amount of Ten Million Dollars ($10,000,000.00) per occurrence, and to provide RAC with a certificate of insurance evidencing such insurance. RAC will be named as a Loss Payee under this policy, and NFI agrees to grant a waiver of subrogation in favor of RAC with respect to liability assumed by NFI under this Agreement.

NFI agrees to maintain automobile liability insurance in the amount of Two Million Dollars ($2,000,000.00) per occurrence, and to provide RAC with a copy of the MCS 90 form filed by NFI with the Federal Motor Carrier Safety Administration evidencing such insurance. RAC will be named as an additional insured party under this policy and NFI agrees to grant a waiver of subrogation in favor of RAC and, with respect to liability assumed by NFI under this Agreement, this coverage will be primary and non-contributory to any insurance policy which RAC may have.

NFI agrees to maintain employer's liability insurance in the amount of One Million Dollars ($1,000,000.00) per occurrence, and to provide RAC with a certificate of insurance evidencing such insurance. NFI agrees to grant a waiver of subrogation in favor of RAC with respect to this policy.

NFI agrees to maintain commercial general liability (including but not limited to contractual liability coverage, with limits in respect of third party liability and property damage) in the amount of One Million Dollars ($1,000,000.00) per occurrence, and to provide RAC with a certificate of insurance evidencing such insurance. RAC will be named an additional insured party under this policy, and NFI agrees to grant a waiver of subrogation in favor of RAC.

NFI further agrees to maintain an all risk cargo insurance policy covering RAC's merchandise pursuant to this Agreement with a limit of One Hundred Thousand Dollars ($100,000.00) per shipment and will have RAC named as Loss Payee under NFI's policy. This insurance shall cover only those liabilities assumed by NFI under this Agreement. NFI agrees to provide RAC with a certificate of insurance evidencing such insurance and, with respect to liability assumed by NFI under this Agreement, this coverage will be primary and non-contributory to any insurance policy which RAC may have.

NFI further agrees to maintain workers compensation insurance covering its employees, as required by applicable State law in statutory minimum limits, and NFI agrees to grant a waiver of subrogation in favor of RAC and any landlord of a RAC store location, where allowable by law.

NFI further agrees to maintain contingent all risk cargo loss or damage insurance in the amount of One Hundred Thousand Dollars ($100,000.00) per shipment and contingent auto liability insurance covering bodily injury and property damage in the amount of Two Million Dollars ($2,000,000.00), and to provide RAC with a certificate of insurance evidencing such insurance and, with respect to liability assumed by NFI under this Agreement, this coverage will be primary and noncontributory to any insurance policy which RAC may have.

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001278

NFI further agrees to maintain an umbrella policy of, or maintain primary limits of, Twenty-Five Million Dollars ($25,000,000.00) to cover the employer's liability, all risk, automobile liability and general liability coverages as listed above and, with respect to liability assumed by NFI under this Agreement, such coverage will be primary and non-contributory to any insurance policy which RAC may have.

All coverages required under this Section 6 shall be placed with carriers rated no less than A-X by AM Best. All policies shall provide for not less than 30 days written notice to RAC of cancellation or material change. NFI's obligation to maintain insurance coverage shall be in addition to, and not in substitution for NFI's other obligations hereunder and NFI's liability to RAC for any breach of an obligation under this Agreement which is subject to insurance hereunder shall not be limited to the amount of coverage required hereunder.

## 7)   LIABILITY FOR LOSS AND/OR DAMAGE TO MERCHANDISE

### NFI LIABILITY PERFORMING WAREHOUSE AND DISTRIBUTION SERVICES

(A) NFI shall be liable for loss of or damage to merchandise stored only to the extent such loss or damage resulted from the negligent acts or omissions or intentional misconduct of NFI, its Carriers, its agents and employees, including accidental damage.

(B) RAC acknowledges that regardless of anything to the contrary, NFI shall not be liable or in any way responsible for loss of or damage to merchandise resulting from improper loading, unloading, bracing, packing, wrapping, palletizing, boxing, or crating by RAC, its consignees or customers, or as the result of the inherent qualities of the merchandise. Nor shall NFI be responsible or liable for loss of merchandise or damage resulting from NFI's failure to detect concealed damage. For purposes of this Agreement, "concealed damage" shall mean damage that has occurred to a product within a shipping carton where there is no visible damage to the shipping carton. All merchandise is stored at RAC's risk of loss from damage or delay caused by acts of God, civil or military authority, enemies of the government, insurrections, riots, civil commotion, seizure under legal process, or by fire, flood, windstorm, earthquakes, or any other cause beyond the control of NFI, provided, however, that NFI shall be liable for such loss from damage or delay to the extent such loss from damage or delay was contributed to by the negligence or intentional misconduct of NFI. During the term of this Agreement, NFI shall comply with the terms and conditions of RAC's 3PL Security Requirements, which are attached as Addendum G and incorporated by this reference.

(C) It is mutually agreed that in the event of loss of or damage to RAC's merchandise, the value for claim purposes will reflect 100% of RAC's full actual loss. For purpose of this Agreement, "full actual loss" is 100% of the landed cost to replace the merchandise.

(D) All claims by RAC for loss and damage shall be submitted to NFI within nine (9) months after shipment of the merchandise from NFI's warehouse, or in the case of failure to make delivery, then within nine (9) months after a reasonable time for delivery has elapsed. RAC shall institute any action at law, related to loss or damage claims, within two (2) years from the date of RAC's claim.

(E) **Shrinkage**. "Shrinkage" is defined as discrepancies (i.e., shortages) between the quantity of goods recorded in NFI's warehouse management system ("WMS") and the quantity of goods counted during a wall-to-wall physical inventory or cycle count, as well as other loss and damage related to NFI's handling of goods within the warehouse. NFI will have a reasonable period of time following each physical inventory, not to exceed sixty (60) days, to attempt to reconcile, through an audit of shipping, receiving and other records, any Shrinkage discovered as a result of such physical inventory. Within each calendar year, any overage discovered may be used to offset any shortage discovered and the dollar value of any Shrinkage will be by netting the total of all overages

8

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001279

against the total of all shortages. After the physical inventory and subsequent reconciliation process, NFI will provide RAC with a list identifying the quantity of each part (SKU) identified in the WMS.

NFI will become responsible for Shrinkage at a distribution center once the facility is opened and receipt of merchandise has begun.

Subject to the limits set forth in this Schedule and the General Terms, NFI will be liable for Shrinkage only to the extent that it exceeds a Shrinkage allowance equal to one tenth of one percent (.001) of the total value of annual through-put volume at the facility during each year of this contract (the "Shrinkage Allowance"). Financial settlement for Shrinkage liability, if any, will be made at the end of each calendar year and upon the termination of this Schedule, in each case within ten (10) business days after NFI has completed the physical inventory and subsequent reconciliation process described in Section 5.3.1 above. NFI's liability for Shrinkage shall be RAC's cost of the missing goods in excess of the Shrinkage Allowance. RAC agrees to provide to NFI a complete list of all goods, by SKU, listing RAC's cost, at least thirty (30) days prior to the opening of the first warehouse location listed on Addendum A. RAC will update such list as products are added or deleted from RAC's product assortment. RAC will update the list from time to time in connection with any shrinkage claims or Shrinkage Allowance calculations.

### NFI LIABILITY PERFORMING DEDICATED FLEET SERVICES

(F) NFI shall be liable to RAC for loss of or damage to merchandise within its possession and control as a motor carrier under 49 U.S.C. Section 14706 and as a motor carrier under common law. NFI shall not be liable to RAC for loss of or damage to merchandise casued by an act of God, the public enemy, the authority of law, the act or omission of RAC, its employees, contractors, agents or vendors, or due to the inherent vice of the merchandise shipped.

(G) In the event of a loss, NFI shall notify RAC as soon thereafter as reasonably practicable.

(H) RAC shall submit all loss and damage claims to NFI, ATTN: Cargo Claims, 1515 Burnt Mill Road, Cherry Hill, New Jersey 08003. All claims by RAC for loss and damage shall be submitted to NFI within nine (9) months after delivery of the merchandise, or in the case of failure to make delivery, then within nine (9) months after a reasonable time for delivery has elapsed. RAC shall institute any action at law, related to loss or damage claims, within two (2) years from the date of RAC's claim.

(I) NFI shall present payment or written declination of any loss or damage claim within sixty days (60) days after receipt of RAC's claim. All undisputed claims must be settled by NFI within one hundred eighty (180) days after receipt. If undisputed claims are not settled within the one hundred and eighty (180) day settlement period, NFI shall submit payment to RAC via check for such undisputed claims. If NFI fails to do so, RAC may offset the undisputed claims against any outstanding amounts due to NFI.

(J) It is mutually agreed that in the event of loss of or damage to RAC's merchandise, the value for claim purposes will reflect 100% of RAC's full actual loss. For purpose of this Agreement, "full actual loss" is 100% of the landed cost to replace the lost or damaged merchandise tendered to NFI for transportation. Maximum liability hereunder shall not exceed One Hundred Thousand Dollars ($100,000) per occurrence. NFI shall be responsible for the full actual loss of merchandise in accordance with this paragraph regardless of whether it can successfully salvage, recover and/or dispose of such merchandise. NFI shall have sole responsibility for salvage, recovery, and/or disposal of damaged merchandise.

(K) Notwithstanding NFI's full responsibility for the full actual loss of merchandise in accordance with the above, any claims for damages against NFI will be offset by the salvage value, if any, for the damaged

9

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001280

merchandise. NFI shall have no right to possession of any merchandise product or package, which has suffered physical damage without the written consent of RAC.

(L)  Except as modified by this Agreement, the Parties agree that Part 370 of Title 49 Code of Federal Regulations will not apply with regard to claims and actions for loss of and damage to merchandise transported under the terms of this Agreement.

### NFI/CARRIER LIABILITY PERFORMING TRANSPORTATION MANAGEMENT SERVICES

(M)  NFI agrees that it will only use duly qualified contract motor carriers who operate under valid permits and authority issued by the U.S. Department of Transportation and any applicable state agency to perform for-hire transportation services in intrastate, interstate and foreign commerce. NFI shall only select a motor carrier to transport a shipment if:  at the time the shipment is to be transported the motor carrier has a safety rating or determination from the U.S. DOT that is either "Satisfactory" or a similar safety rating issued by the U.S. DOT. NFI shall only select a motor carrier to transport a shipment if the motor carrier has agreed to perform transportation of the shipment in full compliance with all applicable safety laws and requirements. NFI agrees to immediately advise RAC if NFI's property transportation broker authority from the U.S. DOT is (are) ever revoked or cancelled. NFI shall require in a written agreement with each motor carrier to which NFI intends to broker transportation service pursuant to this Agreement that the motor carrier agrees to advise NFI immediately if the motor carrier's authority from the U.S. DOT, public liability insurance and/or cargo insurance is (are) ever revoked or cancelled. NFI agrees to immediately advise RAC if NFI becomes aware that the motor carrier authority, public liability insurance and/or cargo insurance of a motor carrier to which NFI intends to broker transportation service pursuant to this Agreement has (have) been revoked or cancelled. Further NFI shall use only contract motor carriers who have minimum personal liability and property damage insurance insuring the carrier against liability in the amount of One Million Dollars ($1,000,000.00) for injury or death to one person and One Million Dollars ($1,000,000.00) for property damage.

(N)  RAC shall have no liability to NFI, for any negligence, gross negligence or intentional act or omission of any motor carrier utilized in accordance with this Agreement.

(O)  NFI shall be liable to RAC for loss of, damage or injury to RAC property occurring while in the possession of or under the control of any Carrier hereunder or resulting from such Carrier's performance of or failure to perform the Transportation Services required under the applicable Carrier Contract, to the same extent as though such Carrier were acting as a common carrier with its performance of the Transportation Services being governed by 49 U.S.C. § 14706 and the tariff provisions of the National Motor Freight Classification.

(P)  NFI shall notify RAC of any loss or damage caused by a Carrier within a reasonably practicable time following notice to NFI of such loss or damage. NFI shall be responsible adjusting all such losses and damages with Carriers and their liability insurers. NFI  will facilitate claim filing and claim management on behalf of Customer with any Carrier it uses to deliver services to RAC. Each claim must contain information necessary to identify the merchandise affected, the basis for liability and the amount of the alleged loss or damage, as well as all appropriate supporting documentation. RAC will cooperate with NFI, Carrier and their respective insurers in their investigation of any claim or potential claim by RAC. NFI may, upon Customer's written request, assign its right against a Carrier for any particular claim to Customer. NFI shall be solely responsible for commencing any civil action brought for cargo loss or damage within the applicable limitation period whether statutory or contractual.

(Q)  Each Carrier's liability to RAC for any such loss or damage to RAC merchandise shall not exceed RAC's landed cost to replace the lost or damaged merchandise. Each Carrier's liability to RAC hereunder for loss of or damage to RAC merchandise, and NFI's liability to RAC pursuant to (O) above, shall not exceed $100,000 per occurrence, however caused.

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001281

(R) NFI shall use motor carriers as may be necessary to met RAC's transporation requirements (each, a "Carrier" and collectively "Carriers"). NFI shall retain such Carriers under fully lawful terms and shall further ensure that each Carrier executes a written Carrier Contract with NFI in the form attached as Addendum E (each, a "Carrier Contract"). NFI represents and warrants that each Carrier Contract shall provide for the following:

i.    The Carrier shall not re-broker, assign or interline any shipment under this Agreement.

ii.   NFI shall be solely and exclusively liable and responsible for the payment of rates and charges to the Carrier engaged by NFI that relate to the transportation of shipments tendered by RAC to NFI pursuant to this Agreement.

iii.  RAC's sole obligation with regard to the payment of transportation charges for services provided under or in relation to this Agreement is to submit payment to NFI for services rendered under this Agreement. NFI shall specifically provide in each Carrier Contract that NFI utilizes to transport RAC's freight that NFI will bill RAC for transportation charges on the Carrier's behalf and shall remit such proceeds to which such motor carrier may be entitled to said Carrier, but that each Carrier shall specifically agree that it will look solely to NFI, and not to RAC, any consignor or any consignee other than RAC, for the payment of its charges.

Furthermore, NFI agrees that it shall be a conduit from RAC to each Carrier for purposes of receiving each Carrier's freight charges from RAC and paying the freight charges to the Carrier. NFI agrees that neither a bank, a factoring company nor any other financial institution shall have a valid security interest in the portion of any freight charges collected by NFI from RAC which are owed to a Carrier. NFI agrees that the portion of any freight charges collected by NFI from RAC which are owed to a Carrier, while in the possession of NFI are held as trust funds for the motor carrier(s) that are entitled to receive payment of such freight charges. NFI agrees to comply with the regulations contained in Part 371 of Title 49, Code Of Federal Regulations for all of NFI's transportation broker business – both in interstate commerce and in intrastate commerce.

**DATA SECURITY REQUIREMENTS**

(S) NFI shall comply with RAC's Data Security Requirements, which are attached as Addendum C and incorporated herein by this reference.

8)    **INDEMNIFICATION**

Except for damage to or loss of goods transported under this Agreement which is covered above, NFI agrees to indemnify, defend, and hold harmless RAC and its employees, agents and affiliates from any and all claims, demands, lawsuits, investigations, proceedings, judgments, amounts paid in settlement, fine, court costs, pre- and post-judgment interest, costs of any supersedeas, appeal, or other bond, deficiencies, losses, including taxes, and all reasonable and necessary expenses (including interest, penalties, and reasonable and necessary legal and accountant fees and disbursements and reasonable and necessary expert fees and expenses) (collectively "Claims") resulting from (a) any material misrepresentation by NFI hereunder, (b) the negligence or intentional misconduct of NFI, its agents, servants or employees, (c) NFI's failure to perform any of its obligations under this Agreement, or (d) any claim or suit whatsoever asserted against RAC as a result of death or bodily injury, or damage to real and/or tangible personal property, arising out of, resulting from, or relating to (i) any acts or omissions by NFI or any Carrier, its employees, subcontractors, affiliates, or employees of affiliates, to the extent such death, bodily injury, or damage is proximately caused by the negligence, gross negligence, or willful misconduct of NFI or any Carrier, their respective officer(s), director(s), partner(s), subcontractor(s); (ii) the negligent selection of a carrier used by NFI in providing transportation services to RAC; or (iii) NFI's failure to secure a Carrier Contract in the form attached as Addendum E with any Carrier that ships product for RAC under this Agreement. Furthermore, NFI will indemnify and defend RAC and its employees, agents and affiliates from any and all Claims for product liability, death, bodily injury, or damage to real and/or tangible personal property

11

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001282

arising out of, or resulting from, the salvage of any merchandise under this Agreement by NFI or its employees, subcontractors, or affiliates.

RAC agrees to indemnify, defend, and hold harmless NFI and its employees, agents and affiliates from any and all Claims resulting from by (a) any material misrepresentation by RAC hereunder, (b) the negligence or intentional misconduct of RAC, its agents, servants or employees, or (c) RAC's failure to perform any of its obligations under this Agreement.

Except as otherwise provided in this Agreement, neither Party shall be liable to the other Party for any consequential, special or punitive damages. This indemnification provision shall survive the termination of the Agreement with respect to any claim incurred during the term of this Agreement.

The party or parties claiming indemnification hereunder (whether one or more) are hereinafter collectively referred to as the "Indemnified Party" and the party against whom such claims are asserted hereunder is hereinafter referred to as the "Indemnifying Party." All claims for indemnification by any Indemnified Party under this Article 8 will be asserted and resolved as follows:

(a)      In the event that any claim or demand for which an Indemnifying Party would be liable to an Indemnified Party hereunder is asserted against or sought to be collected from such Indemnified Party by a third party (a "Third Party Claim"), such Indemnified Party will with reasonable promptness notify the Indemnifying Party of such claim or demand, specifying the nature of and specific basis for such claim or demand and the amount or the estimated amount thereof to the extent then feasible (which estimate will not be conclusive of the final amount of such claim and demand (the "Claim Notice")). The Indemnifying Party will not be obligated to indemnify such Indemnified Party with respect to any such claim or demand to the extent the failure of such Indemnified Party to promptly notify the Indemnifying Party of such a claim or demand materially prejudices the Indemnifying Party's ability to defend against the claim or demand. The Indemnifying Party will have thirty (30) days from the personal delivery or mailing of the Claim Notice (the "Notice Period") to notify such Indemnified Party (i) whether it disputes the liability of the Indemnifying Party to such Indemnified Party hereunder with respect to such claim or demand and (ii) whether it desires at the sole cost and expense of the Indemnifying Party, to defend such Indemnified Party against such claim or demand with legal counsel reasonably satisfactory to the Indemnified Party; provided, however, that such Indemnified Party is hereby authorized prior to and during the Notice Period to file any motion, answer or other pleading which it deems necessary or appropriate to protect its interests or those of the Indemnifying Party and not materially prejudicial to the Indemnifying Party; provided, further, nothing contained in the immediately preceding proviso will be deemed to authorize the Indemnified Party to make any filings referenced therein after the Indemnifying Party has given notice of the Indemnifying Party's intent to assume the defense of the applicable Third Party Claim. In the event that the Indemnifying Party disputes its obligation to provide indemnification or fails to respond within the above-referenced thirty (30) day period, the Indemnified Party may undertake the defense of the applicable Third Party Claim and pursue any legal remedies available to the Indemnified Party arising out of the Indemnifying Party's refusal/failure to provide indemnification. Although assumption and control of the defense of a Third Party Claim is optional on the part of an Indemnifying Party, the indemnification obligations referenced in this paragraph are not optional. In the event that the Indemnifying Party notifies such Indemnified Party within the Notice Period that it desires to defend such Indemnified Party against such claim or demand, except as hereinafter provided, the Indemnifying Party will have the exclusive right to defend by all appropriate proceedings. If such Indemnified Party desires to participate in, but not control, any such defense or settlement it may do so at its sole cost and expense. If requested by the Indemnifying Party, such Indemnified Party agrees to cooperate (at the expense of the Indemnifying Party) with the Indemnifying Party and its counsel in contesting any claim or demand which the Indemnifying Party elects to contest, and, if appropriate and related to the claim or demand in question, in making any counterclaim against the person asserting the Third Party Claim, or any cross-complaint against any person. No claim or demand may be settled by the Indemnifying Party without the consent of such Indemnified Party, which consent will not be

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001283

unreasonably withheld, conditioned or delayed, unless the proposed settlement involves only the payment of money damages and does not impose an injunction or other obligation upon the Indemnified Party. No claim or demand for which the Indemnified Party is seeking or intends to seek indemnification may be settled by the Indemnified Party without the consent of the Indemnifying Party, which consent will not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, in connection with a Third Party Claim asserted against both such Indemnified Party and the Indemnifying Party, if a conflict exists or may reasonably be expected to exist in connection with the representation of both such Indemnified Party and the Indemnifying Party by the legal counsel chosen by the Indemnifying Party, such Indemnified Party will have the right to select its own legal counsel, subject to the approval of such legal counsel by the Indemnifying Party, such approval not to be unreasonably withheld, conditioned or delayed. If such Indemnified Party selects its own legal counsel pursuant to the immediately preceding sentence and the underlying Third Party Claim is otherwise subject to the scope of the indemnification obligations of the Indemnifying Party pursuant to this Agreement, the reasonable fees and expenses of such legal counsel will be included within the indemnification obligations of the Indemnifying Party; provided that under no circumstances will the Indemnifying Party be obligated to indemnify such Indemnified Party against the fees and expenses of more than one law firm selected by such Indemnified Party in connection with a single claim (notwithstanding the number persons against whom the Third Party Claim may be asserted). All fees and expenses required to be reimbursed pursuant to this paragraph will be paid periodically, within thirty (30) days following written demand for payment submitted to the Indemnifying Party by the Indemnified Party. Each such demand for reimbursement must be accompanied by documentation reasonably supporting such demand.

(b)    In the event any Indemnified Party should have a claim against any Indemnifying Party hereunder which does not involve a claim or demand being asserted against or sought to be collected from it by a third party, such Indemnified Party will send a Claim Notice with respect to such claim to such Indemnifying Party.

**Intellectual Property Indemnity.**  NFI will, at its own expense, indemnify, defend, and hold harmless (except with respect to the value of the time of an employee of RAC and/or any Affiliate of RAC) RAC and its affiliates and their respective officers, directors, employees and agents against any and all Damages that may result from any allegations that any products or services provided by NFI pursuant to this Agreement constitute an infringement, misappropriation or misuse of any patent, copyright, trademark or trade secret or other Intellectual Property Right ("Challenged Products/Services").  If, at any time, in NFI's opinion, any products or services provided by NFI pursuant to this Agreement are likely to become the subject of such an infringement, misappropriation or misuse claim or suit, NFI may, without limiting any other rights of NFI (a) procure for RAC, at NFI's expense, the right to continue using such products and/or services; (b) replace or modify such products and/or services, at NFI's expense, so that such products and/or services become non-infringing and/or cease to misappropriate or misuse the Intellectual Property Rights of any third party but without substantially and adversely changing their original functionality; (c) permit RAC to procure, at NFI's expense, substitute products and/or services of comparable quality and function to replace such products and/or services; or (d) discontinue providing such products and/or services, and release RAC from any further obligations with respect to such products and/or services.  NFI will have no liability under any provision of this section with respect to any claim if (a) the infringement, misappropriation or misuse is based upon (and would not have occurred without) (i) the use of the Challenged Products/Services with any equipment or software not made, provided or contracted for by NFI (unless such use is authorized in NFI's documentation or is mutually agreed to by the parties), (ii) modification of such Challenged Products/Services by RAC (unless such modification is described in any NFI documentation or is mutually agreed to by the parties), (iii) compliance by NFI with RAC's unique written specifications or instructions (excluding general product/services functionality requirements of RAC), or (iv) use by RAC of the Challenged Products/Services in manner not authorized by this Agreement; (b) such claim arises out of or is attributable to the use by RAC of other than the then current version of the Challenged Products/Services and usage of the then current version would have avoided the claim; or (c) a demand for indemnification arises directly or indirectly out of or is attributable to (i) an allegation of infringement, misappropriation or misuse asserted by the parents,

13

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001284

subsidiaries or other affiliates of RAC or (ii) the continued use by RAC of the products and/or services provided by NFI pursuant to this Agreement following receipt by RAC of written notice from NFI stating that NFI has elected (pursuant to this section) to discontinue providing such products and/or services. The foregoing states the entire liability of NFI with respect to infringement of patents, copyrights, trade secrets, trademarks or other third party Intellectual Property Rights by the products and/or services provided by NFI pursuant to this Agreement, and any resulting unavailability of such products and/or services. NFI agrees that the limitations set forth in Section 7 (General Liability), including, without limitation, the limitation on NFI's maximum aggregate liability, will not apply to NFI's liability under the provisions of this section. The indemnification procedures set forth above shall apply to this intellectual property indemnity section.

9)   **CHARGES, UNDERCHARGES AND OVERCHARGES**

An action at law by NFI to recover unpaid charges alleged to be due hereunder shall be commenced not more than twelve (12) months after the Services have been provided with respect to which such charges are claimed. An action at law by RAC to recover overcharges alleged by RAC to be due hereunder shall be commenced not more than twelve (12) months after the Services have been provided with respect to which such overcharges are claimed. To the extent permitted by applicable law, the expiration of the said twelve (12) month period shall be a complete and absolute defense to any such action, without regard to any mitigating or extenuating circumstance or excuse whatsoever. The provisions of this clause shall survive the termination, expiration or cancellation of this Agreement.

10)   **ASSIGNMENT**

Neither Party shall assign, transfer or delegate to any person, firm or corporation, its duties under this Agreement without first obtaining the written consent of the other Party; except that, this Agreement may be assigned or transferred by RAC without such consent to (i) its parent corporation, (ii) any corporation a majority of whose capital stock is owned by RAC or by the parent corporation of RAC, or (iii) any entity that succeeds to all or substantially all of the business or assets or capital stock of RAC, whether by sale, merger, reorganization, consolidation or otherwise.

Further, nothing herein shall prohibit NFI from assigning or pledging, as the case may be, any receivable due it hereunder as part of financing arrangements made or entered into by NFI in the course of its business, provided however that such receivable shall continue to be subject to the provisions contained in this Agreement. In such cases, NFI shall provide written notice to RAC of such assignment.

11)   **ENTIRE AGREEMENT**

This Agreement, together with the exhibits, schedules and attachments hereto, constitute the entire Agreement between the Parties with respect to the subject matter hereof, and may not be changed, waived or modified except by written agreement signed by authorized representatives of both Parties hereto specifically stating that such writing is an amendment to this Agreement.

12)   **FORCE MAJEURE**

Neither Party shall be liable to the other for failure to perform any of its obligations under this Agreement during any time in which such performance is prevented by fire, flood, or other natural disaster, war, embargo, riot, civil disobedience, or the intervention of any government authority, or any other cause outside of the reasonable control of RAC or NFI, provided that the Party so prevented uses its best efforts to perform under this Agreement and provided further that such Party provides reasonable notice to the other Party of such inability to perform.

14

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001285

Notwithstanding the foregoing, should NFI's performance under this Agreement be prevented or delayed for a period of more than five (5) days, NFI shall provide RAC with a contingency plan to continue the affected services by the end of the fifth calendar day of such delay, in a form reasonably acceptable to RAC. In the event NFI's performance is prevented or delayed for a period of more than thirty (30) days, RAC may immediately terminate this Agreement without penalty to either party.

### 13)   SEVERABILITY

If any portion of this Agreement is held invalid, illegal, or unenforceable for any reason whatsoever by a court of competent jurisdiction, such portion shall be enforced to the fullest extent permitted by applicable law, and the validity, legality, and enforceability of the remaining terms shall not in any way be affected or impaired thereby.

### 14)   NOTICES

All notices or other communications required in writing by this Agreement shall be sent certified mail postage pre-paid and addressed as follows:

| RAC | NFI |
|---|---|
| ATTN: Joel Mussat, Chief Omichannel Officer<br>Rent-A-Center<br>5501 Headquarters Drive<br>Plano, Texas 75024 | ATTN: Joe Roeder, President<br>1515 Burnt Mill Road<br>Cherry Hill, New Jersey 08003 |
| With a copy to:  ATTN: General Counsel (same address as above) | With a copy to:  ATTN: Legal Department (same address as above) |

### 15)   GOVERNING LAW; ARBITRATION

The validity, enforceability and construction of the terms, provisions and conditions of this Agreement shall be governed by the law of the United States, including, without limitation, the Interstate Commerce Act and, to the extent applicable hereto, by the law of the State of Texas. Further, it is mutually agreed that either NFI or RAC shall exercise any right or remedy hereunder in the state or federal courts located in Collin County, Texas to the exclusion of all other locations.

Notwithstanding the foregoing, the Parties agree that any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules and governed by the laws of the State of Texas. Claims shall be heard by a single arbitrator. The decision of the arbitrator shall be binding on all Parties and shall not be subject to further review or appeal. Judgment on the award rendred by the arbitrator by be entered in any court having jurisdiction thereof. The venue of any arbitration shall only be in Collin County, Texas to the exclusion of any other location. Time is of the essence for any arbitration under this Agreement and arbitration hearings shall take place within 90 days of filing and awards rendered within 120 days. The arbitrator shall agree to these limits prior to accepting appointment. The arbitrator will have no authority to award punitive or other damages not measured by the prevailing Party's actual damages, except as may be required by statute. The arbitrator shall not award consequential damages in any arbitration initiated under this section. The arbitrator shall award to the prevailing Party, if any, as determined by the arbitrator, all of its costs and fees. "Costs and fees" means all reasonable pre-award expenses of the arbitration, including the arbitrator's fees, administrative fees, travel expenses, out-of-

15

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001286

pocket expenses such as copying and telephone, court costs, witness fees, and reasonable attorneys' fees. The award of the arbitrator shall be accompanied by a reasoned opinion. Except as may be required by law, neither a Party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of NFI and RAC.  The parties acknowledge and agree that disputes relating to either Party's obligation to indemnify the other for third party personal injury claims that exceed one million dollars ($1,000,000) shall not be subject to binding arbitration in accordance with this paragraph.

To the extent this Agreement applies to dedicated fleet services to be provided by NFI the Parties agree that this Agreement is and shall be a contract pursuant to the meaning set forth in 49 U.S.C. § 14101(b), and to the extent that any right or remedy provided in this Agreement conflicts, or is otherwise inconsistent with, the rights and remedies provided under Part B, Subtitle IV, Title 49, U.S. Code ("Part B"), the Parties hereby expressly waive all such rights and remedies, and that all rights and remedies provided by Part B which have not been specifically waived in this Agreement and which are not inconsistent or in conflict with the rights and remedies provided in this Agreement shall continue to apply to the Parties' duties and responsibilities under this Agreement. Notwithstanding the foregoing, to the extent this Agreement applies to dedicated fleet services to be provided by NFI nothing in this Agreement shall be construed as a waiver by either Party of any provision of Part B or other applicable law governing NFI's compliance with all registration, financial, safety and insurance requirements.

16)     **WAIVER OF JURY TRIAL**

EACH PARTY HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FULLY WAIVES ANY RIGHT TO TRIAL BY JURY TO THE EXTENT THAT ANY SUCH RIGHT NOW OR HEREAFTER EXISTS WITH RESPECT TO THIS AGREEMENT AND/OR THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY OR THEREBY OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH OR THEREWITH. EACH PARTY ACKNOWLEDGES AND AGREES THAT THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY SUCH PARTY AND IS INTENDED TO ENCOMPASS EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO TRIAL BY JURY WOULD OTHERWISE ACCRUE. EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

17)     **ATTORNEYS' FEES**

In the event either Party is successful in a court of law or in an arbitration proceeding related to this Agreement, the successful Party shall be entitled to recover from the other Party all reasonable attorneys' fees, in addition to other costs of the action.  Any dispute over attorneys' fees shall be resolved by arbitration in accordance with Section 15.

18)     **CONFIDENTIALITY**

All information and materials provided pursuant to or in connection with this Agreement shall be subject to the provisions of the Nondisclosure Agreement entered into between the Parties as of May 1, 2014.

19)     **WAIVER**

One or more waivers by any Party of any breach by any other Party of any of the provisions of this Agreement shall not constitute a waiver of any other breach.  Any Party's failure to enforce a provision of this Agreement shall not be deemed a waiver of the provision or of the right to enforce it in the future.

16

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001287

20)   **INSPECTION OF RECORDS**

RAC and RAC's external audit firm in coordination with RAC (provided it executes a Confidentiality Agreement), shall have the right upon reasonable notice to inspect and audit all supporting documentation and records relating to the processes and systems, including inventory and IT controls, maintained by NFI in connection with this Agreement, and the Services supplied hereunder, during the term hereof and for a period of three (3) years thereafter.  Such inspection and/or audit shall be conducted at RAC's expense during normal business hours at NFI's principal place of business. NFI agrees to cooperate fully in any such inspection.

21)   **FINANCIAL INFORMATION**

NFI shall from time to time provide RAC with such financial and other information concerning NFI as RAC may reasonably request to confirm that NFI has the financial strength and stability to perform its obligations under this Agreement.  Any financial information provided by NFI shall be prepared in accordance with generally accepted accounting principles and shall fairly present the financial condition and results of operations of NFI for the indicated period.

22)   **TERMINATION OR REASSIGNMENT OF PERSONNEL**

NFI will implement and maintain safeguards to assure that access of terminated and reassigned personnel to RAC's merchandise, information systems, and/or communication network will be fully restricted.  Additionally, NFI shall be responsible for the return of all equipment, security badges and access cards issued to such personnel by RAC.

23)   **PUBLICITY**

NFI shall not publicize or disclose the terms or existence of this Agreement, nor shall NFI use the name(s), trademark(s), or trade name(s) of RAC, its subsidiaries or affiliates, except as follows:  i) With the prior written consent of RAC; or ii) as may be necessary for NFI to perform its obligations under this Agreement; or iii) as may otherwise be required by law.  RAC may impose, as a condition of its consent, any restrictions which RAC deems appropriate, in its sole discretion.  NFI shall provide 10 days written notice to RAC prior to disclosure under subsections (ii) or (iii) above.

24)   **NON-SOLICITATION**

Neither Party will, directly or indirectly, either for its own benefit or the benefit of any other person, (i) induce or attempt to induce any employee of the other Party to leave the employ of the other Party, (ii) in any way interfere with the relationship between the other Party and any employee of the other Party, or (iii) , induce or attempt to induce any customer, supplier, licensee, or business relation of the other Party to cease doing business with the other Party, or in any way interfere with the relationship between the other Party and any customer, supplier, licensee, or business relation of the other Party.

25)   **COUNTERPARTS**

This Agreement may be executed in multiple counterparts, each of which will be deemed to be an original and all of which will be deemed to be a single agreement.  This Agreement will be considered fully executed when all Parties have executed an identical counterpart, notwithstanding that all signatures may not appear on the same counterpart.  Signatures to this Agreement may be transmitted by facsimile or portable document format (pdf) and to the extent so transmitted shall be deemed to be original.

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001288

[Signature Page Follows]

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001289

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective authorized representatives as of the date first above written.

NFI                                                    **Rent-A-Center Texas, L.P.**

By: _____                          By: _____
Authorized Signature                                   Authorized Signature

Print Name: _Joe Roader_                               Print Name: _Joel Mussat_

Title: _President_                                      Title: _EVP – Chief Omnichannel Officer_

10/23/14

19

RAC-001290

Addendum A
## Warehouse and Distribution Services

This Addendum ("Addendum A") is attached to and made a part of the Master Services Agreement (the "Master Agreement") dated _____10/21/14_____, 2014, by and between Rent-A-Center Texas, L.P. ("RAC") and NFI Interactive Logistics, LLC ("NFI").

In the event of any conflict between the terms and conditions set forth in the Master Agreement and the terms and conditions set forth in this Addendum A, the terms and conditions of this Addendum A shall control.

A.    Locations

NFI shall provide warehousing, distribution and related services at the following warehouse locations:

1.    Dallas / Fort Worth, TX – specific site TBD; will open on or before May 4, 2015

2.    Chino, CA – specific site TBD; will open on or before June 1, 2015

3.    Atlanta, GA – specific site TBD; will open on or before June 1, 2015

4.    Columbus, OH – specific site TBD; will open on or before June 15, 2015

5.    Oldmans Township, NJ – New Building Under Construction; will open on or before June 15, 2015.

The final site and facility selection for each of the above referenced locations shall be subject to final approval by RAC, which shall not be unreasonably withheld or delayed.  If NFI is unable to meet any of the above opening dates for a particular location, NFI shall, at its own expense and subject to RAC's express approval, find and use alternate means to store and transport  RAC's merchandise as required under this Agreement until such facilities are opened.

B.    General Terms and Conditions

1.  All orders under this Agreement will originate from RAC's Field Support Center in Plano, Texas.  NFI will not receive orders from individual store locations.  NFI shall receive shipments of RAC merchandise at the warehouse locations referenced above.  NFI shall be responsible for the unloading of the merchandise from the trucks and trailers upon proper positioning at the warehouse docks..

2.  The merchandise shall be stored by NFI at the warehouse until such time that orders are received by NFI from RAC that specified merchandise is to be shipped out of the warehouse.  NFI shall

20

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001291

be responsible for loading the goods to be shipped onto trucks and trailers properly positioned at the warehouse docks by NFI or its agents and contractors.

3.  RAC agrees not to ship merchandise to NFI as the named consignee. If, in violation of this provision, merchandise is shipped to NFI as named consignee, RAC agrees to notify the carrier in writing prior to such shipment, with copy of such notice to NFI, that NFI is a warehouseman and has no beneficial title or interest in such property, and RAC further agrees to indemnify and hold harmless NFI from any and all claims for transportation charges for inbound freight that is neither provided nor managed by NFI.

4.  All merchandise for storage shall be delivered at the warehouse properly marked and packaged for handling.  RAC shall furnish at or prior to the time of such delivery, a manifest showing marks, brands, or sizes to be kept and accounted for separately, and the class of storage and other services desired.

5.  Instructions to transfer RAC merchandise stored by NFI at the warehouse facility are to be communicated to NFI in writing or electronically.  Said instructions are not effective until delivered to and received by NFI.  Instructions sent via EDI shall be considered delivered and received upon submission by RAC and acknowledgment of receipt by NFI.

6.  NFI shall have a general warehouseman's lien on all RAC merchandise within NFI warehouses in order to secure any unpaid charges under this Agreement, provided such charges are not more than thirty (30) days past due or are being contested in good faith.  NFI's lien shall not exceed the unpaid charges.  This lien shall also secure payment to NFI for all expenses, including attorney fees and costs, incurred by NFI associated with collecting and enforcing this lien, as well as interest at the rate of 1 ½ percent per month on all outstanding amounts.

7.  NFI shall  be liable for demurrage, delays in unloading inbound trailers, and/or delays in obtaining and loading trailers for outbound shipment unless  such demurrage or delay results from acts of God, war, public enemies, seizure under legal process, riots and civil commotion's, or any reason beyond NFI's control.

8.  No merchandise shall be delivered or transferred except upon receipt by NFI of written or electronic instructions from RAC.

9.  When merchandise is ordered out, delivery shall be based upon mutually agreed upon service levels and optimal routing to be established for NFI to carry out instructions, and if NFI is unable because of acts of God, war, public enemies, seizure under legal process, riots and civil commotion's, or any reason beyond NFI's control, or because of loss or destruction of merchandise for which NFI is not liable, NFI shall not be liable for failure to carry out such instructions for as long as any such occurrence continues and provided that NFI uses reasonable efforts to carry out the instructions.  Any merchandise remaining in storage will continue to be subject to charges, as applicable and permitted under this Addendum A.

10.  All Fixed expenses for warehouse services as set forth on this Addendum A wil be due on the 1st day of each calendar month, and will be invoiced by NFI on the 1st day of the prior month.  All Variable and Supplemental expenses will be invoiced on a weekly basis.

21

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001292

11. Annual increases to Warehouse and Distribution Services rates and charges will be assessed at 1.5% each year of this Agreement.


Initials, RAC: _____          Initials, NFI: _____

22

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER                                                    RAC-001293

## EXHIBIT 1 TO ADDENDUM A
## WAREHOUSE AND DISTRIBUTION SERVICES

### DESCRIPTION OF SERVICES & OPERATIONAL REQUIREMENTS

The following is a description of the Scope Of Work which NFI and RAC will be operating under.

**Information Technology**
NFI will set up, manage, and maintain a Warehouse Management System ("WMS") at each distribution center location to track and manage RAC's merchandise while in the distribution centers. RAC is not responsible for any license costs, support costs, or any other associated fees with the purchase, customization, or usage of the WMS systems, except those that are outlined in the Startup and Fixed Cost expenses as outlined in Exhibit 2 of this Addendum A.

**Inbound receiving (including damage inspection, claims processing, refusal of over-shipment, tracking of partial shipments, and providing visibility to scheduled receipts)**
Inbound shipments will be scheduled and unloaded either as Live Loads or Dropped Trailers. All trailers will be unloaded in a secured Truck Yard. Item Master & Bill of Material will be sent to NFI by RAC via EDI or as mutually agreed by the parties. For those items with no dimensions, NFI will measure and weigh and report results to RAC and input into Item Master, not to exceed 20% of the skus to be handled.

Inbound loads will be in four (4) product categories:
1. Appliances
   a. Major appliances (e.g.washers, dryers, stoves, refrigerators)
   b. Small appliances (e.g. air conditioners,)

2. Computers (e.g. desktops, laptops, tablets, etc.)

3. Electronics (e.g. games, cellular phones, televisions, etc.)

4. Furniture
   a. Small furniture (e.g. lamps, end tables, cabinets)
   b. Large furniture (e.g. mattresses, sofas, love seats, recliners, dining tables)

Products will be received and quantities confirmed against an electronic ASN provided by RAC.
Inbound shipments will be visually inspected for external damage. The WMS will track the Date Of Inbound Receipt to manage FIFO (first in, first out) product selection for outbound orders. FIFO will be executed such that there will be no greater than a thirty (30) day age differential between the receipt of the oldest and newest item. All variances, over/under, and damages will be reported via a 944 Receipt Confirmation. Reports will be available to RAC via NFI's Navitrace portal or by request at no additional charge.

**Material Put Away**
Put Away will be to the following types of Storage Locations
1. Floor locations
   a. 1-high to 5-high stack height maximized based on manufacturer guidelines and quantities on hand
   b. Major appliances and large furniture

2. Custom i.e stack or tier rack deep rack locations for large furniture
   a. Custom length pallets will be used for transport & storage, using extended fork lift equipment

3. Single Select 5-High Pallet Rack

4. High Value: secure storage space will be provided i.e. doors with locks and/or fencing and/or cages, with cameras.

23

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001294

**Inventory Storage**

Put Away product will be scanned into the storage locations. The worker will scan the product and the put away location to confirm the location of the product. The WMS will track the located product.

**Management Of Target Inventory Levels**

RAC will have visibility of the inventory via NFI's Navitrace portal. This will also be available via EDI confirmation sent from NFI to client's host by purchase order.

**Monthly cycle counting adjusted based on results and shrink; semi-annual complete physical inventories per RAC requirements**

Facilities will have dedicated Inventory Control staff that will be responsible for conducting daily cycle counts. NFI will count each location monthly. Semi-annual physical inventories are out of scope for the standard operation, and will be conducted by NFI as requested and required, subject to supplemental hourly rates for inventory preparation, counting and reconciliation. The physical inventories will be conducted in accordance with RAC's requirements and NFI's guidelines. Inventory variances will be reported to NFI Management and to RAC via EDI or as mutually agreed.

**Palletization / re-packaging**

Requests, by RAC for special palletization work or re-packaging will be managed as Value Added Services (VAS) outlined in the Agreement.

**Sorting and Stocking Of Product**

Merchandise will be sorted and stocked by SKU. Only one (1) SKU will be stored in a given location. For any merchandise that is communicated by RAC via Item Master to NFI to be lot controlled, NFI will segregate and store based on lot.

**Outbound store order selection (using the first in, first out (FIFO) method)**

NFI's WMS will manage FIFO using the Date Of Inbound Receipt. Outbound orders will be filled in accordance with FIFO by having the WMS direct the Order Selector to pick the appropriate FIFO product.

**Staging and loading**

NFI will receive orders from RAC via EDI or as mutually agreed.. NFI will route the orders via its Transportation Management System ("TMS") to determine the appropriate carrier based upon business rules as determined by RAC. Once routed, NFI will notify the carrier(s) to schedule pick-ups.

**Dedicated Fleet**

NFI will stage outbound orders first by store, then by load. The outbound trucks will be loaded so that the product will be able to be un-loaded in stop order. Trucks will be loaded in a manner that prevents damage to the merchandise and allows the driver to unload the truck without store assitance , using a lift gate, at the store locations. Some product may be double stacked if it can be down-stacked manually. All orders will be tendered to the dedicated fleet in order to meet the service levels established by the parties.

**Serial Number Recording**

NFI will capture and record inbound serial identification numbers and any applicable lot numbers, via the ASN, upon inbound arrival. Outbound serial identification numbers will be recorded, via scan, upon outbound shipping.

**Annual Volume Assumptions (by units)**

The parties agree that the below chart is not at all meant as a guarantee from RAC as to volumes of RAC merchandise to be stored and handled by NFI at these locations, but rather contains those approximate volumes upon which NFI's distribution network and pricing were modeled.

|  | CA | TX | OH | GA | NJ |
|---|---|---|---|---|---|
| Appliance Inbound | 21,273 | 56,342 | 112,032 | 96,360 | 82,369 |
| Computer Inbound | 39,325 | 36,718 | 49,788 | 66,962 | 71,436 |
| Electronics Inbound | 40,815 | 50,472 | 84,758 | 82,064 | 113,658 |

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001295

| | | | | | |
|---|---|---|---|---|---|
| Furniture Inbound | 38.474 | 88.194 | 166,067 | 144,832 | 100,286 |
| Appliance Outbound | 21.273 | 56,342 | 112,032 | 96,360 | 82,369 |
| Computer Outbound | 39.325 | 36.718 | 49,788 | 66,962 | 71,436 |
| Electronics Outbound | 40.815 | 50,472 | 84,758 | 82,064 | 113,658 |
| Furniture Outbound | 38.474 | 88.194 | 166,067 | 144,832 | 100,286 |
| **Totals** | **139,887** | **231,726** | **412,645** | **390,219** | **367,749** |

**Distribution Service Level Commitments:**

1. **\*On Time Shipments from the Warehouses: 96.5% or greater**
   \* Combined total of all shipments (all warehouses) loaded on outbound carriers on-time (i.e., no later than the day after NFI received the order) divided by the total number of shipments (all warehouses).

2. **\*Shipping Accuracy / Fill Rate: 98.5% or greater**
   \* Orders shipped without exceptions (e.g., over or short) divided by the total number of shipments (all warehouses).

3. **\*Dock to Stock: 97.5% or greater**
   \* Receipts unloaded at all warehouses combined (i.e., unloaded within 24 hours after the inbound appointment time) and available in the WMS to order against divided by the total number of order received at all warehouses.

4. **\*Inventory Accuracy: 98% or greater**
   \* Total unit variance (i.e., measured by the cycle counts) divided by the total units counted (all warehouses)

5. **\*Damage Rate: 2% or less**
   \* Total number of units damaged (all warehouses) divided by total number of units delivered (all warehouses).

All service level issues shall count against the above Service Level Commitments except to the extent caused by the actions or inactions of RAC, RAC vendors or in-bound carriers (delivering to the five warehouses), or force majeure events (as defined in Section 12 of the Agreement). "Damage", as used above, shall only include damage to goods/merchandise, not damage to packaging.

Initials, RAC: _7. m._       Initials, NFI: _____

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001296

## EXHIBIT 2 TO ADDENDUM A
## WAREHOUSE AND DISTRIBUTION SERVICES

**FIXED MONTHLY RATE (Per Month)**

| CATEGORY | CA | TX | OH | GA | NJ |
|---|---|---|---|---|---|
| Facility Expense | $26,711 | $37,283 | $69,519 | $57,147 | $63,856 |
| Management Fee | $22,603 | $26,244 | $27,441 | $26,962 | $29,054 |
| General Administrative | $3,376 | $3,937 | $5,498 | $4,952 | $5,166 |
| Depreciation (MHE, Rack, IT) | $8,312 | $10,557 | $14,590 | $12,894 | $12,679 |
| Total Monthly Fixed Expense | $60,972 | $78,021 | $117,048 | $101,955 | $110,755 |
| Average Square Footprint | 40,000 | 75,000 | 135,000 | 110,000 | 100,000 |
| Average Monthly Inventory - Cases | 11,203 | 17,750 | 31,310 | 30,012 | 30,646 |

**VARIABLE HANDLING RATES (Per Unit)**

| CATEGORY | CA | TX | OH | GA | NJ |
|---|---|---|---|---|---|
| Appliance Inbound | $0.63 | $0.55 | $0.58 | $0.52 | $0.56 |
| Computer Inbound | $0.02 | $0.02 | $0.02 | $0.02 | $0.02 |
| Electronics Inbound | $0.03 | $0.03 | $0.03 | $0.03 | $0.03 |
| Furniture Inbound | $1.63 | $1.45 | $1.51 | $1.36 | $1.47 |
| | | | | | |
| Appliance Outbound | $1.66 | $1.47 | $1.53 | $1.38 | $2.72 |
| Computer Outbound | $0.53 | $0.47 | $0.49 | $0.44 | $0.48 |
| Electronics Outbound | $0.53 | $0.47 | $0.49 | $0.44 | $0.48 |
| Furniture Outbound | $1.60 | $1.41 | $1.47 | $1.33 | $1.43 |

**Forecasted Annual Unit Volume (Assumed for solution development)**

| CA | TX | OH | GA | NJ |
|---|---|---|---|---|
| 21,273 | 56,342 | 112,032 | 96,360 | 82,369 |
| 39,325 | 36,718 | 49,788 | 66,962 | 71,436 |
| 40,815 | 50,472 | 84,758 | 82,064 | 113,658 |
| 38,474 | 88,194 | 166,067 | 144,832 | 100,286 |
| | | | | |
| 21,273 | 56,342 | 112,032 | 96,360 | 82,369 |
| 39,325 | 36,718 | 49,788 | 66,962 | 71,436 |
| 40,815 | 50,472 | 84,758 | 82,064 | 113,658 |
| 38,474 | 88,194 | 166,067 | 144,832 | 100,286 |
| 139,887 | 231,726 | 412,645 | 390,219 | 367,749 |

Annual Units Shipped

| | CA | TX | OH | GA | NJ |
|---|---|---|---|---|---|
| RAC Annual Fixed Spend | $731,664 | $936,252 | $1,404,576 | $1,223,460 | $1,329,060 |
| RAC Annual Handling Spend | $217,472 | $409,274 | $800,734 | $642,056 | $654,682 |
| RAC Annual Spend (Fixed + Variable) | $949,136 | $1,345,526 | $2,205,310 | $1,865,516 | $1,983,742 |
| RAC One Time Start Up Expenses | $128,331 | $146,449 | $186,433 | $170,060 | $174,479 |

**TOTAL ALL SITES COMBINED**

| | |
|---|---|
| Annual Cartons Shipped | 1,542,226 |
| RAC Annual Fixed Spend | $5,625,012 |
| RAC Annual Handling Spend | $2,724,218 |
| RAC Annual Spend (Fixed + Variable) | $8,349,230 |
| RAC One Time Start Up Expenses | $805,752 |

Includes 100% of one time Start Up Expenses and 0% of Capital Expenditures for MHE, Rack and IT

**PRICING ASSUMPTIONS**

**FIXED MONTHLY EXPENSES**
Facility Expense includes rent, CAM, insurance, taxes, utilities, security
Management and management and supervision salaries, clerks and inventory control wages, and related benefits and expenses
General Administrative includes Regional Allocation and general administrative expenses
Depreciation (MHE, Rack, IT) includes 100% of facility racking expense (10 year amort.) and 100% MHE, IT hardware and software expenses (5 year amort.)

**Storage Profile**

| | Units / Pallet | % of Units |
|---|---|---|
| Appliances | 3 | 23.9% |
| Computers | 112 | 17.1% |
| Electronics | 72 | 24.1% |
| Furniture | 11 | 34.9% |

**VARIABLE HANDLING RATES**
Includes Direct Labor wages, related benefits and expenses, general warehouse supplies, fuel, lift repairs and maintenance
Assumes integration for electronic delivery and receipt of Style Master, Inbound ASN, Outbound Orders
Average inbound truck is 20 pallets, 3 cases per pallet, 10 SKUs
Average outbound order is 13 lines, 13 handled units, 12 cases per outbound pallet

**Appliance Inbound**
Floor Loaded; 30% double-stacked on trucks
Clamp Unload, 2 or 4 at a time
5- high bulk stacking on floor

**Computer Inbound**
Palletized & Wrapped
Avg. 112 cases per pallet
Single SKU per pallet; 15% pallet breakdown by SKU

**Electronics Inbound**
Palletized & Wrapped
Avg. 72 cases per pallet
Single SKU per pallet; 15% pallet breakdown by SKU

**Furniture Inbound**
Small furniture, lamps, end tables, etc. arrive palletized
Large furniture, tables, mattresses, etc., arrive floor loaded
Small furniture handled at pallet level with Reach Truck or Forklift
Large furniture handled with Reach Truck, Forklift & 25% manual handling
35% of large furniture placed on custom pallets to be stored length-wise into 2- deep locations
No upholstered furniture
Lot tracking

**Appliance Outbound**
Picking is by Clamp Truck
One (1) appliance per grab
One (1) SKU per location picked
Pick to staging area
Serial number capture

**Computer Outbound**
Picking is with double pallet jack to a pallet
Picked items to be consolidated with balance of store order
No overbuying of product
Kitting will be processed as VAS: (e.g. assembling laptop, bag, iPad case, etc.)
Serial number capture

**Electronics Outbound**
Picking is with double pallet jack to a pallet
Picked items to be consolidated with balance of store order
No overbuying of product
Kitting will be processed as VAS: Phones, Cameras, etc. with accessories
32% of TV's 48" and larger may require "Pick Assist"
Serial number capture

**Furniture Outbound**
Small furniture, lamps, end tables, etc., picked with double pallet jack to a pallet
Large furniture picked with forklift from rack or floor
Up to 50% of large furniture (Mattresses, heavy wooden furniture) may require "Pick Assist"
Picked items to be consolidated with balance of store order
No overbuying of product
Lot tracking

26

RAC-001297

**Start-up Costs:**

| | | |
|---|---|---|
| Distribution: | $805,752.00 | |
| Dedicated Fleet: | $510,000.00 | |
| Total Start-up Costs: | $1,315,752.00 | |
| Start-up Costs down payment: | $330,000.00 | Payable 1-Nov-14 |
| Start-up Costs remaining payments:$85,108.09 | | 12-equal payments starting on 12/1/2014 |

| SUPPLEMENTAL SERVICES | RATE | PER |
|---|---|---|
| Parcel Over Pack | $0.62 | Box made |
| Parcel Processing | $0.57 | Box processed |
| Pallet Level out handling rate | $3.50 | Per Pallet |
| VAS labor to be approved in writing by RAC, before work is performed | $36.00 | Per Hour |
| Document scan charge for inbound and outbound | $2.50 | Per Sheet |
| Expedited Shipment Charge – SAME DAY | $20.00 | Order |
| Non-ASN Receiving | $3.75 | Per Line Item Handled |
| Promotional Labeling (In Excess of 30% total cartons shipped) | $0.20 | Per Printed Label w/Appliation. |
| Additional Space | | |
| Texas | $0.58 | Per Sq. Ft. Per Month |
| California | $0.70 | Per Sq. Ft. Per Month |
| Ohio | $0.60 | Per Sq. Ft. Per Month |
| New Jersey | $0.70 | Per Sq. Ft. Per Month |
| Georgia | $0.59 | Per Sq. Ft. Per Month |
| Minimum 5,000 sq. ft. Increments Upon Customer Request and Availability. | | |
| Supplies, such as pallets and cardboard boxes, purchased for the RAC operations will be billed as cost plus 10% | | |

| **OVERTIME LABOR SERVICES** | OVERTIME | SUNDAY & HOL. |
|---|---|---|
| CLERICAL | $39.00 | $52.00 |
| WAREHOUSEMAN | $54.00 | $72.00 |

WAREHOUSE OVERTIME REQUIRES SUPERVISION.  THIS TIME WILL BE CHARGED AT THE LABOR RATE LISTED ABOVE.  WEEKEND AND HOLIDAY OVERTIME REQUIRE A 4-HOUR MINIMUM CHARGE.  NFI WILL SECURE  APPROVAL FROM RAC PRIOR TO UTILIZING OVERTIME, SUNDAY OR HOLIDAY LABOR.

**Productivity Standards**

| | Handling UOM | CA | | TX | | OH | | GA | | DE | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Cartons Per Hour | Pallets Per Hour | Cartons Per Hour | Pallets Per Hour | Cartons Per Hour | Pallets Per Hour | Cartons Per Hour | Pallets Per Hour | Cartons Per Hour | Pallets Per Hour |
| INBOUND WHSE FUNCTIONS | | | | | | | | | | | |
| Appliance Unload | Pallet | 99.0 | 99.0 | 99.0 | 99.0 | 99.0 | 99.0 | 99.0 | 99.0 | 99.0 | 99.0 |
| Computer Unload | Pallet | 4,256.0 | 38.0 | 4,256.0 | 38.0 | 4,256.0 | 38.0 | 4,256.0 | 38.0 | 4,256.0 | 38.0 |
| Electronics Unload | Pallet | 2,751.2 | 38.0 | 2,751.2 | 38.0 | 2,751.2 | 38.0 | 2,751.2 | 38.0 | 2,751.2 | 38.0 |
| Furniture Unload | Case/Unit | 34.9 | 15.5 | 34.9 | 15.5 | 34.9 | 15.5 | 34.9 | 15.5 | 34.9 | 15.5 |
| Appliance Putaway | Pallet | 114.4 | 114.4 | 114.4 | 114.4 | 114.4 | 114.4 | 114.4 | 114.4 | 114.4 | 114.4 |
| Computer Putaway | Pallet | 2,788.8 | 24.9 | 2,788.8 | 24.9 | 2,788.8 | 24.9 | 2,788.8 | 24.9 | 2,788.8 | 24.9 |
| Electronics Putaway | Pallet | 1,853.4 | 25.6 | 1,853.4 | 25.6 | 1,853.4 | 25.6 | 1,853.4 | 25.6 | 1,853.4 | 25.6 |
| Furniture Putaway | Pallet | 48.2 | 21.4 | 48.2 | 21.4 | 48.2 | 21.4 | 48.2 | 21.4 | 48.2 | 21.4 |
| OUTBOUND WHSE FUNCTIONS | | | | | | | | | | | |
| Appliance Picking | Case/Unit | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 |
| Computer Picking | Case/Unit | 80.0 | 0.7 | 80.0 | 0.7 | 80.0 | 0.7 | 80.0 | 0.7 | 80.0 | 0.7 |
| Electronics Picking | Case/Unit | 80.0 | 1.1 | 80.0 | 1.1 | 80.0 | 1.1 | 80.0 | 1.1 | 80.0 | 1.1 |
| Furniture Picking | Case/Unit | 23.2 | 10.3 | 23.2 | 10.3 | 23.2 | 10.3 | 23.2 | 10.3 | 23.2 | 10.3 |
| Appliance Loading | Pallet | 48.0 | 48.0 | 48.0 | 48.0 | 48.0 | 48.0 | 48.0 | 48.0 | 16.0 | 16.0 |
| Computer Loading | Pallet | 288.0 | 24.0 | 288.0 | 24.0 | 288.0 | 24.0 | 288.0 | 24.0 | 288.0 | 24.0 |
| Electronics Loading | Pallet | 288.0 | 24.0 | 288.0 | 24.0 | 288.0 | 24.0 | 288.0 | 24.0 | 288.0 | 24.0 |
| Furniture Loading | Pallet | 192.0 | 16.0 | 192.0 | 16.0 | 192.0 | 16.0 | 192.0 | 16.0 | 192.0 | 16.0 |

Initials, RAC: _7. M._          Initials, NFI: _____

27

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001298

## Addendum B
## Transportation Services

This Addendum ("**Addendum B**") is attached to and made a part of the Master Services Agreement (the "Master Agreement") dated ___October 21___, 2014, by and between Rent-A-Center Texas, L.P. ("**RAC**") and NFI Interactive Logistics, LLC ("**NFI**").

In the event of any conflict between the terms and conditions set forth in the Master Agreement and the terms and conditions set forth in this Addendum B, the terms and conditions of this Addendum B shall control.

A.   Dedicated Fleet Operations

NFI agrees to transport for RAC a series of shipments of merchandise as tendered by RAC, as more specifically described in Exhibit 1 attached hereto ("Dedicated Fleet Operations"). NFI will make available for the use of RAC the type of specific equipment, services and employees as are agreed upon by and between the Parties and which are necessary to meet the distinct needs of RAC. The applicable Rates and Charges for the Dedicated Fleet Operations are set out in Exhibit 3 attached hereto.

1.   Equipment

NFI, in performing the Dedicated Fleet Operations hereunder, agrees to provide and keep available during the term of this Agreement and any renewal period, those vehicles as specified on Exhibit 2 attached hereto (the "**Equipment**"), solely and exclusively for the benefit of RAC. NFI shall, at its sole cost and expense, furnish all oil, tires, and other parts, supplies and equipment necessary or required for the safe and efficient operation and maintenance of the Equipment. NFI shall pay all expenses of every nature, including the expense of road service and repair, in connection with the use and operation of the Equipment and shall, at its sole cost and expense, at all times during the Initial Term of this Agreement and any Renewal Term, maintain the Equipment in good repair, mechanical condition and appearance in accordance with U.S. Department of Transportation and Federal Highway Administration standards. In the event that any Equipment is lost, stolen, destroyed, irreparably damaged from any cause whatsoever or otherwise becomes unavailable for the sole and exclusive benefit of RAC, NFI agrees to replace the same with Equipment of like kind and quality in good repair, mechanical condition and appearance in accordance with U.S. Department of Transportation and Federal Highway Administration standards.

2.   Operators, Supplies

a.   NFI, at its expense, shall furnish skilled and competent operators, necessary for the safe operation of the vehicles; it being understood, however, that such operators, and any other persons employed by NFI in or about the performance of the Dedicated Fleet Operations, shall be, and remain, the employees of NFI and not of RAC. All such operators shall be licensed and trained in accordance with applicable state and federal laws and regulations, including without limitation the requirements imposed by the Federal Motor Carrier Safety Regulations ("FMCSRs") set forth at 49 C.F.R. Parts 390-397.

28

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001299

b.     NFI shall assume the full responsibility for payment of all state and federal taxes, unemployment insurance, pension and Social Security charges applicable to an employer for all employees employed by NFI in the performance of the Dedicated Fleet Operations and further agrees to meet all requirements that may be specified in regulations now and hereafter promulgated from time to time by state. federal, and provincial administrative officials.

3.     Personnel and Facilities

NFI agrees at its sole expense, to provide and maintain at or near the DC location(s) suitable secure, adequately lighted and fenced space designated for the parking of NFI's Equipment.

In coordination with NFI, RAC shall have access to NFI facilities, as needed, excluding any U.S. national holidays.

4.     Safety

NFI will report to RAC immediately any safety related incidents, relating to RAC operations.

With respect to its Dedicated Fleet Operations, NFI shall:

(i)     hold a safety rating of "Satisfactory" issued by the United States Department of Transportation's Federal Motor Carrier Safety Administration ("FMCSA") or predecessor or successor administration to FMCSA;

(ii)    maintain a good reputation in the trucking industry and maintain financial solvency;

(iii)   be adequately insured as required in Section 6 of the Agreement;

(iv)   maintain a reliable and good freight claims record;

(v)    utilize drivers who have been properly trained in the requirements imposed by the Federal Motor Carrier Safety Regulations ("FMCSRs") set forth at 49 C.F.R. Parts 390-397;

(vi)   with respect to the transportation of RAC merchandise via the operation of motor vehicles that either have a gross vehicle weight rating ("GVWR") of 26,001 pounds or more, or a gross combination weight rating ("GCWR") of 26,001 pounds or more inclusive of a towed unit with a GVWR of more than 10,000 pounds. assign to such motor vehicles for those hauls only drivers who hold valid Commercial Driver's Licenses in accordance with 49 C.F.R. Part 383 and who have been subjected to mandatory alcohol and controlled substances testing in accordance with 49 C.F.R. Part 382;

(vii)  assign to transportation of RAC's merchandise only motor vehicles and trailers that have been properly inspected, maintained and/or repaired in accordance with the requirements of 49 C.F.R. Part 396;

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001300

(viii)   not engage in any trade, practice or other activity which is harmful to the goodwill of RAC or reflects unfavorably on the reputation of RAC, or which constitutes deceptive or unfair competition, consumer fraud or misrepresentation; and hold a current and valid contract carrier permit issued to it by the FMCSA, any predecessor or successor administration within the United States Department of Transportation, or the former Interstate Commerce Commission, authorizing such Carrier to perform the transportation services contemplated by this Agreement.

B.   Transportation Management

1.   Services

NFI agrees to arrange and manage transportation by Carriers selected and contracted by NFI of RAC merchandise outbound to RAC locations, as specifically described in Exhibit 4 attached hereto, in accordance with the terms and conditions stated below ("Transportation Management Services"). Rates and charges for the transportation management services provided by NFI hereunder are specifically set forth in Exhibit 5 attached hereto.

a. Order Entry - NFI will work with RAC to determine the most optimal order entry strategy. NFI will connect via EDI, or mutually agreed upon electronic interface with RAC's host system to effectively route store level deliveries.

b. Optimization - NFI will conduct optimization activities to create additional ROI. NFI will negotiate a revenue share on all additional "out of scope" activities that drive savings for RAC as described in Exhibit 6 attached hereto.

c. Route Guide - NFI will execute a carrier route guide on behalf of RAC based on a mutual agreement. NFI will assist with the RFP process to create the highest level of efficiency.

d. Connectivity – NFI will electronically connect with each carrier to create visibility for each shipment. All carriers will be required to communicate unforeseen accessorial fees to NFI and RAC based on mutually agreed upon parameters.

e. Resources - NFI will allocate the necessary resources to service the volume and scope.

f. Web Interface - RAC will utilize NFI's proprietary web portal "Navitrace" as its Transportation Management System, or other method of communication as mutually agreed by the parties. The system will create visibility and generate KPI's for RAC shipments.

g. Reporting - NFI will create customized score cards, cost savings and KPI reports based on customer paremeters.

h. Implementation – NFI agrees to consult and map out processes, with RAC's involvement, to create the most optimal supply chain SOP's. The implementation timeline will be based on scope and RAC requirements.

2.   NFI Retention of Carriers

a. NFI shall use Carriers as may be necessary to meet RAC's transportation requirements. RAC may, at its option, participate in the identification and/or evaluation of prospective Carriers. However, NFI shall have sole responsibility for ensuring any selected Carrier is in compliance with all requirements established under this Addendum B and the Agreement. NFI shall retain such Carriers

30

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

under fully lawful terms and shall further ensure that each such Carrier executes a written Carrier Contract with NFI in the form attached as Addendum E to the Agreement, including without limitation all terms required under Section 7 of the Agreement. If RAC demands that NFI utilize a Carrier, despite that fact that NFI has communicated to RAC that such Carrier does not meet NFI standards and/or the requirements established under this Addendum B and the Agreement, NFI will not be held liable for breach of this Agreement if such Carrier fails to meet the Service Level Commitments defined in Exhibit 4 to this Addendum B.

   b.  NFI will work in conjunction with RAC to create a route guide that's conducive with supply chain requirements. NFI shall take commercially reasonable effort to assure that such Carriers utilize equipment that is safe and in good working order, and that all Carriers utilized by NFI shall:

   (i)   hold a safety rating of "Satisfactory" issued by the United States Department of Transportation's Federal Motor Carrier Safety Administration ("FMCSA") or predecessor or successor administration to FMCSA;

   (ii)  have a good reputation in the trucking industry and maintain financial solvency;

   (iii) be adequately insured in accordance with the requirements of 49 C.F.R. Part 387, unless a higher requirement is set forth in the Carrier Contract with the Carriers it selects, in which case such higher level of coverage shall apply;

   (iv)  maintain a reliable and good freight claims record;

   (v)   utilize drivers who have been properly trained in the requirements imposed by the Federal Motor Carrier Safety Regulations ("FMCSRs") set forth at 49 C.F.R. Parts 390-397;

   (vi)  with respect to the transportation of RAC merchandise via the operation of motor vehicles that either have a gross vehicle weight rating ("GVWR") of 26,001 pounds or more, or a gross combination weight rating ("GCWR") of 26,001 pounds or more inclusive of a towed unit with a GVWR of more than 10,000 pounds, assign to such motor vehicles for those hauls only drivers who hold valid Commercial Driver's Licenses in accordance with 49 C.F.R. Part 383 and who have been subjected to mandatory alcohol and controlled substances testing in accordance with 49 C.F.R. Part 382;

   (vii) assign to transportation of RAC's merchandise only motor vehicles and trailers that have been properly inspected, maintained and/or repaired in accordance with the requirements of 49 C.F.R. Part 396;

   (viii) not engage in any trade, practice or other activity which is harmful to the goodwill of RAC or reflects unfavorably on the reputation of RAC, or which constitutes deceptive or unfair competition, consumer fraud or misrepresentation; and hold a

31

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001302

current and valid contract carrier permit issued to it by the FMCSA, any predecessor or successor administration within the United States Department of Transportation, or the former Interstate Commerce Commission. authorizing such Carrier to perform the transportation services contemplated by this Agreement.

C.      Exhibits Applicable to this Addendum

The following schedules are incorporated by reference into this Addendum B and shall be binding upon the parties:

Exhibit 1 – Dedicated Fleet Operations of Services

Exhibit 2 – Dedicated Equipment Requirements

Exhibit 3 – Schedule of Rates and Charges (Dedicated Fleet Operations)

Exhibit 4 – Description of Transportation Management Services

Exhibit 5 – Schedule of Rates and Charges (Transportation Management)

Exhibit 6 – Warehousing & Dedicated Fleet Gainshare

Exhibit 7 – Transportation Management Gainshare

Exhibit 8 – Dedicated Fuel Surcharge Table

Initials, RAC: _____      Initials. NFI: _____

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001303

### EXHIBIT 1 TO ADDENDUM B
### DEDICATED FLEET OPERATIONS

## Description of Services

Dedicated Fleet services will handle store deliveries within 250 miles of DC location.  Some deliveries may be outside the 250 range to account for large regional markets.   Dedicated fleet equipment will run round trip, multi-stop deliveries/pickups, and round trip fuel.  The equipment, drivers and management will be billed on a weekly invoice on  fixed and variable pricing as outlined in Exhibit 3 to Addedum B.

## Operating Assumptions

The charges shown on Exhibit 2, and the resources provided as shown, are predicated on the following operating assumptions. Deviations from these assumptions could result in a need for additional Equipment, which will be mutually agreed upon prior to any implementation, and/or the need for revised pricing and charges.  If revised pricing/charges cannot be mutually agreed upon for material deviations from these assumptions, then NFI shall have no obligation to perform services related to such material deviations. .

- 45 Minute Stop Time @ Stores (threshold delivery –driver must be prepared to make the delivery without store assistance.)
- On Site Management
- Delivery Days M-F
- Delivery Hours 9:00AM – 18:00PM
- Driver Unload
- Liftgates on all Equipment
- Sleepers and Straight Trucks will be used for all deliveries
    - Straight Trucks - 1200 Cube
- 53' Dry Van, 48' Dry Van, 28' Pup will be used with the Sleepers for deliveries
    - 53' – 2500 Cube
    - 48' – 2200 Cube
    - 28' – 1400 Cube
- FSC Program - $1.20 Peg on 6 Cent Scale based on the U.S. Department of Energy national posted price as outlined in Exhibit 7 to Addedum B
- Locations:
    - Oldmans Township, NJ, Columbus, OH, Chino, CA, Dallas/Fort Worth area, TX, Atlanta area, GA
- DOT HOS Rules in Effect: 14 Hour Work Time, 11 Hour Drive Time, 10 Hour Layovers
    - Some States allow for 12 Hours Drive Time

## Dedicated Transportation Service Level Commitments
1. On Time Delivery (within a one-hour window):  98% or greater
2. *Damage Rate:  2% or less
    *Number units damaged divided by number of units delivered.
3. Dedicated Equipment and Driver Requirements Established in Exhibit 2.

All service level issues shall count against the above Service Level Commitments except to the extent caused by the actions or inactions of RAC, or force majeure events (as defined in Section 12 of the Agreement). "Damage", as used above, shall only include damage to goods/merchandise, not damage to packaging.

Initials, RAC: _7.m._          Initials, NFI: _____

33

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001304

## EXHIBIT 2 TO ADDENDUM B
## DEDICATED FLEET OPERATIONS

### DEDICATED EQUIPMENT REQUIREMENTS

| Equipment and Drivers | Ann MI | Tolls/Wk | Lay | Power | | | | Trailers | | | | | Drivers | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | SL | ST | Tot | Mi/Yr/Trk | 53 | 48 | 28P | Tot | Mi/Yr/Trl | DRV | Mi/Yr/Drv |
| Atlanta, GA Area | 384,171 | $0.00 | 7 | 5 | | 5 | 76,834 | 11 | 2 | | 13 | 29,552 | 5 | 76,834 |
| Oldman's Township, NJ | 672,438 | $2,872.50 | 11 | 3 | 6 | 9 | 74,715 | | 8 | | 8 | 48,031 | 10 | 67,244 |
| Chino, CA | 416,021 | $0.00 | 11 | 5 | | 5 | 83,204 | 2 | 5 | 6 | 13 | 32,002 | 6 | 69,337 |
| Columbus, OH Area | 1,193,020 | $205.49 | 24 | 14 | | 14 | 85,216 | 25 | | 10 | 35 | 34,086 | 16 | 74,564 |
| Dallas/Fort Worth Area | 426,686 | $40.38 | 11 | 6 | | 6 | 71,114 | 15 | | | 15 | 28,446 | 6 | 71,114 |
| Total | 3,092,336 | $3,118 | 64 | 33 | 6 | 39 | 79,291 | 53 | 15 | 16 | 84 | 36,814 | 43 | 71,915 |

Initials, RAC: _____   Initials, NFI: _____

34

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001305

### EXHIBIT 3 TO ADDENDUM B
### DEDICATED FLEET OPERATIONS

### RATES & CHARGES

NFI will provide weekly invoices to RAC for the following established and agreed upon rates:

**Pricing Structure:**

| Scenario 2 - 5 Year | Weekly Fixed | PerMile Variable | Total Annual Cost |
|---|---|---|---|
| Atlanta, GA Area | $9,185 | $1.591 | $1,088,909 |
| Oldman's Township, NJ | $14,032 | $1.836 | $1,964,346 |
| Chino, CA | $9,440 | $1.790 | $1,235,746 |
| Columbus, OH Area | $23,025 | $1.775 | $3,314,657 |
| Dallas/Fort Worth Area | $10,312 | $1.623 | $1,228,738 |
| Total | $65,994 | | $8,832,396 |

Fuel Surcharge will be billed as a separate line item in the weekly invoice.

All miles will be billed using PC Miler v 26 Streets and Tolls Practical Miles.

All empty and loaded miles associated with RAC Vendor Inbound Loads will be billed at the Variable Rate. Example: If NFI is delivering stores 1, 2 and 3 and coming back to the DC and RAC asks NFI to pickup a vendor at point B, then those miles are billed as a variable rate. DC, Store1, Store2, Store3 and then the return to the DC is 100 miles round trip. If the vendor pickup is added to the route and the total miles is now 125 round trip, NFI will bill RAC 25 additional miles at the variable rate.

Any 3rd Party backhaul that NFI hauls, NFI will share 80% of the Revenue with RAC and keep 20% for administrative costs. NFI will apply RAC's share of backhaul Revenue as a credit against invoices on a weekly basis.

NFI will provide RAC auditable back-up detail for all routes and associated mileage detail billed. Data shall accompany each billing provided to RAC.

**Tolls**: All associated toll costs will be a pass-through to RAC based on PC Miler Practical Toll Application.

35

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

**Assessorial Charges:** No additional charges will be incurred by RAC for assessorial activities not defined herein.

**Detention:** Detention will be billed at a rate of $60 per Hour after one (1) Hour Free Time (billed in 15 minute increments).

**Stop offs:** $30.00 per additional stop-off in transit.  Does not include Routed stops on the route. This is for any stop added to the route, post-dispatch.

**Permanent Fleet Add & Delete Rates:** $215 per Week for Trailer (and liftgate) Additions/$750 per Week for Tractor Additions plus pickup/delivery charges, which would include the applicable mileage rates (hereinafter, "Fleet Add & Delete Rates").  NFI will secure RAC's approval prior to making any fleet additions or deletions under this paragraph.

**Equipment Reduction**: If it is determined, based on volume, that the fleet will need to be reduced NFI and RAC will re-negotiate a new rate and elimination of specialized equipment (Liftgates) will need to be addressed per depreciation schedule.

**Surge Rates:** Fleet Add & Delete Rates will apply for weekly or longer surges. For less than weekly surges, if NFI is unable to secure assets from another NFI operation, third party Carriers will be required to cover surge volume and it will be billed as a "pass-through" basis plus a flat fee of $100 per shipment. If NFI is able to utilize assets from another NFI operation, then the weekly rates will be prorated by the number of days used. NFI will secure RAC's approval prior to securing a third party Carrier to address surge volume.

**Rates & Charges:**  All fixed and variable rates and charges stated in this Exhibit 3 will remain fixed for the first twenty-four (24) months dating from the Term Commencement Date.  Thereafter, all fixed and variable rates and charges stated in this Exhibit 3 will increase by 1.5% every twelve (12) months.

Initials, RAC: ___ 𝒥.𝓂.         Initials, NFI: _____

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001307

## EXHIBIT 4 TO ADDENDUM B

## DESCRIPTION OF TRANSPORTATION MANAGEMENT SERVICES

### 1. Services

NFI agrees to arrange and manage transportation by Carriers selected and contracted by NFI of RAC merchandise inbound to RAC store locations in accordance with the terms and conditions stated below ("Transportation Management Services"). Rates and charges for the transportation management services provided by NFI hereunder are specifically set forth in Exhibit 5 to Addendum B.

a. Order Entry - NFI will work with RAC to determine the most optimal order entry strategy. NFI will connect via EDI or other mutually agreed upon electronic interface with RAC's host system to effectively route store level deliveries.

b. Optimization - NFI will conduct optimization activities to create additional ROI. NFI will negotiate a revenue share on all additional "out of scope" activities that drive savings for RAC.

c. Route Guide - NFI will create and maintain a carrier route guide on behalf of RAC based on a mutual agreement. NFI will assist with the RFP process to create the highest level of efficiency.

d. Connectivity – NFI will electronically connect with each carrier to create visibility for each shipment. All carriers will be required to communicate unforeseen accessorial fees to NFI and RAC based mutually agreed upon parameters.

e. Resources - NFI will allocate the necessary resources to service the volume and scope for this Agreement.

f. Web Interface - RAC will utilize NFI's proprietary web portal "Navitrace" as its Transportation Management System. The system will create visibility and generate KPI's for RAC shipments.

g. Reporting - NFI will create customized score cards, cost savings and KPI reports based on customer paremeters.

h. Implementation – NFI agrees to consult and map out processes to create the most optimal supply chain SOP's. The implementation timeline will be based on scope and RAC requirements.

i. Transportation Management (TM) services will handle store deliveries that are typically over 250 miles of DC location and not handled by the NFI Dedicated Fleet.

### 2. Operating Assumptions

The charges shown in Exhibit 5 are predicated on the following operating assumptions. Deviations from these assumptions could result in a need for revised pricing or charges, which will be mutually agreed upon prior to any implementation. If revised pricing/charges cannot be mutually agreed upon for material deviations from these assumptions, then NFI shall have no obligation to perform services related to such material deviations.

• 45 Minute Stop Time @ Stores (threshold delivery –driver must be prepared to make the delivery without store assistance.)
• Delivery Days M-F
• Delivery Hours 9:00AM – 18:00PM
• Driver Unload
• Liftgates on all Equipment
• FSC Program - $1.20 Peg on 6 Cent Scale based on the U.S. Department of Energy national posted price as outlined in Exhibit 8 to Addedum B
• Origin Locations: Oldmans Township, NJ, Columbus, OH, Chino, CA, Dallas/Fort Worth area, TX, Atlanta area, GA
• DOT HOS Rules in Effect: 14 Hour Work Time, 11 Hour Drive Time, 10 Hour Layovers

37

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001308

• Some States allow for 12 Hours Drive Time

**3. Volumes by DC (NFI's Pricing and Solution was developed based upon the following volumes as provided by RAC)**

| DC | Shipments | Miles | Pounds | Cube | Cost | FSC |
|---|---|---|---|---|---|---|
| Atlanta, GA Area | 7,280 | 2,618,587 | 13,263,016 | 2,669,524 | $2,457,820 | $860,237 |
| Oldman's Township, NJ | 7,696 | 2,583,467 | 11,565,632 | 2,236,416 | $2,928,658 | $1,025,030 |
| Chino, CA | 5,772 | 3,978,735 | 5,518,552 | 1,425,580 | $1,649,809 | $577,433 |
| Columbus, OH Area | 5,460 | 2,185,211 | 8,274,448 | 1,728,584 | $1,618,875 | $566,606 |
| Dallas/Fort Worth Area | 8,996 | 5,082,818 | 13,610,220 | 2,895,672 | $3,211,705 | $1,124,097 |
| | | | | | | |
| TOTALS | 35,204 | 16,448,819 | 52,231,868 | 10,955,776 | $11,866,866 | $4,153,403 |

**4. Transportation Management Service Level Commitments**

a. *On-Time Pick-up 95% or greater
* Total shipments departing from the five NFI Distribution Centers on their scheduled  departure date, divided by the total number of orders due to depart.

b. *On-Time Delivery 95% or greater
* Monthly total orders delivering on or before the published MABD (must arrive by dates), divided  by the total monthly shipment count.

c. *Damages  2% or less
* Number units damaged divided by number of units delivered.

All service level issues shall count against the above Service Level Commitments except to the extent caused by the actions or inactions of RAC, or force majeure events (as defined in Section 12 of the Agreement). "Damage", as used above, shall only include damage to goods/merchandise, not damage to packaging.

With respect to Transportation Management Service Level Commitments only, NFI shall have an additional thirty (30) days, beyond the cure period stated in Section 1 of the Agreement, to cure any claimed breach.

Initials, RAC: _____          Initials, NFI: _____

38

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001309

## EXHIBIT 5 TO ADDENDUM B
## TRANSPORTATION MANAGEMENT SERVICES

### RATES AND CHARGES

Automated transaction fee: $9/shipment on third party carrier shipments.

Manual shipment entry: $14/shipment on third party carrier shipments.

Should RAC elect to utilize NFI to manage shipments to Hawaii, Alaska, and Puerto Rico destinations, NFI will make available the rates set forth below from October 2014-September 2015.  Notwithstanding the foregoing, if RAC suggests or identifies an alternate carrier for shipments to these destinations, NFI will make any lower rates from such alternate carrier available to RAC.  Thereafter, pricing will be agreed-upon between the parties on an annual basis; if the parties are unable to reach an agreement on new pricing, then NFI will conduct an RFP on RAC's behalf.

| Origin: Carson, CA dock Destination: Hawaii door | | |
|---|---|---|
| Plus FSC @ 39.5% | Minimum Charge | LCL Rate per CBFT |
| | $115.00 | $4.00 |

| Origin: Carson, CA dock Destination: | Minimum Charge | LCL Rate per CBFT | Keep from freezing fee per CBFT |
|---|---|---|---|
| Anchorage Door AK | $50.00 | $2.10 | $0.15 |
| Fairbanks Door AK | $75.00 | $2.65 | $0.20 |
| Sodotna Door AK | $75.00 | $2.50 | $0.20 |
| Wasilla Door AK | $75.00 | $2.40 | $0.20 |
| | | FSC 35% Port fee $0.011/cbft or $0.31 per hundred weight | |
| LTL Chino, CA to Fife, WA $0.3245 per lb plus FSC Carson, CA to Fife, WA: Minimum 2000 lbs | $16.25 per hundred weight | | |

| Origin: Jacksonville, FL Destination: Commonwealth PR, door | Minimum Charge | LCL Rate per CBFT |
|---|---|---|
| | $70.00 | $2.20 |
| | FSC 34.5% | |
| | Export Docs Fee $15.00 per BOL | |
| $30 per BOL, value exceeding $2500 of any one commodity | | |
| FCL Inbound 08234 to Jacksonville, FL $2050 per53' | | |
| LTL from Newark, NJ to Jacksonville, FL $0.2345 per lb plus FSC | | |

39

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001310

| Additional Charges: | | |
|---|---|---|
| All Markets | Sort & Segregate | $0.10 per CBFT, minimum $10.00 per shipment |
| All Markets | Inside Delivery | $0.00 (included in the rate) |
| All Markets | Second Man | $50.00 per hour, %50.00 minimum |
| All Markets | Residential Delivery | $55.00 per pallet, $110 minimum |
| All Markets | Military Base Delivery | $85.00 per shipment |
| Puerto Rico | Old San Juan Delivery | $85.00 per shipment |
| All Markets | Storage | $0.09 per cbft per day, $14.00 minimum |
| All Markets | Reconsignment | $35.00 per shipment |
| Hawaii | Will Call | Included in ocean rate |
| Alaska & Puerto Rico | Will Call | $8.00 per pallet, $25.00 minimum |
| All Markets | Merchandise COD Fee | $4.5% of Amounted Collected, $45.00 minimum |
| All Markets | FCL/FTL Inbound | Inbound rates are based upon Live Load, Legal Road Weight with no Hazardous Materials. If otherwise additional charges will apply. |

Initials, RAC: _J. m._

Initials, NFI: _____

40

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001311

## EXHIBIT 6 TO ADDENDUM B
## WAREHOUSING & DEDICATED FLEET GAINSHARE PROGRAM

**Purpose:**
To create a mutually beneficial program that maximizes cost savings through best practices.

**Savings Commitment:**
NFI agrees to provide a dedicated Project Team focused on identifying and quantifying supply chain savings opportunities. RAC and NFI shall agree to define a baseline that will be utilized to quantify and measure the results of the Project Team. RAC and NFI agree that items comprising the baseline include but are not limited to the following:

- Freight Cost

- Warehouse Operations

- Inventory

- Product Sourcing

- Equipment Usage

- Order Management

- Process Analysis and Standardization

- Other areas identified by members of the RAC or NFI project teams.

NFI shall prepare and document business cases for cost savings detailing reductions to these baseline components. The parties will meet monthly to review the documented business cases, agree on the prioritization of the projects to pursue, and the quantification of the savings estimates. RAC and NFI will agree to distribute the results of the initiatives according to the Gainshare structure outlined below.

**Logistics Council:**
It is agreed that a Logistics Council will be formed and be made up of appointed representatives from both parties to determine valid cost savings initiatives. All proposals for cost savings shall be presented to the Logistics Council in a business case format with calculated costs, benefits, return on investment, etc. The Logistics Council shall review any proposed cost savings and either accept or reject them in writing. Options that are accepted by the Logistics Council will be implemented and tracked. Options that are not implemented due to RAC constraints will be excluded from the documented savings number.

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001312

**Calculation of Gain Share:**

The parties shall compare the documented savings number (as agreed upon and documented by the Logistics Council) to the actual/realized savings that are achieved. Positive differences between the documented savings number and the actual/realized savings through this comparison shall be subject to the gain share table listed below.

**Gain Share Savings Table**

| Actual/Realized Savings Threshold | RAC Share of Savings | NFI Share of Savings |
|---|---|---|
| <$500,000 | 100% | 0% |
| $500,001 to $1,000,000 | 90% | 10% |
| $1,000,001 to $3,000,000 | 80% | 20% |
| $3,000,001 to $5,000,000 | 70% | 30% |
| $5,000,001 to $7,000,000 | 60% | 40% |
| >$7,000,000 | 50% | 50% |

NFI will include in weekly invoices the gain share as a separate line item expense owed to NFI on a monthly basis, to begin the month immediately following achievement of the threshold goal.

Note: For purposes of determining the percentage of savings allocated to each party, it is understood that the threshold amounts listed in the table above are cumulative over the term of the contract. The share of savings allocated to each party shall apply within each savings threshold band. Once a threshold is met, the next allocation will apply to incremental savings at the new percentages. For example, if $2,000,000 is achieved in 2015 then NFI would receive 0% of $500,000 in savings ($0) plus 10% of the next $500,000 ($50,000), and 20% of the remaining $1,000,000 ($200,000), for a total amount of $250,000.

Initials, RAC: _____   Initials, NFI: _____

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001313

## EXHIBIT 7 TO ADDENDUM B
## TRANSPORTATION MANAGEMENT GAINSHARE PROGRAM

**Purpose:**
To create a mutually beneficial program that maximizes cost savings through best practices.

**Savings Commitment:**
NFI agrees to provide a dedicated Project Team focused on identifying and quantifying supply chain savings opportunities. RAC and NFI shall agree to define a baseline that will be utilized to quantify and measure the results of the Project Team. The baseline will be based on the initial sourcing exercise and established prior to the first ship date of the program. In lieu of annual index adjustments, RAC/NFI may request a new sourcing exercise no more than two (2) times per year and with sixty (60) days' notice for execution of the sourcing exercise. This exercise will be completed to reestablish the baseline. Should no request be made for a reestablishment of the baseline within the existing carrier pricing agreement associated to the expiration of the previous pricing agreement, NFI will conduct a standard sourcing exercise to coincide with the expiration of those pricing agreements. Both parties agree that through this process there will be no cap on the increase or decrease in pricing. RAC and NFI agree that items comprising the baseline include transportation management services (i.e. non-fleet/distribution services).

NFI shall prepare and share savings strategies with RAC on a quarterly basis. No process that could potentially delay or negatively affect RAC's supply chain will be implemented without consent and collaboration. The parties will meet monthly to review the documented business cases, agree on the prioritization of the projects to pursue, and the quantification of the savings estimates. RAC and NFI will agree to distribute the results of the initiatives according to the Gainshare structure outlined below.

**Logistics Council:**
It is agreed that a Logistics Council will be formed and be made up of appointed representatives from both parties to determine valid cost savings initiatives. All complex savings proposals and activities for cost savings purposes shall be presented to the Logistics Council in a business case format with calculated costs, benefits, return on investment, etc. These activities may include pool distribution, dwell time associated with consolidation, etc. The Logistics Council shall review any complex proposed cost savings and either accept or reject them in writing. Options that are accepted by the Logistics Council will be implemented and tracked. Options that are not implemented due to RAC constraints will be excluded from the documented savings number.

**Calculation of Gain Share:**
The parties shall compare the documented savings number (as agreed upon and documented by the Logistics Council) to the actual/realized savings that are achieved. Positive differences between the documented savings number and the actual/realized savings through this comparison

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001314

shall be subject to the gainshare table listed below.  Negative difference shall reduce the Gain Share amount owed to NFI.

**Gain Share Savings Table**

| Actual/Realized Savings Threshold | RAC Share of Savings | NFI Share of Savings |
|---|---|---|
| $0-$500,000 | 100% | 0% |
| $500,001-$1,000,000 | 90% | 10% |
| $1,000,001-$3,000,000 | 80% | 20% |
| $3,000,001-$5,000,000 | 70% | 30% |
| 5,000,001-$7,000,000 | 60% | 40% |
| >$7,000,001 | 50% | 50% |

NFI will include in weekly invoices the gain share as a separate line item expense owed to NFI on a quarterly basis, to begin the month immediately following achievement of the threshold goal.

Note: For purposes of determining the percentage of savings allocated to each party, it is understood that the threshold amounts listed in the table above are cumulative over the term of the contract. Once each threshold is met, the share of savings will be adjusted to apply to incremental savings above the threshold.  The share of savings allocated to each party shall apply within each savings threshold band.  Once a threshold is met, the next allocation will apply to incremental savings at the new percentages.  For example, if $2,000,000 is achieved in 2015 then NFI would receive 0% of $500,000 in savings ($0) plus 10% of the next $500,000 ($50,000), and 20% of the remaining $1,000,000 ($200,000), for a total amount of $250,000.

Initials, RAC: _____        Initials, NFI: _____

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001315

## EXHIBIT 8 TO ADDENDUM B
### DEDICATED FUEL SURCHARGE TABLE

The weekly price is reported each Monday by the Department of Energy (DOE) and will be used to determine the fuel surcharge applicable for the next seven (7) days. Any adjustments in the fuel surcharge will become effective 12:01am, Tuesday and remain in effect through 11:59pm on the following Monday.

For every six-cents change in the NATIONAL Average Index the following surcharge will be applied in addition to the base rate.

| DOE NATIONAL POSTED PRICE/GALLON | | FUEL SURCHARGE BASE | DOE NATIONAL POSTED PRICE/GALLON | | FUEL SURCHARGE |
|---|---|---|---|---|---|
| $ 1.200 | $ 1.259 | $0.01 | $3.000 | $ 3.059 | $0.31 |
| $ 1.260 | $ 1.319 | $0.02 | $3.060 | $ 3.119 | $0.32 |
| $ 1.320 | $ 1.379 | $0.03 | $3.120 | $ 3.179 | $0.33 |
| $ 1.380 | $ 1.439 | $0.04 | $3.180 | $ 3.239 | $0.34 |
| $ 1.440 | $ 1.499 | $0.05 | $3.240 | $ 3.299 | $0.35 |
| $ 1.500 | $ 1.559 | $0.06 | $3.300 | $ 3.359 | $0.36 |
| $ 1.560 | $ 1.619 | $0.07 | $3.360 | $ 3.419 | $0.37 |
| $ 1.620 | $ 1.679 | $0.08 | $3.420 | $ 3.479 | $0.38 |
| $ 1.680 | $ 1.739 | $0.09 | $3.480 | $ 3.539 | $0.39 |
| $ 1.740 | $ 1.799 | $0.10 | $3.540 | $ 3.599 | $0.40 |
| $ 1.800 | $ 1.859 | $0.11 | $3.600 | $ 3.659 | $0.41 |
| $ 1.860 | $ 1.919 | $0.12 | $3.660 | $ 3.719 | $0.42 |
| $ 1.920 | $ 1.979 | $0.13 | $3.720 | $ 3.779 | $0.43 |
| $ 1.980 | $ 2.039 | $0.14 | $3.780 | $ 3.839 | $0.44 |
| $ 2.040 | $ 2.099 | $0.15 | $3.840 | $ 3.899 | $0.45 |
| $ 2.100 | $ 2.159 | $0.16 | $3.900 | $ 3.959 | $0.46 |
| $ 2.160 | $ 2.219 | $0.17 | $3.960 | $ 4.019 | $0.47 |
| $ 2.220 | $ 2.279 | $0.18 | $4.020 | $ 4.079 | $0.48 |
| $ 2.280 | $ 2.339 | $0.19 | $4.080 | $ 4.139 | $0.49 |
| $ 2.340 | $ 2.399 | $0.20 | $4.140 | $ 4.199 | $0.50 |
| $ 2.400 | $ 2.459 | $0.21 | $4.200 | $ 4.259 | $0.51 |
| $ 2.460 | $ 2.519 | $0.22 | $4.260 | $ 4.319 | $0.52 |
| $ 2.520 | $ 2.579 | $0.23 | $4.320 | $ 4.379 | $0.53 |
| $ 2.580 | $ 2.639 | $0.24 | $4.380 | $ 4.439 | $0.54 |
| $ 2.640 | $ 2.699 | $0.25 | $4.440 | $ 4.499 | $0.55 |
| $ 2.700 | $ 2.759 | $0.26 | $4.500 | $ 4.559 | $0.56 |
| $ 2.760 | $ 2.819 | $0.27 | $4.560 | $ 4.619 | $0.57 |
| $ 2.820 | $ 2.879 | $0.28 | $4.620 | $ 4.679 | $0.58 |
| $ 2.880 | $ 2.939 | $0.29 | $4.680 | $ 4.739 | $0.59 |
| $ 2.940 | $ 2.999 | $0.30 | $4.740 | $ 4.799 | $0.60 |

Note:

For fuel prices in excess of 4.799 per gallon, add one cent for each six-cents per gallon increase in the fuel price.

Initials, RAC: 7.M.

Initials, NFI:

45

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001316

## Addendum C
## RAC Security Requirements

**General Security** – NFI shall at all times during the term of this contract provide and maintain up-to-date security consistent with established industry standards and best practices with respect to (a) the services contracted, (b) the applications or systems used to provide and maintain services to RAC, (c) the NFI's physical facilities, and (d) the NFI's computer infrastructure and networks, to prevent unauthorized internal or external access either to RAC's information or to the systems and/or applications that are used to store, process, or transmit RAC information. NFI will install all patches, fixes, upgrades, updates and new versions of any security software it employs in a timely manner after adequate testing has been performed. NFI will maintain appropriate safeguards to restrict access to RAC information to only those employees, agents, contractors or service providers of NFI who require access to the information to carry out the purposes for which it was disclosed to NFI. For information disclosed in electronic form, NFI agrees that appropriate safeguards including electronic barriers (e.g., "firewalls" or similar barriers) and secure access controls shall be implemented prior to NFI's receipt of RAC information. For information disclosed in written form, NFI agrees that appropriate safeguards include secured storage of RAC information. NFI also will establish and maintain any additional physical, electronic and procedural controls and safeguards to protect RAC information from unwarranted disclosure as may be required for RAC to comply with all applicable federal, international and state laws and regulations now in effect or hereafter imposed, passed or promulgated.

**Application Security** - NFI agrees at all times to provide, maintain and support its Software and subsequent updates, upgrades, and bug fixes such that the Software is, and remains secure from, vulnerabilities, in accordance with generally recognized and comparable industry practices or standards.

**Right to Audit** - Upon its request and with sufficient notice, RAC may conduct a security audit of NFI through a mutually agreeable third-party auditor. The audits and test result information, to the extent related to the RAC business only, will be shared with RAC and should be sufficient to assure RAC that NFI implements information security measures that are consistent with its obligations under this agreement.

**Information Transmission** - NFI agrees that any and all electronic transmission or exchange of system and application data with RAC and/or any other parties expressly designated by RAC shall take place via secure means (using HTTPS or SFTP or equivalent).

**Information Storage** – NFI agrees to store all RAC backup data as part of its designated backup and recovery processes, which shall be stored consistent with NFI's confidentiality obligations as set forth in the Agreement.

**Information Re-Use** - NFI agrees that any and all information exchanged shall be used expressly and solely for the purposes enumerated in this contract (and any subsequent, approved addenda). Information shall not be distributed, repurposed or shared across other applications, environments, or business units of the NFI. The provider further agrees that no RAC information of any kind shall be transmitted, exchanged or otherwise passed to other vendors or e parties except on a case-by-case basis as specifically agreed to in writing by Rent-A-Center, Inc.

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001317

## Addendum D
### Key Performance Indicators

NFI shall provide reporting to RAC on a weekly or monthly basis on the following KPIs, in a form reasonably acceptable to RAC:

### WAREHOUSING
    i.    Fulfilment
        a.   Order Accuracy
        b.   Order Fill Rate (against on hand inventory available)
    ii.   On-Time Shipment
    iii.  Dock to Stock Cycle Time
    iv.  Damage Rate
    v.   Inventory Accuracy
        a.   Location Accuracy
        b.   Inventory Accuracy
    vi.  Timely outbound order confirmation from warehouse
    vii.  Productivity
        a.   # of cases/pieces picked per hour
    viii. Costs
        a.   Warehouse productivity to standards (as in contract)
        b.   Total Cost per Unit- all inclusive
        c.   % Orders without Claims
    ix.  Storage Utilization
        a.   Warehouse Utilization (Pallet locations occupied/design capacity)
        b.   Rack Utilization (Bin locations occupied/available)
        c.   Bulk Utilization (Pallet locations occupied/available)

### TRANSPORTATION
    x.   Customer Satisfaction
        a.   On-Time Delivery by Site
        b.   Over, Short & Damages
    xi.  Trip Management
        a.   Cost Per Mile
        b.   Cost Per Stop/Store Delivery
        c.   Cost Per Cube
        d.   Net cost per mile after B/H is factored in
    xii.  Driver Management
        a.   Driver Utilization
        b.   Driver Turnover
        c.   # of Trucks Available
    xiii. Equipment Management
        a.   Power & Trailer Unit Utilization
        b.   Empty miles per week
        c.   Number of Vendor and 3rd Party B/H's per week and Revenue per week
        d.   # of Drivers Available
    xiv. Carrier Performance
        a.   Carrier On-Time Pickup
        b.   Carrier On-Time Delivery
        c.   # Expedite Loads

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001318

d.   % Expedite Loads
e.   % of stores delivered by mode (NFI Fleet, LTL, Parcel)

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001319

### Addendum E
### Form of Carrier Contract

TRANSPORTATION AGREEMENT

This Transportation Agreement and the terms and conditions set forth herein govern the legal relationship between NFI Interactive Logistics, LLC ("BROKER") and the motor carrier providing transportation services to or through BROKER ("CARRIER"). This Agreement and the terms and conditions shall constitute the entire agreement between the parties. Performance of any work by CARRIER for or through BROKER shall constitute acceptance by CARRIER of the terms and conditions hereunder.

1. <u>Term</u>. The term of this Agreement shall be for a period of one (1) year from the date of this Agreement and shall renew for successive one (1) year periods until terminated by either party at any time upon thirty (30) days' prior written notice.

2. <u>Representations</u>. CARRIER represents and warrants that it is duly and legally qualified to provide, as a contract carrier, the transportation services contemplated herein. CARRIER further represents and warrants that it has a "satisfactory" safety rating issued from the U.S. Department of Transportation, and agrees to comply with all federal, state and local laws regarding the provision of the transportation services contemplated under this Agreement. In the event that CARRIER is requested by Broker to transport any shipment required by the U. S. Department of Transportation to be placarded as a hazardous material, the CARRIER represents and warrants that it holds all federal and/or state permits and registrations necessary and shall provide BROKER copies of all appropriate documents upon BROKER's request. Furthermore, CARRIER represents and warrants that all of CARRIER's drivers transporting hazardous materials are properly trained under federal and state laws.

3. <u>Services</u>. CARRIER shall transport all of BROKER's shipments without delay and in a safe and lawful manner. CARRIER shall immediately notify BROKER of any likelihood of delay. CARRIER agrees to provide electronic tracking information upon request from broker. CARRIER shall transport all freight tendered by BROKER only on equipment operated under CARRIER's authority and which is in good and safe operating condition. CARRIER shall not in any way sub-contract, broker or arrange for the freight to be transported by a third party without BROKER's prior written consent. Neither party hereto will be liable for the failure to tender or timely transport freight under this Agreement if such failure, delay or other omission is caused by strikes, acts of God, war, civil disorder, or through compliance with legally constituted order of civil or military authorities. CARRIER shall issue a bill of lading for property it receives for transportation under this contract and shall be liable to the person entitled to recover under the bill of lading. Failure to issue a bill of lading shall not affect the liability of the CARRIER. CARRIER's liability shall begin at the time cargo is loaded upon CARRIER's equipment at point of origin and continue until said cargo is delivered to the designated consignee at final destination or to any intermediate stop-off party. CARRIER shall obtain from the consignee a complete, signed delivery receipt or bill of lading for each shipment, and it shall notify BROKER immediately of any exception on any document. Such receipt or bill of lading shall be prima facie evidence of receipt of property, in good

49

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001320

order and condition, unless otherwise noted upon the face of such a document. CARRIER shall send BROKER delivery receipts and original signed bills of lading as proof of delivery. Documents for each of BROKER's shipments shall name BROKER as "broker" and CARRIER as "carrier." If there is a wrongly worded document, the parties will treat it as if it showed BROKER as "broker" and CARRIER as "carrier." If there is a conflict between this Agreement and any transportation document related to BROKER's shipment, this Agreement shall govern.

4. No Restrictions. There is no minimum volume of freight contemplated by this Agreement. BROKER is not restricted from tendering its freight to other carriers. CARRIER is not restricted from performing transportation services for other shippers or brokers.

5. Independent Contractor Status. Carrier shall be wholly responsible for performing the contemplated transportation and for all costs and expenses of such transportation including, but not limited to, costs and expenses of all of CARRIER's transportation equipment, its maintenance and repair, and those persons who operate it. CARRIER shall be deemed to be an independent contractor of BROKER and, as such, is wholly responsible in every way for such persons as CARRIER hires or employs (including owner-operators) and all costs related thereto. Nothing herein contained shall be construed to be inconsistent with this relationship.

6. Indemnification. CARRIER shall defend, indemnify and hold BROKER, together with any shipper or customer for which BROKER brokers or arranges shipments (each, a "Customer") and their employees, officers, directors, managers and agents harmless from and against any and all losses (including as a result of personal injury or death), liabilities, damages, claims, fines, penalties, costs or expenses, including reasonable attorney's fees, caused by, arising out of or in any way related to CARRIER's (a) performance of the contemplated transportation hereunder, (b) violations of law, (c) negligence or willful misconduct or (d) breach of any terms of this Agreement.

7. Insurance. During the term of this Agreement, CARRIER shall procure and maintain, at its sole cost and expense:

a. Commercial Automobile Liability Insurance, with a combined single limit of not less than U.S.$1,000,000 each occurrence, covering all vehicles, however owned, used by Carrier to transport BROKER's shipments, including coverage for all liabilities for personal injury (including death) and property damage arising out of CARRIER's transportation under this Agreement.

b. All Risk Broad Form Motor Truck Cargo Legal Liability Insurance in an amount not less than U.S.$100,000 per occurrence. Such insurance policy shall list BROKER as loss payee and provide coverage to BROKER, the Customer or the owner and/or consignee for any loss, damage or delay claim to any property coming into the possession or custody of CARRIER under this Agreement. Unless approved in advance by BROKER, the coverage provided under the cargo policy shall have no exclusions or restrictions of any type that would foreseeably preclude coverage relating to a cargo loss, damage or delay claim.

50

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001321

c. CARRIER shall cause its insurance carrier to forward promptly to BROKER a standard Certificate of Insurance with NFI Logistics, LLC named as the certificate holder. CARRIER must notify BROKER in writing thirty (30) days prior to cancellation of any such insurance.

8. <u>Liability</u>. For purposes of loss, damage and/or delay of Customer's freight while under CARRIER's care, custody or control, CARRIER shall assume common carrier liability as defined by 49 U.S.C. §14706. The loss, damage or injury shall be measured as the actual replacement cost, reduced by any reasonable salvage value of any damaged commodities. In addition, CARRIER shall indemnify BROKER for all indirect, special or consequential damages, or other special economic losses that might be awarded against BROKER on any Customer claim. CARRIER shall pay to BROKER, or it shall allow BROKER to deduct from the amount BROKER owes CARRIER, for Customer's loss for the commodities so lost, delayed, damaged or destroyed and the amount of any indemnity, as stated above. CARRIER's liability is for the full policy limits of its insurance as provided herein, on a per motor vehicle, trailer or container basis, regardless of any policy limitation or applicability. In addition, for any claim arising from any reckless, dishonest, negligent or illegal acts of CARRIER's employees or agents, or claim arising from CARRIER furnishing contaminated equipment, CARRIER shall be solely liable and responsible for such claim.

9. <u>Release of Liens</u>. CARRIER shall not withhold any freight due to any dispute with BROKER regarding freight charges or for non-payment. CARRIER waives and releases all liens which it might otherwise have on any of BROKER's or Customer's freight in its possession.

10. <u>Charges</u>. The parties agree the rates and charges for the contemplated transportation shall be established in writing, including individual Rate Confirmation Sheets, freight bills or other documents, and are incorporated by reference. Broker will pay CARRIER the agreed amount within thirty (30) days of BROKER's receipt of CARRIER's freight bill, bill of lading, clear delivery receipt, and any other documents necessary to enable BROKER to ascertain transportation has been properly provided. Only BROKER (and not CARRIER) shall bill Customer for transportation; CARRIER shall not seek to collect from Customer or any other party involved with the shipment or otherwise contact any such party. CARRIER agrees that BROKER, at its option, may offset against any payments owed to CARRIER amounts CARRIER owes BROKER hereunder.

11. <u>No Back-Solicitation</u>. Carrier agrees that, for a period of one (1) year following the date of the initial referral or the date that service is last performed for such account under the terms of this Agreement, whichever is later, it will not directly or indirectly contact, communicate with or deal with any account where (a) the availability of such traffic first became known to CARRIER as a result of BROKER's efforts, or (b) where the traffic of the shipper, consignor, consignee or customer of the BROKER was first tendered to the CARRIER by the BROKER. The parties agree that the provisions of this paragraph are intended to prohibit CARRIER from soliciting any of BROKER's accounts. In the event that CARRIER breaches this provision, CARRIER shall be liable to BROKER for commission in the amount of twenty percent (20%) of the gross revenue per load on any freight so transported by CARRIER for any of BROKER's accounts, together with interest at a rate of ten percent (10%) per annum and all costs and

51

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001322

reasonable legal fees in the event legal proceedings are necessary to collect the amounts. The provisions of this paragraph shall be applicable to CARRIER and to its officers, directors, shareholders, employees, agents, drivers, owner-operators, subsidiaries and affiliates.

12. BROKER Solely Liable for Payment.  BROKER shall be solely and exclusively liable and responsible for the payment of rates and charges to CARRIER engaged by BROKER that relate to the transportation of shipments tendered by a Customer to BROKER pursuant to this Agreement.  A Customer's sole obligation with regard to the payment of transportation charges for services provided under or in relation to this Agreement is to submit payment to BROKER for services rendered under this Agreement. BROKER will invoice Customer for transportation charges on CARRIER's behalf and shall remit such proceeds to which CARRIER may be entitled.  CARRIER represents and warrants that it will look solely to BROKER, and not to any Customer, consignor or consignee, for the payment of its charges. BROKER shall be a conduit from its Customer to CARRIER for purposes of receiving CARRIER's freight charges from a Customer and paying such charges to CARRIER.

13. Amendment: Assignment. This Agreement cannot be altered or amended except in writing signed by both parties hereto. It may not be assigned or transferred by either party, in whole or in part.

14. Severability. If any provision of this Agreement results in a violation of any law, such provision shall be severed and the Agreement's remaining provisions shall continue in full force and effect.

15. Waiver. CARRIER and BROKER expressly waive all rights and remedies allowed under 49 U.S.C. §14101, to the extent they conflict with this Agreement. BROKER's failure to insist upon CARRIER's performance under this Agreement or to exercise any right or privilege shall not be a waiver of any of BROKER's rights or privileges.

16. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey, without regard to the principles of conflicts of law of that state or any other jurisdiction. Broker and Carrier hereby consent and submit exclusively to the jurisdiction and service of process of the courts of the State of New Jersey or the courts of the United States located in Camden County, New Jersey.

17. Conflicts Between this Agreement and Shipping Documents.  Any conflict between a term or condition of this Agreement and a term or condition contained in any shipping document, including, without limitation, a bill of lading, shall be resolved in favor of this Agreement.

"I, _____, am the Partner for _____. I am authorized to execute the Transportation Brokerage Agreement (the "Agreement") set out above dated _____ between NFI Logistics and _____ and legally bind _____ to the terms and conditions set forth therein. This electronic signature serves as an original, and any electronic version and other signatures are

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001323

incorporated as if originals into the Agreement. This electronic signature shall have the same force and effect as an original source.

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001324

**Addendum F**

**RAC Corporate Structure**

Rent-A-Center Corporate Structure 1/1/14



54

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001325

Addendum G

Rent-A-Center 3PL Security Requirements

In an effort to establish security controls for Rent-A-Center (RAC) merchandise, the following set of requirements must be reviewed and established.  All procedures listed in this document are subject to random audit by RAC personnel.

**Employee Screening**

- **Criminal Background Checks** – It is expected that all NFI Employees have undergone a criminal background check.  The background includes felony convictions up to 7 years.  NFI will also require all Temporary Laborers and Independent Contracts to meet or exceed the requirements in this paragraph. If the individual does not pass these requirements, they are prohibited from working on the RAC account.

- **Drug Screening** - It is expected that all NFI Employees have undergone a drug screening. NFI will also require all Temporary Laborers and Independent Contracts to meet or exceed the requirements in this paragraph. If the individual does not pass a drug screening, they should be restricted from working or having any affiliation with the RAC account.

**Facility Security**

- **Access Control** – The facility must have an access control system to monitor employee access throughout the building. The system must have reporting capabilities.

- **Burglar Alarm System** – The facility must have a functional burglar alarm system during non-business hours. This alarm must be activated when the facility is shut down.  The system should include the following:  24 hour monitoring by a third-party alarm company, key pad, man-door contacts, overhead door contacts and interior motion detectors.   All former employees' access must be terminated immediately from the system.

- **CCTV** – The facility should possess an adequate CCTV system.  This includes a DVR (Digital Video Recording) system that has the capability of recording at least 21 or more days of consecutive data. Cameras must be color and include adequate coverage of the interior and exterior of the facility.  At least two or more cameras at opposite angles must be directed on the merchandise slots and staging areas. Idle RAC freight must have camera coverage.

- **Locks/Keys** – The facility must have adequate and working locks on all facility man and overhead doors. Key control must be in place to include a listing of all personnel with keys and repossession of former employee's keys.

- **Personal Vehicles** – Under no circumstances should employee's personal vehicles be parked inside the facility.  Designated parking areas should be implemented at the facility and management oversight of parking should be conducted.   Vehicles should not be parked near overhead doors or truck entrances and exits.

- **Employee Locker Areas** – Employees should have an area to secure personal belongings prior to entering the RAC warehouse facility.  No personal backpacks or pursues will be permitted on the RAC warehouse floor.

55

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001326

- **Compliance Audits-** A Compliance Audit will be completed by Facility Management once a quarter and the results must be shared with RAC. RAC reserves the right to conduct an independent Audit at the facility.

## Transportation Security

- **NFI Inter-Facility Transfers** – RAC freight being transferred should be protected at all times. Seals must be placed on all inter-facility shipments to ensure the driver does not have access to the freight.

- **NFI - Store Deliveries** – Once RAC freight has been loaded on the truck, a seal must be attached to the locking/handle mechanism on the back of the truck. The seal number must be recorded in the bill of lading/manifest that shows the **date, drivers name, carrier** SM name, signature and **seal number**.

- **Store - Store Deliveries** – Once RAC freight has been unloaded loaded to the designated store, the designated seal indicated in the driver paperwork must be attached to the locking/handle mechanism by the RAC SM to the back of the truck. The seal number must be recorded in the bill of lading/manifest that shows the **date, drivers name, SM name, signature and seal number**.

## Driver Requirements

- **Driver Identification** – All Drivers and Helpers must have proper identification on their person while handling product for the RAC account. This ID can be a valid state Driver's license/Identification Card or visible company Identification Card.

- **Vehicle** – The driver must possess a truck, cargo van or delivery vehicle that has adequate space for all RAC freight. The vehicle must have working locks**.** No merchandise is permitted in the cab.

- **Driver Helpers –** All Helpers must be documented and approved by carrier management. Authorized Helpers must undergo the required employee screening.

- **Returning Same Day** – Under no circumstances should the driver be taking RAC product home.
  ***There are instances in some markets where geographical distances make returning to the facility difficult. In these instances the driver must have prior approval by management and RAC Transportation must be notified.***

- **Dock Check In Procedure** – All drivers returning to the facility must undergo a formalized dock check-in process. This includes a member of management or designated employee verifying RAC returns as it is being removed from the vehicle. Also, verification should be made of the quantity of items brought back either by scanner or paperwork. Prior to departure, the vehicle must be checked (cab included) for any RAC freight. This is to establish a proper chain of custody for RAC freight.

- **In-Transit** – If the driver stops (food, restroom break, the vehicle must be locked. Under no circumstances should the driver leave keys in the ignition, when not present with the vehicle.

56

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

**Product Handling**

- **Damages** – Any product that is found damaged while processing, must be placed on a Damage Report. The report should contain label numbers and route descriptions of where it came from. The Damage Report should be sent to RAC Transportation that same day.

- **High Theft Electronics** – All designated small, high theft merchandise must be stored in a secured / controlled area with limited access prior to shipping. These items must be transported in a secured container with a security seal/tape (if a seal is used, the number must be located in the driver's paperwork) Pallets must be properly secured with multiple layers of shrink-wrap to limit the freights exposure.

- **Inventory** – Cycle counts must be completed on high risk merchandise once a week and held in a secure area. The balance of inventory in the facility should be cycle counted at least once a month. Inventory variances must be researched and reported within 8 hours or 1 business day. RAC reserves the right to conduct an independent investigation should it be deemed necessary.

**Imports**
- **C-TPAT Certified** – All 3PL providers must currently be C-TPAT certified, meeting the standard requirements.

**Technology**

- **Scanning Technology** – The carrier should make all attempts to establish scanning and chain of custody of RAC freight.

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001328

## Addendum H





# Rent-A-Center
# Solutions Scope Definition

58

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001329

# Table of Contents

1   Objectives ................................................................................................................ 60
   1.1 Systems .......................................................................................................... 60
   1.2 Sites ................................................................................................................ 60
   1.3 Product ............................................................................................................ 60
   1.4 Terminology .................................................................................................... 60
2   Deployment Methodology ...................................................................................... 61
   2.1 Roles Terminology .......................................................................................... 61
   2.2 Roles & Responsibilities ................................................................................. 62
   2.3 Critical Success Factors .................................................................................. 63
3   Project Schedule & Governance ........................................................................... 63
   3.1 Project Calendar ............................................................................................. 63
   3.2 Key Deliverables & Milestones ....................................................................... 64
   3.3 Project Governance ......................................................................................... 64
   3.4 Change Management ....................................................................................... 65
   3.5 Assumptions .................................................................................................... 65
4   WMS & TMS Interfaces ......................................................................................... 65
   4.1 List of Interfaces ............................................................................................. 65
   4.2 Interface Scope & Assumptions ...................................................................... 66
5   WMS Scope ........................................................................................................... 67
   5.1 Interfaces ........................................................................................................ 67
   5.2 Inbound processing ......................................................................................... 67
   5.3 Outbound processing ...................................................................................... 67
   5.4 Inventory control ............................................................................................. 68
   5.5 Reporting ......................................................................................................... 68
   5.6 Assumptions .................................................................................................... 68
6   TMS Scope ............................................................................................................ 68
   6.1 Interfaces ........................................................................................................ 68
   6.2 Outbound processing ...................................................................................... 68
   6.3 Mode Selection ............................................................................................... 69
   6.4 Reporting ......................................................................................................... 69
   6.5 Assumptions .................................................................................................... 69
7   Pricing and Financial Commitments ...................................................................... 69
8   Appendix ................................................................................................................ 70
   8.1 RAC Supply Chain Systems ........................................................................... 70
   8.2 RAC Integration Architecture .......................................................................... 71
   8.3 Project Change Request (PCR) Form .............................................................. 72

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001330

**I   Objectives**

This document outlines the systems and solutions that will be deployed by NFI and RAC in support of distribution and transportation operations as outlined by the RAC – NFI MSA.

## 1.1   Systems

Following systems are in scope for this project
NFI
- WMS4000 (Infor)
- TMS
- Navitrace (Reporting)
- Kewell (Parcel Shipping)
- Sterling B2B Integrator & Boomi (Integration)

RAC
- See RAC Supply Chain Systems section

## 1.2   Sites

| Site | Area (Sq. Ft.) |
|------|----------------|
| Chino, CA | 40,000 |
| Oldmans Township, NJ | 100,000 |
| Columbus, OH | 135,000 |
| Dallas/Fort Worth, TX | 75,000 |
| Atlanta, GA | 110,000 |

## 1.3   Product

RAC divides its product into following four categories. Expected SKU count across these four categories is about 300 distinct SKUs.

- Appliances – may have serial number tracking
- Electronics – may have serial number tracking
- Computers – may have serial number tracking
- Furniture – may have lot # tracking and / or multi-box SKUs (parent & child relationship)

## 1.4   Terminology

| Name | Definition |
|------|------------|
| WMS | Warehouse Management System |
| TMS | Transportation Management System |
| ESB | Enterprise Service Bus |
| PO | Purchase Order |
| ASN | Advance Shipment Notification |
| Transfer Order | Store Orders |
| PCR | Project Change Request |

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001331

## 2   Deployment Methodology

NFI's **"Common Deployment Framework"** (**CDF**) provides a roadmap for successful project execution driven by years of expertise in deploying distribution and transportation solutions. **CDF** is architected on five discrete phases with clear deliverables as outlined below. Initiating and Planning phase determines the subset of deliverables required for remainder duration and phases (Executing, Monitoring & Closing) of the project.



## 2.1   Roles Terminology

| Terminology | Definition |
|---|---|
| Owns: | Party is primarily responsible for activity.  Task may include but not limited to the following:<br>1) plans and facilitates the activity<br>2) conducts meeting relative to the activity<br>3) creating necessary documentation for follow up or final deliverable |
| Supports: | Party is secondary and participates in the activity to ensure success.  Tasks may include but are not limited to the following:<br>1) attends meetings<br>2) takes notes as necessary<br>3) provides information required for final documentation<br>4) supports issue resolution |
| Reviews: | Party is responsible to review documentation and provides comments / suggestions based on experience. |
| N/A: | No action / participate required by party. |

61

RAC-001332

## 2.2   Roles & Responsibilities

| Deliverable | NFI Responsibility | RAC Responsibility |
|---|---|---|
| **INITIATING** | | |
| Project Plan | Owns | Supports |
| Project Charter | Co-Owns | Co-Owns |
| Project Stakeholders | Co-Owns | Co-Owns |
| Customer Questionnaire | Supports | Owns |
| Scoping & Sizing Doc | Owns | Reviews |
| **PLANNING** | | |
| Business Requirements | Supports | Owns |
| Discovery Sessions | Co-Owns | Co-Owns |
| Solution Document(s) | Owns | Supports |
| Integration Guides | Co-Owns | Co-Owns |
| Planning Phase Approval | Reviews | Owns |
| **EXECUTING** | | |
| Interface Dev & Unit Testing @ RAC | Reviews | Owns |
| Interface Dev & Unit Testing @ NFI | Owns | Reviews |
| Construction & Unit Testing | Owns | Reviews |
| CS & Integration Testing (QA) | Co-Owns | Co-Owns |
| Ops Testing (UAT) | Owns | Supports |
| Training | Owns | Reviews |
| Readiness Review | Co-Owns | Co-Owns |
| Executing Phase Approval | Reviews | Owns |
| Deploy (Go-Live) | Owns | Supports |
| **MONITORING** | | |
| Project Management | Co-Owns | Co-Owns |
| Issues List | Owns | Supports |
| **CLOSING** | | |
| Transition Documents | Owns | Reviews |
| Transition to support | Owns | Reviews |

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001333

## 2.3   Critical Success Factors

Critical success factors that must be managed jointly by NFI and RAC are listed below:

1. Disciplined control of common processes across sites.
2. Clear and proactive communication plan to all stakeholders.
3. Clear communication and documentation of requirements:
   - Functional
   - Performance
   - Infrastructure
   - Interfaces
4. Completion and agreement of a comprehensive design.
5. Focus on ROI/business case benefits throughout the project.
6. Clear and disciplined scope control via PCR process.
7. Reasonable volume ramp-up strategy.
8. Well defined training program.

## 3   Project Schedule & Governance

## 3.1   Project Calendar

Following project calendar was built during initial review sessions with RAC. A detailed project plan will be built in partnership with RAC during **Initiating** phase.

| RAC Schedule | 2014 | | | | 2015 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug |
| WMS Initiate & Plan | | | | | | | | | | | | |
| WMS Execute, Monitor & Close: Site #1 | | | | | | | | ★ | | | | |
| WMS Execute, Monitor & Close: Site #2 | | | | | | | | | ★ | | | |
| WMS Execute, Monitor & Close: Site #3 | | | | | | | | | ★ | | | |
| WMS Execute, Monitor & Close: Site #4 | | | | | | | | | | ★ | | |
| WMS Execute, Monitor & Close: Site #5 | | | | | | | | | | ★ | | |
| TMS Initiate & Plan | | | | | | | | | | | | |
| TMS Execute, Monitor & Close: Site #1 | | | | | | | | ★ | | | | |
| TMS Execute, Monitor & Close: Site #2 | | | | | | | | | ★ | | | |
| TMS Execute, Monitor & Close: Site #3 | | | | | | | | | ★ | | | |
| TMS Execute, Monitor & Close: Site #4 | | | | | | | | | | ★ | | |
| TMS Execute, Monitor & Close: Site #5 | | | | | | | | | | ★ | | |

**Legend:**
- Colored cells indicate activity by site and CDF phase (Initiate, Plan, Execute, Monitor and Close).
- Stars indicate go-lives
- 4 weeks of post go-live support is planned

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001334

## 3.2   Key Deliverables & Milestones

| Deliverable | Responsible | Date Required |
|---|---|---|
| Electronic Connectivity with RAC | RAC & NFI Jointly | Dec 01, 2014 |
| Web services proof of concept QA | RAC & NFI Jointly | Dec 19, 2014 |
| Test 888 EDI | RAC (Sends) | Jan 21, 2015 |
| Test 850/856EDI Feed | RAC & NFI Jointly | Jan 26, 2015 |
| Test 997/816/944 EDI | RAC & NFI Jointly | Feb 6, 2015 |
| Test 940/945 EDI Feed | RAC | Feb 16, 2015 |
| Test 947/846 EDI Feed | RAC & NFI Jointly | Feb 25, 2015 |
| Test 990 and 214 EDI Feed | RAC & NFI Jointly | Mar 06, 2015 |
| Test 855/860 | RAC & NFI Jointly | Mar 06, 2015 |
| Test 888 EDI | NFI (Sends) | Mar 09, 2015 |
| Brokered Transportation Management Division fully staffed with staff equal to expected volume | NFI | Mar 09, 2015 |
| Customized Transportation Management Web Portal made available to RAC key staff | NFI | Mar 09, 2015 |

## 3.3   Project Governance

Following results proven governance processes are strongly recommended:

64

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001335

- NFI and RAC should dedicate a project manager on respective ends to manage respective phases and activities in alignment with <u>roles & responsibilities</u>.
- NFI and RAC should establish a periodic project status review meeting or conference call.

## 3.4  Change Management

NFI will report any scope changes via a PCR (project change request) document, and seek approval prior to commencing any out of scope work. PCR form is outlined in <u>Project Change Request Form</u> appendix section.

## 3.5  Assumptions

- Detailed project plan will be developed during **Initiating** phase.
- Project schedule is contingent upon a contract signed date of 10/13/2014. Any delays in contract signing will impact project schedule and go-live date.
- Scope changes may impact project calendar and will be managed via PCR process.
- RAC uses every commercially reasonable effort to ensure that RAC team members are available as required to ensure project success.
- This project calendar is dependent on RAC defined requirements and scope.  Delays outside of NFI control may result in a PCR.
- While NFI team is on-site at RAC offices, RAC provides NFI staff with a work area and other facilities reasonably needed, including work space, copiers, access to telephone and fax communications and internet access.

### 4    WMS & TMS Interfaces

## 4.1  List of Interfaces

Following interfaces are in-scope between NFI WMS & TMS solutions and RAC systems.

| EDI Transaction | WMS Scope | TMS Scope | Originator | Consumer | Description |
|---|---|---|---|---|---|
| 214 | | X | NFI | RAC | Transportation Carrier Shipment Status Message |
| 816 | X | X | RAC | NFI | Consignee Master |
| 846 | X | | NFI | RAC | Inventory Inquiry/Advice |
| 850 | X | | RAC | NFI | New Purchase Order (PO) |
| 855 | X | | NFI | RAC | Purchase Order Acknowledgement |
| 860 | X | | RAC | NFI | Purchase Order Changes |

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001336

| EDI Transaction | WMS Scope | TMS Scope | Originator | Consumer | Description |
|---|---|---|---|---|---|
| 856 | X | | RAC | NFI | Shipment Notification (ASN) |
| 888 | X | | RAC | NFI | Item Maintenance |
| 888 | X | | NFI | RAC | Item Weight & Dimension Updates |
| 940 | X | X | RAC | NFI | Transfer Orders |
| 944 | X | | NFI | RAC | Purchase Order Receipt |
| 945 | X | | NFI | RAC | Transfer Shipment Confirmation |
| 947 | X | | NFI | RAC | Warehouse Inventory Adjustment |
| 990 | | X | NFI | RAC | Load Tender Confirmation |
| 997 | X | X | NFI & RAC | NFI & RAC | Functional Acknowledgement |

## 4.2   Interface Scope & Assumptions

- NFI and RAC will collaborate to define EDI X12 interface specifications for all transactions listed above during **Planning** phase.
- For each interface listed in section above, **Originator** is responsible for publishing the data in defined EDI X12 format. For example, for EDI 850, RAC is responsible for extracting data from RAC systems, converting to defined EDI X12 format, and publishing to NFI.
- For each interface listed in section above, **Consumer** is responsible for consuming the data in agreed upon EDIX12 formats, and providing acknowledgement as defined during **Planning** phase. For example, for EDI 850 and 855, NFI is responsible for consuming 850 (PO) and publishing 855 (PO acknowledgement) in agreed upon EDI X12 format.
- NFI solutions will interface with a single RAC system (ESB or SFTP server) for publishing and consuming all interfaces noted above.
- RAC owns and maintains ESB and/or SFTP server, and provides appropriate access to NFI interfaces.
- RAC will validate EDI data for interfaces originating from RAC such as items, PO, ASN, transfer orders prior to publishing to ESB or SFTP server. For example, RAC will validate that items in PO, ASN and transfer orders are valid, and transmitted to NFI previously via 888 interface.
- NFI solutions will validate EDI data for interfaces originating from RAC systems. For example, NFI solutions will validate that EDI 945 Shipment Confirmation contains RAC identified mandatory data elements and is otherwise compliant with mutually defined EDI specifications.

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001337

- Web services integration proof of concept will be jointly owned by NFI & RAC, and completed by 12/19/2014, contingent upon a project start date of 10/13/2014.

## 5    WMS Scope

## 5.1    Interfaces
- RAC will upload item master information to NFI systems via 888 EDI with such information as is mutually agreed by the parties during **Planning** phase
- RAC will download consignee master information to NFI systems via EDI 816 with with such information as is mutually agreed by the parties during **Planning** phase.
- Invalid data EDI feeds may fail delivery, and may cause operational processing delays.
- RAC will provide PO for every inbound shipment.
- RAC will provide ASNs for 80% of all inbound shipment.
- RAC will provide BOM for multi-SKU boxes via 888 EDI.
- NFI will architect a single interface with RAC, such that separate interfaces for each each site/distribution center will not be required.

## 5.2    Inbound processing
- Inbound shipments will have clearly labeled product to include manufacturer part number, UPC codes, lot codes, and serial numbers.
- Items requiring measurement capture will take place only at NFI facility processing first receipt, and the appropriate hourly rate is applicable.  Measurements will be shared with other facilities in network thereafter.
- RAC systems will accept damage, hold, and other non-available inventory information on 944 EDI transactions.
- RAC will be able to accept confirmation for manually keyed in ASNs where ASN from manufacturer was not available.
- NFI will capture serial number when available on ASN's as catch-in and provide on receipt confirmation.
- NFI will receive kits at the component level and will store in warehouse in separate locations.
- NFI will putaway product using FIFO with a thirty day window tolerance.

## 5.3    Outbound processing
- RAC will accumulate order data by store and release to NFI providing sufficient time, typically 24 hours, to optimize, allocate, process, and ship in time for on time delivery. TMS will plan shipments for orders, and then drop to WMS.
- NFI will allocate product using FIFO with a thirty day window tolerance.
- RAC will order kits and NFI will allocate complete components of kits of the same manufacturer lot code.
- NFI will provide a single shipping label per shipment unit of measure, carton or pallet, using RAC provided specifications.
- NFI will provide a standard VICS BOL format which will be used on all LTL shipments, provided RAC may modify the VICS BOL terms or content.
- NFI will provide a single packing list to use on all outbound shipments.
- NFI will ship to domestic locations with exception of Puerto Rico.  RAC will provide international shipment documents when required to ship to Puerto Rico.
- RAC will provide order types on 940 EDI shipment orders and will help define business rules associated.
- Changes and cancellations of orders released to NFI will be not be allowed after TMS optimization. Shortages will be communicated to RAC prior to shipping.
- RAC will control inventory allocation to orders based on available inventory levels at each NFI facility.
- NFI will capture serial numbers via scan when available as catch data during picking of item and provide that data on shipment confirmation EDI.

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001338

## 5.4   Inventory control

- NFI will send EDI 846 inventory snapshots nightly for each facility.  RAC will reconcile inventory and request cycle counts based on variances
- NFI will perform cycle count and physical count as outlined in master agreement. Frequency and timing of count events may be adjusted as needed.
- NFI will communicate agreed upon inventory adjustment types via EDI 947.
- NFI and RAC will collaborate to design a solution for set management and kitting requirements using WMS' BOM functionality during **Planning** phase.  Any customization required to facilitate RAC specific requirements around set management and kitting shall be included as part of this Solution Scope Definition, and shall not be subject to additional fees or costs.
- Serial numbers captured as catch-out data and reported during receipt and shipping of item.
- NFI systems will provide allocatable and non-allocatable inventory information on EDI 947 and 846. RAC systems are expected to consume this information, and drop orders based on available inventory.

## 5.5   Reporting

Following Navitrace reports are available out of the box:

- Open Order Report – Used to provide visibility of open orders at NFI facilities and provide real time order status. Data provided for open orders will also be available for shipped orders.
- Inventory report – Will provide visibility of inventory levels by Product, manufacturer lot, inventory condition at each NFI facility.
- Open Receipt Report – Used to provide status of receipts not closed in system by PO and ASN.

## 5.6   Assumptions

- It is assumed that processes across facilities included in the roll out are sufficiently similar to allow for a common design with similar processes.
- Automation such as MHS, pick / put to light or conveyer systems is out of scope.
- Voice picking is out of scope.
- WMS will get orders that have planned shipments from TMS.
- Returns are out of scope.
- Reporting section outlines a list of Navitrace reports available out of the box and used widely by NFI customers. Any additional report requests will be scope and priced via the established PCR process.
- Dates above are contingent on a project start date of 10/13/2014.

### 6   TMS Scope

## 6.1   Interfaces

- RAC will provide Transfer Requests (Outbound Orders) via 940 EDI transactions that includes all of NFI's defined data requirements.
- Invalid data EDI feeds may fail delivery, and may cause operational processing delays.
- NFI will provide either a 997 EDI or 990 EDI in response to Transfer request (Outbound Order).
- NFI will provide a 214 EDI for each delivery stop/event.
- NFI will architect a single interface with RAC, such that separate interfaces for each each site/distribution center will not be required.

## 6.2   Outbound processing

- NFI will develop and implement a complete TMS solution (all necessary hardware, software, middleware, and technical support) capable of managing outbound order transportation for the 5 different sites listed in this scope document. NFI and RAC will define detailed design during Planning phase, which will be architected to provide a single interface with RAC, rather than separate interfaces for the individual sites listed in this scope document.
- NFI will design, configure and deploy a TMS solution capable of balancing RAC's outbound order volume using Dedicated Fleet, Brokered Transportation Management, and Parcel mode. The TMS solution will consider constrains that will be defined by NFI and RAC during the Planning phase.

68

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001339

## 6.3   Mode Selection

NFI will provide the following transportation mode services:

- Dedicated Fleet:
    - o   NFI will provide a Dedicated Fleet for each of the 5 sites equal to the expected volume.
- Brokered Transportation Management:
    - o   NFI will provide RAC with guidance on NMFCs for the purpose of proper LTL rating.
    - o   NFI will develop a Transportation spend bench mark three months after the last site's go live in order to develop a continuous improvement process.
- Parcel:
    - o   NFI will process parcels as pass-through but rates will be based on NFI's current negotiated discount.
    - o   NFI will develop the parcel implementation process flow.

## 6.4   Reporting

NFI will develop and implement a custom web portal solution that allows key RAC staff to access order related information. NFI will also provide RAC with canned KPIs that provide metrics on the Dedicated and TM performance. Following out of the box reports are available via Navitrace:

- Daily On-Time Delivery Metric Report
- Shipment Delay At Stop Report
- Driver/Tractor Utilization Report
- Miles & Stops Per Driver Report

## 6.5   Assumptions

- RAC will define a pre-determined order size so that orders are only released to NFI's TMS once they reach a certain size. NFI will implement this logic for multiple order types, including without limitation standard orders, promotional orders, rush orders, replenishment, etc.
- During Planning phase, NFI (with RAC's support) will define up what point TMS will allow order change and cancels.
- Dates outlined above are contingent upon a 10/13/2014 project start date.

### 7   Pricing and Financial Commitments

WMS, TMS, Reporting and Interface scope of work as outlined in this document is priced into the Fixed Expenses of Addendum A and B of the RAC – NFI MSA.

Any out of scope work (the "Services") will be performed on a time and materials basis at a rate of $180 per hour through 12/31/2015. Thereafter, services rate will increase by the national rate of inflation for preceding 12 month period as measured by the Consumer Price Index by the United States Bureau of Labor Statistics (CPI-U) per year, not to exceed 1.5% for any 12 month period.

Services will be scoped and priced via the PCR process. NFI will not commence any Services without prior authorization from RAC. Invoicing and payment for the Services is in accordance with the Agreement. Approved travel and expenses will be billed at actual cost incurred in accordance with RAC's Travel and Expense Policy. Sales, use or excise taxes are added to invoices if required by state and local tax law. Taxes are the responsibility of RAC and payable when invoiced unless RAC provides a properly executed exemption certificate.

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001340

8   Appendix

## 8.1   RAC Supply Chain Systems

Following Supply Chain Systems diagram was provided by RAC. NFI solutions will interface with a single solution --
ESB or STFP server.



CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001341

## 8.2   RAC Integration Architecture

Following integration picture was provided by RAC. NFI will interface via EDI solutions through SFTP protocol or through ESB web services as outlined in <u>WMS & TMS</u> Interfaces.



CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001342

7.    **Estimated cost:**
Invoicing and payment for the Services provided under this change Request is in accordance with the Agreement. All work will be performed on a time and materials basis.  Budgetary estimates are dependent on joint commitments from NFI and RAC on scope, timeline and deliverables.  Any changes in scope, timeline or commitments may have an impact on budget and will require budgetary approval via PCR process. Total professional fees for services in this change Request are estimated to be $XXX. Travel and expenses are estimated at $YYY and billed at actual cost incurred in accordance with NFI's Employee Travel and Expense Policy.  Stated rates and/or fees do not include sales, use or excise taxes.  Taxes are added to invoices if required by state and local tax law.  Taxes are the responsibility of the client and payable when invoiced unless the client provides a properly executed exemption certificate.

8.    **Execution**

Intending to be legally bound, each of the undersigned parties has caused its duly authorized representative to execute this Change Request on the date indicated below.

| NFI | RAC |
|---|---|
| Signature: | Signature: _Joel Mussat_ |
| Name: _Joe Roeder_ | Name: _Joel Mussat_ |
| Title: _President_ | Title: EVP – Chief Omnichannel Officer |
| Date: _10/23/14_ | Date: _October 21, 2014_ |

73

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER

RAC-001343