CHRISTINA G. SARCHIO (Pro Hac Vice)
christina.sarchio@dechert.com
DECHERT LLP
1900 K Street, NW
Washington, District of Columbia 20006
Telephone:     202.261.3300
Facsimile:      202.261.3333

H. JOSEPH ESCHER III (No. 85551)
h.joseph.escher@dechert.com
LILY A. NORTH (No. 260709)
lily.north@dechert.com
DECHERT LLP
One Bush Street, Suite 1600
San Francisco, California  94104
Telephone:     415.262.4500
Facsimile:      415.262.4555

GREGORY G. ISKANDER (No. 200215)
giskander@littler.com
LITTLER MENDELSON, P.C.
Treat Towers
1255 Treat Boulevard, Suite 600
Walnut Creek, California 94597
Telephone: 925.932.2468
Facsimile: 925.946.9809

ROBERT F. FRIEDMAN (Pro Hac Vice)
rfriedman@littler.com
LITTLER MENDELSON, P.C.
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, Texas 75201.2931
Telephone: 214.880.8100
Facsimile: 214.880.0181

VICKIE E. TURNER (No. 106431)
vturner@wilsonturnerkosmo.com
WILSON TURNER KOSMO LLP
550 West C Street, Suite 1050
San Diego, CA 92101
Telephone: 619.236.9600
Facsimile: 619.236.9669

Attorneys for Defendants
RENT-A-CENTER, INC. and RENT-A-CENTER WEST, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| PAULA L. BLAIR, ANDREA ROBINSON, and FALECHIA HARRIS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RENT-A-CENTER, INC., a Delaware corporation; RENT-A-CENTER WEST, INC., a Delaware corporation; and DOES 1-50, inclusive<br><br>Defendants. | Case No.  3:17-cv-02335-WHA<br><br>**DECLARATION OF DAVID JACOBY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGEMENT**<br><br>DATE:     August 23, 2018<br>TIME:      8:00 a.m.<br>JUDGE:   Hon. William Alsup<br><br>Complaint Filed:  March 13, 2017<br><br>Trial Date: December 3, 2018 |

DECHERT LLP
ATTORNEYS AT LAW

1

I, DAVID JACOBY, declare and state as follows:

## I.      Introduction

### A.      Professional Background

1.  I have been consulting for approximately 30 years in supply chain management, including but not limited to logistics network design, warehousing, third party logistics (3PL) contracting, and transportation management. I am currently the President of Boston Strategies International. Previously I served as a Principal at CFGW (now Norbridge Inc.), Manager at A.T. Kearney, and a Research Associate at Temple Barker & Sloane (now Oliver Wyman), all management consulting firms with supply chain management practices. During my career, I have helped some of the world's largest companies optimize their operations, logistics and procurement activities and organizations. A complete resume can be found in Exhibit A attached hereto.

### B.      Academic and Educational Background

2.  I hold an MBA from the Wharton School, a Masters in International Business from The Lauder Institute and a Bachelor of Science in Finance and Economics from the University of Pennsylvania. I have taught Operations Management at Boston University's graduate school of business, and I am a Certified Fellow in Production and Inventory Management (CFPIM), Certified in Supply Chain Management (CSCP), Certified in Integrated Resource Management (CIRM), Certified in Purchasing Management (Lifetime C.P.M.), and Certified in Transportation and Logistics (CTL). At the International Supply Chain Education Alliance (ISCEA), I have served on the Ptak Prize Selection Committee.

### C.      Retention for This Matter

3.  Counsel engaged me in May 2018 to serve as an expert in the Blair et al v. Rent-A-Center (RAC) case, and specifically address Rent-A-Center's use of centralized distribution centers to move merchandise to its retail stores and the accumulation of related costs.

4.  My scope of work is focused on transportation, logistics, and supply chain management.

5.  I was retained through Thomas Reuters Expert Witness Services, which has been compensated for my review and analysis in this matter at the hourly rate of $595 per hour, plus reimbursement of expenses in connection with the services rendered to Defendants.  The fees I receive are not contingent on the outcome of this litigation.

6.  To my knowledge there is no conflict of interest between my work on this case and any other work I am doing or have done.

**D.     Materials Reviewed**

13. In developing this declaration, I relied on the following documents:

    a.   Plaintiffs' Notice of Cross Motion For Partial Summary Judgment

    b.   Declaration of Zachariah P. Dostart in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment and Opposition to Defendants' Motion for Partial Summary Judgment and exhibits thereto.

    c.   RAC 1271–1343 (Master Services Agreement)

    d.   RAC 5637 (Excel workbook)

    e.   RAC 5645 (Excel workbook)

    f.   RAC 5649 (Excel workbook)

    g.   RAC 5651 (Excel workbook)

    h.   Logistics Management Magazine's summary of CSCMP's 2018 State of Logistics report

14. In interpreting the documents and the issues in this case, I relied on my consulting experience.

15. I reserve the right to supplement this Declaration should new information become available to me.

DECHERT LLP
ATTORNEYS AT LAW

II.      **Comments on Whether NFI's and NPS's Services were "Freight" or "Distribution" Activities**

16. NFI and NPS have been functioning as value-added distribution companies, not just transportation companies. As such, their cost would seem to be acceptable in the cost basis, per the Act, which stipulates that "lessor's cost" means the actual, cost, including actual freight charges, of the rental property to the lessor from a wholesaler, *distributor*, supplier, or manufacturer…" (italics added).

17. NFI is a Third Party Logistics Provider, or 3PL, which is a distribution company that offers tailored order fulfillment services, logistics and transportation assets, and operational resources to customers. Often the arrangements involve upfront investment and dedicated systems, facilities, workflows, fleets, and services such as inventory management, consignment, vendor-managed inventory programs, kitting, and assembly. The contract structure usually consists of multiple forms of compensation, which may include investment costs, fixed costs, activity fees, and incentives or penalties for performance. The 3PL model became increasingly popular throughout the 1990s and early 2000s.

18. Based on the Master Agreement between NFI and RAC, it seems that NFI has been functioning as a value-added distribution provider to RAC. According to the Master Agreement between RAC and NFI,[1] the firm provided a full range of distribution activities – "warehousing, distribution and related services" in five distribution centers nationwide.[2] These included, for example:

- Information technology services to track and manage the flow of materials throughout the network of distribution centers

- Inbound Receiving

- Put-away

- Inventory storage

[1] RAC 1272
[2] RAC 1291

DECHERT LLP
ATTORNEYS AT LAW

DECL. OF DAVID JACOBY RE: MOT. FOR PARTIAL SUMM. J.          Case No. 3:17-CV-02335-WHA

- Setting and management of appropriate inventory target levels
- Cycle counting
- Palletization and repackaging
- Order management
- Pick / pack
- Staging and loading
- Management of dedicated truck fleet
- Routing and scheduling
- Carrier management
- Safety performance as per detailed standards in all aspects of workflow
- Facility security
- Product handling standards

19. NFI matched the definition of a value-added distributor in other ways. It worked to agreed Service Level Agreements (SLAs), such as 96.5%+ On-Time Shipments, 98.5%+ Fill Rate, 98%+ Inventory Accuracy, and 2% or less Damage Rate.

20. Also, its fees were structured in a complex way that assured overall performance and to prevent sub-optimization (the supplier reaching one target at the expense of another). The fee structure involved, for example:

- Fixed fees
- Per-use charges
- Savings commitments
- Gainsharing splits
- Surcharges
- A wide variety of KPIs

21. National Product Service (NPS), appears to also have provided a unique distribution role – as a repair service provider, so a CPU from NPS should be seen as that of a distributor, not a transportation company. "The National Service Product, the charter is to repair and replace product that goes either damaged or

1    has a defect," explained Daniel Glasky.[3] The operator was "repairing all of the

2    defective product back to rent-ready working condition," particularly for "TVs, air

3    conditioners, window units, fireplaces, smartphones" as elicited in the deposition

4    of Bobby Pope.[4]

5    22.  Therefore, the types of costs that Bobby Pope discusses[5] are those of a Distributor,

6    not a Freight provider, and these distribution costs are not prohibited by the Act.

7    **III.    Conclusion**

8    23.  In summary, based on my review of the new materials made available to me, I

9    believe that NFI and NPS were functioning as value-added distributors, so

10   amounts paid to them would seem to conform with the requirements of the

11   Karnette Act.

---

[3] Deposition of Daniel Glasky, p. 113 (Exhibit 5 to Declaration of Zacharaiah P. Dostart).
[4] Deposition of Booby Pope, p. 53 and 55 (Exhibit 4 to Declaration of Zacharaiah P. Dostart).
[5] Bobby Pope, in his deposition, explains that "labor, driver labor, trucks, leasing fees, insurance, registration, fuel cost, supply items, shipping blankets, material-handling equipment, hotel, meals" are included in the CPU of NPS.

5

1       I declare under penalty of perjury that the foregoing is true and correct.  Executed this 2nd

2  day of August 2018.

 

                                              David Jacoby