IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAULA BLAIR, ANDREA ROBINSON, and
FALECHIA HARRIS, individually and on
behalf of all others similarly situated,

    Plaintiffs,

  v.

RENT-A-CENTER, INC., a Delaware
corporation, RENT-A-CENTER WEST, INC.,
a Delaware corporation, and DOES 1–50,
inclusive,

    Defendants.

No. C 17-02335 WHA

**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this action brought under California's Karnette Rental-Purchase Act, the parties cross-move for summary judgment on certain of plaintiffs' claims. For the reasons herein, the parties' respective motions for summary judgment are **GRANTED IN PART AND DENIED IN PART**.

## STATEMENT

Defendants Rent-A-Center, Inc. and Rent-A-Center West, Inc. (collectively "RAC") maintained rent-to-own stores throughout California. These stores rented and sold both new and used household merchandise (*e.g.*, appliances, electronics, and furniture) to consumers for periodic payments. Customers could either rent the merchandise for a period of time or, if all

payments had been made after a specified period, the consumer would own the merchandise (Dkt. No. 120-45).

In calculating the merchandise's statutory-maximum price, RAC could take into account the merchandise's "actual cost, including actual freight charges," so it becomes necessary to understand how merchandise arrived at RAC's stores. RAC used three methods to deliver merchandise to its approximately 131 California stores during the putative class period. *First*, under the "direct-to-store" model, vendors shipped merchandise directly to an RAC store. Those vendors invoiced RAC for both the cost of the merchandise and the associated freight expense. Under the direct-to-store model, RAC took title to an item upon delivery to RAC's store. *Second*, vendors shipped merchandise to RAC's authorized service center, RAC National Produce Service, LLC ("NPS"). NPS — a wholly-owned subsidiary of RAC — stored the merchandise, then transported it to RAC's stores. Under this model, RAC took title to an item when it arrived at an NPS facility. *Third*, vendors shipped merchandise to a third-party logistics provider, NFI Industries ("NFI"). NFI then warehoused the merchandise at one of its five distribution centers before transporting the merchandise to an RAC store. Under the NFI model, RAC took title to an item when it arrived at an NFI facility.

To set the rental price for a particular item, RAC's merchandising team negotiated prices with vendors, then provided pricing information to RAC's pricing team. The pricing team input the price of the merchandise — including charges associated with the cost of transporting the merchandise to RAC's stores — into RAC's system. RAC then used a software program to calculate maximum permissible rental pricing terms based on the item's cost. For merchandise shipped direct-to-store, the item's freight cost was included in the vendor's invoice. For merchandise transported to stores by NFI or NPS, the vendor charged for freight to get the item to NFI or NPS's warehouse, then RAC added a corresponding up-charge (*i.e.*, "cost per unit" or CPU) to the item's cost for its transportation to RAC's store.

RAC calculated the corresponding up-charge differently depending on whether the merchandise was transported by NFI or by NPS. For each item stored and transported by NPS, RAC included a flat up-charge of $23.49, regardless of the item's size, weight, or distance

2

shipped. For items stored and transported by NFI, RAC allocated an up-charge by dividing NFI's projected annual fees by the number of units RAC anticipated shipping through NFI, then adjusting that amount to take into account the item's weight, volume, and other factors that could affect shipping costs (Dkt. Nos. 120-5, 120-6, 120-7, 120-8, 120-9, 120-42).

Another issue concerns arbitration clauses. RAC customers entered into rental-purchase agreements either at RAC stores or over the phone. If a customer ordered a product over the phone, the customer signed the rental-purchase agreement upon the item's delivery. Customers chose the term in which payments would be made (weekly, bi-weekly, semi-monthly, or monthly) and the number of payments. Once a customer and RAC agreed to the terms of a rental, an RAC employee generated a written rental-purchase agreement through RAC's software (Dkt. No. 120-45). The form rental-purchase agreement offered to RAC customers referenced arbitration twice. The first page of the rental-purchase agreement stated, in bold type (Dkt. No. 120-46):

> **ARBITRATION: An Arbitration Agreement comes with and is incorporated into this rental purchase agreement. You should read the Arbitration Agreement before signing this agreement.**

That same page of the rental-purchase agreement contained the following notice:

> **NOTICE TO LESSEE:** Do not sign this Rental-Purchase Agreement before you read it, including the Arbitration Agreement, or if it contains any blank spaces. You are entitled to an exact copy of the Rental-Purchase Agreement you sign. Keep it to protect your legal rights.

In addition to presenting customers with the rental-purchase agreement, RAC presented customers with a separate five-page arbitration agreement. RAC also presented customers with various other documents depending on the transaction, such as a "90 Day Same as Cash Notice," "Rental Order Form," "Delivery Checklist," or "Early Purchase Option Chart" (Dkt. Nos. 120-12, 120-13, 120-15, 120-45).

3

In March 2017, plaintiff Paula Blair initiated this putative class action in state court. RAC removed the action to this district court under the Class Action Fairness Act of 2005 and moved to partially compel Blair's suit to arbitration. While the motion to compel arbitration was pending, an amended complaint added plaintiffs Andrea Robinson and Falechia Harris. The amended complaint sought relief for violations of (1) California's Karnette Rental-Purchase Act, (2) California's Consumers Legal Remedies Act, (3) usury, and (4) Section 17200 of the California Business and Professions Code. RAC renewed its motion to compel arbitration as to Blair, but could not locate signed arbitration agreements for Robinson or Harris, so it did not seek to compel arbitration of their claims. Because Blair had opted out of the arbitration agreement contained in her 2016 rental-purchase agreement, RAC only sought to compel arbitration of Blair's claims relating to the 2015 agreement (Dkt. Nos. 1, 13, 16, 22, 43, 54).

An order dated October 3, 2017, denied most of RAC's motion to compel arbitration, granted RAC's motion to strike Blair's class action claims arising out of the 2015 agreement, and denied RAC's motion to stay pending arbitration. An October 25 order amended the October 3 order to remove the language striking Blair's class action claims. RAC appealed both orders and that appeal is still pending. Now both sides move for partial summary judgment on plaintiffs' Karnette Act claim (Dkt. Nos. 62, 82–84, 118, 128). This order follows full briefing and oral argument.

**ANALYSIS**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Here, the relevant facts are not in dispute. The parties' summary judgment motions instead raise two purely legal questions of statutory interpretation, as now discussed.

**1. "SINGLE DOCUMENT" REQUIREMENT.**

The parties first dispute whether or not RAC violated Section 1812.623(a) of the Karnette Act by presenting customers with *both* a rental-purchase agreement *and* a separate

4

arbitration agreement. The Karnette Act requires rental-purchase agreements to contain certain disclosures and information (such as pricing information and the duration of the rental) and requires that pricing terms be grouped together "in a box formed by a heavy line" immediately above the consumer's signature. Cal. Civ. Code § 1812.623(b). Section 1812.623(a) further provides (emphasis added):

> Every rental-purchase agreement shall be contained in *a single document* which shall set forth *all of the agreements* of the lessor and the consumer with respect to the rights and obligations of each party.

Here, RAC's rental-purchase agreement incorporated the arbitration agreement by reference. Accordingly, RAC's practice of presenting customers with both a rental-purchase agreement and a separate arbitration agreement did not violate Section 1812.623(a). Under California law, a document incorporates another document by reference if the following conditions are met. *First*, "[t]he reference to the incorporated document must be clear and unequivocal." *Second*, "the terms of the incorporated document must be known or easily available to the contracting parties." *Cariaga v. Local No. 1184 Laborers Int'l Union of N. Am.*, 154 F.3d 1072, 1074 (9th Cir. 1998) (citation omitted). Both requirements were met here. The rental-purchase agreement clearly and unequivocally incorporated the arbitration agreement by stating, in bold type, that the arbitration agreement came with and was "incorporated into" the rental-purchase agreement. Moreover, the rental-purchase agreement instructed consumers not to sign the rental-purchase agreement before reading it, "including the Arbitration Agreement." RAC's arbitration agreement was also "easily available," since RAC presented it to customers at the same time as it presented the rental-purchase agreement.

Importantly, under California law "a contract and a document incorporated by reference into the contract are read together as a single document." *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1269 (9th Cir. 2017) (citation omitted). Plaintiffs argue, without citation to any authority, that the incorporation-by-reference rule is a matter of contract interpretation and accordingly cannot be applied to determine compliance with the Karnette Act's "single document" requirement. This order disagrees. "[T]he Legislature is presumed to know about existing case law when it enacts or amends a statute." *In re W.B.*, 55 Cal. 4th 30, 57 (2012), *as*

*modified on denial of reh'g* (Sept. 26, 2012). The California Legislature also codified the incorporation-by-reference rule in Section 1642 of the Civil Code. That section provides that "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." The incorporation-by-reference rule may therefore be applied in determining RAC's compliance with the Karnette Act.

Contrary to plaintiffs' contentions, allowing RAC to incorporate the arbitration agreement by reference does not defeat the Karnette Act's goal of "ensur[ing] that consumers are protected from misrepresentations and unfair dealings by ensuring that consumers are adequately informed of all relevant terms . . . before they enter into rental-purchase contracts." Cal. Civ. Code § 1812.621. Rather, by incorporating the arbitration agreement by reference, RAC more easily brings the consumer's attention to the existence of the arbitration agreement. If RAC were instead required to include the entirety of their arbitration agreement within the same document, reference to arbitration could be buried in the middle of very long contracts. (In other cases, the Court has seen such practices.) This would hinder, rather than promote, the Karnette Act's goals.

Similarly unconvincing is plaintiffs' argument that presenting customers with a separate arbitration agreement may cause customers to feel that they have come too far not to proceed, or that customers may sign the arbitration agreement with little attention given to it. The rental-purchase agreement's clear disclosures caution against such conduct by directing the customer to read the accompanying arbitration agreement prior to signing the rental-purchase agreement. RAC's motion for summary judgment on this issue is accordingly **GRANTED**. Plaintiffs' motion for summary judgment on this issue is **DENIED**.

### 2. "LESSOR'S COST" REQUIREMENT.

The parties also move for summary judgment on the their respective interpretations of the term "lessor's cost" as defined in the Karnette Act. The maximum price a rent-to-own company may charge for a particular item of merchandise is determined by applying a set multiplier to the "lessor's cost." Cal. Civ. Code § 1812.644(b). Section 1812.622(k), in turn, defines the "lessor's cost" as (emphasis added):

> [T]he *documented actual cost*, including actual freight charges, of the rental property *to* the lessor *from* a wholesaler, distributor, supplier, or manufacturer and net of any discounts, rebates, and incentives.

In interpreting the definition of "lessor's cost," this order "first looks to the language of the statute, giving effect to the words' plain meaning; '[i]f the language is unambiguous, the plain meaning controls.'" *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 650 (9th Cir. 2016) (quoting *Voices of the Wetlands v. State Water Res. Control Bd.*, 52 Cal. 4th 499, 519 (2011)). "If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." *Coalition of Concerned Communities, Inc. v. City of Los Angeles*, 34 Cal. 4th 733, 737 (2004).

Plaintiffs argue that RAC's calculation of "lessor's cost" violated the Karnette Act in two ways. *First*, RAC included in its "lessor's cost" charges for so-called "intra-company" storage and transportation of merchandise, *i.e.*, freight charges RAC incurred *after* RAC took title to the merchandise but prior to the merchandise's arrival at an RAC store. *Second*, even assuming such freight expenses may be included in RAC's "lessor's cost," plaintiffs argue that RAC impermissibly calculated those expenses using estimated, projected, or averaged costs rather than an item's "actual cost." This order addresses each argument in turn.

Under plaintiffs' reading of the Act, Section 1812.622(k) limits "actual freight charges" to those incurred in shipping an item "*to*" the rent-to-own company "*from* a wholesaler, distributor, supplier, or manufacturer." Moreover, plaintiffs argue, an item is no longer in transport "to" the lessor "from" the vendor once the lessor takes legal title to the item. Such a construction, however, would lead to absurd results. A rent-to-own company incurs "actual freight charges" in transporting merchandise to its stores regardless of where in the supply chain it takes legal title. Plaintiffs agree that freight charged by a vendor to transport merchandise directly to a lessor's store may be included within the "lessor's cost." Yet under plaintiffs' interpretation of the statute, if a lessor pays a manufacturer for merchandise prior to the item's shipment and thereby gains legal title, any freight charges incurred in shipping via a common

7

carrier such as Fed-Ex or UPS could not be included, despite such charges being a clear part of the item's "actual cost."

Plaintiffs fail to adequately explain why the California Legislature would have intended to include freight in "lessor's cost" when charged by a manufacturer but not when charged by a third party. Nothing in the Karnette Act or its legislative history supports such an arbitrary distinction. Although plaintiffs describe NPS and NFI as providing "intra-company storage and transportation expenses," the record doesn't challenge NFI and NPS as distinct corporate entities from RAC. While NPS is a wholly-owned subsidiary of RAC, plaintiffs have made no showing that would justify disregarding NPS's separate corporate form. As a result, for purposes of the Karnette Act, NPS (and NFI) must be treated like a third-party common carrier.

A more reasonable interpretation is that rent-to-own companies may set pricing terms based on the "actual cost" of merchandise, including the actual cost of getting the merchandise to the stores where it can be available to consumers. This encompasses freight charged directly by a manufacturer or other vendor *and* freight charged by a delivery service to transport the item to the lessor's store.

This interpretation comports with the California Legislature's purpose in enacting Section 1812.622(k). In amending the Karnette Act in 2006, the California Legislature explained that the revised statute sought to address problems the California Attorney General and others had encountered with the Act in practice. The amendments sought to remedy these challenges by "creating reasonable bright-line pricing caps" and "bring[ing] certainty" to these caps by tying them to the lessor's cost. This would "help law enforcement by making it easier to obtain documentation supporting the cash price and payments disclosed in the [rental-purchase agreement]" and avoid a "fact intensive inquiry" in determining an item's price cap (Dkt. No. 120-1). Distinguishing amongst freight costs based on when a lessor gains title to an item would create more, not fewer, avenues for manipulation (and litigation).

This order accordingly holds that a rent-to-own company may include within its "lessor's cost" the "actual freight costs," if documented, incurred in having merchandise shipped to its stores, whether shipped directly by a manufacturer or other vendor, through a

8

logistics provider such as NFI or NPS, or through a third-party common carrier such as FedEx or UPS.

This order now turns to plaintiffs' second argument that — even assuming freight charged by NFI and NPS may be included in RAC's "lessor's cost" — RAC impermissibly calculated its "lessor's cost" based on estimated, projected, or averaged costs rather than "actual costs." The Karnette Act is clear on this point. "Lessor's cost" is a function of "documented *actual* cost, including *actual* freight charges." Thus, the Act's statutory price-caps must be calculated using "*actual*" costs, not budgeted, estimated, or forecasted costs.

The legislative history of the Karnette Act's 2006 amendments supports this construction of Section 1812.622(k). In a letter dated June 16, 2006, the Consumer Attorneys of California wrote a letter to Assembly Member Betty Karnette with concerns regarding the proposed amendments to the Karnette Act. As is relevant here, the letter suggested (Dkt. No. 128-3):

> "Lessor's cost" definition should add language to qualify freight charges as "actual freight charges" as discovery in some cases suggested a lack of accounting for 'actual' freight costs vs. some approximated or collective value that was not truly representative of the RTOs actual freight costs.

A short time later, the California Legislature amended the bill to insert "actual" before "freight charges" in the definition of "lessor's cost" (Dkt. No. 128-4 at 20).

Thus, a rent-to-own company like RAC could contract in advance with a carrier like NPS to pay a flat fee for each item delivered to one of its stores via the carrier. Then, for each item, the rent-to-own company would incur an actual charge (equal to the flat fee) for each item so delivered. The carrier would then provide documentation identifying that delivery (and, for convenience, perhaps all other deliveries in a given time period). It should not matter that the flat fee would apply to both light items as well as heavy items, for the contract would specify that fee as the actual freight charge. Of course, the parties could also contract for a graduated fee based on size or weight or class of product but that would be a matter of negotiation. The key is that a contract would obligate the rent-to-own company to pay and thus that would

9

become the actual charge. Put differently, if a shipper pays UPS $50 to ship something that FedEx would have shipped for $40, the $50 is the actual freight cost.

Applying this to our record, RAC has a serious problem, for RAC didn't use documented actual freight costs, as laid out above, but instead imposed an up-charge based on *projected* future costs. Specifically, under the NFI/RAC contract, RAC paid NFI fixed annual and monthly fees plus variable fees depending on the types of products shipped and the frequency of shipments. In arriving at an item's particular up-charge, RAC started with an annual forecast of the amount it would pay NFI under their contract, divided that estimate by the number of units it anticipated shipping, then adjusted that average to take into account weight, volume, and other factors that could affect shipping costs. RAC revised this allocation every few months and, accordingly, the same type of merchandise could have a different up-charge depending on when in the year it was shipped. The record is silent as to whether or not RAC ever revised its up-charges where the actual results differed from RAC's projections.

With respect to items shipped through NPS, RAC "allocated" the company-wide cost of having NPS ship new merchandise to its stores. RAC arrived at this per-item allocation after NPS calculated the aggregate expenses incurred by NPS in transporting the goods, such as "labor, . . . trucks, leasing fees, insurance, registration, fuel costs, . . . [and] material-handling equipment" (Dkt. No. 128-5 at 82:14–17). RAC then paid these company-wide expenses by uniformly applying the $23.49 up-charge to each product shipped through NPS.

Plaintiffs make much of the fact that RAC applied the NPS up-charge uniformly without regard to an item's size, weight, time stored, or distance shipped. But this alone would not violate the Karnette Act. As stated, it would be possible for a lessor to incur such a uniform cost in transporting products while at the same time having that uniform cost be directly attributable to each item shipped. For example, as stated, it would be permissible for RAC to negotiate a deal with a common carrier (such as UPS) in which RAC would pay $23.49 per item shipped regardless of the actual cost to the common carrier in shipping the item. So long as RAC had documentation which allowed the fact-finder to trace the per-item charge to merchandise, the manner of payment (such as a year-end invoice) would be irrelevant. In such

10

a case, the actual cost to RAC in obtaining the item would be the flat $23.49 charged by the carrier, regardless of whether the item was a gift card or an air conditioner.

RAC would violate the Act, by contrast, by negotiating a deal with a common carrier where RAC paid a flat annual or monthly fee for the common carrier's shipments, then RAC evenly allocated that annual or monthly sum amongst all products shipped. In such a case, the charge by the common carrier would *not* be tied directly to an individual item.

In sum, RAC's practices with respect to NFI and NPS did not amount to an allocation of documented actual freight costs. Rather, the amount RAC used to calculate an item's "lessor's cost" was either an average of the company's nationwide logistics expenses (NPS), or an allocation of a future projection of expenses (NFI). Such practices may be "normal and consistent with industry standards," as RAC argues, but that does not mean they are compliant with the Karnette Act. Plaintiffs' motion for summary judgment on this issue is accordingly **GRANTED**. RAC's motion for summary judgment is **DENIED**.[1]

## CONCLUSION

For the reasons stated, the parties' respective motions for summary judgment are **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

Dated: November 1, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[1] Following the hearing on the parties' motions, RAC filed an administrative motion for leave to submit a post-hearing declaration to address certain questions raised by the undersigned during the hearing (Dkt. No. 141). RAC's motion is **GRANTED**.