IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAULA BLAIR, ANDREA ROBINSON, and FALECHIA HARRIS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RENT-A-CENTER, INC., a Delaware corporation, RENT-A-CENTER WEST, INC., a Delaware corporation, and DOES 1–50, inclusive,<br><br>Defendants. | No. C 17-02335 WHA<br><br>**ORDER RE MOTION FOR CLASS CERTIFICATION** |

**INTRODUCTION**

In this action brought under California's Karnette Rental-Purchase Act, plaintiffs move for class certification. For the reasons herein, plaintiffs' motion for class certification is **GRANTED IN PART AND DENIED IN PART**. This order certifies one class, appoints the named plaintiffs and Celinda Garza as class representatives, and appoints plaintiffs' counsel of record as class counsel.

**STATEMENT**

This order incorporates by reference the statement set forth in the order granting in part and denying in part the parties' cross-motions for summary judgment (Dkt. No. 154). In brief, defendants Rent-A-Center, Inc. and Rent-A-Center West, Inc. (collectively "RAC") maintained rent-to-own stores throughout California. Plaintiff Paula Blair entered into a rental-purchase

agreement with RAC for an air conditioner in 2015. Also in 2015, plaintiff Andrea Robinson entered into a rental-purchase agreement for a used television and plaintiff Falechia Harris entered into a rental-purchase agreement for two televisions. In 2016, Blair entered into a rental-purchase agreement for a used Microsoft Xbox and proposed class representative Celinda Garza entered into a rental-purchase agreement for a refrigerator (Dkt. Nos. 109-22, 109-29, 109-31, 109-33).

Plaintiffs seek to represent a class of approximately 338,000 individuals who entered into rent-to-own agreements with RAC in California since March 2013. Plaintiffs also seek to represent a subclass of individuals for whose transactions RAC cannot produce a signed arbitration agreement. Plaintiffs articulate four theories of liability. *First*, for merchandise transported to RAC's stores through NFI or NPS, RAC impermissibly included an up-charge in RAC's "lessor's cost." *Second*, while the Karnette Act defines "lessor's cost" as "net of any discounts, rebates, and incentives," RAC did not fully subtract all discounts, rebates, and incentives it received for merchandise. *Third*, for certain transactions, RAC's pricing violated the Karnette Act's price caps even using RAC's theory of the case with respect to "lessor's cost." *Fourth*, in some instances, RAC failed to properly disclose in its rental-purchase agreements whether merchandise was "new" or "used" (Dkt. No. 109).[1]

Based on the foregoing theories, plaintiffs seek to certify the following class and subclass:

1. <u>California Class</u>: All individuals who, on or after March 13, 2013, entered into a rent-to-own transaction with RAC in California.

2. <u>Usury Subclass</u>: All individuals who, on or after March 13, 2013, entered into a rent-to-own transaction with RAC in California, and for whose transactions RAC cannot produce a signed arbitration agreement.

This order follows full briefing and oral argument.

---

[1] Plaintiffs also seek class certification on the theory that RAC's presentation of an arbitration agreement separate and apart from the rental-purchase agreement violated the Karnette Act's "single document" rule. This theory of liability has since been disposed of on summary judgment in favor of RAC (Dkt. No. 154).

2

**ANALYSIS**

Pursuant to FRCP 23(a), for a named plaintiff to obtain class certification, the court must find: (1) numerosity; (2) common questions of law or fact; (3) typicality; and (4) adequacy of the class representatives and counsel. The proposed class must also be ascertainable. In addition to satisfying FRCP 23(a)'s prerequisites, the party seeking class certification must show that the action is maintainable under FRCP 23(b)(1), (2), or (3). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613–14 (1997). Here, plaintiffs seek class certification under FRCP 23(b)(3), which further requires predominance and superiority, or, in the alternative, under FRCP 23(b)(2), which requires that the primary relief sought be declaratory or injunctive.

1. **NUMEROSITY.**

Under FRCP 23(a)(1), numerosity is satisfied by showing that "joinder of all members is impracticable." There are at least 338,000 individuals that fall within the definition of the proposed class (Dkt. No. 91-1 ¶ 2). Numerosity is therefore demonstrated for the class.

With respect to the proposed usury subclass, RAC has stipulated that the number of class members for whom RAC cannot produce a signed arbitration agreement is sufficiently numerous for purposes of FRCP 23(a)(1) (Dkt. No. 104 ¶ 1). RAC nonetheless disputes numerosity as to the proposed subclass, arguing that putative class members are bound by RAC's arbitration agreement even where RAC cannot find an executed arbitration agreement.

The definition of plaintiffs' proposed subclass is problematic. Assuming the remainder of FRCP 23(a) and (b)'s requirements are met, the better course is to certify plaintiffs' usury claim as to the entire California Class. It will then be RAC's burden to show that any particular class member (or set of class members) is bound by RAC's arbitration agreement. If RAC meets its burden of proof as to any class member, that individual will be excluded from the class with respect to their usury claim. Any factual disputes that arise regarding the existence

of an arbitration agreement can be resolved either at an evidentiary hearing or at trial. Numerosity has therefore been demonstrated.[2]

### 2. TYPICALITY.

Typicality under FRCP 23(a)(3) is shown when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted).

With respect to plaintiffs' Karnette Act claims, plaintiffs fail to establish standing for violations stemming from (1) RAC's misclassification of products as "new" when those items were, in fact, "used," and (2) RAC's failure to adjust its "lessor's cost" to reflect discounts, rebates, or incentives received from its vendors. Plaintiffs do not dispute that they were not personally affected by these alleged practices. This lack of standing is fatal to plaintiffs' attempt to certify a class under such theories. While plaintiffs seek leave to add a new class representative who has standing, the deadline to add new parties passed in December 2017 and plaintiffs provide no explanation as to their failure to timely seek leave to add a new party. Accordingly, the class will exclude those consumers whose Karnette Act claims arise solely from RAC's misclassification of products as "new" or RAC's failure to adjust its prices for discounts, rebates, or incentives.

Plaintiffs also claim that RAC's "litigation database" shows that RAC violated the Karnette Act's price caps even under RAC's theory of "lessor's cost." Plaintiffs fail to establish, however, that Blair, Harris, or Garza have standing under such a theory of liability. Neither side's expert identified these individuals' rental-purchase agreements as violating the Karnette Act's price caps under RAC's theory of the case. By contrast, RAC's expert evaluated

---

[2] The October 25 order granting in part and denying in part RAC's motion to compel arbitration invited defendants to argue at the class certification stage whether or not RAC's arbitration agreement barred plaintiff Blair's class claims. RAC chose not to address this issue in its briefing and accordingly it is not reached here.

4

Robinson's purchase and determined that she may have been overcharged $0.01 even assuming RAC had properly calculated its "lessor's cost." Robinson nevertheless fails to show that her claim is typical. As a concession to the shortness of life, this order declines to certify a class based on a *de minimus* overcharge of one penny. While other putative class members' purchases may have further exceeded the statutory price cap, Robinson's claim is not typical of such purchases. Therefore, this order will not certify a class under this theory.

Plaintiffs' remaining theory of liability under the Karnette Act, in addition to their usury claim and derivative Section 17200 and CLRA claims — as to which plaintiffs' standing is undisputed — arise from RAC's common policies and practices and are therefore typical. Although RAC argues in conclusory terms that plaintiffs' usury claim "may" involve "numerous" unique defenses, RAC fails to explain how plaintiffs are uniquely vulnerable to atypical defenses under the facts and circumstances of the instant case.

### 3. ADEQUACY.

FRCP 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This prerequisite has two parts: (1) that the proposed representative plaintiffs and their counsel do not have any conflicts of interest with the proposed class; and (2) that they will prosecute this action vigorously on behalf of the class. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Nothing in the record indicates, and RAC does not argue, that plaintiffs would have a conflict with other potential class members. RAC nevertheless argues that the "lawyer-driven nature" of this action renders the proposed representatives inadequate. This order disagrees.

*First*, a named plaintiff need not have a detailed understanding of the legal or factual basis of a class action suit so long as she has "some minimal familiarity with the litigation." *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 110 (N.D. Cal. 2008) (Judge Charles Breyer) (citation omitted). Here, the proposed representatives have demonstrated sufficient familiarity with the underlying theory of the dispute. Blair testified during her deposition, for example, that RAC "illegally charged too much for the products that they -- that they sell" (Dkt. No. 120-10 at 58:3–5). Blair's inability to provide a basis for her belief that RAC's prices exceeded

permissible amounts independent of her discussions with counsel does not show an unfamiliarity with the case or otherwise defeat class certification.

Nor does Blair's 2016 purchase of an Xbox after having obtained her current counsel make her an inadequate plaintiff. Blair made three separate purchases from RAC — a TV and stand in 2012, an air conditioner in 2015, and an Xbox in 2016. Blair testified during her deposition that she did not enter into an agreement for the Xbox to strengthen her position in this litigation. Rather, she explained that she "had no intention of getting the Xbox," but that while she was in RAC's store to make a payment on her air conditioner she "just got talked into buying the Xbox" (*id.* at 138:12–25). RAC makes much of Blair's decision not to return the Xbox despite not having used it but fails to explain how this makes her an inadequate representative.

*Second*, the fact that the named plaintiffs joined the litigation only after receiving counsel's solicitation in the mail does not defeat class certification. Unlike in *Bodner v. Oreck Direct, LLC*, No. C 06–4756, 2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) (Judge Marilyn Hall Patel), on which RAC relies, plaintiffs have demonstrated that they are familiar with this dispute and will act vigorously on behalf of the class. In *Bodner*, by contrast, counsel had recruited a new plaintiff who had an "undeniable and overwhelming ignorance regarding the nature of [the] action" after "counsel's previous abortive attempt to bring a seemingly identical lawsuit in another district." *Id.* at *2–3.

*Third*, RAC attacks the proposed representatives' credibility by contending that the declarations submitted in support of their motion for class certification "suspiciously omit or shade key information" (Dkt. No. 119 at 24). Contrary to RAC, the proposed representatives' declarations do not contradict their deposition testimony. For example, RAC takes issue with Andrea Robinson's sworn statement that an RAC employee handed Robinson "multi-page forms" and did not allow Robinson to negotiate the terms of those forms (Dkt. No. 109-29 ¶ 3), given Robinson's repeated assertions during her deposition that she did not remember her transaction with RAC (Dkt. No. 120-17 at 88:4–8). But RAC fails to mention other portions of

6

Robinson's deposition testimony where she recalled receiving multiple agreements from RAC in connection with her purchase (*id.* 78:11–15).

*Fourth*, RAC cites as "factual background" Harris's 25-year-old fraud conviction for trying to cash a check that was not hers and a bench warrant that issued after Harris failed to appear at a related court hearing. RAC does not actually argue that these things make Harris an inadequate representative and this order declines to so find. In addition to the staleness of the conviction, nothing in the record indicates that Harris has been anything but credible in this action. This ancient conviction does not sufficiently undermine her credibility such that she would be rendered an inadequate class representative.

RAC does not challenge the adequacy of plaintiffs' counsel, Dostart Hannink & Coveney LLP and Altshuler Berzon LLP, as class representatives. Nor does RAC dispute that plaintiffs' counsel would prosecute this action vigorously on behalf of class members. As the record reflects, both Dostart Hannink & Coveney LLP and Altshuler Berzon LLP have experience representing plaintiffs in complex class actions (Dkt. Nos. 109-1, 109-2). This order finds Blair, Robinson, Harris, Garza, and their counsel to be adequate representatives as required by FRCP 23(a)(4).[3]

### 4. COMMONALITY.

Commonality is satisfied if "there are questions of law or fact common to the class." FRCP 23(a)(2). The party seeking class certification must show that their claims depend on a common contention "capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1112 (9th Cir. 2014) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)) (emphasis omitted). "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019.

---

[3] This order treats plaintiffs' request to appoint Celinda Garza (a non-party) as a class representative as a motion to allow Garza to intervene as a named plaintiff under FRCP 24 and to amend the complaint to so reflect. The request is **GRANTED**. Both the intervention and the amendment are allowed.

7

Plaintiffs' Karnette Act and usury claims (as well as their derivative Section 17200 and CLRA claims) present common issues capable of classwide resolution. As the parties' cross-motions for summary judgment demonstrated, whether or not RAC properly included certain expenses within its "lessor's cost" presents a common issue. Plaintiffs' usury claim also presents common issues, including whether or not RAC's rent-to-own transactions are a "loan or forbearance" within the meaning of the California Constitution, and, if so, whether or not the "loan or forbearance" is "absolutely repayable by the borrower" under the terms of the rental-purchase agreements.

### 5. FRCP 23(B)(3) PREDOMINANCE.

FRCP 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." This requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc.*, 521 U.S. at 623. Class certification under FRCP 23(b)(3) is proper when common questions represent a significant portion of the case and can be resolved for all members of the class in a single adjudication. *Comcast v. Behrend*, 569 U.S. 27 (2013). Only some of plaintiffs' claims meet this standard, as now discussed.

#### A. Usury Claim.

The California Constitution provides that "no corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action." Cal. Const. art. XV, § 1. For items that "are for use primarily for personal, family, or household purposes," the maximum permissible interest rate is 10%. *Ibid.* Plaintiffs submit that whether a particular transaction violates the 10% maximum can be determined by querying RAC's transactions database. RAC does not substantively dispute this, but responds that plaintiffs have failed to explain how usury should be applied to rent-to-own contracts. Whether and how usury should be applied to rent-to-own transactions are common legal questions which will predominate over individual issues. Certification of this claim is allowed.

**B. Karnette Act Claim.**

As discussed above, plaintiffs claim that RAC violated the Karnette Act by impermissibly including certain up-charges in its "lessor's cost." Specifically, for each item stored and transported by NPS, RAC included a flat up-charge of $23.49, regardless of the item's size, weight, or distance shipped. For items stored and transported by NFI, RAC allocated an up-charge by dividing NFI's projected annual fees by the number of units RAC anticipated shipping through NFI, then adjusting that amount to take into account the item's weight, volume, and other factors that could affect shipping costs.

As an initial matter, the undersigned judge has doubts that class members whose products were shipped through NPS or NFI can feasibly be identified. Although RAC created and produced a database of information regarding the California rental-purchase transactions entered into during the class period, as well as separate spreadsheets listing the NFI and NPS up-charges associated with shipments of merchandise, RAC claims that these up-charges cannot easily be linked to particular rental-purchase agreements. Rather, RAC argues, the only way to determine whether a product was subject to an up-charge is to pull the cost information for each of the 1.2 million items one-by-one. Plaintiff's expert opines in a reply declaration that the transactions identified in the NFI and NPS spreadsheets "generally correspond" with entries in RAC's transactions database, but this correlation appears to only exist for 82.3% of the transactions listed in the NFI spreadsheet and for 78.1% of the transactions listed in the NPS spreadsheet. Moreover, even as to these transactions, plaintiff's expert described the process of matching them to a rental-purchase agreement as "time-intensive," "costly," and "labor-intensive" (Dkt. Nos. 120-31, 127-1).

In any event, even if identification of the relevant putative class members was feasible, determining RAC's liability under the Karnette Act will require the fact-finder to ascertain the amount properly attributable to RAC's "lessor's cost." As explained in the parallel order regarding the parties' summary judgment motions, the Court has ruled that RAC may include within its "lessor's cost" the "actual freight costs," if documented, incurred in having merchandise shipped to its stores through NFI or NPS. In light of this ruling, determining the

amount properly included within RAC's "lessor's cost" would devolve into an unmanageable morass of factual issues surrounding the calculation of each item's actual freight cost. Indeed, plaintiffs implicitly acknowledge this by arguing for a rule regarding freight and "lessor's cost" that would have avoided this difficulty. Because such re-calculations of RAC's "lessor's cost" would be necessary in calculating the Karnette Act's price caps and, therefore, in determining RAC's liability, individual questions will predominate in the resolution of this claim.

**C. CLRA and Section 17200 Claims.**

The parties agree that plaintiffs' CLRA and Section 17200 claims are largely derivative of their Karnette Act claims. As to the CLRA, plaintiffs allege that each violation of the Karnette Act is also a violation of the CLRA. For the reasons explained, such claims are not appropriate for class resolution under FRCP 23(b)(3). So too for plaintiffs' derivative Section 17200 claims.

Plaintiffs also allege that RAC's arbitration agreement — which this Court held impermissibly precludes public injunctive relief in violation of *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017) — violates Section 1770(a)(14) of the California Civil Code, which prohibits "[r]epresenting that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law." This common question of law will predominate over any questions affecting only individual class members. To the extent plaintiffs' Section 17200 claim is derivative of this alleged violation or plaintiffs' claim for usury, it is also suitable for class treatment.

**5. FRCP 23(B)(3) SUPERIORITY.**

Class certification under FRCP 23(b)(3) is appropriate only if class resolution "is superior to other available methods for fairly and efficiently adjudicating the controversy." RAC argues that notifying class members and distributing any monies received would be difficult given "the transient nature of RAC's customers who are typically seeking to rent products because their life situation is in flux," and that in past cases involving RAC, class action administrators have been unable to find the majority of RAC's customers to award them settlement money. Maybe so. Nevertheless, a single proceeding in this forum is preferable and

10

more efficient than individual proceedings. A class action would therefore be superior to individual actions for the adjudication of plaintiffs' claims.

**6. FRCP 23(B)(2) INJUNCTION CLASS.**

Plaintiffs seek to alternatively certify their proposed class under FRCP 23(b)(2). Certification under FRCP 23(b)(2) "is appropriate only where the primary relief sought is declaratory or injunctive." A class may be certified even where monetary relief is sought but only if such relief is "merely incidental" to the primary claim for the injunction. *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001). Plaintiffs agree that the monetary damages they seek are not "incidental" to their request for injunctive and declaratory relief. Certification under FRCP 23(b)(2) is therefore inappropriate.

## CONCLUSION

Plaintiffs' motion for class certification is **GRANTED IN PART AND DENIED IN PART**. The following class is **CERTIFIED**: "All individuals who, on or after March 13, 2013, entered into a rent-to-own transaction with RAC in California." This class definition shall apply for all purposes, including settlement. This class is certified only as to plaintiffs' usury claim and, to the extent described above, plaintiffs' CLRA and Section 17200 claims. Paula Blair, Andrea Robinson, Falechia Harris, and Celinda Garza are hereby **APPOINTED** as class representatives. Plaintiffs' counsel from Dostart Hannink & Coveney LLP and Altshuler Berzon LLP are hereby **APPOINTED** as class counsel.

By **NOVEMBER 16 AT NOON**, the parties shall jointly submit a proposal for class notification with a plan to distribute notice — including by first-class mail — by **NOVEMBER 30**. In crafting their joint proposal, counsel shall please keep in mind the undersigned judge's guidelines for notice to class members in the "Notice and Order Regarding Factors to be Evaluated for Any Proposed Class Settlement" (Dkt. No. 55).

**IT IS SO ORDERED.**

Dated: November 1, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE