IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAULA BLAIR, ANDREA ROBINSON, and
FALECHIA HARRIS, individually and on
behalf of all others similarly situated,

        Plaintiffs,

    v.

RENT-A-CENTER, INC., a Delaware
corporation, RENT-A-CENTER WEST, INC.,
a Delaware corporation, and DOES 1–50,
inclusive,

        Defendants.

No. C 17-02335 WHA

**ORDER RE MOTION
FOR SUMMARY JUDGMENT
AND MOTION FOR PARTIAL
RECONSIDERATION**

**INTRODUCTION**

    In this class action involving rent-to-own transactions, defendants move for summary judgment on plaintiffs' usury claim and plaintiffs move for partial reconsideration of an order granting in part and denying in part class certification. To the extent stated below, the motion for summary judgment is **GRANTED**. The motion for partial reconsideration is **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

    Defendants Rent-A-Center, Inc. and Rent-A-Center West, Inc. (collectively "RAC") maintained rent-to-own stores throughout California. These stores rented and sold new and used household merchandise (*e.g.*, appliances, electronics, and furniture) to consumers for periodic payments. Customers could either rent the merchandise for a period of time or, if all

1  payments had been made after a specified period, the consumer would own the merchandise.

2  Consumers also had the right to acquire the merchandise prior to the end of the specified period

3  by exercising an early-purchase option.  The rental-purchase agreements governing these

4  transactions defined plaintiffs as "lessee/renter/consumer" and defined RAC as "lessor/owner."

5  The agreements further provided that "[p]ayments [were] due at the beginning of each term that

6  you choose to rent the property."  The consumer had no obligation to renew the agreement

7  beyond the initial term, but could elect to do so by making an advance payment for another

8  successive term (Dkt. Nos. 118-39, 118-40).

9        In March 2017, plaintiff Paula Blair initiated this action in state court.  After RAC

10  removed the action to this district court, an amended complaint added plaintiffs Andrea

11  Robinson and Falechia Harris.  The operative complaint sought relief for violations of (1)

12  California's Karnette Rental-Purchase Act, (2) California's Consumers Legal Remedies Act, (3)

13  usury, and (4) Section 17200 of the California Business and Professions Code.  An October

14  2017 order denied most of RAC's motion to compel arbitration and denied RAC's motion to

15  stay pending arbitration.  RAC's appeal of the arbitration order is still pending and oral

16  argument on appeal is set for February 2019 (Dkt. Nos. 1, 43, 62, 82).

17        A November 1 order granted in part and denied in part the parties' cross-motions for

18  summary judgment on plaintiffs' Karnette Act claim.  A parallel order issued that same day

19  granted in part and denied in part plaintiffs' motion for class certification.  RAC now moves for

20  summary judgment on plaintiffs' usury claim (the only claim certified for class treatment) and

21  plaintiffs move for partial reconsideration of the order granting in part and denying in part class

22  certification (Dkt. Nos. 153–55, 163).  This order follows full briefing and oral argument.

**ANALYSIS**

23

24  **1.    SCHEDULING ORDER.**

25        The scheduling order set a October 18 deadline to file dispositive motions.  The order

26  provided that no dispositive motions would "be heard more than 35 days *after* this deadline, *i.e.*,

27  if any party waits until the last day to file, then the parties must adhere to the 35-day track in

28  order to avoid pressure on the trial date" (Dkt. No. 92) (emphasis in original).  Although RAC

1    filed the instant motion on October 18, because of the Thanksgiving holiday RAC noticed the

2    motion for hearing on November 29 — 42 days after the October 18 deadline.  While this order

3    agrees that RAC did not adhere to the scheduling order in noticing a hearing date, the trial has

4    since been continued to April 2019 and RAC otherwise filed the motion by the October 18

5    deadline.  There is accordingly no prejudice to plaintiffs in proceeding to address the motion on

6    the merits.  Plaintiffs' motion to strike the motion for summary judgment is **DENIED**.

7            **2.      MOTION FOR SUMMARY JUDGMENT.**

8            Summary judgment is proper where the pleadings, discovery, and affidavits show that

9    there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a

10   matter of law."  FRCP 56(a).  Material facts are those which may affect the outcome of the case.

11   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Here, the relevant facts are not in

12   dispute.

13          The California Constitution provides that "any loan or forbearance of any money, goods,

14   or things in action, if the money, goods, or things in action are for use primarily for personal,

15   family, or household purposes," may accrue "at a rate not exceeding 10 percent per annum."

16   Cal. Const. Art. 15, § 1.  California's usury law therefore applies only to transactions which

17   constitute a "loan or forbearance."  This order concludes that the rent-to-own transactions at

18   issue in this litigation do not constitute a loan or forbearance and that California's usury laws

19   are therefore inapplicable.

20          A "loan of money is a contract by which one delivers a sum of money to another, and

21   the latter agrees to return at a future time a sum equivalent to that which he borrowed."  Cal.

22   Civil Code § 1912.  Rent-to-own transactions do not fall within this definition.  Under the

23   parties' rental-purchase agreements, plaintiffs made rental payments in advance to lease

24   household goods on a weekly or monthly basis.  Plaintiffs agree that this is a lease "in form" but

25   argue that the transaction is nevertheless a loan "in substance."  To be sure, in determining

26   whether a transaction is a usurious loan, one "must look to the substance of the transaction

27   rather than to its form."  *W. Pico Furniture Co. v. Pac. Fin. Loans*, 2 Cal. 3d 594, 603 (1970).

28   According to plaintiffs' characterization, if a consumer makes all rental payments delineated in

3

a rental-purchase agreement and thereby gains ownership of an item, the consumer has in effect

borrowed money to purchase the item and then repaid the purchase price with an additional

sum. If the consumer chooses not to make all rental payments, plaintiffs argue, the consumer

has effectively borrowed the item and paid a hefty price for the item's use during the rental

period. Contrary to plaintiffs' characterizations, plaintiffs never incurred a debt or obligation to

purchase the goods they rented. Rather, they paid in advance of each rental period with the

choice to terminate the rental agreement at any time. While plaintiffs indisputably paid RAC

significantly more to rent these items than they would have paid to purchase outright from a

traditional retailer, this does not transform the rental transaction into a loan.

The Karnette Act itself — the very premise on which plaintiffs have anchored their case

— defines a rental-purchase agreement as "an agreement between a lessor and a consumer

pursuant to which the lessor *rents or leases*, for valuable consideration, personal property for

use by a consumer for personal, family, or household purposes for an initial term not exceeding

four months *that may be renewed or otherwise extended*, if under the terms of the agreement the

consumer acquires an option or other legally enforceable right to become owner of the

property." Cal. Civ. Code § 1812.622 (emphasis added). The Act further provides that a rental-

purchase agreement "shall not be construed to be, nor be governed by . . . [a] lease or agreement

that constitutes a security interested, as defined in Section 1201 of the Commercial Code." *Ibid.*

Section 1201 provides that "[w]hether a transaction in the form of a lease creates a 'security

interest' is determined pursuant to Section 1203," which in turn states that "[a] transaction in

the form of a lease creates a security interest if the consideration that the lessee is to pay the

lessor for the right to possession and use of the goods is an obligation for the term of the lease

*and is not subject to termination by the lessee*." Accordingly, under the text of the Karnette Act

and California law, a rental-purchase agreement (which can be canceled by the consumer at any

time without penalty) does not create a security interest.

Plaintiffs concede that RAC is not liable under California usury law for rental-purchase

transactions that fully comply with the Karnette Act's pricing requirements. They instead argue

that a transaction becomes subject to usury when it fails to adhere to the Act's price caps. This

4

order disagrees. That a violation of the Karnette Act's price-caps may be remedied both through the Karnette Act's remedial provisions and through other "remedies[] or penalties established under other laws," Cal. Civ. Code § 1812.648, does not mean that the non-compliance of a rental-purchase agreement transforms the nature of the transaction into a loan or forbearance subject to usury laws.

In sum, because the parties' rental-purchase transactions do not constitute a "loan or forbearance" under California law, RAC's motion for summary judgment on plaintiffs' usury claim is **GRANTED**. Importantly, because RAC moved for summary judgment before notice regarding class certification was sent to members of the class, this ruling binds only the named plaintiffs. *Schwarzschild v. Tse*, 69 F.3d 293, 297 (9th Cir. 1995).

### 3. MOTION FOR PARTIAL RECONSIDERATION.

Under Civil Local Rule 7-9(b), a party may seek leave to move for reconsideration if the party can demonstrate either: (1) that there is a material difference in fact or law between the time of the motion for leave and the time of an entry of an interlocutory order; (2) that new material facts emerged or a change of law occurred after the entry of the order; or (3) a manifest failure by the court to consider material facts or dispositive legal arguments which were presented before the interlocutory order was entered. These requirements allow for reconsideration of prior rulings under certain limited circumstances, but the rule does not allow a party to simply relitigate an issue that has already been argued and decided. *Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir. 1985).

Plaintiffs' motion seeks reconsideration of one issue decided in the November 1 order regarding class certification — namely, whether plaintiffs' claim that RAC violated the Karnette Act's price caps satisfies the predominance element of FRCP 23(b)(3). Plaintiffs' motion argues two main points.

*First*, the November 1 summary judgment order ruled that RAC could include within its "lessor's cost" the "actual freight costs," if documented, incurred in having merchandise shipped to its stores through NFI or NPS. The November 1 order accordingly denied certification of plaintiffs' Karnette Act claim (and derivative Section 17200 and CLRA claims)

5

1    on the ground that individualized issues would predominate because RAC would be entitled to

2    prove some amount of "actual" freight cost incurred with respect to each of the transactions at

3    issue. In their motion for reconsideration, plaintiffs argue that the November 1 order erred in

4    assuming that RAC's records could, in fact, establish an "actual" NFI- or NPS- related freight

5    cost for each item. Because such records either do not exist or were not produced in discovery,

6    plaintiffs argue, individualized calculations of each item's actual freight cost would not

7    predominate over common issues at trial.

8         As to merchandise shipped through NPS, plaintiffs are correct. The record was (and

9    remains) silent as to how RAC could prove any actual, documented freight costs associated with

10   items shipped through NPS. At most, RAC points to spreadsheets and deposition testimony

11   which explain how RAC arrived at the decision to impose the flat $23.49 up-charge and later

12   spreadsheets documenting the aggregate costs of shipments made through NPS on a quarterly

13   basis. This evidence does nothing more than identify the total cost (albeit on a component-by-

14   component basis) of shipping the NPS products and a comparison of those total costs to the

15   total costs upon which the $23.49 up-charge was based. These documents do not demonstrate

16   how RAC could show the "actual cost" of these shipments on an item-by-item basis as set forth

17   in the November 1 summary judgment order. Individualized questions will therefore not

18   predominate in determining RAC's liability for such transactions under the Karnette Act.

19   (Because of overreaching by plaintiffs in the original motion, this subtlety went unnoticed in

20   that round of briefing.)

21        With respect to items shipped through NFI, by contrast, the record confirms that RAC

22   has produced sufficient documents to demonstrate some amount of "per item" freight costs,

23   including documentation of the agreed-upon rates for handling, mileage, fuel, and tolls, broken

24   down by category (*e.g.*, appliance, computer, electronics, furniture). The November 1 summary

25   judgment order made clear that RAC could contract in advance with carriers "to pay a flat fee

26   for each item delivered to one of its stores via the carrier" so long as RAC obtained

27   documentation with respect to that delivery (Dkt. No. 154 at 9–10). RAC has produced

28   documents — the Master Services Agreement (and its various amendments) between RAC and

6

NFI, invoices of amounts actually charged pursuant to these agreements, and shipping information — from which to calculate actual freight costs attributable to shipping items through NFI's distribution centers to RAC's retail stores.  This, in turn, would require individualized inquiries that would predominate over common questions in determining RAC's liability under the Karnette Act.

*Second*, the November 1 order noted its "doubts that class members whose products were shipped through NPS or NFI [could] feasibly be identified."  As the order explained, although RAC produced a database of information regarding California rental-purchase transactions and a spreadsheet listing merchandise shipped through NPS, plaintiffs' expert had opined that the transactions identified in the spreadsheets only "generally correspond[ed]" with entries in RAC's database and that this correlation appeared to exist for only 78.1% of the transactions shipped through NPS.  Because the November 1 order determined that the individualized issues would predominate in calculating RAC's "lessor's cost," however, this issue was not definitively resolved.  This order concludes that the concerns mentioned in the November 1 order do not preclude class certification.

While the party seeking certification must demonstrate that an identifiable and ascertainable class exists, a class is sufficiently ascertainable when "all the parameters for membership in the class are objective criteria, and defendant's business records should be sufficient to determine the class membership status of any given individual." *Akaosugi v. Benihana Nat. Corp.*, 282 F.R.D. 241, 255 (N.D. Cal. 2012).  RAC has produced a dataset identifying shipments made through NPS. This dataset contains 37,997 observations, at least 25,871 of which plaintiffs' expert has already determined correspond to a specific customer.  As plaintiffs explain, not all of these items will be matched with a putative class member because, for example, some items were never leased to a customer.  Moreover, RAC has yet to produce an updated transaction database which matches the time period covered by the NPS spreadsheet.  Although RAC critiques plaintiffs' methodology, it does not refute that the customers can, with effort, be identified.  Plaintiffs have sufficiently established that records exist from which the parties can identify class members without individualized issues

7

predominating.  Plaintiffs' motion for partial reconsideration is accordingly **GRANTED IN PART AND DENIED IN PART**.  With respect to plaintiffs' Karnette Act claim and derivative Section 17200 and CLRA claims, this order will certify a subclass of individuals whose transactions with RAC involved items shipped through NPS, as set forth below.

**CONCLUSION**

To the extent stated above, RAC's motion for summary judgment is **GRANTED** and plaintiffs' motion for reconsideration is **GRANTED IN PART AND DENIED IN PART**.  In addition to the usury class certified in the November 1 order, the following subclass is certified:  All individuals who, between March 13, 2013 and January 17, 2018, entered into a rent-to-own transaction with RAC in California for an item that was shipped to a RAC retail location by RAC National Product Services, LLC and as to which RAC allocated a freight up-charge.

At the parties' request, the deadline to send out class notification was deferred pending a ruling on the instant motion for summary judgment and motion for partial reconsideration.  By **FEBRUARY 20 AT NOON**, the parties shall jointly submit a proposal for class notification with a plan to distribute notice — including by first-class mail — by **MARCH 1**.  In crafting their joint proposal, counsel shall please keep in mind the undersigned judge's guidelines for notice to class members in the "Notice and Order Regarding Factors to be Evaluated for Any Proposed Class Settlement," Dkt. No. 55, and take into account the rulings contained herein.  All costs of notice must be paid by plaintiffs.

Also by **FEBRUARY 20**, the parties shall file a joint submission updating the Court on the status of RAC's currently-pending appeal and explaining whether or not, following the distribution of class notice, the case should be stayed pending resolution of that appeal.

**IT IS SO ORDERED.**

Dated: February 11, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

8